# EXHIBIT 1



United States Department of Justice                    Offices of the United States Attorneys

THE UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT *of* NEW YORK

Search

SEARCH

**HOME**    **ABOUT**    **PRIORITIES**    **NEWS**    **RESOURCES**    **PROGRAMS**    **EMPLOYMENT**

**CONTACT**

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE                                      Thursday, October 1, 2020

# Founders And Executives Of Off-Shore Cryptocurrency Derivatives Exchange Charged With Violation Of The Bank Secrecy Act

## Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer Flouted U.S. Anti-Money Laundering Rules

Audrey Strauss, the Acting United States Attorney for the Southern District of New York, and William F. Sweeney Jr., Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced the indictment of Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, charging the four with violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at the Bitcoin Mercantile Exchange or "BitMEX."  The case is assigned to United States District Judge John G. Koeltl.  REED was arrested in Massachusetts this morning, and will be presented in federal court there.  HAYES, DELO, and DWYER remain at large.

Acting Manhattan U.S. Attorney Audrey Strauss said:  "With the opportunities and advantages of operating a financial institution in the United States comes the obligation for those businesses to do their part to help in driving out crime and corruption.  As alleged, these defendants flouted that obligation and undertook to operate a purportedly 'off-shore' crypto exchange while willfully failing to implement and maintain even basic anti-money laundering policies.  In so doing, they allegedly allowed BitMEX to operate as a platform in the shadows of the financial markets.  Today's indictment is another push by this Office and our partners at the FBI to bring platforms for money laundering into the light."

FBI Assistant Director William F. Sweeney Jr. said:  "As we allege here today, the four defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements.  One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost

just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time."

According to the allegations in the Indictment[1]:

HAYES, DELO, and REED founded BitMEX in or about 2014, and DWYER became BitMEX's first employee in 2015 and later its head of business development. BitMEX, which has long serviced and solicited business from U.S. traders, was required to register with the Commodity Futures Trading Commission ("CFTC") and to establish and maintain an adequate AML program. AML programs ensure that financial institutions, such as BitMEX, are not used for illicit purposes, including money laundering.

Despite those obligations, HAYES, DELO, REED, and DWYER knew by no later than in or about September 2015 that, because BitMEX served U.S. customers, it was required to implement an AML program that included a "know your customer" or "KYC" component, but chose to flout those requirements. Indeed, each of the defendants knew of customers residing in the United States who continued to access BitMEX's trading platform through at least in or about 2018, and that BitMEX policies nominally in place to prevent such trading were toothless or easily overridden to serve BitMEX's bottom line goal of obtaining revenue through the U.S. market without regard to U.S. regulation. While knowing of BitMEX's obligation to implement AML and KYC programs because BitMEX was serving U.S. customers, HAYES, DELO, REED, and DWYER took affirmative steps purportedly designed to exempt BitMEX from the application of U.S. laws such as AML and KYC requirements. For example, the defendants caused BitMEX and its parent corporations formally to incorporate in the Seychelles, a jurisdiction they believed had less stringent regulation and from which they could still serve U.S. customers without performing AML and KYC. Indeed, in or about July 2019, HAYES bragged that the Seychelles was a more friendly jurisdiction for BitMEX because it cost less to bribe Seychellois authorities – just "a coconut" – than it would cost to bribe regulators in the United States and elsewhere.

\*          \*          \*

HAYES, 34, of Buffalo, New York and Hong Kong, DELO, 36, of the United Kingdom and Hong Kong, REED, 31, of Massachusetts, and DWYER, 37, of Australia and Bermuda, are each charged with one count of violating the Bank Secrecy Act, and one count of conspiring to violate the Bank Secrecy Act, each of which carries a maximum penalty of five years in prison. The maximum potential sentences in this case are prescribed by Congress and are provided here for informational purposes only, as any sentencing of the defendants will be determined by the judge.

Ms. Strauss praised the outstanding investigative work of the FBI's New York Money Laundering Investigation Squad, and the assistance of the FBI's Boston, Milwaukee, and Minneapolis Field Offices. Ms. Strauss also thanked the attorneys and investigators at the CFTC for offering their expertise in the development of this investigation.

The prosecution is being handled by the Office's Money Laundering and Transnational Criminal Enterprises Unit. Assistant U.S. Attorneys Jessica Greenwood and Samuel Raymond are in charge of the prosecution.

[1] As the introductory phrase signifies, the entirety of the text of the Indictment, and the description of the Indictment set forth herein, constitute only allegations, and every fact described should be treated as an allegation.

**Attachment(s):**

<u>Download Arthur Hayes et al. indictment.pdf</u>

**Topic(s):**

Financial Fraud

**Component(s):**

<u>USAO - New York, Southern</u>

**Contact:**

James Margolin, Nicholas Biase

(212) 637-2600

**Press Release Number:**

20-218

Updated October 1, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                :    **SEALED**
**INDICTMENT**

      - v. -                                :

                          20 Cr. 500

ARTHUR HAYES,                           :
BENJAMIN DELO,
SAMUEL REED, and                        :
GREGORY DWYER,

                               :

               Defendants.          :

- - - - - - - - - - - - - - - - - - - X

### COUNT ONE
### (Violation of the Bank Secrecy Act)

The Grand Jury charges:

### Overview

1.   At all times relevant to this Indictment, BitMEX, or the "Bitcoin Mercantile Exchange," has operated as an online trading platform through the website wwww.bitmex.com. BitMEX solicits and accepts orders for trades in, among other things, futures contracts and other derivative products tied to the value of cryptocurrencies including Bitcoin.  BitMEX accepts Bitcoin to margin and guarantee its derivative products, and as of at least in or about March 2017, has offered its customers up to 100 times leverage on certain of its products.

2.   Since its launch in November 2014 and continuing up to and including the present, BitMEX has actively sought to, and

has in fact, served thousands of customers located in the United States, even after purportedly withdrawing from the U.S. market in or about September 2015.

3.    By engaging in the foregoing activities, BitMEX has at all relevant times been a futures commission merchant ("FCM") required to comply with the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* (the "BSA").

4.    From at least in or about September 2015 and continuing up to and including the present, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, in their respective roles as executives of BitMEX, willfully failed to establish, implement, and maintain an adequate anti-money laundering ("AML") program, including an adequate customer identification program, more commonly referred to as a know your customer ("KYC") program, for BitMEX, in violation of the BSA.

### BSA Requirements

5.    The Bank Secrecy Act, as amended by the Patriot Act of 2001, is designed to "prevent, detect, and prosecute international money laundering and the financing of terrorism." 31 U.S.C. § 5311. The BSA imposes reporting, recordkeeping, and controls requirements on covered "financial institutions," which include futures commission merchants that are required to

register as such under the Commodity Exchange Act (the "CEA").
31 U.S.C. § 5312(c).

6.    The CEA requires an entity to register as an FCM with
the United States Commodity and Futures Trading Commission (the
"CFTC") if it solicits or accepts orders for commodity futures
contracts, swaps, or retail commodity transactions (among other
specified products), and in or in connection with such activity
accepts any money or property to margin, guarantee, or secure
any trades or contracts that result or may result therefrom.
Bitcoin and other virtual currencies are "commodities" under the
CEA.

7.    Under the BSA, an FCM must establish an AML program
that is approved by senior management and that includes, at a
minimum: "policies, procedures, and internal controls reasonably
designed to prevent the financial institution from being used
for money laundering or the financing of terrorist activities";
independent compliance testing; ongoing training for appropriate
personnel; and "risk-based procedures for conducting ongoing
customer due diligence."  *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R.
§ 1026.210.  FCMs must also file suspicious activity reports
("SARs") including for transactions involving funds or other
assets of at least $5,000 if the FCM knows, suspects, or has

reason to suspect, among other things, that the transaction involves funds derived from illegal activity or that the FCM is being used to facilitate criminal activity. *See* 31 C.F.R. § 1026.320.

8. As part of its AML program, an FCM must implement a written KYC program that includes "risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable." This KYC program must enable an FCM to "form a reasonable belief that it knows the true identity of each customer." At a minimum, an FCM must collect the name, date of birth, address, and government identification number of each customer prior to account opening, and must take steps to verify that information in a reasonable time. The KYC program must also include procedures for "determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency." *See* 31 U.S.C. § 5318(l); 31 C.F.R. § 1026.220.

## The Defendants' Roles at BitMEX

9. ARTHUR HAYES, BENJAMIN DELO, and SAMUEL REED, the defendants ("the Founders"), are the co-founders of BitMEX. The Founders founded BitMEX in or about January 2014. BitMEX began to support live trading in or about November 2014.

10.   BitMEX has at all relevant times been owned and
operated by and through one or more parent companies
(collectively with BitMEX, the "Company") registered in the
Seychelles.  The Company also has subsidiaries and affiliates
registered in the United States and elsewhere that conduct
BitMEX operations and employ staff involved in BitMEX's
operations.  From its founding to the present, the Company has
never had a physical presence in the Seychelles.

11.   From the founding of the Company continuing up to and
including at least in or about July 2019, the Founders were co-
owners of the Company and collectively held an approximately 90%
ownership share in the Company.

12.   The Founders have at all relevant times controlled the
Company.  ARTHUR HAYES, the defendant, has been, at all relevant
times, the Chief Executive Officer of the Company.  BENJAMIN
DELO, the defendant, was, from at least March 2015 until at
least January 2018, the Chief Operating Officer of the Company,
and was the Chief Strategy Officer of the Company from at least
September 2018 until May 2019.  SAMUEL REED, the defendant, has
been, at all relevant times, the Chief Technology Officer of the
Company.  GREGORY DWYER, the defendant, is a longtime friend and
former colleague of ARTHUR HAYES, the defendant.  DWYER was

5

hired by the Company as its first non-Founder employee in or about late 2015. DWYER has served a variety of functions at the Company including the Head of Business Development.

**The Company**

13. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has offered and allowed its customers to trade "Bitcoin futures," the value of which are derived by reference to the Bitcoin/U.S. dollar exchange rate as published on a third-party cryptocurrency exchange. At various times since its launch in or about November 2014, BitMEX expanded its product offering to include additional futures contracts based on cryptocurrencies other than Bitcoin and/or the U.S. dollar.

14. From in or about May 2016 and continuing up to and including at least in or about September 2020, BitMEX has also offered and allowed its customers to trade a "Bitcoin perpetual swap," the value of which is derived by reference to the Bitcoin/U.S. dollar exchange rate as published on a third-party cryptocurrency exchange.

15. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has accepted Bitcoin to margin customer trades. In or about 2015,

BitMEX offered up to 50 times leverage on certain of its products. Since at least in or about March 2017, BitMEX has offered up to 100 times leverage on certain of its products. At all relevant times, margin on BitMEX has been denominated in Bitcoin.

16. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has accepted Bitcoin to guarantee customer trades. Specifically, BitMEX operates an "Insurance Fund" that it uses to guarantee the shortfall in the event that one counter-party to a trade on BitMEX goes into bankruptcy. BitMEX pays for its Insurance Fund by charging its customers a fee on the value of positions that remain open at the end of each eight-hour trading window. Because BitMEX transacts with its customers solely in Bitcoin, this fee to guarantee trade settlement is collected in Bitcoin.

17. From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX has solicited and accepted offers on its cryptocurrency futures and swaps from customers located in the United States, including individual retail customers. As of in or about September 2018, for example, internal BitMEX records reflected thousands of BitMEX accounts with United States location information that

were enabled for trading.

18.  Because BitMEX is a derivatives exchange that offers
and sells commodity futures and swaps to retail and non-retail
customers in the U.S, and in connection with such offers and
sales accepted property to margin, guarantee, and secure those
trades and contracts, it was required to register with the CFTC
as an FCM.  At no point has BitMEX registered with the CFTC as
an FCM.

19.  From at least in or about 2017 through in or about early
2019, BitMEX personnel, including GREGORY DWYER and others,
conducted BitMEX operations from an office in Manhattan, New York,
including but not limited to customer support, business
development, and marketing, involving customers located in the
United States and elsewhere.

## The Defendants Deliberately Failed to Implement BSA-Compliant AML and KYC Programs at BitMEX

20.  ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY
DWYER, the defendants, in their respective roles as executives
of BitMEX, each willfully caused, aided, abetted, and conspired
to commit violations of the BSA at BitMEX.

21.  At all times relevant to this Indictment, ARTHUR
HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the

defendants, have intended for BitMEX to solicit and accept

customers in the United States, and otherwise operate there,

without complying with U.S. AML and KYC requirements. By at

least in or about September 2015, the defendants understood that

such AML and KYC requirements would in fact apply to BitMEX if

it served U.S. customers or operated within the United

States. The defendants thus took affirmative steps purportedly

designed to exempt BitMEX from the application of U.S. laws like

AML and KYC requirements. For example, the defendants caused

the Company to formally incorporate in the Seychelles, a

jurisdiction they believed had less stringent regulation, and

from which they could still serve U.S. customers and operate

within the United States without performing AML and

KYC. Indeed, HAYES, the defendant, bragged in or about July

2019 that the Seychelles was a more friendly jurisdiction for

BitMEX because it cost less to bribe Seychellois authorities –

just "a coconut" – than it would cost to bribe regulators in the

United States and elsewhere.

        22.   Those affirmative steps purportedly designed to exempt

BitMEX from the application of U.S. law demonstrate that from in

or about September 2015 and continuing up to and including at

least in or about September 2020, ARTHUR HAYES, BENJAMIN DELO,

SAMUEL REED, and GREGORY DWYER, the defendants, willfully caused
BitMEX to reject adoption or implementation of BSA-compliant AML
and KYC programs.  For instance, the defendants caused BitMEX to
reject adoption or implementation of formal policies,
procedures, and internal controls for AML; independent
compliance testing for AML; and training for appropriate
personnel in AML.  Because BitMEX has at no relevant time had an
adequate KYC program, BitMEX could not and did not monitor its
customer transactions for money laundering and sanctions
violations.  From its launch in or about November 2014 and
continuing up to and including at least in or about September
2020, BitMEX did not file any SARs reporting suspected illegal
activity on BitMEX.

    23.  The defendants also caused BitMEX to allow customers,
including individual retail customers, to register and trade
without providing sufficient identifying information or
documents to allow BitMEX to form a reasonable belief that it
knows the true identity of its customers.  Prior to in or about
August 2020, customers could register to trade on BitMEX
anonymously, by providing only a verified email address and
without providing any identifying information or documentation.
Indeed, in its initial marketing period in 2015, BitMEX's

website expressly advertised that "No real-name or other advanced verification is required on BitMEX."

24. As a result of its failure to implement AML and KYC programs, BitMEX made itself available as a vehicle for money laundering and sanctions violations. For example, in or about May 2018, ARTHUR HAYES, the defendant, was notified of claims that BitMEX was being used to launder the proceeds of a cryptocurrency hack. BitMEX did not implement a formal AML policy in response to this notification. Further, internal BitMEX reports identified that customers located in Iran, who are subject to U.S. sanctions, traded on the platform from at least in or about November 2017 through at least in or about April 2018. HAYES and BENJAMIN DELO, the defendant, personally communicated with BitMEX customers who self-identified as Iranian. BitMEX did not implement a formal AML policy in response to this Iranian customer activity.

25. From in or about September 2015, when the CFTC issued public enforcement orders clarifying that cryptocurrencies are commodities for purposes of the CEA, and continuing up to and including at least in or about September 2020, each of the defendants knew that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements, that

11

BitMEX did not have adequate AML and KYC programs, and that BitMEX in fact continued to serve customers in the United States. Each of the defendants willfully caused BitMEX's failure fail to adopt or implement adequate AML and KYC programs, or aided and abetted that failure. Each of the defendants has at relevant times actively encouraged or allowed BitMEX to be accessed and used by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing BitMEX, as described below.

26. For instance, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, knew that specific customers, residing in the United States, continued to access BitMEX's platform into in or about 2018, with the knowledge of HAYES, DELO, REED, and DWYER, each of whom failed to take steps to deactivate the accounts of these U.S. customers. DELO and DWYER knowingly allowed one of these customers to access BitMEX using a non-U.S. passport in the name of a third party that did not belong to this customer. DELO also allowed another customer to continue to access a BitMEX trading account despite this customer being "US based," because "[h]e's famous in Bitcoin," and falsely changed this customer's internal country of residence to a country other than the United States. REED

allowed a friend of his who he knew resided in the United States to continue to access BitMEX's platform up to and including at least in or about October 2018.

27.   ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, had access to internal BitMEX reports, which tracked and reported trading revenue by country monthly. Each and every report from in or about November 2017 through in or about July 2018 showed U.S. customers trading on BitMEX's platform.   In a deposition before the CFTC in or about January 2019, REED falsely denied knowing that BitMEX maintained reports identifying U.S. customers on the platform. In truth and in fact, in or about December 2018, REED received a report dated in or about October 2018 which showed trading revenue attributable to U.S. customers.

28.   After in or about September 2015, when the CFTC issued the public enforcement orders clarifying that cryptocurrencies are commodities for purposes of the CEA, BitMEX announced that it was withdrawing from the U.S. market.   BitMEX implemented an internet protocol ("IP") address check (the "IP Address Check") purportedly designed to identify and block customers located in the United States from trading on BitMEX.   But as the defendants well knew, and as the defendants intended, BitMEX applied the IP

Address Check on just a single occasion for each customer. As a result, if a customer showed a non-U.S. IP Address for the IP Address Check, that customer could thereafter access and trade on BitMEX's platform from U.S. IP Addresses. The defendants also caused BitMEX to further undermine the effectiveness of the IP Address Check, by among other methods, providing an anonymous means of accessing the platform, through the Tor network, a special Internet network that makes it practically impossible to physically locate the computers hosting or accessing websites on the network. The defendants also caused BitMEX to take no steps to restrict access of BitMEX via virtual private network ("VPN") services, which the defendants knew allowed U.S. customers to circumvent the IP Address Check by making it appear as though they were accessing BitMEX from outside the United States. The defendants also caused BitMEX to implement a policy through at least in or about September or October 2018 which exempted U.S. IP addresses – and only U.S. IP addresses – from an internal term of service rule which putatively blocked BitMEX access from IP addresses in certain restricted jurisdictions.

29. BitMEX also engaged in marketing activities with the effect and intent of attracting U.S. customers. ARTHUR HAYES and GREGORY DWYER, the defendants, regularly attended

14

cryptocurrency conferences in New York and elsewhere in the United States, and had meetings in the United States with potential and existing customers based in the U.S. In or about May 2018, BitMEX rented three Lamborghinis and had them parked outside of the Consensus Bitcoin conference in Manhattan. ARTHUR HAYES, the defendant, declared this "stunt" a success based on the coverage from U.S. news media. And in or about 2018, ARTHUR HAYES, the defendant, made repeated appearances on U.S. television shows with viewership primarily in the United States during which he promoted BitMEX.

### Statutory Allegations

30.   From at least in or about September 2015, up to and including in or about September 2020, in the Southern District of New York and elsewhere, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, did willfully cause a financial institution to violate the Bank Secrecy Act by failing to establish, implement, and maintain an anti-money laundering program that satisfies the minimum standards required by 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220, to wit, the defendants caused BitMEX, a futures commission merchant with U.S. customers, to fail to establish and implement an anti-money laundering program that includes policies,

15

procedures, and internal controls reasonably designed to prevent BitMEX from being used for money laundering or terrorist financing; independent compliance testing; ongoing training for appropriate personnel; and risk-based procedures for verifying the identity of each BitMEX customer to the extent reasonable and practicable.

(Title 31, United States Code, Sections 5318(h)(1) and (l), 5322(a) and (c); Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Conspiracy to Violate the Bank Secrecy Act)

The Grand Jury further charges:

31.     The allegations contained in paragraphs 1 through 29 of this Indictment are repeated and realleged as if set forth fully herein.

32.     From at least in or about September 2015, up to and including at least in or about September 2020, in the Southern District of New York and elsewhere, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, and with others known and unknown, to cause a financial institution to violate the Bank Secrecy Act, in violation of 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§

1026.210 and 1026.220, to wit, the defendants caused BitMEX, a futures commission merchant with U.S. customers, to fail to establish and implement an anti-money laundering program that includes policies, procedures, and internal controls reasonably designed to prevent BitMEX from being used for money laundering or terrorist financing; independent compliance testing; ongoing training for appropriate personnel; and risk-based procedures for verifying the identity of each BitMEX customer to the extent reasonable and practicable.

**Overt Acts**

33. In furtherance of the conspiracy, and to effect the illegal objects thereof, ARTHUR HAYES, BENJAMIN DELO, SAMUEL REED, and GREGORY DWYER, the defendants, together with others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

a. From at least in or about 2017 through in or about early 2019, BitMEX personnel, including DWYER and others, conducted BitMEX operations from an office in Manhattan, New York, including but not limited to customer support, business development, and marketing, involving customers located in the United States and elsewhere.

b. From at least in or about September 2015 through at

least in or about October 2019, HAYES, DELO, REED, and DWYER allowed particular known customers who resided in the United States to obtain or maintain access to BitMEX in violation of its purported U.S. user ban, and DELO and DWYER and others known and unknown falsified or allowed to be falsified internal BitMEX records claiming that these customers resided outside of the United States.

      c.   In or about May 2018, HAYES was notified of claims that BitMEX was being used to launder the proceeds of a cryptocurrency hack. Neither HAYES nor any other BitMEX employee took any action to implement a formal AML policy in response.

      (Title 18, United States Code, Section 371.)

_____
FOREPERSON

_Audrey Strauss_
AUDREY STRAUSS
Acting United States Attorney

18

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**ARTHUR HAYES,**
**BENJAMIN DELO,**
**SAMUEL REED, and**
**GREGORY DWYER,**

**Defendants.**

**SEALED INDICTMENT**

20 Cr.

(31 U.S.C. §§ 5318(h)(1) and (l),
5322(a) and (c); 31 C.F.R. §§ 1026.210
and 1026.220; and 18 U.S.C. §§ 2 and
371.)

AUDREY STRAUSS
Acting United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT 2

**Release Number 8270-20**

**CFTC Charges BitMEX Owners with Illegally Operating a Cryptocurrency Derivatives Trading Platform and Anti-Money Laundering Violations**

**October 01, 2020**

**Washington, D.C.** — The Commodity Futures Trading Commission today announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging five entities and three individuals that own and operate the **BitMEX** trading platform with operating an unregistered trading platform and violating multiple CFTC regulations, including failing to implement required anti-money laundering procedures. This case is brought in connection with the Division of Enforcement's Digital Asset and Bank Secrecy Act Task Forces.

Among those charged are company owners **Arthur Hayes**, **Ben Delo**, and **Samuel Reed**, who operate BitMEX's platform through a maze of corporate entities. These entities, also named as defendants in the complaint, are **HDR Global Trading Limited**, **100x Holding Limited**, **ABS Global Trading Limited**, **Shine Effort Inc Limited**, and **HDR Global Services (Bermuda) Limited (BitMEX)**. BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

"Digital assets hold great promise for our derivatives markets and for our economy," said Chairman Heath P. Tarbert. "For the United States to be a global leader in this space, it is imperative that we root out illegal activity like that alleged in this case. New and innovative financial products can flourish only if there is market integrity. We can't allow bad actors that break the law to gain an advantage over exchanges that are doing the right thing by complying with our rules."

"As the CFTC has made clear, registration requirements are a cornerstone of the regulatory framework that protects Americans and U.S. financial markets," added Division of Enforcement Director James McDonald. "Effective anti-money laundering procedures are among the fundamental requirements of intermediaries in the derivatives markets, whether in traditional products or in the growing digital asset market. This action shows the CFTC will continue to work vigilantly to protect the integrity of these markets."

In its continuing litigation against the defendants, the CFTC seeks disgorgement of ill-gotten gains, civil monetary penalties, restitution for the benefit of customers, permanent registration and trading bans, and a permanent injunction from future violations of the Commodity Exchange Act (CEA).

**Related Criminal Action**

The U.S. Attorney for the District of New York indicted Hayes, Delo, and Reed, along with Gregory Dwyer, on federal charges of violating the Bank Secrecy Act and conspiracy to violate the Bank Secrecy Act. *See United States v. Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer*, Case No. 20-CR-500 (SDNY). The indictment was unsealed today.

**Case Background**

The complaint alleges that from at least November 2014 through the present, and at the direction of Hayes, Delo, and Reed, BitMEX has illegally offered leveraged retail commodity transactions, futures, options, and swaps on cryptocurrencies including bitcoin, ether, and litecoin, allowing traders to use leverage of up to 100 to 1 when entering into transactions on its platform. According to the complaint, BitMEX has facilitated cryptocurrency derivatives transactions with an aggregate notional value of trillions of dollars, and has earned fees of more than over $1 billion since beginning operations in 2014. Yet, as alleged in the complaint, BitMEX has failed to implement the most basic compliance procedures required of financial institutions that impact U.S. markets.

The complaint charges BitMEX with operating a facility for the trading or processing of swaps without having CFTC approval as a designated contract market or swap execution facility, and operating as a futures commission merchant by soliciting orders for and accepting bitcoin to margin digital asset derivatives transactions, and by acting as a counterparty to leveraged retail commodity transactions. The complaint further charges BitMEX with violating CFTC rules by failing to implement know-your-customer procedures, a customer information program, and anti-money laundering procedures.

As alleged in the complaint, BitMEX touts itself as the world's largest cryptocurrency derivatives platform, with billions of dollars' of trading volume each day. Much of this volume, and related transaction fees, derives from the operation of the platform from the U.S. and its extensive solicitation of and access to U.S. customers, the complaint alleges. Nevertheless, BitMEX has failed to register with the CFTC, and has failed to implement key safeguards required by the CEA and CFTC's regulations designed to protect the U.S. derivatives markets and market participants.

The CFTC strongly urges the public to verify a company's registration with the Commission before committing funds. If unregistered, a customer should be wary of providing funds to that company. A company's registration status can be found using NFA BASIC.

The CFTC thanks and acknowledges the assistance of the U.S. Attorney's Office for the Southern District of New York, the Federal Bureau of Investigation, the Hong Kong Securities and Futures Commission, and the Financial Service Authority Seychelles.

The Division of Enforcement staff members responsible for this case are Joy McCormack, Carlin Metzger, Jeffrey Gomberg, Joseph Platt, Ray Lavko, Brigitte Weyls, Elizabeth N. Pendleton, Scott Williamson, and Robert T. Howell. Staff from the Division of Market Oversight, Division of Clearing and Risk, and Division of Swap Dealer and Intermediary Oversight also assisted in this matter.

**-CFTC-**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) ) **CIVIL ACTION NO: 20-cv-8132** |
| Plaintiff, | ) ) |
| v. | ) ) **Hon._____** |
| HDR Global Trading Limited, 100x Holdings Limited, ABS Global Trading Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited, Arthur Hayes, Ben Peter Delo, and Samuel Reed | ) **Jury Trial Demanded** ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND
CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT
AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal agency, for its Complaint against Defendants HDR Global Trading Limited ("HDR"), 100x Holdings Limited ("100x"), ABS Global Trading Limited ("ABS"), Shine Effort Inc Limited ("Shine"), and HDR Global Services (Bermuda) Limited ("HDR Services"), all doing business as "BitMEX," as well as BitMEX's co-founders Arthur Hayes ("Hayes"), Benjamin Delo ("Delo"), and Samuel Reed ("Reed") (collectively, "Defendants" or "BitMEX"), alleges as follows:

## I.      SUMMARY

1.      BitMEX touts itself as the world's largest cryptocurrency derivatives platform in the world with billions of dollars' worth of trading each day.  Much of this trading volume and its profitability derives from its extensive access to United States markets and customers.

Nevertheless, BitMEX has never been registered with the CFTC in any capacity and has not complied with the laws and regulations that are essential to the integrity and vitality of the U.S. markets, like know-your-customer procedures to prevent money laundering, or procedures designed to detect and prevent manipulative trading and other illicit activities.  Instead, BitMEX has profited while illegally offering leveraged retail commodity transactions, futures, options and swaps; operating as an unregistered futures commission merchant ("FCM"); and operating a facility for the trading of swaps without being registered as a swap execution facility ("SEF") or as a designated contract market ("DCM").  Therefore, the CFTC brings this action against Defendants, the owners and operators of the BitMEX virtual currency derivatives trading platform, to enjoin their ongoing illegal offering of commodity derivatives to U.S. persons, their acceptance of funds to margin derivatives transactions from individuals and entities in the U.S., and their operation of a derivatives trading platform in the U.S. in violation of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1-26 (2018), and the CFTC Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2019).

2.      Beginning no later than November 2014 and continuing to the present (the "Relevant Period"), Defendants have offered commodity futures, options, and swaps on digital assets, including bitcoin, ether, and litecoin, to persons in the United States, from offices in the United States, through the website www.bitmex.com and a mobile application, without registering as an FCM or being designated or registered as a contract market (a DCM) by the Commission.  Defendants also have operated a facility for the trading or processing of swaps without being registered as a DCM or a SEF.

3.      During the Relevant Period, BitMEX has conducted trillions of dollars in digital asset derivatives transactions and earned fees worth more than $1 billion from transactions on its

platform. BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons. BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus.

4.      Throughout the Relevant Period, and through the operation of the BitMEX platform, Defendants have violated, and continue to violate, core provisions of the CEA and Regulations, including:

i.      offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b), 7 U.S.C. § 4(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2019);

ii.     offering, entering into, confirming the execution of, or transacting in off-exchange transactions in commodity options, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019);

iii.    acting as an unregistered FCM, in violation of Section 4d of the Act, 7 U.S.C. § 6d (2018);

iv.     operating a facility for the trading or processing of swaps without being registered as a SEF or as a DCM, in violation of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019);

v.      failing to supervise, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2019); and

vi.     failing to comply with applicable provisions of the Bank Secrecy Act, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2019).

5.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

6.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l (2018), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

8.      Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in the Southern District of New York, and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

### III.   PARTIES

#### A.   The CFTC

9.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

#### B.   Defendants

10.     **HDR Global Trading Limited** was incorporated in the Seychelles in 2014 as a Seychelles International Business Company.  Throughout the Relevant Period, HDR has owned and operated the BitMEX trading platform.  Despite being incorporated in the Seychelles, HDR does not have, and never has had, any operations or employees in the Seychelles.  HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  "HDR" derives from the first letter of the last names of Hayes, Delo, and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in HDR.

11.     **100x Holdings Limited** is a holding company recently incorporated by Hayes, Delo, and Reed in Bermuda.  In a July 15, 2020, blog post on the BitMEX website, Hayes "introduced" 100x and represented that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform."

12.     **ABS Global Trading Limited** is a Delaware limited liability company incorporated in 2017 through which BitMEX conducts some operations in the United States.  It is a subsidiary of HDR and 100x, and it is ultimately owned and controlled by Hayes, Delo, and Reed.  "ABS" derives from the first letters of the first names of Hayes, Delo, and Reed:  Arthur, Ben and Sam.

5

13.     **Shine Effort Inc Limited** is a Hong Kong corporation incorporated in 2014, and a subsidiary of HDR and 100x.  Shine is the corporate entity through which BitMEX conducts proprietary trading on its own BitMEX platform, as well as proprietary trading with other market participants on exchanges and over the counter throughout the world.  Shine is controlled by Hayes, Delo, and Reed.

14.     **HDR Global Services (Bermuda) Limited** is a Bermudian entity incorporated in 2018 that employs certain personnel performing duties for BitMEX.

15.     HDR, 100x, ABS, Shine, and HDR Services act as a single, integrated common enterprise.  They share common office space, employees and operational resources.  They advertise on a single website that does not distinguish between entities.  They share common directors.  They share common ownership.  They share common legal and compliance resources.  They share operating expenses, and report financial activities in consolidated financial statements.  BitMEX employees and executives refer to a BitMEX enterprise as opposed to distinguishing between legal entities.  Employees of the various entities have "bitmex.com" email addresses.  These entities operate as an integrated, common enterprise, and are described together in this complaint as "BitMEX."

16.     **Arthur Hayes** is a co-founder and co-owner of BitMEX, and describes himself as Chief Executive Officer of BitMEX.  He is a U.S. citizen who currently resides in Hong Kong.  Hayes owns property in the U.S., and files U.S. income tax returns.  During the Relevant Period, Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S.  Hayes also owns and operates an entity named Headline Asia, through which he conducts transactions with and on the BitMEX platform, and with other cryptocurrency

exchanges and over-the-counter trading partners.  He has never been registered with the Commission in any capacity.

17.     **Ben Peter Delo** is a co-founder and co-owner of BitMEX, and during the Relevant Period he has been the Chief Operating Officer of BitMEX.  He is a U.K. citizen and, on information and belief, currently resides in Hong Kong.  He has never been registered with the Commission in any capacity.

18.     **Samuel Reed** is a co-founder and co-owner of BitMEX, and describes himself as Chief Technology Officer of BitMEX.  He is a U.S. citizen and has resided in Milwaukee, Wisconsin and Boston, Massachusetts during the Relevant Period.  During the Relevant Period, Reed has held his ownership interest in the BitMEX entities through a Wisconsin limited liability company that maintains bank accounts at banks in the United States, and owns property in the U.S.  Reed has never been registered with the Commission in any capacity.

19.     Hayes, Delo, and Reed together control the operations of the BitMEX enterprise.

### IV.     STATUTORY BACKGROUND AND LEGAL FRAMEWORK

20.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5 (2018).

21.     Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity.  The CEA requires that, subject to certain exemptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade, Section 4 of the Act, 7 U.S.C. § 6 (2018), and Regulation 48.3, 17 C.F.R. § 48.3 (2019); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market, 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(a) (2018), and Regulation 37.3, 17 C.F.R. § 37.3 (2019); commodity options must likewise be conducted on a board of trade designated as a contract market, Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019).

22.     A cryptocurrency or virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.

23.     Bitcoin, ether, litecoin, and other virtual currencies are distinct from "real" or "fiat" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.  Digital assets, such as bitcoin, ether, and litecoin are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).

24.     In recent years, as digital asset and virtual currency markets have evolved, the CFTC has approved the offer of futures contracts on virtual currencies by boards of trade

8

registered with the CFTC such as the Chicago Mercantile Exchange and Chicago Board Options

Exchange.

25.    With limited exceptions, Section 5h(a) of the Act, 7 U.S.C. § 7b-3 (2018), and

Regulation 37.3, 17 C.F.R. § 37.3 (2019), make it illegal for a person to operate a facility for the

trading or processing of swaps unless the facility is registered as a designated contract market or

a swap execution facility with the CFTC.

26.    Section 1a(47)(A)(iii) and (vi) of the Act, 7 U.S.C. § 1a(47)(A)(iii), (vi) (2018),

broadly defines "swap" to include "any agreement, contract, or transaction"—

> (iii) [T]hat provides on an executory basis for the exchange, on a fixed or
> contingent basis, of 1 or more payments based on the value or level of 1 or more
> interest or other rates, currencies, commodities, securities, instruments of
> indebtedness, indices, quantitative measures, or other financial or economic
> interest or property of any kind, or any interest therein or based on the value
> thereof, and that transfers, as between the parties to the transaction, in whole or in
> part, the financial risk associated with a future change in any such value or level
> without also conveying a current or future direct or indirect ownership interest in
> an asset (including any enterprise or investment pool) or liability that incorporates
> the financial risk so transferred, including any agreement, contract or transaction
> commonly known as . . . (I) an interest rate swap; . . . (VII) a currency
> swap; . . . (XXII) a commodity swap . . . [or]
>
> (vi) that is any combination or permutation of, or option on, any agreement,
> contract, or transaction described in any of [these clauses].

27.    The provisions of the Act and Regulations that apply to DCMs and SEFs, the

facilities where the trading of commodity derivatives typically occurs, establish important

protections for United States derivatives markets and market participants.  For example, DCMs

and SEFs must conform to core principles that are designed to achieve the prevention of market

abuse, Sections 5(d)(12)(a) and 5h(f)(2)(B) of the Act, 7 U.S.C. §§ 7(d)(12)(a),  7b-3(f)(2)(B)

(2018); ensure their financial stability, Sections 5(d)(21) and 5h(f)(13) of the Act, 7 U.S.C.

§§ 7(d)(21), 7b-3(f)(13) (2018); protect their information security, Regulations 38.1051(a)(2)

and 37.1401(a)(2), 17 C.F.R. §§ 38.1051(a)(2), 37.1401(a)(2) (2019); and safeguard their systems in the event of a disaster, Regulations 38.1051(a)(3) and 37.1401(a)(3), 17 C.F.R. §§ 38.1051(a)(3), 37.1401(a)(3) (2019). Further, DCMs and SEFS must ensure that the contracts they list for trading are "not readily susceptible to manipulation," Sections 5(d)(3) and 5h(f)(3) of the Act, 7 U.S.C. §§ 7(d)(3), 7b-3(f)(3) (2018); DCMs must "prevent market disruption," Section 5(d)(4) of the Act,7 U.S.C. § 7(d)(4) (2018), and SEFs must monitor trading "to prevent manipulation, price distortion, and disruptions," Section 5h(f)(4)(B) of the Act, 7 U.S.C. § 7b-3(f)(4)(B) (2018); DCMs and SEFs must impose position limits designed to reduce the potential threat of market manipulation or congestion, Sections 5(d)(5) and 5h(f)(6) of the Act, 7 U.S.C. §§ 7(d)(5), 7b-3 (f)(6) (2018); DCMs and SEFs must establish and enforce rules to minimize conflicts of interest, Sections 5(d)(16) and 5h(f)(12) of the Act,7 U.S.C. §§ 7(d)(16), 7b-3(f)(12) (2018); and DCMs and SEFs must maintain and retain important records and provide them to the Commission, Sections 5(d)(18) and 5h(f)(10) of the Act, 7 U.S.C. §§ 7(d)(18), 7b-3(f)(10) (2018).

28.     An FCM is an individual, association, partnership, corporation, or trust that is (i) engaged in soliciting or in accepting orders for regulated transactions including futures, swaps, commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail commodity transactions; and which, in connection with these activities, "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." Section la(28)(A) of the Act, 7 U.S.C. § la(28)(A) (2018).

29.     Retail commodity transactions are transactions that are entered into with, or offered to, non-eligible contract participants "on a leveraged or margined basis, or financed by

the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2018). Retail commodity transactions are subject to Section 4(a) of the Act, 7 U.S.C. §§ 6(a) (2018), "as if" they are a contract of sale of a commodity for future deliver, and therefore must be executed on a regulated exchange.

30.     An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2018).

31.     FCM's hold customer funds to margin commodity derivative transactions. They are a critical component of the U.S. financial system, and therefore must meet stringent requirements imposed by the Act and Regulations. Among the most fundamental of these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a) (2018), which makes it illegal for any person to be an FCM unless registered as such with the Commission. FCMs must establish safeguards to prevent conflicts of interest, Section 4d(c) of the Act, 7 U.S.C. § 6d(c) (2018); segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018).

32.     Regulation 166.3, 17 C.F.R. § 166.3 (2019), requires a Commission registrant such as an FCM to diligently supervise all activities of its officers, employees, and agents relating to its business as an FCM. The term "Commission registrant" as used in 17 C.F.R. § 166.3 means "any person who is registered or required to be registered with the Commission

pursuant to the Act or any rule, regulation, or order thereunder" Regulation 166.1(a), 17 C.F.R. § 166.1(a) (2019).

33.     Regulation 42.2, 17 C.F.R. § 42.2 (2019) requires, among other things, that every FCM shall comply with the applicable provisions of the Bank Secrecy Act (BSA) and the regulations promulgated by the Department of the Treasury under that Act at 31  C.F.R. chapter X, and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220, which require that a customer identification program ("CIP") be adopted as part of the firm's BSA compliance program.

34.     31 U.S.C. § 5318(l) (2018) requires, among other things, that financial institutions such as FCMs implement reasonable procedures to verify the identity of any person seeking to open an account, maintain records of information used to verify a person's identify, and consult lists of known or suspected terrorists or terrorist organizations (such as those created and distributed by the Office of Foreign Asset Control of the United States Department of Treasury ("OFAC") to determine whether a person seeking to open an account appears on any such list.

35.     The regulations promulgated by the Department of Treasury under 31 C.F.R. chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identify of each customer sufficient to enable the FCM to form a reasonable belief that it knows the true identify of each customer; (2) retain records collected pursuant to the CIP; and (3) implement procedures for determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations.

## V.   FACTS

### A.   The BitMEX Trading Platform and Products

36.     BitMEX is a peer-to-peer "crypto-products platform" that offers the trading of cryptocurrency derivatives including bitcoin, ether and litecoin.  As of September 5, 2020, BitMEX advertises that it has a transaction volume of $74.06 billion during the prior thirty days, and $956.83 billion during the past year.

37.     BitMEX offers leveraged trading of cryptocurrency derivatives to retail (non-ECP) and institutional customers in the U.S. and throughout the world through BitMEX's website, www.bitmex.com, the BitMEX mobile app, and by direct connection to its trading engine servers via the BitMEX application protocol interface ("API").  The API connection is generally used by more technologically sophisticated BitMEX customers.

38.     On its website, BitMEX advertises that "sign up takes less than 30 seconds," and that customers can "trade in minutes; deposits only require one confirmation."  BitMEX allows customers to open accounts with an anonymous email and password, and a deposit of bitcoin.  BitMEX does not collect any documents to verify the identity or location of the vast majority of its users.

39.     BitMEX is a pure derivatives exchange as opposed to a spot market for the purchase or sale of virtual currencies.  BitMEX allows customers to place buy or sell orders for its various cryptocurrency derivatives with leverage of up to 100 to 1, meaning a customer with $10,000 in his or her account may execute a trade with a notional value of $1,000,000.  BitMEX does not actually deliver the cryptocurrencies underlying the contracts it offers for trading on its platform.

40.     BitMEX offers the leveraged trading of cryptocurrency derivatives; BitMEX does not actually deliver the cryptocurrencies whose prices underlie the various contracts and transactions BitMEX offers.

41.     BitMEX accepts deposits to and allows withdrawals from the platform in bitcoin. BitMEX requires customers to deposit bitcoin to margin trading positions in its various contracts. BitMEX allows customers to place buy (long) and sell (short) orders in an electronic order book, and matches customer orders in what it calls its "trading engine."

42.     To keep positions open, BitMEX customers are required to hold a percentage of the value of their trading positions on the exchange as margin.  BitMEX describes "Initial Margin" as "the minimum amount of bitcoin you must deposit to open a position."  BitMEX describes "Maintenance Margin" as "the minimum amount of bitcoin you must hold to keep a position open."  If a customer's margin balance drops below the Maintenance Margin level, BitMEX takes over the customer's trading position, the position is liquidated, and the customer's maintenance margin is lost.  If BitMEX is able to liquidate the position at above what it calls the "bankruptcy" price, the funds are added to BitMEX's "Insurance Fund."  If BitMEX is unable to liquidate the position above the bankruptcy price, BitMEX uses funds from its Insurance Fund to make up the difference, or may close out positions of other traders on the exchange in what BitMEX calls an "Auto-Deleveraging event."

43.     BitMEX acts as the counterparty to certain transactions on its platform, such as through its internal "market-making" desk, or through the BitMEX "Liquidation Engine" that can assume a customer's position under certain circumstances.

44.     In general, BitMEX makes money by charging execution fees for trades made on the BitMEX platform.  BitMEX has made more than $1 billion in fees since its inception in 2014.

45.     Hayes, Delo, and Reed launched the BitMEX trading platform for live trading in November of 2014.  Initially, BitMEX offered only two futures contracts, the "XBT" and the "XBU," both of which were based on the value of a dollar against the value of a bitcoin.  Over time, BitMEX added various virtual currency derivatives contracts to its suite of products, including futures, options and swaps on bitcoin, litecoin and ether.

46.     On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD perpetual swap."  On its website, BitMEX has described its "Perpetual Contract" (or "perpetual swap contract") as "a product similar to a traditional Futures Contract in how it trades."  BitMEX claims its "XBTUSD" perpetual swap is "the most traded cryptocurrency product of all time."

47.     Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5 trillion contracts traded on its platform.  Most of that volume—more than two trillion contracts—has been in the XBTUSD swap.

48.     Despite its significant trading volume, the varied products offered for trading, and acting in a capacity requiring designation or registration as a DCM or SEF, BitMEX has not implemented rules or procedures to achieve compliance with the core principles required of DCMs or SEFs under the CEA and Regulations.  Among other critical issues, BitMEX has failed to implement rules or procedures sufficient to ensure that: the contracts it offers are not readily susceptible to manipulation; market participants are prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct are subject to discipline.

49.     Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information.

50.     Further, BitMEX has failed to establish rules to minimize conflicts of interest. This is apparent because Hayes, Delo, Reed, and numerous other BitMEX employees trade on the platform, and BitMEX's own internal "market-making" desk has at times been one of the largest traders on the platform.

**B.     BitMEX's U.S. Operations and Offices**

51.     Throughout the Relevant Period, BitMEX has conducted major components of its business and maintained a significant presence in the U.S.

52.     During the Relevant Period, BitMEX has employed approximately half of its workforce in the U.S., including at least 9 in New York and 56 in San Francisco.

53.     BitMEX's U.S.-based employees' and agents' compensation is typically paid by ABS, a company controlled by Hayes, Delo, and Reed.  An April 27, 2017 Service Agreement between HDR and ABS renders ABS staff contractually responsible for BitMEX's business development, marketing, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco and New York.

54.     BitMEX executives based outside of the U.S. frequently visit BitMEX's San Francisco offices.  Hayes and other BitMEX sales staff have frequently traveled to the U.S. to solicit customers for BitMEX and to publicly promote BitMEX in through U.S. media outlets.

55.     Since the BitMEX San Francisco office opened in 2017, at least the following functions have been performed from that office:  Product Engineering, Incident Response, and Software and Security Engineering, Product Management, User Experience/Visual Design/UX,

Dev Ops Engineering, Data Engineering, Kubernetes Engineering, Web Development, Human

Resources, Ventures, Security and IT, Communications, Marketing, Accounting, and Recruiting.

56.     Beginning in 2014 and continuing through the Relevant Period, Reed has worked

primarily from within the U.S.  Reed was the primary architect of BitMEX's website and order

entry system.  Reed also has been responsible for BitMEX's information security management,

along with a team based primarily in BitMEX's San Francisco office.  On March 1, 2018,

BitMEX leased office space for ABS in Milwaukee, Wisconsin, where Reed performed work for

BitMEX.

57.     BitMEX's Head of Business Development was based in New York for the

majority of the Relevant Period.  This executive reported to, and continues to report to Hayes.

While residing and acting on behalf of BitMEX in the U.S., specifically in this District, this

executive has been responsible for leading BitMEX's Customer Support team, managing sales

staff worldwide, leading institutional sales, speaking publicly about BitMEX, developing

products for BitMEX, and leading BitMEX's internal "market making" desk that trades on the

BitMEX platform.

58.     BitMEX continued to increase its New York presence in 2018, hiring a Marketing

Manager in April 2018 to promote BitMEX, an Investment Associate in May 2018, an Art

Director in July 2018, and a Content Manager to write strategic marketing communications,

press releases, pitches, emails, and web content in October 2018.  Consistent with this increased

presence, on May 1, 2018, a BitMEX executive signed an agreement for office space in New

York.

59.     To respond to U.S. customer service issues and emails, BitMEX hired a Customer

Service Representative in October 2017 to work remotely from New Jersey.

60.     BitMEX recently closed its New York office, but continues to run significant portions of its derivatives trading platform from San Francisco, and remotely from other parts of the U.S.

61.     BitMEX uses vendors based in the United States for critical components of its business, for example using Google products for email services, using Slack for an internal BitMEX communications platform, and Amazon Web Services for data storage and handling.

62.     BitMEX also uses the benefits and protections of the U.S. legal system.  For example, BitMEX has applied for various United States trademarks and service marks on the BitMEX name and logo.  On March 29, 2018, BitMEX applied with the United States Patent and Trademark Office for a trademark on the word "BitMEX."  The owner of record for the "BitMEX" U.S. Word Mark is HDR.

## C.  Hayes, Delo, and Reed Have Controlled BitMEX and Operated BitMEX as a Common Enterprise

63.     Throughout the Relevant Period, Hayes, Delo, and Reed have controlled the BitMEX common enterprise, including the various corporate entities that comprise BitMEX for the common purpose of operating the BitMEX trading facility.  Hayes, Delo, and Reed each sign documents on behalf of the various BitMEX corporate entities.  They control the bank and trading accounts for the various BitMEX corporate entities.  They have the authority to hire and fire employees.  And they ultimately control the deposits to and withdrawals from the BitMEX platform.

64.     Hayes, Delo, and Reed incorporated HDR as a Seychelles International Business Company on June 23, 2014.  They were the three original Directors of HDR, and each owned approximately one third of that entity.

65.     Hayes signed many of the initial corporate documents for HDR, agreeing in documents to act "as principal agent" of the entity, and representing that HDR would not "engage in any businesses which are considered to be illegal in Hong Kong or other countries in the world."

66.     Hayes, Delo, and Reed incorporated Shine in Hong Kong on August 6, 2014.  The first Director and Chairman of the company was Hayes.  Delo was later appointed as Chairman of Shine, and in that role approved the lease of office space in the Cheung Kong Centre in Hong Kong.

67.     Hayes, Delo, and Reed incorporated ABS in Delaware on April 27, 2017, at which time Hayes was "elected as the sole director of the Corporation."  In a corporate resolution on the same date, Hayes was appointed to be the President, Secretary and Treasurer of ABS, and given authority to open and manage bank accounts on behalf of ABS.  The same resolution "authorized and directed [ABS] to borrow funds from HDR Global Trading Limited."

68.     A November 2017 ABS corporate resolution authorized Hayes and Reed as "designated signatories," able to open bank accounts on behalf of ABS.  Hayes and Reed also have held credit cards for ABS.

69.     Hayes, Delo, and Reed have shared responsibility for various aspects of the BitMEX business.  At a high level, Delo has been responsible for building and overseeing the BitMEX trading engine, Reed has been responsible for building and overseeing the BitMEX website, API and order entry system, and Hayes has been responsible for strategic decisions, business development, marketing, and management of the BitMEX enterprise.  Hayes has also been primarily responsible for representing BitMEX in public speaking engagements and

appearances, and has authored many of the posts on the BitMEX blog.  Hayes regularly appears

as a speaker at conferences throughout the world, including in the U.S., on behalf of BitMEX.

70.     Hayes, Delo, and Reed have worked together to build the BitMEX platform, and

all have been involved in the critical decisions for the enterprise, such as whether (or not) to

pursue regulatory approval for the platform, or whether (or not) to implement KYC or AML

policies and procedures.  For example, in August 2014, shortly before the launch of the platform,

Hayes wrote to Delo that BitMEX would not do any KYC, saying "Basically just valid email

address until we feel significant pressure to do otherwise."

71.     Hayes, Delo, and Reed all were involved in discussions with compliance

consultants for BitMEX, even before the launch of the platform, and all three have participated

in discussions with BitMEX's numerous lawyers to discuss legal and regulatory issues facing

BitMEX.

72.     Hayes, Delo, and Reed have made decisions on BitMEX's products, including

deciding how to structure BitMEX's futures, options and swaps contracts.  Hayes, Delo, and

Reed also have been involved with developing and managing BitMEX's internal market maker

trading algorithms.

73.     The control by Hayes, Delo, and Reed continues today.  While BitMEX has hired

employees to manage certain aspects of trading facility, those individuals all ultimately act under

the direction and control of Hayes, Delo, and Reed.  Key financial and trading decisions require

"Founder" approval, meaning approval by Hayes, Delo, and Reed.

### D.     BitMEX Solicits US Customers

74.     BitMEX has devoted significant resources to soliciting customers in the U.S.

BitMEX solicits orders from U.S.-based customers for futures, options, and swaps by advertising

on its website and on social media, including the BitMEX blog, Twitter, Reddit, Telegram,

Facebook, and a BitMEX YouTube page.  A 2015 BitMEX investor presentation prepared by Hayes stated that a "constant presence on these media platforms ensures that . . . [when the] Bitcoin community thinks of derivatives BitMEX comes to mind."  BitMEX also solicits customers and advertises in the U.S. at various conferences and at meetings with individual customers.

75.     BitMEX also solicits customers through its "affiliate" program.  BitMEX's affiliate program allows U.S. customers to solicit other customers to trade on the platform in exchange for compensation from BitMEX.  BitMEX provides customers with an affiliate link which they can share, for example as many BitMEX affiliate marketers do on Twitter, and receive compensation for customers who follow the link to open accounts and trade on the platform.

76.     Dozens of U.S. residents publicly identify themselves on social media as traders on the BitMEX platform, often also providing affiliate links encouraging social media followers to open accounts and trade on the BitMEX platform.  BitMEX is aware of this because BitMEX monitors social media platforms such as Twitter, Telegram and Reddit for references to BitMEX, for years pulling references to BitMEX customers who participated in BitMEX's affiliate program.

77.     In October of 2016, a senior BitMEX executive confirmed directly in response to a customer question that U.S. persons could solicit for BitMEX in connection with the affiliate program and be paid by BitMEX in bitcoin on the BitMEX platform, stating:  "It is fine for you to set up the account (while being located in the US) with us if you are not trading and only withdrawing the affiliate commissions . . . You do not need to do anything on your end to restrict them from your marketing, if they happen to sign up with a US IP and they are not US residents

then we will ask them to provide alternative verification. If they sign up from a non-US IP then no need to worry."

78.     As of July 27, 2018, at least 1,100 U.S. affiliate program customers received affiliate payments from BitMEX for soliciting customers to trade on BitMEX.  In 2019, BitMEX paid out $66 million to customers in affiliate commissions.

79.     Senior executives at BitMEX have openly acknowledged the solicitation of U.S. customers through the BitMEX affiliate marketing scheme, noting in internal chats that one user "openly tells Americans on Twitter and his website to use a VPN [a Virtual Private Network] to sign up for BitMEX" providing his BitMEX affiliate link and VPN link at the same time, having "pulled in around -43 XBT from the [affiliate] program."  Hayes was in direct contact with this specific affiliate marketer, handling BitMEX's relationship with the user and communicating with him about his BitMEX affiliate pay-outs.

80.     The use by U.S. customers of VPN services, which create a private network from a public internet connection and mask the customer's internet protocol (IP) address so online actions are virtually untraceable, to access and trade on the BitMEX platform, is an open secret. For example, YouTube contains videos of U.S. customers trading on BitMEX, along with instructions on how to access BitMEX from the U.S.  Messaging applications Discord and Telegram have chat groups that instruct U.S. residents to use a VPN to access BitMEX if trading from the U.S.  Internal documents including BitMEX customer service representative emails and chats reflect regular awareness of the use by U.S. persons of VPN services to access and trade on the BitMEX platform.

81.     In addition to soliciting U.S. retail customers, BitMEX has also marketed directly to proprietary trading firms and other institutional customers based in the U.S., has held meetings

22

in the U.S., and has solicited firms to open accounts to trade on BitMEX through off-shore entities.  Internal BitMEX emails note the need to focus on "business development and marketing" to institutional customers, with a dedicated employee for "US and European markets."

82.     In 2014, BitMEX solicited a proprietary trading firm headquartered in Chicago, Illinois to be the first "lead market maker" on the BitMEX platform.  Hayes, Delo, and Reed were all directly involved in communications with the firm's executives in Chicago.

83.     BitMEX staff frequently has met with U.S. traders.  For example, BitMEX executives traveled to Chicago in July 2018 to meet with at least seven major Chicago-based trading firms.  In addition, BitMEX executives also met with prominent proprietary trading firms in New York.

84.     Throughout the Relevant Period, BitMEX's U.S. customers have been able to access the BitMEX platform from the U.S.—either via API or through the BitMEX website accessed on their own computers located in the U.S. via a VPN.

E.     **BitMEX Fails To Implement Anti-Money Laundering and Know-Your-Customer Procedures, or a Customer Information Program.**

85.     Throughout the Relevant Period, BitMEX has failed to implement any KYC procedures or a CIP that would enable it to identify U.S. persons–or the true identity of the vast majority of its customers, whether from the U.S. or elsewhere.

86.     BitMEX has not implemented any AML policies or procedures, which are required of financial institutions such as FCMs to prevent or detect, among other things, terrorist financing or other criminal activity.

87.     BitMEX has no CIP, which, like KYC procedures, is required of certain financial institutions including FCMs.

88.     BitMEX has also "deleted" records for numerous accounts, in certain cases explicitly because a user was found to be located in the U.S. or another "restricted jurisdiction." In a December 2018 chat involving BitMEX Customer Support personnel, a BitMEX supervisor describes the policy:  "At the moment we are deleting people's accounts once they have withdrawn if they are from a restricted jurisdiction."

89.     Throughout the Relevant Period, Hayes, Delo, and Reed have been fully aware that U.S. customers have used VPN to access the BitMEX platform.  For example, Delo and Reed regularly received email notification indicating new U.S. customers were opening accounts on BitMEX, and its self-identified "thought leader" and "visionary" Hayes has also advised U.S. customers on how to trade on BitMEX, stating, "If you have a non-US company that can open an account with us, Greg our head of business development can assist."  BitMEX even maintained an internal dashboard of open accounts from supposedly restricted jurisdictions.

90.     Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program.

91.     Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other account and transactional information for U.S. based traders.  For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform.

92.     As late as November 3, 2018, still BitMEX did not "have any rules in place" with regard to U.S. customers.  Even after BitMEX began imposing some restrictions on access to the platform by U.S. traders, Hayes, Delo, and Reed crafted exceptions for certain U.S. traders and were aware that other U.S. traders accessed the platform by using VPN.  Further, BitMEX's lack

of any KYC procedures or a CIP made BitMEX's superficial steps to block U.S. traders

ineffective.

      **F.**      **BitMEX Was Aware of U.S. Regulatory Requirements but Attempted to Evade Them**

    93.     Hayes, Delo, and Reed were aware of the regulatory regime applicable to U.S.

financial institutions such as FCMs, but made conscious decisions throughout the Relevant

Period to avoid and evade them.

    94.     For example, in a March 2015 investor presentation laying out BitMEX's

business plan, Hayes wrote that:

    a.   BitMEX chose to incorporate HDR in the Seychelles because "FX exchanges do not

        need to register for a financial services license if they conduct all of their business

        offshore,"

    b.   "Bitcoin derivatives are completely unregulated worldwide.  No government

        regulator has come out with any definitive guidance.  Regulators are still trying to

        tackle the exchanging of fiat and Bitcoin.  The fact that BitMEX is Bitcoin only and

        does not touch and [sic] domestic fiat currency also helps shield the exchange from

        regulations."

    c.   "The CFTC is expected to deliver guidance on Bitcoin derivatives sometime in 2H

        2015, BitMEX wants to be able to service the US market."  Attorneys for BitMEX

        "will be advising BitMEX on how to tackle any regulation that the CFTC plans to

        enact.  As it currently stands now the type of Bitcoin derivatives that BitMEX offers

        can be traded by US persons."

    d.   "BitMEX deals only in Bitcoin and does not transfer between two value stores.

        From a regulatory standpoint, this means that BitMEX is not required to conduct

KYC or AML on any accounts.  Users can sign up with just a verified email address."

e. "BitMEX recognizes that to attacht [sic] the deepest pools of liquidity obtaining a financial license in a well respected jurisdiction is a must.  AS trading volumes and revenues grow, BitMEX will be actively looking at favorable jurisdicts [sic] from which to become a regulated derivatives exchange.  New Zealand, Islae of Man, Jersey, and Gibraltar, are some of the jurisdicitons [sic] that BitMEX and its legal team are investigating."

95.     BitMEX's co-founders were aware of the need to know the identity of BitMEX customers throughout the Relevant Period.  Around the launch of the platform, Hayes, Delo, and Reed contacted a compliance consultant who told them in November of 2014 that:

> You need to know [who] you think you are dealing with is in fact who you are dealing with. Specifically, because of the nature of your business, you require this to be a global identity dataset. You need to ensure that you do not violate countless international statutory regulations which prohibit dealing with a variety of barred entities.

Nonetheless, Hayes, Delo, and Reed decided to ignore U.S. and other countries' regulations requiring BitMEX to verify the identity of its customers.

96.     In 2015, a potential business partner for BitMEX asked Hayes about BitMEX's "regulatory compliance landscape," asking "do you have any particular licenses or registrations in any jurisdictions to conduct your business?  Such as FinCEN, BitLicense or money transmitter licenses?  Do you do business in the US (ie do you accept customers resident in the US)?"  Hayes responded, "We do not have any licenses. We are incorporated in the Seychelles, and accept customers globally except for NY State."

97.     In a blog post in May of 2015, Hayes mocked the efforts of a competitor to comply with U.S. regulatory requirements.  Hayes wrote that this exchange "Kissed the Ring and can sort of offer their services throughout the US."  Hayes noted in the same blog post a different firm in the virtual currency industry on the "wrong side of the tracks," because it had "failed to adhere to the Bank Secrecy Act."

98.     In September of 2015, the CFTC charged and settled  two matters involving violations of the CEA by two firms involved in digital asset transactions, one of which was charged with illegally operating a facility for the trading or processing of bitcoin options and swaps without being registered with the CFTC as a DCM or SEF.  Hayes recognized that "this will have an impact on" BitMEX's business, and that one of BitMEX's goals is to "obtain legal clarity as to next steps as it regards to US Bitcoin regulations and the CFTC."

99.     Yet BitMEX's efforts to evade, rather than comply with, regulations in the U.S. continued well after 2015 and even to the present.  For example, throughout the Relevant Period BitMEX executives coached U.S.-based trading firms to incorporate off-shore entities in order to open trading accounts on BitMEX through those off-shore entities.  The notes of one BitMEX executive in 2018 reflect the rationale:  "We do not service US individuals or US entities given we do not have the required licenses that fall under CFTC regulations when offering derivative products.  As such, we cannot have clients based in the US with trading functions that could give a US regulator an argument to assert jurisdiction on."  Yet, the executives at the U.S. based firms courted and regularly communicated with regarding trading on the BitMEX platform were inevitably based in the U.S.

100.     In August of 2020, BitMEX finally announced plans to begin conducting KYC on customer accounts, supposedly to begin at some point in 2021.  But Hayes, Delo, and Reed made

deliberate decisions throughout the Relevant Period to refrain from implementing KYC and

AML procedures, despite knowing other business partners and competitors were implementing

such procedures.  For example, Hayes communicated with executives of other cryptocurrency

exchanges about KYC obligations.  In fact, Hayes regularly filled out KYC forms for himself

and BitMEX's various corporate entities at other exchanges and with BitMEX trading partners,

often noting BitMEX's own decision not to implement any KYC or AML procedures.  For

example on March 17, 2016, Hayes exchanged emails with a U.S.-based exchange in response to

questions about BitMEX's policies:

> Apart from blocking US residents from using our platform we do no other KYC
> as we are not required to under Seychelles law for the products that we offer. For
> non US persons we require only a verified email address.

101.    At the time Hayes wrote that BitMEX was "blocking" U.S.-based users,

thousands of U.S. persons were in fact trading on BitMEX's platform.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b) of
the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2019)**

**Execution of Futures Transactions on an Unregistered Board of Trade**

102.    The allegations set forth in paragraphs 1 through 101 are re-alleged and

incorporated herein by reference.

103.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR

Services, all acting as a common enterprise and doing business as BitMEX, and through their

officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(a) by:

  a.  offering to enter into retail commodity transactions, or contracts for the purchase or

      sale of bitcoin, litecoin and ether for future delivery;

b.  entering into retail commodity transactions, or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery;

c.  confirming the execution of retail commodity transactions, or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery; and

d.  conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, retail commodity transactions or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery;

without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

104.    BitMEX's retail commodity transactions are and were offered, entered into or executed on a leveraged or margined basis, or are and were financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

105.    BitMEX's retail commodity transactions are and were offered to, entered into or executed with persons who are not eligible contract participants or eligible commercial entities and who are not engaged in a line of business related to cryptocurrencies.

106.    In the alternative, during the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(b) and Commission Regulation 48.3, 17 C.F.R. § 48.3 (2019), by permitting direct access to its electronic trading and order matching system without obtaining an Order of Registration for a foreign board of trade from the Commission.

107.    Each offer to enter into, execution of, and/or confirmation of the execution of illegal off exchange futures transactions, including, without limitation, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or, alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3.

108.    During the Relevant Period, Hayes, Reed and Delo directly or indirectly controlled BitMEX, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Hayes, Reed and Delo are therefore liable for BitMEX's violations described in this Count to the same extent as BitMEX.

109.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX.

## COUNT II

### Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019)

### Illegal Off-Exchange Commodity Options

110.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

111.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated 7 U.S.C. § 6c(b) and Regulation 32.2 by offering to

enter into, entering into, confirming the execution of, maintaining positions in, and otherwise conducting activities relating to commodity option transactions in interstate commerce.

112.    The commodity options that BitMEX offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered board of trade, nor has BitMEX sought registration as an exempt foreign board of trade.

113.    Each act in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

114.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

115.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

**COUNT III**

**Violation of Section 4d of the Act, 7 U.S.C. § 6d (2018)**

**Failure to Register as a Futures Commission Merchant**

116.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

117.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, have operated as a Futures Commission Merchant, and are continuing to operate as a Futures Commission Merchant, by:

a.    engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

b.    engaging in soliciting or accepting orders for swaps;

c.    engaging in soliciting or accepting orders for agreements, contracts or transactions described in section 2(c)(2)(D)(i) of the Act (retail commodity transactions); and/or

d.    acting as a counterparty in agreements, contracts, or transactions described in section 2(C)(2)(D)(i);

and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the BitMEX platform.

118.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as a Futures Commission Merchant.

119.    Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

120.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6d.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6d.

121.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6d.

## COUNT IV

### Violations of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019)

### Failure to Register as a Designated Contract Market or Swap Execution Facility

122.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

123.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3(a)(1) by operating a facility for the trading of swaps on digital assets including bitcoin, ether, and litecoin without registering with the CFTC as a DCM or a SEF.

33

124.    BitMEX has operated and is continuing to operate a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform, including the trading or processing of swap on digital assets including bitcoin, ether, and litcoin, without being registered as a DCM or SEF.

125.    Certain products that have traded on BitMEX, including "perpetual swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47).

126.    Each act in violation of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

127.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

128.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

**COUNT V**

**Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2019)**

**Failure to Supervise**

129.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

130.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 166.3 by employing an inadequate supervisory system and failing to perform its supervisory duties diligently.  More specifically, BitMEX violated and is continuing to violate 17 C.F.R. § 166.3 by, among other things, failing to implement a Customer Information Program, failing to implement and conduct Know-Your-Customer procedures, failing to implement Anti-Money Laundering procedures, and by failing to ensure that its partners, officers, employees, and agents, lawfully and appropriately handled all commodity interest accounts at BitMEX.

131.    BitMEX is and has been acting as an FCM, and therefore 17 C.F.R. § 166.3 applies to BitMEX, as if it were a Commission registrant.

132.    Each act in violation of 17 C.F.R. § 166.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

133.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 17 C.F.R. § 166.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 166.3.

134.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or

agents acting for BitMEX described in this Complaint were done within the scope of their office,

employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other

officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R.

§ 166.3.

## COUNT VI

### Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2019)

### Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

135.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated

herein by reference.

136.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR

Services, all acting as a common enterprise and doing business as BitMEX, and through their

officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing

to implement a Customer Information Program, failing to implement Know-Your-Customer

policies and procedures, failing to implement an Anti-Money Laundering program, failing to

retain required customer information, and failing to implement procedures to determine whether

a customer appears on lists of known or suspected terrorists or terrorist organizations such as

those issued by OFAC.

137.    Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation.

138.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in

good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's

violations of 17 C.F.R. § 42.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo

are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 42.2.

139.     The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or

agents acting for BitMEX described in this Complaint were done within the scope of their office,

employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other

officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R.

§ 42.2.

## VII.     RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section

6c of the Act, 7 U.S.C. § 13a-l (2018), and pursuant to the Court's own equitable powers, enter:

A.     An order finding that Defendants 100x, HDR, ABS, Shine, and HDR Services,

collectively doing business as BitMEX, and through their officers, employees, and agents,

including without limitation Hayes, Delo, and Reed, violated Section 4(a) of the Act, 7 U.S.C.

§ 6(a) (2018) (or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3,

17 C.F.R. 48.3 (2019)); Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R.

§ 32.2 (2019); Section 4d of the Act, 7 U.S.C. § 6d (2018); Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1)

(2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019); Regulation 166.3, 17 C.F.R. § 166.3 (2019);

and Regulation 42.2, 17 C.F.R. § 42.2 (2019).

B.     An order of permanent injunction prohibiting Defendants and any other person or entity

associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6, 6c(b), 6d,

and 7b-3(1), and 17 C.F.R. §§ 32.2, 37.3(a)(1), 42.2, 48.3 and 166.3.

C.     An order of permanent injunction prohibiting Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

     (i)    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40) (2018));

     (ii)   entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

     (iii)  having any commodity interests traded on Defendants' behalf;

     (iv)  controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

     (v)   soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

     (vi)  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

     (vii)  acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.   An order directing Defendants and any third party transferee and/or successors

thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.    An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with , or amount Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F.    An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.    An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act, as described herein;

H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

I.   Such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated:  October 1 , 2020                Respectfully submitted,

Commodity Futures Trading Commission
By its attorneys:

*/s/ Carlin Metzger*

Carlin Metzger (*Pro Hac Vice Pending*)
Senior Trial Attorney
*cmetzger@cftc.gov*
312-596-0536

Brigitte Weyls (*Pro Hac Vice Pending*)
Senior Trial Attorney
*bweyls@cftc.gov*

Joseph Platt (*Pro Hac Vice Pending*)
Trial Attorney
*jplatt@cftc.gov*

Elizabeth N. Pendleton (*Pro Hac Vice Pending*)
Chief Trial Attorney
*ependleton@cftc.gov*

Scott R. Williamson (*Pro Hac Vice Pending*)
Deputy Regional Counsel
*swilliamson@cftc.gov*

Robert T. Howell
Deputy Director
*rhowell@cftc.gov*

Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0700
(312) 596-0714 (fax)
*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*

# EXHIBIT 3

# Project Syndicate

# The Great Crypto Heist

*Jul 16, 2019* | **NOURIEL ROUBINI**

NEW YORK – There is a good reason why every civilized country in the world tightly regulates its financial system. The 2008 global financial crisis, after all, was largely the result of rolling back financial regulation. Crooks, criminals, and grifters are a fact of life, and no financial system can serve its proper purpose unless investors are protected from them.
Hence, there are regulations requiring that securities be registered, that money-servicing activities be licensed, that capital controls include "anti-money-laundering" (AML) and "know your customer" (KYC) provisions (to prevent tax evasion and other illicit financial flows), and that money managers serve their clients' interests. Because these laws and regulations protect investors and society, the compliance costs associated with them are reasonable and appropriate.

But the current regulatory regime does not capture all financial activity. Cryptocurrencies are routinely launched and traded outside the domain of official financial oversight, where avoidance of compliance costs is advertised as a source of efficiency. The result is that crypto land has become an unregulated casino, where unchecked criminality runs riot.

This is not mere conjecture. Some of the biggest crypto players may be openly involved in systematic illegality. Consider BitMEX, an unregulated trillion-dollar exchange of crypto derivatives that is domiciled in the Seychelles but active globally. Its CEO, Arthur Hayes, boasted openly that the BitMEX business model involves peddling to "degenerate gamblers" (meaning clueless retail investors) crypto derivatives with 100-to-one leverage.

To be clear, with 100-to-one leverage, even a 1% change in the price of the underlying assets could trigger a margin call and wipe out all of one's investment. Worse, BitMEX applies high fees whenever one buys or sells its toxic instruments, and then it takes another bite of the apple by siphoning customers' savings into a "liquidation fund" that is likely to be many times larger than what is necessary to avoid counter-party risk. It is little wonder that, according to one independent researcher's estimates, liquidations at times account for up to half of BitMEX's revenue.

BitMEX insiders revealed to me that this exchange is also used daily for money laundering on a massive scale by terrorists and other criminals from Russia, Iran, and elsewhere; the exchange does nothing to stop this, as it profits from these transactions.

As if that were not enough, BitMEX also has an internal for-profit trading desk (supposedly for the purpose of market making) that has been accused of front running its own clients. Hayes has denied this, but because BitMEX is totally unregulated, there are no independent audits of its accounts, and thus no way of knowing what happens behind the scenes.

At any rate, we do know that BitMEX skirts AML/KYC regulations. Though it claims not to serve US and UK investors who are subject to such laws, its method of "verifying" their citizenship is to check their IP address, which can easily be masked with a standard VPN application. This lack of due diligence constitutes a brazen violation of securities laws and regulations. Hayes even openly challenged anyone to try to sue him in the unregulated Seychelles, knowing he operates in the shadow of laws and regulations.

Earlier this month, I debated Hayes in Taipei and called out his racket. But, unbeknownst to me, he had secured exclusive rights to the video of the event from the conference organizers, and refused for a week to release it in full. Instead, he published cherry-picked "highlights" to create the impression that he performed well. I suppose this is par for the course among crypto scammers, but it is ironic that someone who claims to represent the "resistance" against censorship has become the father of all censors now that his con has been exposed. Finally, shamed in public by his own supporters, he relented and released the video.

On the same day we debated, the United Kingdom's Financial Conduct Authority proposed an outright ban on retail high-risk crypto investments. Yet, barring a concerted response by policymakers, retail investors who are lured into the crypto domain will continue to be suckered. Price manipulation is rampant across all the crypto exchanges, owing to pump-and-dump schemes, wash trading, spoofing, front running, and other forms of manipulation. According to one study, up to 95% of all transactions in Bitcoin are fake, indicating that fraud is not the exception but the rule.

Of course, it is no surprise that an unregulated market would become the playground of con artists, criminals, and snake-oil salesmen. Crypto trading has created a multi-billion-dollar industry, comprising not just the exchanges, but also propagandists posing as journalists, opportunists talking up their own financial books to peddle "shitcoin," and lobbyists seeking regulatory exemptions. Behind it all is an emerging criminal racket that would put the *Cosa Nostra* to shame.

It is high time that US and other law-enforcement agencies stepped in. So far, regulators have been asleep at the wheel as the crypto cancer has metastasized. According to one study, 80% of "initial coin offerings" in 2017 were scams. At a minimum, Hayes and all the others overseeing similar rackets from offshore safe havens should be investigated, before millions more retail investors get scammed into financial ruin. Even US Secretary of the Treasury Steven Mnuchin – no fan of financial regulation – agrees that cryptocurrencies must not be allowed to "become the equivalent of secret numbered accounts," which have long been the preserve of terrorists, gangsters, and other criminals.

## NOURIEL ROUBINI

Nouriel Roubini, Professor of Economics at New York University's Stern School of Business and Chairman of Roubini Macro Associates, was Senior Economist for International Affairs in the White House's Council of Economic Advisers during the Clinton Administration. He has worked for the International Monetary Fund, the US Federal Reserve, and the World Bank. His website is NourielRoubini.com.

https://prosyn.org/YfJc9G7

© Project Syndicate - 2020

# EXHIBIT 4

1   J. Noah Hagey, Esq. (SBN: 262331)
      hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
      levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone:  (415) 599-0210
5   Facsimile:  (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
      curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Times Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone:  (646) 829-9403
9   Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

12

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco

10/23/2020
Clerk of the Court
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                     **COUNTY OF SAN FRANCISCO**

15

16  FRANK AMATO, RGB COIN LTD.,          Case No: CGC-19-581267
    and ELFIO GUIDO CAPONE on behalf
17  of the G AND M CAPONE TRUST,          **DECLARATION OF ELFIO GUIDO
                                          CAPONE IN SUPPORT OF
18          Plaintiffs,                   PLAINTIFFS' *EX PARTE*
                                          APPLICATION FOR A RIGHT TO
19          v.                            ATTACH ORDER, WRIT OF
                                          ATTACHMENT, AND TEMPORARY
20  HDR GLOBAL TRADING LIMITED, d/b/a     PROTECTIVE ORDER
    BITMEX; ARTHUR HAYES; ABS
21  GLOBAL TRADING LIMITED; and DOES      **Hearing**
    1-10,                                 **Date:**  Monday, October 26, 2020
22                                        **Time:** 9:15 a.m.
            Defendants.                   **Dept.:** 304
23                                        **Judge:** The Hon. Anne-Christine Massullo

24                                        **Complaint filed:**  Dec. 4, 2019
                                          **FAC filed:**  April 27, 2020
25                                        **SAC filed:**  August 18, 2020

26                                        **Trial Date:** None Set

27                                        **REDACTED**

28

I, Elfio Guido Capone, declare:

1.      I am a Plaintiff in the above-captioned matter.

2.      I make this declaration based on personal knowledge.  If called as a witness, I would and would testify competently to the facts stated herein.

3.      I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies.  As an "angel" investor, I have made capital contributions to several business start-ups over the years.  An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial moments when most other financial institutions and institutional investors are unwilling to back nascent and underfunded businesses.

**A.      My Investment in BitMEX**

4.      I became acquainted with Defendant Arthur Hayes ("Hayes") near the beginning of January 2015, when he connected with me on LinkedIn and arranged a Skype conversation.  In connection with this conversation, he sent me an investor presentation to solicit my investment in BitMEX.  The presentation stated that BitMEX was "seeking an equity funding round $1 million." Hayes himself also told me that BitMEX was finalizing a valuation in connection with its anticipated equity financing round "in the next couple of days."

5.      Between January and March 2015, I exchanged further communications with Hayes, requesting additional information regarding his estimated return on investment rates and his projected trading volumes for the BitMEX platform.  Hayes explained to me that he believed his trading volumes were conservative and with cryptocurrency investments becoming more and more mainstream, BitMEX trading volumes would "skyrocket."  Based on Hayes's representations, I decided to invest in BitMEX.  I inquired whether I was the first investor to commit to the fundraising round, and Hayes represented that he had commitments for another $150,000 to $200,000 from other investors and was engaging lawyers to draft the investment paperwork.

6.	In March 2015, Hayes reiterated that BitMEX was looking to sell equity shares with the same rights as the founders.  He also assured me that I would be purchasing preference shares that would convert 1:1 to common equity held by the founders.

7.	On March 25, 2015, Hayes wrote to me to summarize our understanding of the terms of my investment.  In particular, he explained that "[b]asically you own the same type and class of equity that [Hayes] and the other two founders have" and that if I agreed with the terms, "we will get the Share Purchase Agreement drawn up" pursuant to which I "will be buying 0.50% of the Seychelles entity [HDR] for $50,000."

8.	In April and May 2015, I waited for Hayes to provide me with an agreement pursuant to which I could purchase equity, but Hayes did not provide the "standard legal agreement drawn up by his lawyers" as he previously stated he would.

9.	On July 15, 2015, Hayes sent me a proposed Simple Agreement for Future Equity ("SAFE") instead of the Share Purchase Agreement we previously discussed.  He represented it as a "safer" option that, according to him, would allow me to get my money back if the business were to fail, while receiving "all the upside if the business goes well."  Hayes also represented again that BitMEX planned a financing round sometime in the second half of 2015, at which point my investment would convert to preferred shares.

10.	When Hayes sent me the SAFE, I explained that the agreement "was a bit legal" and requested a "common man's" explanation of the terms.  Hayes explained that "Basically you are getting a 20% discount to the next round's financing, subject to a cap on ownership" and that BitMEX was "targeting a $9mm pre money valuation by end of November" 2015.

11.	On July 16, 2015, I executed the SAFE on behalf of the G and M Capone Trust.  Shortly thereafter, I wired $25,000 to Hayes's personal bank account in Hong Kong.  Hayes agreed that I could list myself as a "seed investor" in BitMEX on my LinkedIn page.  My understanding today is that my investment and Frank Amato's investment were the first two outside investments that HDR received, and together we helped BitMEX pay its bills, purchase equipment, and pay for other costs that, at the time, were necessary to keep the company afloat.

12.     Attached hereto as **Exhibit 1** is a true and correct copy of the SAFE that I executed with Defendant HDR on July 16, 2015.

13.     As of today, Hayes and HDR have not issued a single share to me and, as I explain below, I have discovered in the course of this lawsuit that they have treated me and Frank Amato as if we had never invested anything.

**B.     Repeated Inquiries About My Equity Rights**

14.     Between July 2015 and July 2019, I repeatedly asked Hayes about my equity rights under my SAFE because as time passed I began to read about BitMEX's success in the news.  In particular, I eventually learned that HDR was a 2015 participant in the Chinaccelerator program, an accelerator program run by a venture capital investment company called SOSV.  It is well-known in the venture capital investing industry, and by angel investors like myself, that participants in accelerator programs like Chinaccelerator give equity to investors in exchange for capital investments.  I believed that as a participant in Chinaccelerator, BitMEX must have issued equity in return for capital from SOSV.  I began to ask Hayes about my equity rights and questions about the November / December 2015 equity financing Hayes had told me would occur and trigger my equity rights.

15.     On November 7, 2015, I inquired about BitMEX's valuation and Hayes explained to me that "SOSV who runs the accelerator program that [HDR was] in" helped arrive at a valuation." Hayes also told me that SOSV was "placing $500k into the round," but that Hayes felt that SOSV's valuation was conservative.  I believed based on this email exchange that my SAFE had already converted, because I understood Hayes to be telling me that BitMEX had raised capital from SOSV at a fixed valuation.

16.     Accordingly, in 2016, I began asking when BitMEX would issue dividends to its shareholders.  Hayes kept answering that BitMEX had no plans to yet, but he did not attempt to correct my understanding that I was a shareholder in the entity.

17.     In November 2018, I followed up with Hayes about my equity rights under my SAFE.  Hayes told me that I was not an equity holder as he previously represented, because I had not invested additional amounts in BitMEX as part of the November / December 2015 fundraising

1  round.  Hayes also told me that my SAFE would never trigger because BitMEX did not plan to
2  raise equity and that raising equity was "never discussed" because BitMEX did not need the
3  money.

4      18.     On November 11, 2018, Hayes sent me an email stating that BitMEX's "legal team
5  is investigating all of your claims."  On November 29, 2018, I wrote to Hayes to ask if he had
6  heard anything yet from his legal team.  Hayes scheduled a call with me for January 3, 2019.
7  During this call, he told me that he had received "an opinion back from legal" that my SAFE had
8  not converted because there was no "cash component" to SOSV's investment into BitMEX.  He
9  offered me "$125,000 to tear up the contract."  I refused.  I continued to ask Hayes about my equity
10  rights, but he ignored all my subsequent attempts to reach him by email or other messaging
11  channels.

12      19.     In 2019, unable to secure any information from Hayes regarding my equity rights, I
13  engaged a lawyer at my expense to send letters to both Hayes and Sean O'Sullivan, SOSV's
14  Managing General Partner.  Hayes did not reply and SOSV instructed me to sort it out with
15  BitMEX's legal department.  BitMEX's legal department never replied.

16      20.     On September 13, 2019, I wrote to Hayes and his two BitMEX co-founders, Sam
17  Reed and Ben Delo, to ask why SOSV's investment of $30,000 for 5% equity in BitMEX did not
18  constitute a triggering event under the terms of my SAFE.  In reply, Ben Delo sent the following



image of Hayes, essentially telling me that I had no recourse against BitMEX because it is incorporated in the Seychelles:

21.     I joined in this lawsuit as a plaintiff on April 27, 2020.

**C.     SOSV's Documents Show That My Equity Rights Triggered In 2015**

22.     I understand that before I joined this lawsuit, requests for documents were sent to SOSV and that SOSV was eventually ordered to produce its documents by a New Jersey court. I signed a certification pursuant to a protective order in this case that allowed me to review the documents that SOSV produced.

23.     In the course of my and Frank Amato's review, we █████████████████████

24.     The timing of the ████████ was also consistent with Hayes's representations to me in 2015 when he was soliciting my investment. Beginning in January 2015, he had repeatedly assured me that BitMEX would soon have an equity financing round. When he presented me with a draft of the SAFE that I ultimately executed, he again assured me that there was an upcoming financing round that would trigger my SAFE. ████████████████████, yet Hayes represented to me for years first that HDR had never had a financing round and then later that the SOSV investment was not a qualifying equity financing.

25.     Even more astonishing to me was our discovery of a ████████████████ In my experience as a private investor, SAFE

holders should be listed in capitalization tables, if only so that other shareholders and investors know that the company they invested in may owe outstanding shares to SAFE holders.

26. ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████
████████████████████

**D.     Hayes And HDR Will Try to Conceal Or Transfer Assets And**

27.     On October 1, 2020, Frank Amato shared with me a Twitter news post reporting that the Commodity Futures Trading Commission ("CFTC") was bringing a lawsuit against BitMEX.  I began investigating the news and discovered that Hayes and his BitMEX co-founders were also criminally indicted by the U.S. Department of Justice.  I learned through subsequent news reports that co-founder Sam Reed was arrested in the United States, but that Hayes and Ben Delo remain at large.  My understanding is that Hayes and Delo have not been apprehended.

28.     In the days that followed, various cryptocurrency-related news outlets that I follow reported on the impact of the CFTC lawsuit and the Department of Justice indictment.  One article at https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/ reported that that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX."

29.     Another at https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm reported that BitMEX's own funds, which I understand to consist mostly of bitcoin or similar cryptocurrencies, were "held in multsig wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal."  In layman's terms, this means that BitMEX's funds are stored in electronic devices—referred to as cryptocurrency "wallets"—that are

1  locked behind passwords in the possession of HDR's founders.  Two such passwords are required

2  to access the cryptocurrency stored in those wallets.  Coincidentally, two HDR founders holding

3  two such passwords remain at large.

4     30.    As a result, Frank Amato and I are now plaintiffs in a lawsuit against a

5  cryptocurrency derivatives trading platform whose trading volume has plummeted following a

6  CFTC lawsuit and a DOJ indictment of the platform's founders.  The loss in trading volume will

7  undoubtedly have a profound impact on HDR's revenue, if it has not already.  And of the three

8  individuals in the world who reportedly have access to BitMEX's cryptocurrency-based funds, two

9  are effectively fugitives of the U.S. government.

10    31.    I believe that in light of these recent developments and my own experience with

11  Defendants—who openly flout their disregard for the law and legal rights—Defendants will

12  transfer their assets outside of the United States and into what the CFTC described as their "maze

13  of corporate entities," making it impossible for Frank Amato and I to collect a judgment against

14  them.  I implore this court to grant the relief we request and secure our recovery.

15

16

17

18                    [Signature page to follow]

19

20

21

22

23

24

25

26

27

28

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 23, 2020

By: _____

Elfio Guido Capone

# EXHIBIT 5

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
        levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone:  (415) 599-0210
5   Facsimile:  (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
        curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Times Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone:  (646) 829-9403
9   Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

12

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
BY: YOLANDA TABO-RAMIREZ
Deputy Clerk

13          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                      **COUNTY OF SAN FRANCISCO**

15

16  FRANK AMATO, RGB COIN LTD.,          Case No: CGC-19-581267
    and ELFIO GUIDO CAPONE on behalf
17  of the G AND M CAPONE TRUST,         **DECLARATION OF FRANK AMATO IN**
                                          **SUPPORT OF PLAINTIFFS' *EX PARTE***
18          Plaintiffs,                   **APPLICATION FOR A RIGHT TO**
                                          **ATTACH ORDER, WRIT OF**
19              v.                        **ATTACHMENT, AND TEMPORARY**
                                          **PROTECTIVE ORDER**
20  HDR GLOBAL TRADING LIMITED, d/b/a
    BITMEX; ARTHUR HAYES; ABS            **Hearing**
21  GLOBAL TRADING LIMITED; and DOES     **Date:**  Monday, October 26, 2020
    1-10,                                **Time:** 9:15 a.m.
22                                        **Dept.:** 304
            Defendants.                   **Judge:** The Hon. Anne-Christine Massullo
23
                                          **Complaint filed:**  Dec. 4, 2019
24                                        **FAC filed:**  April 27, 2020
                                          **SAC filed:**  August 18, 2020
25
                                          **Trial Date:** None Set
26
                                          **REDACTED**
27

28
                                                        Case No. CGC-19-581267
_____
DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

I, Frank Amato, declare:

1. I am a Plaintiff in the above-captioned matter.

2. I make this declaration based on personal knowledge. If called as a witness, I would and would testify competently to the facts stated herein.

3. I am a private investor in the Financial Technologies sector, with a focus on bitcoin and other blockchain technologies. As an "angel" investor, I have made capital contributions to several business start-ups over the years. An angel investor is an individual who provides capital to these start-ups, usually in exchange for an ownership interest, at the initial stage when most other financial institutions and investors are not prepared to back these businesses.

4. I became acquainted with Defendant Arthur Hayes ("Hayes") on August 18, 2014 when he wrote to me via a LinkedIn message that he was seeking equity investors for BitMEX, a cryptocurrency derivatives trading platform.

5. Hayes and his co-founders Sam Reed and Ben Delo created and operate an online cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the largest trading platforms of its type in the world, with billions of dollars in trades taking place daily. BitMEX publicly posts its daily, monthly, and yearly trading volume on its website, found at www.bitmex.com.

6. Beginning on September 11, 2014 and through April 16, 2015, Hayes communicated with me repeatedly to solicit my investment in BitMEX. Having read later interviews with Hayes, including the interview available at https://www.cryptoglobe.com/latest/2018/09/800-billion-the-story-of-crypto-derivatives-exchange-bitmex-and-its-ceo-arthus-hayes/, I now know that BitMEX was struggling greatly at the time, with Hayes calling the Platform's trading volumes "pathetic."

7. During our initial communications, I was told that I would receive 0.50% of BitMEX for a $50,000 investment. For example, on March 20, 2015, Hayes wrote to me to "make sure we are on the same page," saying that he was "looking to sell common equity shares, so you will have same right as us [the founders]." After I requested that I lower my investment, I was told

1   that I would receive 0.50% of BitMEX for $30,000.  I was told that my investment would be made

2   pursuant to a Republic of Seychelles Share Purchase Agreement.

3         8.     In May 2015, Hayes told me that instead of a Share Purchase Agreement, he wanted

4   me to invest through a "convertible financing structure" in which my investment would "convert to

5   preferred shares at [BitMEX's] next round of financing."  Hayes sent me a Simple Agreement for

6   Future Equity ("SAFE") pursuant to which I would invest in BitMEX.  Given the change, I

7   requested time to review the agreement and confirmed with Hayes that I was investing in the initial

8   round, "pre-Series A" financing round.  Hayes assured me that my "shares will convert at the next

9   financing round, which will be our first financing round."

10         9.     In response to my inquiry concerning the terms of the investment, Hayes wrote back

11   to me that "the relevant terms" are that "investment will convert to preference shares at our next

12   equity financing round," that "shares will convert at a 20% discount to the per share price," and

13   that "after converting your ownership stake is capped at 0.50% based on a $30,000 USD

14   investment."

15        10.     The SAFE contained a provision under which HDR was required to automatically

16   issue shares to me upon an "Equity Financing" event.  When such an event occurred, the SAFE

17   contained a formula for determining the number of shares HDR would issue, with a cap for my

18   ownership interests at 0.50% of the entity.

19        11.     Based on my experience as an angel investor, it is not unusual for SAFEs to be

20   triggered extremely quickly.

21        12.     Relying on Hayes's representations that my investment would convert into equity at

22   the next financing round which HDR was going to raise, I executed the SAFE on June 15, 2015 and

23   wired Hayes $30,000 on June 26, 2015. Attached hereto as **Exhibit 1** is a true and correct copy of

24   the SAFE that I executed with Defendant HDR on June 15, 2015.

25        13.     I later discovered that HDR was a 2015 participant in the Chinaccelerator program,

26   an accelerator program run by a venture capital investor called SOSV.  Participants in accelerator

27   programs like Chinaccelerator give equity to investors in exchange for capital investments.  After

28   discovering that HDR had participated in Chinaccelerator, in November 2018 I emailed Hayes to

DECL. OF FRANK AMATO ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER
AND WRIT OF ATTACHMENT, OR, IN THE ALTERNATIVE, A TEMPORARY PROTECTIVE ORDER

inquire about my equity rights, as I believed that SOSV's investment into HDR should have triggered my SAFE. Hayes informed me that my SAFE had not converted into equity because "no equity financing has occurred."

14. Between November 2018 and February 2019, I repeatedly inquired about my equity rights, but Hayes continued to invent new reasons why my equity rights had not triggered. For example, on January 2, 2019, Hayes told me that the reason why SOSV's investment into HDR had not triggered was because SOSV did not give any money to HDR in exchange for HDR's equity. I only have very recently have discovered, though discovery from SOSV, that this representation was false.

15. I initiated this lawsuit on December 4, 2019 to hold Defendants to account for their wrongful conduct.

16. I understand that in the course of this lawsuit, SOSV was ordered by a New Jersey Court to produce documents. Under the Protective Order that I has been entered between the parties in this case, I understand SOSV agreed to allow me and co-Plaintiff Mr. Capone to review the documents that they produced.

17. During my review of SOSV's production, I saw ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████

18. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████

19. ████████████████████████████████████████████████
████████████████████████████████████████



1    20.

6    21.

8    In other words, it appeared as if Mr. Capone and I had never made any investment in HDR.

10    22.

14    23.    My equity rights in HDR have never been acknowledged, nor have I ever received a dividend payment.

24.    I now know that ever since I invested in June of 2015, Hayes and BitMEX embarked on a campaign to cheat me out of my ownership rights, including millions of dollars of dividends that BitMEX has issued to its shareholders.

25.    Further, recent events concerning HDR and its founder Hayes have caused me concern regarding my ability to collect the funds that HDR owes to me.

26.    I saw on twitter and online news sources on October 1, 2020 that Hayes and his co-founders in BitMEX, Sam Reed and Ben Delo, and another BitMEX employee, Greg Dwyer, were criminally indicted by the U.S. Department of Justice. I understand that although Sam Reed was arrested in the United States and then posted bail, the other two founders of BitMEX, Hayes and Ben Delo, remain at large.

27.    I also saw that on the same day, the Commodity Futures Trading Commission had launched a complaint against Defendants HDR, Hayes, and ABS, as well as other BitMEX-

affiliates and its founders, for a wide variety of regulatory violations.  I have reviewed the DOJ indictment and the CFTC complaint.

28.     Since I stay current on cryptocurrency- and BitMEX-related news sources and articles, I read various news reports, including the article accessible at https://coingeek.com/bitmex-ceo-arthur-hayes-resigns/, which states that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX."

29.     Moreover, I also saw other news stories, including the article available at https://cryptonews.com/news/breaking-arthur-hayes-steps-down-as-ceo-of-bitmex-7931.htm, that disclosed that BitMEX's own funds, which I understand to consist mostly of bitcoin, were "held in multi[-signature] wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal.  In short, BitMEX's substantial cryptocurrency-based assets are accessible only by its founders who are facing criminal charges, two of whom remain at large.

30.     Such conduct is disturbing, especially in connection with Hayes's and HDR's apparent willingness to regularly disregard the law.  I saw a video showing a debate between Hayes and another guest concerning BitMEX's practices, dated July 15, 2019, titled "The Tangle in Taipei with Arthur Hayes and Nouriel Roubini," which is available at https://www.youtube.com/watch?v=qlZukhN_C6c&t=9m52s, in which Hayes was asked by a debate moderator how the Seychellois authorities compare to other global regulators. Hayes stated "it just costs more to bribe them," and, when pressed by the moderator about "that not being an answer," Hayes responded that "it is an answer" and that he pays "a coconut" to bribe the Seychellois authorities.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  October 23, 2020

By: _____
Frank Amato

# EXHIBIT 6

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
        levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone:  (415) 599-0210
5   Facsimile:  (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
        curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Times Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone:  (646) 829-9403
9   Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

12

13

14                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                      **COUNTY OF SAN FRANCISCO**

16

17

18  FRANK AMATO, RGB COIN LTD.,          Case No: CGC-19-581267
    and ELFIO GUIDO CAPONE on behalf
19  of the G AND M CAPONE TRUST,         **DECLARATION OF J. NOAH HAGEY**

20        Plaintiffs,                    **Hearing**
                                         **Date:**  Monday, October 26, 2020
21            v.                         **Time:** 9:15 a.m.
                                         **Dept.:** 304
22  HDR GLOBAL TRADING LIMITED, d/b/a    **Judge:**  The Hon. Anne-Christine Massullo
    BITMEX; ARTHUR HAYES; ABS
23  GLOBAL TRADING LIMITED; and DOES     **Complaint filed:**  Dec. 4, 2019
    1-10,                                **SAC filed:**  August 18, 2020
24        Defendants.
                                         **Trial Date:** None Set
25
                                         **REDACTED**
26

27

28

I, J. Noah Hagey, Esq., declare:

1. I am an attorney duly admitted to practice in the State of California. I am a named partner at the law firm BraunHagey & Borden LLP, counsel of record for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust in the above-captioned action (together, "Plaintiffs"), and I provide this declaration in accordance with California Rule of Court 3.1202. I base this declaration on facts within my personal knowledge and from my discussions with other attorneys at BraunHagey & Borden LLP who have worked on this case, and if called upon to testify, I could and would testify competently thereto.

2. On October 22, 2020, at 3:04 p.m. PT, via email, I informed Jones Day, counsel of record for Defendants HDR Global Trading Limited ("HDR") and ABS Global Trading Limited ("ABS"), and Akin Gump Strauss Hauer & Feld LLP, counsel of record for Defendant Arthur Hayes ("Hayes"), that Plaintiffs would be moving for *ex parte* relief at 9:15 a.m. on October 26, 2020, in Dept. 304 of the Superior Court of California, County of San Francisco, in connection with the above-captioned action. I further informed Defendants that Plaintiffs' *ex parte* application sought a temporary protective order in aid of attachment and related relief, and inquired whether Defendants would oppose such application. Defendants stated that they would.

3. I and Douglas Curran, another partner at BraunHagey & Borden LLP working on this case, have repeatedly asked Defendants' counsel for information regarding their clients' expatriation and dissipation of assets. Defendants' counsel has so far refused to provide any substantive information at all.

4. Attached hereto as **Exhibit 1** is a true and correct copy of the Department of Justice's indictment against Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, captioned *United States v. Hayes, et al.*, 20-cr-500 (S.D.N.Y.), released on October 1, 2020.

5. Attached hereto as **Exhibit 2** is a true and correct copy of the Commodity Futures Trading Commission's complaint against HDR, ABS, Hayes, 100x Holdings Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited, Ben Peter Delo, and Samuel Reed, filed on October 1, 2020, styled *CFTC v. HDR Global Trading Ltd., et al.* 20-cv-8132 (S.D.N.Y.), filed on October 1, 2020.

DECLARATION OF J. NOAH HAGEY

6.      On October 15, 2020, following (i) SOSV's production of documents showing a clear and plain right to Plaintiffs' recovery, and (ii) the filing of the CFTC and DOJ actions, Mr. Curran emailed a series of questions to Defendants' counsel in an effort to determine whether Defendants were, in fact, expatriating assets.  Attached hereto as **Exhibit 3** is a true and correct copy of Mr. Curran's October 15 email to Defendants.

7.      Defendants' counsel refused to provide those answers promptly, and instead suggested the parties meet and confer about those matters on October 19, 2020.

8.      During the October 19 meet and confer, Defendants' counsel simply stated they were "not prepared" to discuss the issues, and claimed they needed additional time to confer with their clients.

9.      The parties then conferred again on October 21; this time, Defense counsel declared that the questions posed in Plaintiffs' October 15 email were "intrusive" and again refused to provide any substantive information.  Defense counsel stated, however, that they would continue to confer with their clients and would consider providing some undefined information on October 23.

10.      Plaintiffs then followed up on October 21 with an email that boils down to a single, basic request: "[P]lease provide a simple schedule or summary of all distributions of any sort – whether dividends or otherwise – that HDR made to its shareholders from June 2015 to the present, including the dates and amounts of those distributions."  Attached hereto as **Exhibit 4** is a true and correct copy of an email chain between counsel for Plaintiffs and Defendants dated October 21, 2020.

11.      Defendants did not respond.

12.      Plaintiffs thereafter informed Defendants that their inability to provide even the most basic information about the improper movement of assets only added to Plaintiffs' well-founded concerns, and left them no choice but to seek this relief.

13.      In response to Plaintiffs' subpoena, third-party SOSV has produced several unitized PDF files bearing bates stamps between SOSV - 1 through SOSV – 6895.  Following Plaintiffs' second motion to enforce litigants' rights, which was granted by Judge Anklowitz sitting in New Jersey on October 16, 2020, SOSV has produced 6,109 native documents without bates stamps.

DECLARATION OF J. NOAH HAGEY

1  Plaintiffs are still reviewing those native documents, but a preliminary review has already shed a

2  significant amount of light on the communications between SOSV and HDR since 2015.  In my

3  review of the documents, ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████

5  ████████████████

6      14.    Attached hereto as **Exhibit 5** is a true and correct copy of an email that appears to

7  have been sent by ████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████

12 ████████████████████████████████████  This email thread was produced by

13 SOSV and is bates stamped SOSV - 2671–72.

14     15.    Attached hereto as **Exhibit 6** is a true and correct copy of a document titled ████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████  and is bates stamped SOSV - 134–39

17 ████████████████████.

18     16.    Attached hereto as **Exhibit 7** is a true and correct copy of an email that appears to

19 have been sent by ████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████████████

21 This email thread was produced by SOSV and is bates stamped SOSV - 1506–10.

22     17.    Attached hereto as **Exhibit 8** is a true and correct copy of an email that appears to

23 have been sent by ████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████████

28

█████████████████ This email thread was produced by SOSV and is bates stamped SOSV - 2136–37.

18. Attached hereto as **Exhibit 9** is a true and correct copy of an email within an email chain that appears to have been sent by ████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████ This email thread was produced by SOSV and is bates stamped SOSV - 2138–39.

19. I have also reviewed text messages and whatsapp messages between ███████ ██████████████████████████████████████ ████████████████████████ These messages were produced as screenshots from the mobile device of █████████████ and were not produced with bates numbers.

20. Attached hereto as **Exhibit 10** is a true and correct copy of a text message chain between ██████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████ █████████████████████████████████ ██████████████████████████████████████

21. Attached hereto as **Exhibit 11** is a true and correct copy of a text message chain between █████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████

DECLARATION OF J. NOAH HAGEY

1  ██████████████████████████████████████████████████

2  ███████████

3      22.     Attached hereto as **Exhibit 12** is a true and correct copy of the CFTC's press release

4  on October 1, 2020 regarding its complaint against BitMEX and its founders, available at

5  https://www.cftc.gov/PressRoom/PressReleases/8270-20.

6      23.     Attached hereto as **Exhibit 13** is a true and correct copy of an email that appears to

7  have been sent from ██████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ████  This email thread was produced by SOSV and is bates stamped SOSV - 2641.

10     24.     Attached hereto as **Exhibit 14** is a true and correct copy of an email that appears to

11 have been sent from ██████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ██████████████████████████████  This email thread was produced by SOSV and

14 is bates stamped SOSV - 2670.

15

16

17     I swear under penalty of perjury under the laws of the United States that the foregoing is

18 true and correct.

19 Dated:  October 23, 2020                    By: _____

20                                                  J. Noah Hagey, Esq.

21

22

23

24

25

26

27

28

DECLARATION OF J. NOAH HAGEY

# EXHIBIT 7

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
        levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone: (415) 599-0210
5   Facsimile: (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
        curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Time Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone: (646) 829-9403
9   Facsimile: (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/23/2020**
**Clerk of the Court**
**BY: YOLANDA TABO-RAMIREZ**
**Deputy Clerk**

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13

14                        **COUNTY OF SAN FRANCISCO**

15

16                                          Case No: CGC-19-581267
    FRANK AMATO, RGB COIN LTD.,
17  and ELFIO GUIDO CAPONE on behalf        **DECLARATION OF PLAINTIFFS'**
    of the G AND M CAPONE TRUST,            **INDUSTRY EXPERT TODD ANTONELLI**
18                                          **IN SUPPORT OF PLAINTIFFS'** *EX*
        Plaintiffs,                         ***PARTE* APPLICATION FOR A RIGHT TO**
19                                          **ATTACH ORDER, WRIT OF**
            v.                              **ATTACHMENT, AND TEMPORARY**
20                                          **PROTECTIVE ORDER**
    HDR GLOBAL TRADING LIMITED, d/b/a
21  BITMEX; ARTHUR HAYES; ABS              **Hearing**
    GLOBAL TRADING LIMITED; and DOES       **Date:** Monday, October 26, 2020
22  1-10,                                   **Time:** 9:15am
                                            **Dept.:** 304
23      Defendants.                         **Judge:** The Hon. Anne-Christine Massullo

24                                          **Complaint filed:** Dec. 4, 2019
                                            **FAC filed:** April 27, 2020
25                                          **SAC filed:** August 18, 2020

26                                          **Trial Date:** None Set

27                                          **REDACTED**

28

                                            Case No. CGC-19-581267
    DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
            ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

I, Todd Antonelli, declare:

1.      I make this declaration based on personal knowledge.  If called as a witness, I could and would testify competently to the facts stated in this Declaration.

2.      I am a Managing Director at Berkeley Research Group in Chicago and serve as a leading financial and strategic advisor to companies in all stages of growth, from venture startups to Global 100 publicly traded companies, including well-known businesses such as Intel, HP, Goldman Sachs, ArcelorMittal, Caterpillar, Stanley Black & Decker, Blackstone, Agilent, Allstate, State Farm, and Starbucks.  A substantial part of my work involves analyzing and advising such clients on all stages of financings, acquisitions and investment, including venture and seed investment and the use of Simple Agreements for Future Equity ("SAFE"), such as those at issue in this case.  I hold an M.B.A. in Finance from New York University and routinely advise clients regarding venture investing, startups, mergers and acquisition, divestitures, IPOs, spin-outs, going private for acquisitive companies, and everything in between.  My curriculum vitae is attached as **Exhibit 1.**

A.      **Summary of Opinions**

3.      I have been asked by Plaintiffs Frank Amato and RGB Coin Ltd. (together, "Amato"), and Elfio Guido Capone on behalf of the G and M Capone Trust ("Capone") (collectively, "Plaintiffs") to provide opinions on (1) whether Amato's and Capone's SAFEs in HDR Global Trading Limited ("HDR") were triggered by HDR's fundraising activities in 2015; and (2) if so, the total amount of dividends that Amato and Capone should have received through their equity rights.

4.      As detailed below, the SAFEs entered by Amato and Capone were triggered upon HDR's ██████████████████████████████████ with venture capital investor, SOSV. ████████████████████████████████████████████ ███████████████████████████[1] Amato should have received ██ shares (representing **0.50% of HDR**) and Capone should have received ██ shares (representing **0.41%**

---

[1]  On the same date, ████████████████████████████████████

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**of HDR**).  Thereafter, Amato and Capone were entitled to participate in dividends distributed to shareholders of the company.

5.  ████████████████████  ████████████  ███████  Of that amount, Amato should have received ██████ and Capone should have received ██████.  The table below summarizes the key inputs and results of my analysis; for clarity, I present only the shareholders required to conduct my analysis.

| Shareholder | Ownership Percentage | Shares | Dividends |
|---|---|---|---|
| HDR Founders | ███ | ███ | ████████ |
| SOSV | ███ | ███ | ████████ |
| Amato | 0.50% | ███ | ████████ |
| Capone | 0.41% | ███ | ████████ |

6.  I understand that Plaintiffs requested from Defendants a schedule or summary of all distributions, dividends or otherwise, that HDR has made to its shareholders from June 2015 to the present.  I further understand that Defendants have not provided this information to Plaintiffs.  Accordingly, my opinions and analysis are based solely on the evidence produced thus far in the case, which likely understates the amount of money owed to Plaintiffs.

7.  I accordingly reserve the right to supplement and/or amend my opinions and analysis in the event that Defendants produce additional relevant documents or information.

**B.    Material Reviewed**

8.  I have been provided with the evidence identified in **Appendix 1** relating to Plaintiffs' SAFE investments, including without limitation:  (a) each SAFE instrument; (b) investment transactions entered by SOSV; (c) business records of SOSV reflecting the accounting and receipt of dividends from HDR; (d) correspondence regarding SOSV's investments and dividends; and (e) the pleadings in this matter.  These materials are the same type of business records I routinely obtain, review, and rely upon in my professional work as a strategic advisor to business and investors.

C.    **Analysis**

9.    The Amato and Capone SAFEs are among the more straightforward SAFEs that I have reviewed and advised on.  Below I describe the features of each SAFE, then discuss the SOSV triggering event, and finally provide the mathematical computation showing the amount of dividends Plaintiffs are owed.

1.    **Plaintiffs' SAFEs**

10.    The Amato SAFE contains, in relevant part, a provision requiring HDR to automatically issue shares to Amato upon an "Equity Financing" event.  Upon that trigger, the SAFE uses a formula for calculating the number of shares to be issued, with a cap of "0.50% of [HDR's] issued and outstanding share capital on a fully-diluted and as converted basis":

---

**1. *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.50% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

---

(**Amato Exhibit 1** § 1(a).)

11.    The Capone SAFE is nearly identical and contains a similar provision, but with the number of shares issued capped at "0.41% of [HDR's] issued and outstanding share capital on a fully-diluted and as converted basis."

---

**1. *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Shares equal to the Purchase Amount divided by the Discount Price. In any event, the member of shares of Safe Preferred Shares issued to the Investor shall not exceed 0.41% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis.

---

(**Capone Exhibit 1** § 1(a).)

12.    Both SAFEs define an "Equity Financing" as follows:

3

> "**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation.

(**Amato Exhibit 1** at 3; **Capone Exhibit 1** at 3.)

13. The SAFEs do not define the term "Preferred Shares." (*See generally*, **Amato Exhibit 1; Capone Exhibit 1**.)

14. Based on my experience, the correct interpretation of these provisions is that Plaintiffs' equity rights would trigger once three conditions were satisfied: (1) there is a "bona fide transaction or series of transactions with the principal purpose of raising capital"; (2) the transaction or series of transactions are transactions "pursuant to which [HDR] issues and sells Preferred Shares"; and (3) HDR sells the shares "at a fixed pre-money valuation."

**2. SOSV's ▮▮▮▮▮▮▮▮▮ Triggered the SAFEs**

15. On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On its face, the ▮▮▮▮▮▮▮ is a bona fide transaction with the principal purpose of raising capital. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SOSV's Chinaccelerator Program.[2] (*See* **Exhibit 2** at SOSV - 293.) Accelerator programs, such as SOSV's Chinaccelerator Program, enable startup companies to compete with one another for funding from venture capital investors such as SOSV, *i.e.*, they are competitions through which startup companies raise capital.[3] Thus, the ▮▮▮▮▮, under which HDR (as a participant in Chinaccelerator) ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, is a bona fide transaction with the principal purpose of raising capital. (*See id*. § 1(a).)

16. **The** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] In fact, Chinaccelerator touts its investment in HDR and BitMEX to attract investors for its funds. For instance, it states that it "invested in BitMEX through Batch 8 which later became a Fintech unicorn." (*See* https://chinaccelerator.com/10th-anniversary/.)

[3] For instance, Chinaccelerator markets itself to startups by advertising that it offers a "$150,000 Investment" of which "US$55,000 is cash investment." (*See* https://chinaccelera1tor.com/offerings/.)

4

Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER



17. *First*, ███████████████████████████████████
█████████████████████████████████████████████████████
████████████████ (*See id*. § 2.) In my experience, ████████████
████████████████████

18. *Second*, █████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██ (*See id*. § 6.) In my experience, ██████████████████████
████

19. *Third*, ████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████ (*See id*. § 8.) By
its own terms, ████████████████████████████████████████
███████████████████████ (*Id*.)

20. In my experience, ██████████████████████████████
█████████████████████████████████████████████████████
████████████████████ In my opinion, ███████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
under a reasonable and commercially standard interpretation of that term as used in SAFEs.

21. ███████████████████████████████████████ Pursuant to the ███
█████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████ (**Exhibit 2** § 1(a).) This represents a

5

Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1 ██████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████████

3      22.     Therefore, ████████████████████████████████████████

4 ████ an "Equity Financing" event under Plaintiffs' SAFEs, which triggered their equity rights.

**3.     Computation of Plaintiffs' Triggered Shares**

     23.     Amato and Capone invested amounts into HDR ($30,000 and $25,000, respectively) ████████████████████████████████████████████ (*Compare* **Amato Exhibit 1** at 1 *and* **Capone Exhibit 1** at 1 *with* **Exhibit 2** § 1(a).) The Amato SAFE, however, limited the number of shares HDR would issue to Amato to "0.50% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis." (**Amato Exhibit 1** § 1(a).) The Capone SAFE, likewise limited the number of shares HDR would issue to Capone to "0.41% of the Company's issued and outstanding share capital on a fully-diluted and as converted basis." (**Capone Exhibit 1** § 1(a).)

     24.     The ██████████████████████████████, when Amato and Capone invested in HDR, ██████████████████████████████████████████ (**Exhibit 3** at 1.) Therefore, the number of shares HDR should have issued to Amato and Capone is a straightforward calculation based on the caps in their respective SAFEs. Amato's right to 0.50% of HDR's issued and outstanding share capital on a fully diluted and as converted basis equates to ████ shares. Capone's right to 0.41% of HDR's issued and outstanding share capital on a fully diluted and as converted basis equates to ████ shares.

     25.     In my opinion, it is unusual and contrary to industry practice for HDR to treat Amato's and Capone's SAFEs as if they simply did not exist. Amato's and Capone's equity rights do not appear to have been included ██████████████████████, which is contrary to industry practice, *even if the SAFEs had not been triggered.* (**Exhibit 3** at 22; **Exhibit 4** at SOSV - 135.) In my long experience working with company capital tables, including with Y Combinator companies and advising on acquisitions involving outstanding SAFEs, I have never seen a company wholesale disregard and ignore its SAFE holders in this manner. Such conduct not only

acts to deprive Plaintiffs of their investment status, but conceals their existence from other investors and is a strong indication that HDR and Hayes intended to deprive Plaintiffs of their equity, no matter what transpired.

26. █████████████████████████████████████████████████████████ ████████████████████████████████████████ **(Exhibit 5** ████████████████████████████████████████████████████ ███████████████████ **Exhibit 6** ████████████████████████████ ████████████████████████

### 4. Computation of Plaintiffs' Outstanding Dividends

27. The computation of Plaintiffs' outstanding dividends is easily performed by using the methodology applied to ████████████████

28. ████████████████████████████████████████████ ████████ **(Exhibit 4** at SOSV - 135.) ███████████████████████ ██████████████████████████████████████████████████ ████████ (*Id.* at SOSV - 137; **Exhibit 7** ██████████████████ ██████ █████████████████████████████████████████

29. Accordingly, by operation of simple math, Amato would have received █████████ ██████████, and Capone would have received █████████████████████.

30. ███████████████████████████████████████. Thus, ██████ ████████████████████████████████████████████████████████ ████████████████ **(Exhibit 3** at 22.) Arthur Hayes and Samuel Reed, who I understand ██████ ██████████████████████████████████████████████████████████ █████████████████████████████████ (*Id.* at 1, 22.) Ben Delo ████████████████████████████████████████ (*Id.* at 22.) Together the HDR founders ██████████████████████████████ ████████████████



Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH
ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**D.      Conclusion**

31.      I have worked with companies and investors for almost my entire career and cannot ever recall a case such as this: where seed investors were deprived of their investment notwithstanding such an obvious triggering event and such obvious success from the use of their capital. Amato and Capone should receive their past-due dividends, along with all other incidents of share ownership.

32.      I reserve the right to supplement and amend my opinions, particularly as HDR reveals additional payments and distributions to which Plaintiffs are entitled a share.

Case No. CGC-19-581267

DECL. OF TODD ANTONELLI ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing matters are true and correct.

3

4    Dated:  October 23, 2020          By: _____

5                                              Todd Antonelli

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 8

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Andrew Levine, Esq. (SBN: 278426)
        levine@braunhagey.com
3   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
4   San Francisco, CA 94104
    Telephone:  (415) 599-0210
5   Facsimile:  (415) 599-0210

6   Douglas Curran, Esq. (*pro hac vice*)
        curran@braunhagey.com
7   BRAUNHAGEY & BORDEN LLP
    7 Time Square, Twenty-Seventh Floor
8   New York, NY 10036
    Telephone:  (646) 829-9403
9   Facsimile:  (646) 829-9403

10  ATTORNEYS FOR PLAINTIFFS
    FRANK AMATO, RGB COIN LTD.,
11  and ELFIO GUIDO CAPONE on behalf
    of the G AND M CAPONE TRUST

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**10/23/2020**
**Clerk of the Court**
**BY: YOLANDA TABO-RAMIREZ**
**Deputy Clerk**

12
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13

14                          **COUNTY OF SAN FRANCISCO**

15

16                                          Case No: CGC-19-581267
    FRANK AMATO, RGB COIN LTD.,
17  and ELFIO GUIDO CAPONE on behalf        **MEMORANDUM OF POINTS AND**
    of the G AND M CAPONE TRUST,            **AUTHORITIES IN SUPPORT OF**
18                                          **PLAINTIFFS' *EX PARTE* APPLICATION**
        Plaintiffs,                         **FOR A RIGHT TO ATTACH ORDER,**
19                                          **WRIT OF ATTACHMENT, AND**
            v.                              **TEMPORARY PROTECTIVE ORDER**
20
    HDR GLOBAL TRADING LIMITED, d/b/a       **Hearing**
21  BITMEX; ARTHUR HAYES; ABS
    GLOBAL TRADING LIMITED; and DOES        **Date:**     Monday, October 26, 2020
22  1-10,                                   **Time:**     9:15 a.m.
                                            **Dept.:**    304
23      Defendants.                         **Judge:**    Hon. Anne-Christine Massullo

24                                          **Complaint filed:**  Dec. 4, 2019
                                            **FAC filed:**        April 27, 2020
25                                          **SAC filed:**        August 18, 2020
                                            **Trial Date:**       None Set
26
                                            **REDACTED**
27

28

                                                      Case No. CGC-19-581267

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 2

    A.    Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights ................. 2

    B.    ████████████████████████████████████████████████████

    C.    Simple Computation of Plaintiffs' Implied Dividends .......................................... 4

    D.    Plaintiffs' Attempts to Gather Information and Avoid Motion Practice ............... 5

ARGUMENT ........................................................................................................... 6

I.    *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE
NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY .......................... 7

II.    PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY
THE CCP'S GROUNDS FOR ATTACHMENT ............................................. 10

    A.    Plaintiffs Have Established the Probable Validity of Their Claims .................... 11

    B.    Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery ........... 14

    C.    Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted .................. 14

    D.    The Amount to Be Secured By the Attachment Is Greater than Zero ................. 15

III.    PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED
DISCOVERY .......................................................................................... 15

CONCLUSION ....................................................................................................... 15

i                 Case No. CGC-19-581267

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

# TABLE OF AUTHORITIES

## CASES

*Bank of Am. v. Salinas Nissan, Inc.*,
  207 Cal. App. 3d 260 (1989) ........................................................................................... 7

*CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*,
  115 Cal. App. 4th 537 (2004) ........................................................................................ 11

*Goldstein v. Barak Constr.*,
  164 Cal. App. 4th 845 (2008) ........................................................................................ 11

*Halstead v. Halstead*,
  72 Cal. App. 2d 832 (1946) ............................................................................................ 14

*Loeb & Loeb v. Beverly Glen Music, Inc.*,
  166 Cal. App. 3d 1110 (1985) ........................................................................................ 14

*Richman v. Hartley*,
  224 Cal. App. 4th 1182 (2014) ........................................................................... 12, 13, 14

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

## **PRELIMINARY STATEMENT**

Plaintiffs respectfully submit this memorandum in support of their request for an emergency temporary protective order ("TPO") and an order of attachment to ensure the availability of assets within the jurisdiction to secure a final judgment. Discovery very recently produced in this matter by one of Defendants' investors, SOSV, proves that Plaintiffs' Simple Agreements for Future Equity ("SAFEs") were triggered, that Plaintiffs' equity interests have vested, and that Plaintiffs are owed an easily calculable share of the more than ██████████████████████ ██████████

Plaintiffs seek relief on an expedited basis to prevent irreparable harm and preserve the status quo. Defendants' principals were indicted by the U.S. DOJ just weeks ago on money-laundering charges. Defendant Hayes himself is now an international fugitive from the U.S. government, along with two his co-defendants. Defendants have substantial offshore resources, accounts, property and other means by which to hide, transfer, other insulate assets. Despite repeated requests, Defendants have refused to provide concrete information or binding assurances regarding the status of California-based assets. Instead, Defendants have withheld evidence of their personal dividend payments and other transfers, the existence of which was only revealed in the last few weeks when SOSV was compelled to produce those documents after multiple court orders from a court in New Jersey.[1] Defendants' ████████████████████████ were made despite the pendency of CFTC and DOJ investigations of which Defendants appear to have been keenly aware.

While attachment is an extraordinary remedy, Plaintiffs readily satisfy the CCP requirements for interim relief of a TPO and an *ex parte* attachment of assets in the amount of $4,006,806.19, representing the amount of dividends Plaintiffs should have been paid during the

---

[1] Defendants themselves have failed to produce any documents at all with information regarding dividend distributions, despite the fact that they go to the heart of the parties' dispute and Plaintiffs have repeatedly requested them. ███████████████████████████████████████████████████████████ ███████████████████████████████████ (*E.g.*, Declaration of J. Noah Hagey ("Hagey Decl.") Ex. 10, April 28, 2020 text from ████████████████████████ ██████████████████████████████████████ (emphasis added))).

period.  Plaintiffs also have identified numerous assets and bank accounts in California for which attachment can easily be made, and there is virtually no risk of prejudice to Defendants, whose business recently had hundreds of millions of dollars in cash on hand.

## BACKGROUND[2]

This case involves a fraudulent worldwide shell game that HDR Global Trading ("HDR"), ABS Global Trading Ltd. ("ABS"), and Hayes (collectively, "BitMEX") have been orchestrating at Plaintiffs' expense for more than five years.  Defendants created and operate an online cryptocurrency-derivatives trading platform called "BitMEX," which, until recently, was one of the largest trading platforms of its type in the world, with billions of dollars in trades taking place daily.  (Amato Decl. ¶ 5.)  In 2015, Hayes solicited investments in BitMEX from Plaintiffs Amato and Capone, two private investors active in the cryptocurrency space.  (*Id*. ¶ 6; Capone Decl. ¶ 4.)  In exchange for their investments, BitMEX and Plaintiffs executed "SAFEs"—meaning a "Simple Agreement for Future Equity"—which permit so-called "angel investors" to make investments at an early stage when it is difficult to value a nascent company.  (Amato Decl. ¶ 3.)  Under the terms of the SAFEs, when a future triggering investment is secured, the SAFEs automatically convert into equity.  (*Id*. ¶ 1, Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a).)

Shortly after Plaintiffs made their investments in June and July 2015, BitMEX received triggering investments from third-party investor SOSV, as recently confirmed by documents SOSV produced.  (Amato Decl. ¶ 19.)  But despite SOSV's investments, Hayes and BitMEX embarked on a years-long campaign to cheat Plaintiffs out of the ownership rights they are entitled to—including millions in dividends—by repeatedly and fraudulently misrepresenting to Plaintiffs that their SAFEs had not converted, that SOSV had not invested money into BitMEX, and that Plaintiffs were not entitled to any ownership interest in the now multi-billion-dollar company.  (*Id*. ¶ 24.)

### A.    Plaintiffs' SAFEs Converted and They Are Entitled to Equity Rights

---

[2]  This application is presented upon the sworn declarations of Plaintiffs Frank Amato (the "Amato Decl.") and Guido Capone ("Capone Decl."), as well as respected industry expert Todd Antonelli (the "Antonelli Decl."), a leading financial and strategic advisor to companies in all stages of growth and an expert in venture capital, early-stage investing, and SAFE agreements.

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

Plaintiff Amato executed a SAFE with HDR on June 15, 2015. (*Id.* ¶ 12, Ex. 1.) Plaintiff Capone executed a SAFE with HDR on July 16, 2015. (Capone Decl. Ex. 1.) Both SAFEs contain a provision under which HDR was required to automatically issue shares to Plaintiffs upon an "Equity Financing" event. (Amato Decl. ¶ 10, Ex. 1 § 1(a), Capone Decl. Ex. 1 § 1(a); Declaration of Todd Antonelli ("Antonelli Decl.") ¶¶ 10–11.) The SAFEs include a formula for determining the number of shares HDR would issue, with a percentage cap of HDR's outstanding share capital: 0.50% for Amato and 0.41% for Capone. (Amato Decl. ¶ 10, Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a); Antonelli Decl. ¶¶ 10–11.) Both SAFEs define an "Equity Financing" event as "a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which [HDR] issues and sells Preferred Shares at a fixed pre-money valuation." (Amato Decl. Ex. 1 at 3; Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.)

A triggering "Equity Financing" event occurred on July 18, 2015, when HDR entered a Stock Purchase Agreement with SOSV (the "SOSV SPA"). (Antonelli Decl. ¶¶ 15–22, Ex. 2.) HDR was selected to be a participant in SOSV's Chinaccelerator program, which provides early funding to startup companies in return for equity. (*Id.* ¶ 15.) ███████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████ (*Id.* ¶ 21, Ex. 2 § 1(a).) ███ ██████████████████████████

Although labeled "Ordinary Shares" in the document, █████████████████ ████████████████████████████████████████████████████████████████████ ██████ as do shares that are typically referred to as "preferred" within the industry. (*Id.* ¶¶ 16– 20.) In particular, ████████████████████████████████████████████ :

- ████████████████████████████████████████████████ (*Id.* ¶ 17 (quoting *id.* Ex. 2 § 2));

- ████████████████████████████████████████████████████████ (*Id.* ¶ 18 (quoting *id.* Ex. 2 § 6)); and

- ████████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████ (*Id.* ¶ 19 (quoting *id.* Ex. 2 § 8).)

According to Mr. Antonelli, who frequently advises companies regarding the use of, and analyzes

financial instruments like SAFEs, anti-dilution and pro rata rights "are commonly associated with

preferred shares." (*Id.* ¶¶ 17–18.) █████████████████████████

█████████████████████████ (*Id.* Ex. 2 § 8.) A liquidation

preference is also "a hallmark benefit of preferred shares." (*Id.* ¶ 20.)

████████████████ that are equivalent to preferred shares at a specified price and

in exchange for a specified ownership percentage was an "Equity Financing" event that triggered

automatic issuance of Plaintiffs' shares. (*Id.*) But, to date, Defendants have refused to issue any

shares to Plaintiffs at all. (Amato Decl. ¶ 23.)

**B.    Defendants Issued Millions in Dividend Payments, But None to Plaintiffs**

Plaintiffs discovered through the produced SOSV documents ████████████████

█████████████████████████████████████████

████████—all while the government investigations against it were pending. (Antonelli Decl.

¶ 30.) █████████████████████████ (*Id.* Ex. 3 at 22; Ex. 5 at

SOSV - 135.) █████████████████████████

█████████████████████████████████████████

████████████████████████████████ (*Id.* Ex. 4 at

SOSV - 137.) █████████████████████████████

█████████████ (*Id.* Ex. 7.) █████████████████████

█████████████████████████ (*Id.* ¶ 28.)

**C.    Simple Computation of Plaintiffs' Implied Dividends**

Based on the information produced by SOSV, a simple calculation shows the *bare minimum*

amount that Plaintiffs are entitled to recover from HDR in the form of unpaid dividends. This is to

say nothing of Plaintiffs' other claims in this case or any other, presently unknown, distributions

that HDR has made. The step-by-step calculation is as follows:

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

**Step 1:** ████████████████████████ (shown by SOSV documents).

**Step 2:** ██████████████████████████████ (shown by SOSV documents).

**Step 3:** ████████████████████████████████████████████████

**Step 4:** Amato *should* have been issued ████████ of HDR (shown by the triggering of his SAFE, which entitles him to 0.50% of the ████████████████).

**Step 5:** Amato therefore was entitled to $2,201,542 in dividends (shown by ████████████████).

**Step 6:** Capone *should* have been issued ████████ of HDR (shown by the triggering of his SAFE, which entitles him to 0.41% of the ████████████).

**Step 7:** Capone therefore was entitled to $1,805,264 in dividends (shown by ████████████████).

(*Id*. ¶¶ 28–29.) Adding together the minimum amounts that Amato and Capone should have received results in a total of **$4,006,806.19**, which is the amount that Plaintiffs now seek to attach.

### D. Plaintiffs' Attempts to Gather Information and Avoid Motion Practice

Plaintiffs have taken steps to negotiate with Defendants a stipulated resolution to this matter, in an effort to avoid involving the Court. In particular, in the wake of the SOSV document production and the criminal and regulatory lawsuits filed by the government, Plaintiffs' counsel repeatedly asked Defendants' counsel for information regarding their clients' dissipation of assets. (Hagey Decl. ¶ 3.) But, as with nearly every other request in this case—whether through formal discovery or otherwise—Defendants' counsel has so far refused to provide any substantive information at all.[3] On October 15, Plaintiffs' counsel emailed questions to Defendants' counsel in an effort to determine whether Defendants were, in fact, expatriating assets. (*Id*. ¶ 6.) Plaintiffs wrote:

> Recently revealed information causes Plaintiffs substantial concern regarding their ability to collect upon final judgment. News reports and court documents show that HDR's principals, including Arthur Hayes, were indicted on October 1 by the U.S. Department of Justice and removed from their positions within [BitMEX] shortly thereafter. The company has also been sued by the CFTC for an array of regulatory violations. . . .
>
> In view of these developments, we pose the following questions regarding whether BitMEX and its agents are taking any steps to transfer assets outside of the jurisdiction or to otherwise dissipate those assets:

---

[3] Indeed, the information in question here likewise bears directly on HDR's ties to this forum, such that it should have been produced in connection with Plaintiffs' jurisdictional discovery requests that were served in <u>February 2020</u>.

(*Id.* Ex. 3 at 1.)  The questions included requests for basic information like "Is Mr. Hayes presently making financial decisions on behalf of BitMEX?" and "Has anyone at HDR or its affiliated companies . . . taken any steps to remove assets from California, other than in the ordinary course of business?" and "Was BitMEX aware that it was the subject of government investigation prior to October 1?"  (*Id.*)  Defendants' counsel refused to provide answers promptly, and instead suggested the parties meet and confer about those matters on October 19, 2020.  (Hagey Decl. ¶ 7.)  But during that call, Defendants' counsel stated they were "not prepared" to discuss the issues, and claimed they needed additional time to confer with their clients.  (*Id.* ¶ 8.)  The parties conferred again on October 21; this time, defense counsel declared that the questions posed in Plaintiffs' October 15 email were "intrusive" and again failed to provide any substantive information.  (*Id.* ¶ 9.)  They claimed, though, that they would consider providing some unspecified information on October 23.  (*Id.*)  Plaintiffs then followed up on October 21 with an email that boils down to a single, basic request: "[P]lease provide a simple schedule or summary of all distributions of any sort – whether dividends or otherwise – that HDR made to its shareholders from June 2015 to the present, including the dates and amounts of those distributions."  (*Id.* Ex. 4.)  Defendants did not respond.  (*Id.* ¶ 11.)  Plaintiffs thereafter informed Defendants that their inability to provide even basic information about the movement of assets only added to Plaintiffs' well-founded concerns, and left them no choice but to seek this relief.  (*Id.* ¶ 12.)

**<u>ARGUMENT</u>**

California law permits a Court to issue a right to attach order on an *ex parte* basis if it finds that: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; (4) the property sought to be attached is not exempt from attachment; (5) the plaintiff will suffer great or irreparable injury if issuance of the order is delayed until the matter can be heard on notice; and (6) the amount to be secured by the attachment is greater than zero.  § 485.220(a).  Attachment can issue in connection with a contract claim, so

1  long as the claim is "a fixed or readily ascertainable amount," § 483.010(a)–(b), and it may issue

2  regardless of "whether or not other forms of relief are demanded." § 483.010(d).[4]

3      The irreparable injury requirement is satisfied if a plaintiff offers facts showing that such

4  injury would result if issuance of the attachment order were delayed until the matter could be heard

5  on notice. §§ 485.010(a), 485.220. Such a showing is made if, "[u]nder the circumstances of the

6  case, it may be inferred that there is a danger that the property sought to be attached would be

7  concealed, . . . or otherwise made unavailable to levy if issuance of the order were delayed until the

8  matter could be heard on notice." § 485.010(b)(1).

9      A plaintiff may also apply for a TPO at the time of applying for a right to attach order,

10 § 486.010(a), which requires the same showing of great or irreparable harm. *Id*. Where a court

11 finds that a TPO is more appropriate, it may grant the TPO and treat the *ex parte* application for

12 attachment as one filed under noticed hearing procedure. § 486.030. Plaintiffs would not object to

13 the Court proceeding in such a manner in these circumstances.

14     Plaintiffs' application satisfies each of these requirements, and a TPO and *ex parte*

15 attachment relief is appropriate for the reasons set forth below.

16 **I.    *EX PARTE* RELIEF AND A TEMPORARY PROTECTIVE ORDER ARE
         NECESSARY TO PREVENT GREAT OR IRREPARABLE INJURY**

17     As an initial matter, Plaintiffs satisfy the statutory requirements for *ex parte* relief. As

18 noted in the preceding section, such relief is appropriate where great or irreparable injury would

19 result to the plaintiff if issuance of the order were delayed until the matter could be heard on notice.

20 § 485.010(a). A TPO requires the same showing. § 486.010(a). The circumstances in this case

21 warrant *ex parte* relief and issuance of a TPO, as Plaintiffs have legitimate concerns that

22 Defendants will soon conceal, expatriate, or otherwise make unavailable the assets that Plaintiffs

23

24

25 [4] An *ex parte* application for a right to attach must also include the following, all of which are in the form application
   submitted herewith: (i) a statement that the attachment is sought to secure the recovery on a claim upon which an

26 attachment may be issued, (ii) a statement of the amount to be secured, (iii) a statement that the attachment is not
   sought for a purpose other than the recovery on the claim, (iv) a statement that the applicant has no information or

27 belief that the claim is subject to bankruptcy proceedings, (v) a description of the property to be attached, and (vi) a
   statement that the plaintiff is informed and believes that such property is subject to attachment. §§ 485.210, 484.020.

28 For defendant corporations, a broad description such as "all corporate property which is subject to attachment" is a
   sufficient description. *Bank of Am. v. Salinas Nissan, Inc.*, 207 Cal. App. 3d 260, 267 (1989); § 484.020(e).

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

seek to attach—and ████████████████████████████████████████████
████████████████████████████████████████████.

On October 1, Defendant Hayes and other HDR co-founders were indicted by the DOJ in the Southern District of New York for violations of and conspiracy to violate the Bank Secrecy Act. (Hagey Decl. Ex. 1.) The indictment alleges that Hayes "willfully failed to establish, implement, and maintain an adequate anti-money laundering ('AML') program, including an adequate customer identification program, more commonly referred to as a know your customer ('KYC') program, for BitMEX, in violation of the BSA." (*Id.* at 2). The same day, the CFTC filed a civil enforcement action against Defendants for operating an unregistered futures trading platform in the United States and failing to comply with AML regulations. (Hagey Decl. Ex. 2.)

Cryptocurrency news sources reported that "money began leaving the BitMEX exchange in exodus" and that "24 hours after the news broke, over 40,000 BTC [Bitcoins] (~$431 million) had been withdrawn from BitMEX." (Amato Decl. ¶ 28) Moreover, BitMEX's own funds are reportedly "held in multi[-signature] wallets that require a signature from multiple private keys in order to be unlocked" with "BitMEX's three founders each hold[ing] a key, and two of three partners must sign each withdrawal," meaning that BitMEX's substantial cryptocurrency assets are accessible and controlled *solely* by its founders, all of whom are facing criminal charges, and two of whom are fugitives. (*Id.* ¶ 29.)

Plaintiffs' fears are not speculative. Defendants are serial offenders when it comes to disregard for the rule of law, as they have demonstrated both by their fraudulent misconduct in their dealings with Plaintiffs and their brazen indifference towards the authority of courts and regulators. For instance, when Mr. Capone inquired about his equity rights in September 2019, HDR co-founder Ben Delo responded to him with an image of Hayes overlaid with text conveying Defendants' belief that they could evade liability because they incorporated HDR as a Seychellois shell company. (Capone Decl. ¶ 17; SAC ¶¶ 168–69.) Delo's email contained the following:



Ben Delo's response to Mr. Capone came shortly after a July 3, 2019 statement made by Hayes, captured on video, in which he was asked by a debate moderator about the differences between various global regulatory authorities and the Seychellois regulatory authorities. Hayes stated "it just costs more to bribe them," and, when pressed by the moderator about "that not being an answer," Defendant Hayes responded, "it is an answer" and claimed he pays "a coconut" to pay off the Seychellois authorities. The DOJ included this same exchange in its indictment, alleging that Hayes "bragged in or about July 2019 that the Seychelles was a more friendly jurisdiction for BitMEX because it cost less to bribe Seychellois authorities - just 'a coconut' - than it cost to bribe regulators in the United States and elsewhere." (Hagey Decl. Ex. 1 ¶ 21.)

Defendants are also no newcomers to shifting funds to evade potential liability. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ And as the CFTC observed, Hayes and HDR's other founders "operate BitMEX's platform through a maze of corporate entities." (Hagey Decl. Ex. 12.)

Further, documents recently produced to Plaintiffs reveal that Defendants long began to spirit away their funds. Defendants knew by no later than January 2019 that they were under investigation by U.S. regulatory agencies because co-founder Reed was deposed by—and allegedly made false representations to—the CFTC. (Hagey Decl. Ex. 2 ¶ 27.) Around that same time, ███

████████████████████████████████████████████████████████

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1 ███████████████████████████████████████████ (Hagey Decl. ¶ 13, Ex. 13.)  In

2 early 2019, after Reed's deposition, ██████████████████████████████████

3 █████████████████████████████████████ (Hagey Decl. Ex. 14 ████████

4 ████████████████████████████████████████████████████████████████████

5 ████████); Ex. 5 ███████████████████████████████████████████████████

6 ████████████████████████████ ████████████████████████████████████████

7 ████, only two months before the DOJ revealed its criminal indictments.   (Hagey Decl. Ex. 7.)

8 　　　Adding to the urgency of the motion and the indicia of obstructionism is Defendants'

9 counsel's ongoing failure to provide even the most basic information about their clients' finances

10 and movement of assets.  As set forth above in Part D of the Background section, in the wake of the

11 SOSV document production and the federal lawsuits, Plaintiffs' counsel have repeatedly asked

12 such basic questions as "Is Mr. Hayes presently making financial decisions on behalf of BitMEX?"

13 and "Has anyone at HDR or its affiliated companies (collectively, 'BitMEX') taken any steps to

14 remove assets from California, other than in the ordinary course of business?"  (Hagey Decl. Ex.

15 3.)  Defendants have stalled and stonewalled, repeatedly indicating that they would confer further

16 with their clients and assuring Plaintiffs that information would be forthcoming.  But, to date, they

17 have provided nothing.

18 　　　The bottom line is that, in total, ███████████████████████████████

19 ████████████████████████████ (Antonelli Decl. ¶ 28.) █████████████████

20 ████████████████████████████████████████████████████████████████████

21 ████████████████████████████████ (*Id*. ¶ 30.)  It is imperative that they not be allowed to

22 make off with more.  The Court should grant a TPO and *ex parte* relief to secure at least the

23 approximately $4 million of dividend payments that should have been distributed to Plaintiffs.[5]

24 **II.    PLAINTIFFS' CONTRACT-BASED DIVIDENDS EASILY SATISFY THE CCP'S**
   **GROUNDS FOR ATTACHMENT**

25 　　　In addition to showing that they will suffer irreparable harm, Plaintiffs also readily satisfy

26 the remaining statutory attachment requirements.  To start, Plaintiffs' claims are "claims upon

27 

28 [5] Plaintiffs' request is narrowly tailored, as they seek to attach only a small amount of their overall claimed damages, limited to that amount that is "readily ascertainable" based on their present knowledge and information.

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF
ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

which attachment may be issued," *see* § 485.220(a), because they are contract claims seeking a "fixed or readily ascertainable" amount that is more than five hundred dollars and not secured by real property. § 483.010(a)–(b). A claimed amount meets this standard if it is "readily ascertainable by reference to the contract" and "the basis of the computation of [the attachment amount] appears to be reasonable and definite." *CIT Grp./Equip. Fin., Inc. v. Super DVD, Inc.*, 115 Cal. App. 4th 537, 540 (2004).[6] Although "the contract sued on must furnish a standard by which the amount due may be clearly ascertained," "it is not necessary that the amount owed appear on the face of the contract." *Id.* Indeed, courts recognize that "it often happens that the amount due under a contract does not appear on the contract itself." *Id.*

Plaintiffs' claims here are based on Defendants' breaches of their SAFEs. (*See* SAC ¶¶ 235–40.) And the amounts Plaintiffs claim for attachment—$4,006,806.19 of unpaid dividends—are "readily ascertainable by reference to" those SAFEs, and the computation of the dividend amounts is both reasonable and definite. *See CIT Grp.*, 115 Cal. App. 4th at 540. The SAFEs "furnish a standard by which the amount due may be clearly ascertained" by explicitly enumerating Plaintiffs' ownership percentages in HDR. *Id.* The amount of dividend payments that Plaintiffs are owed is directly calculable ██████████████████████████████████████████ ████████████████████████ As explained there, Amato was entitled to $2,201,542 in dividends, and Capone was entitled to $1,805,264. Adding these amounts together results in $4,006,806. (Antonelli Decl. ¶ 29.)

## A. Plaintiffs Have Established the Probable Validity of Their Claims

The next statutory attachment requirement is that a plaintiff seeking attachment must establish "the probable validity of the claim upon which the attachment is based." § 492.030(a)(2). "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." § 481.190; *Goldstein v. Barak Constr.*, 164 Cal. App. 4th 845, 852 (2008). Plaintiffs readily meet this standard, as their claims against Defendants stem from Defendants' failure to perform their obligations under Plaintiffs' SAFEs. The elements to a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance of the

---

[6] All internal quotation marks and citations omitted unless otherwise noted.

contract or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damage to the plaintiff. *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

There is no question that contracts—the SAFEs—are valid and were executed by Plaintiffs and HDR. (*See* Amato Decl. Ex. 1; Capone Decl. Ex. 1.) Although Hayes fabricated a variety of false explanations for why Plaintiffs' equity rights never triggered, he has never disputed that the SAFEs are valid and enforceable. (Capone Decl. ¶¶ 15-16.) There is likewise no dispute that Plaintiffs each performed under their SAFEs: Plaintiff Amato wired $30,000 to Defendants on June 26, 2015 and Plaintiff Capone wired $25,000 to Defendant Hayes's personal bank account on July 16, 2015. (Amato Decl. ¶ 12; Capone Decl. ¶ 11.) There is also no question that Plaintiffs have been damaged because they have been deprived of the benefit of their investments: approximately 1% equity in the world's largest cryptocurrency derivatives trading platform █████████████████, and millions of dollars in dividend payments, as explained in Part B of the Background section above.

Defendants' refusal to issue Plaintiffs their shares in HDR constitutes breach of Plaintiffs' SAFEs. Both SAFEs required HDR to "automatically issue to the Investor a number of shares" based on a set formula, "[i]f there is an Equity Financing" event. (Amato Decl. Ex. 1 § 1(a); Capone Decl. Ex. 1 § 1(a); Antonelli Decl. ¶¶ 10-11.) Both SAFEs also define an "Equity Financing" as "a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Shares at a fixed pre-money valuation." (Amato Decl. Ex. 1 at 3; Capone Decl. Ex. 1 at 3; Antonelli Decl. ¶ 12.) In other words, HDR was obligated to issue shares to Plaintiffs "once three conditions were satisfied: (1) there is a 'bona fide transaction or series of transactions with the principal purpose of raising capital'; (2) the transaction or series of transactions are transactions 'pursuant to which [HDR] issues and sells Preferred Shares'; and (3) HDR sells the shares 'at a fixed pre-money valuation.'" (Antonelli Decl. ¶ 14.)

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

MPA ISO PLAINTIFFS' *EX PARTE* APPLICATION FOR A RIGHT TO ATTACH ORDER, WRIT OF ATTACHMENT, AND TEMPORARY PROTECTIVE ORDER

1  [redacted] (*Id.* ¶¶ 15–20, Ex. 2.)  This transaction satisfied all three conditions to

2  trigger automatic issuance of Plaintiffs' shares, as the Declaration of Mr. Antonelli, an industry

3  expert in the areas of venture capital, finance, early-stage investing, and SAFE agreements, readily

4  demonstrates:

5      *First*, SOSV is a venture capital investor that runs an accelerator program called

6  Chinaccelerator, a program through which startup companies (like HDR circa 2015) compete for

7  funding.  (*Id.* ¶ 15.)  In SOSV and Chinaccelerator's own words, they "invested in BitMEX through

8  Batch 8 which later became a Fintech unicorn."  (*Id.* ¶ 15 n.1.)  [redacted]

9  [redacted] was therefore a bona fide

10  transaction with the principal purpose of raising capital for HDR.  (*Id.* ¶ 15.)

11      *Second*, [redacted]

12  [redacted] "Preferred Shares" is not a defined term in Plaintiffs' SAFEs, (*id.* ¶ 13), and

13  Plaintiffs allege that Defendants leveraged this ambiguity to "deliberately structur[e] subsequent

14  rounds of capital financing in order to avoid triggering the SAFEs"—for example, by labeling the

15  shares HDR sold to raise funding as something other than "Preferred Shares."  (SAC ¶ 245.)  The

16  SOSV documents confirm Plaintiffs' allegations:  [redacted]

17  [redacted] (Antonelli Decl. ¶

18  16, Ex. 2 § 1(a).)  [redacted]

19  [redacted] (*Id.* ¶ 16.)

20  [redacted]

21  [redacted], as set forth above in Part C of the Background

22  section and explained in Mr. Antonelli's declaration.  (*Id.* ¶¶ 17-19.)  [redacted]

23  [redacted] (*Id.* Ex. 2 §

24  8.)  [redacted]

25  [redacted] (*Id.* ¶¶ 17-18.)  [redacted]

26  [redacted] under a reasonable and commercially standard interpretation of that

27  term as used in Plaintiffs' SAFEs."  (*Id.* ¶ 20.)

28

1 ████████████████████████████████████████████████

2 (*Id.* ¶ 21.) ████████████████████████████████████████

3 ██████████████████████████████████ (*Id.* Ex. 2 § 1(a).) ██████████

4 ████████████████████████████████████████ (*Id.*) ██████

5 ██████████████████████████████████████████████

6 ██████ (*Id.*)

7 ████████████████████████████████████████████████

8 ██████████████████████████████████████████

9 ████████████████████████ (*Id.* ¶ 22.) Today, more than

10 five years later, HDR has yet to issue any shares to Plaintiffs, which plainly breaches the SAFEs,

11 such that Plaintiffs will prevail on their breach of contract claim.

12        **B.**      **Plaintiffs Seek Attachment for the Purpose of Securing Their Recovery**

13      Plaintiffs also satisfy the next statutory requirement of § 485.220(a) because they seek

14 attachment in order to secure their recovery. The purpose of attachment "is to secure and insure the

15 payment of any judgment that may be recovered in the successful prosecution of an action in order

16 that the ends of successful litigation are not fruitlessly pursued or frustrated." *Loeb & Loeb v.*

17 *Beverly Glen Music, Inc.*, 166 Cal. App. 3d 1110, 1118 (1985) (citing *Halstead v. Halstead*, 72 Cal.

18 App. 2d 832, 836 (1946)). As discussed above in Part I of the Argument section, Defendants'

19 years-long campaign to deprive Plaintiffs of their equity rights, liberal misuse of shell corporations,

20 and the targeting of Defendants by government investigations, give rise to a legitimate concern that

21 Defendants will attempt to frustrate judgment by expatriating or secreting funds. Plaintiffs seek

22 attachment only to prevent such misconduct and secure their recovery. § 492.030(a)(5).

23        **C.**      **Plaintiffs Will Suffer Irreparable Injury if the Order is Not Granted**

24      Plaintiffs can also readily show that they will suffer irreparable injury if a temporary

25 protective order is not issued, for the reasons set forth above in Part I of this Argument section.

26 The bottom line is that if a TPO is not issued, Defendants would be free to continue expatriating

27 and otherwise dissipating assets while a motion on ordinary notice is pending, such that Plaintiffs

28 may never be able to recover the substantial funds owed to them.

**D. The Amount to Be Secured By the Attachment Is Greater than Zero**

Plaintiffs likewise satisfy this final statutory requirement, as they seek attachment in an amount greater than zero. They seek $4,006,806.19 in dividend payments they were entitled to under their SAFEs, and there is no basis to reduce this amount. §§ 492.030(a)(6), 483.015(b).

**III. PLAINTIFFS ALSO SHOULD BE PERMITTED EXPEDITED DISCOVERY**

Finally, to the extent the Court declines to grant a TPO or *ex parte* relief, it should order expedited discovery regarding all matters relating to asset expatriation and dissipation, including, at a minimum: (1) the amounts and dates of all distributions and/or transfers to shareholders; (2) all documents concerning amounts transferred following the filing of this lawsuit; and (3) Defendants' knowledge of the government investigations. For the reasons explained throughout, Plaintiffs have real and pressing concerns that Defendants are taking steps to impair their ability to collect the funds they are entitled to. Defendants' lack of candor on these matters to date, as set forth in Part D of the Background section, has only exacerbated Plaintiffs' concerns. Expedited discovery would permit Plaintiffs to obtain the information they need.[7]

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an *ex parte* right to attach order, a writ of attachment against HDR Global Trading Limited, and a temporary protective order. Plaintiffs are prepared to file an undertaking for the writ, pursuant to § 489.210.

Dated: October 23, 2020

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: *s/ J. Noah Hagey*
       J. Noah Hagey

*Attorneys for Plaintiffs Frank Amato, RGB Coin Ltd., and Elfio Guido Capone on behalf of the G and M Capone Trust*

---

[7] Plaintiffs reserve the right to seek additional attachment, as appropriate, following the production of such discovery.

# EXHIBIT 9

1   Stephen D. Hibbard (State Bar No. 177865)
    sdhibbard@jonesday.com
2   Matthew J. Silveira (State Bar No. 264250)
    msilveira@jonesday.com
3   Dennis F. Murphy, Jr. (State Bar No. 301008)
    dennismurphy@jonesday.com
4   JONES DAY
    555 California Street, 26th Floor
5   San Francisco, CA 94104
    Telephone: +1.415.626.3939
6   Facsimile: +1.415.875.5700

7   Attorneys for Defendants
    HDR GLOBAL TRADING LIMITED and
8   ABS GLOBAL TRADING LIMITED

9   Peter I. Altman (State Bar No. 285292)
    paltman@akingump.com
10  Marshall L. Baker (State Bar No. 300987)
    mbaker@akingump.com
11  Shelly A. Kim (State Bar No. 322231)
    shelly.kim@akingump.com
12  Jessica H. Ro (State Bar No. 329737)
    jro@akingump.com
13  AKIN GUMP STRAUSS HAUER & FELD LLP
    1999 Avenue of the Stars, Suite 600
14  Los Angeles, CA 90067
    Telephone:   +1.310.229.1000
15  Facsimile:   +1.310.229.1001

16  Attorneys for Defendant
    ARTHUR HAYES

17

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**11/02/2020**
**Clerk of the Court**
**BY: SANDRA SCHIRO**
**Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| FRANK AMATO, RGB COIN LTD., and ELFIO GUIDO CAPONE on behalf of the G AND M CAPONE TRUST, | Case No: CGC-19-581267 |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO SEAL OR STRIKE PLAINTIFFS' EX PARTE APPLICATION** |
| v. | |
| HDR GLOBAL TRADING LIMITED, d/b/a BITMEX; ARTHUR HAYES; ABS GLOBAL TRADING LIMITED; and DOES 1-10, | Assigned for All Purposes to: Hon. Anne-Christine Massullo, Dept. 304 |
| Defendants. | Date: December 18, 2020 Time: 10:00 a.m. |
| | Second Am. Compl. filed: Aug. 18, 2020 |

**CASE NO. CGC-19-581267**

**MPA ISO DEFS.' MOT. TO SEAL OR STRIKE PLS.' EX PARTE APP.**

# I.    INTRODUCTION

Defendants file this motion to resolve a dispute that never should have arisen and that they believed had already been resolved.  On the morning of October 23, Plaintiffs filed an ex parte application for a right to attach order, writ of attachment, and temporary protective order (the "Ex Parte Application") notwithstanding Defendants' proposal of a negotiated resolution that would avoid the need for motion practice.  The next business day, the parties agreed to substantially the same proposal that Defendants had proposed before the Ex Parte Application was filed, and notified the Court that the Ex Parte Application could be taken off calendar without prejudice to its renewal.  The Court did just that, and confirmed that it would dispose of the courtesy copies of the Ex Parte Application, which it had never reviewed.

Despite the resolution of the dispute underlying the Ex Parte Application and the fact that the Court never considered, let alone ruled on that application, Plaintiffs refuse to withdraw those papers.  Instead, Plaintiffs are requiring that Defendants move to seal the extensive confidential material submitted in connection with the Ex Parte Application.  Moreover, Plaintiffs insist on this needless expenditure of Court, party, and third-party resources despite the fact that Plaintiffs violated the protective order in filing the Ex Parte Application.  Withdrawing the Ex Parte Application from the public record is the most efficient means to end Plaintiffs' violation.

Because Plaintiffs have refused to minimize the work required of the parties and the Court, notwithstanding their protective order violation, Defendants move to strike the Ex Parte Application in its entirety.  That remedy is well within the Court's inherent authority given that the Court never even considered, let alone decided, the Ex Parte Application and because such a remedy is the most efficient way to limit the needless expenditure of resources and stem the damage flowing from Plaintiffs' protective order violation.  In the alternative, the Court should strike or permanently seal all of the material initially lodged confidentially under seal, and the entirety of certain documents containing confidential information that were initially filed on the public docket in violation of the protective order.  Defendants reserve their right to seek further remedies related to Plaintiffs' violation of the protective order.

## II.     BACKGROUND

On Friday October 16, the Court held the first Case Management Conference ("CMC") in this matter.  At the CMC, Plaintiffs suggested that they might seek a writ of attachment, noting that they had sent an email to Defendants the previous evening asking questions related to that form of relief.  The Court explained that a writ of attachment is an extraordinary remedy with a high bar, but did not address the substance of Plaintiffs' assertions, which had not been raised in the parties' case management statements filed just two days prior, and encouraged the parties to "work it out" short of motion practice.  *See* 10/16/20 Tr. at 24:3-25:13, 37:5-6.

The Court also addressed the topic of sealing at the CMC.  In addition to directing the parties to "deal with the sealing motions at the time" of the underlying motion addressing confidential material, *id.* at 46:16-25, the Court asked the parties "to be judicious in terms of what you attach" and to "be mindful, when you are attaching documents, about the sealing requirements and the work," *id.* at 47:5-17.  Moreover, the Court assured the parties that it would provide guidance if it found a motion to seal unsatisfactory, rather than "automatically just unseal[ing] confidential documents."  *Id.* at 46:26-47:4.

On Friday October 23 at 10:21 a.m., Plaintiffs filed the Ex Parte Application, set for hearing the following Monday at 9:15 a.m.  At an informal discovery conference later that day, Defendants explained that they had been in contact with Plaintiffs both before and after the filing of the Ex Parte Application and had made a proposal before the Ex Parte Application was filed that would have mooted the relief sought in that application and avoid unnecessary motion practice.  The Court noted that it had not seen the papers, but encouraged the parties to work cooperatively to resolve the issue without motion practice.  To that end, the Court continued the ex parte hearing from Monday, October 26 to Tuesday, October 27, and directed the parties to notify the Court by Monday at 1:00 p.m. if they were able to reach an agreement that would avoid the need for Tuesday's hearing.

On Monday, October 26, the parties called the Court to report that they had been able to reach an agreement such that the Ex Parte Application could be taken off calendar, without prejudice to Plaintiffs' renewing that application if they thought it necessary.  As a result, the

Court took the hearing off calendar.  In addition, the Court stated that it had not read the Ex Parte Application and would dispose of the courtesy copies Plaintiffs had delivered.

On Thursday, October 29, Defendants directly proposed that the parties stipulate to the removal of the Ex Parte Application from the Court's record.  Defendants explained that removal from the record would avoid the need for the parties, third parties whose confidential information was filed with the Ex Parte Application, and the Court to expend resources addressing the sealing of materials that were never considered, let alone addressed by the Court.  Defendants also explained that removal of the papers from the docket would be the simplest and least intrusive method of removing confidential information that Plaintiffs had included on the public docket without lodging that information conditionally under seal, in violation of the protective order in this case.  Plaintiffs asked for Defendants to identify the portions of the submitted documents filed in violation of the protective order.  Plaintiffs then stated that their response to this request for removal of the papers would be tied to Defendants accommodating *other*, distinct requests regarding expedited discovery and relief beyond a writ of attachment, which Plaintiffs had raised in a letter earlier that day.

On Friday, October 30, the parties met and conferred again.  Defendants renewed their request that Plaintiffs agree to remove the Ex Parte Application from the Court's records.  Defendants further identified specific portions of that application that had been filed in violation of the Protective Order.  Plaintiffs, however, declined to stipulate to removal of the Ex Parte Application from the Court's record.  Instead, in a purported effort to compromise, Plaintiffs offered to stipulate that (i) Defendants' time to submit any sealing motion be extended by two weeks (or so) under CRC 2.551(b)(3)(B); and (ii) the parties will promptly replace the documents you identify below with versions that redact the additional information you request.  Plaintiffs later agreed to replace the entirety of three documents filed in support of the Ex Parte Application with conditionally under seal versions.  *See generally* Silveira Decl.[1]

_____

[1] Consistent with the Court's guidance at the CMC to avoid unnecessary sealing issues, Defendants have limited their submission of factual material underlying this motion to relevant, non-confidential information to avoid the need for still further expenditure of party, third-party, and Court resources on sealing issues that are ancillary to the merits of this dispute.

CASE NO. CGC-19-581267

**MPA ISO DEFS.' MOT. TO SEAL OR STRIKE PLS.' EX PARTE APP.**

III.     ARGUMENT

A.     **The Court Should Strike the Entire Ex Parte Application From Its Files.**

A Superior Court has the "inherent and plenary [power]" to "strike from its files" material that "was in no sense essential to decision of the question before the court." *Warner v. Warner*, 135 Cal. App. 2d 302, 304–305 (1955), *cited approvingly by Overstock.com, Inc. v. Goldman Sachs Group, Inc.*, 231 Cal. App. 4th 471, 500 (2014). Where a court strikes such materials, they "have effectively been removed from the court's file, eliminating the need to address any sealing issues as to these materials." *Overstock.com*, 231 Cal. App. 4th at 500; *cf. Mercury Interactive Corp. v. Klein*, 158 Cal. App. 4th 60, 105 (2007) (holding that the "sealed records rules did not apply" to documents that "consisted of discovery material that was not admitted at trial or used as a basis of the court's adjudication of a substantive matter").

Plaintiffs' Ex Parte Application—more than 250 pages, including exhibits—is full of confidential material designated as such under the protective order. Plaintiffs attached entire contracts and emails that have been designated confidential and discussed those confidential materials at length in their memorandum of points and authorities and expert declaration. While Plaintiffs lodged much of this confidential material under seal and made redactions to the documents summarizing that material, their redaction efforts were insufficient. Plaintiffs included confidential material even in their redacted versions of documents and filed them in the public file, in violation of the protective order. Plaintiffs' initial proposal to remedy these protective order violations by replacing the public documents with further-redacted versions would just exacerbate the damage to Defendants given that litigants in other proceedings have already downloaded the documents and placed them in other public court files and on the internet. Placing new versions in the public file would only draw more attention to the confidential material placed in the public file in violation of the protective order, as third parties would be able to compare improperly and properly redacted versions and identify the very material that never should have been made public.

Shortly before this motion was filed, Plaintiffs stated that they agreed to replace the as-submitted versions of three documents that Defendants had identified as disclosing confidential

information with conditionally under seal versions.  Assuming Plaintiffs follow through with that course of action, the Court should nonetheless strike the entire Ex Parte Application from the public file.  Not only is such a remedy proper under California precedent—no part of the Ex Parte Application is "essential to decision of the question before the Court," *Warner*, 135 Cal. App. 2d at 304–305, because the Court never considered, let alone decided, the questions presented by those papers—but there is also no prejudice to Plaintiffs.  The parties reached an interim agreement that moots the Ex Parte Application and agreed to finalize the agreement by the end of November.  And the removal of the Ex Parte Application from the Court's calendar does not prejudice the renewal of that request.  The Court should thus exercise its inherent authority to mitigate the damage that Plaintiffs' violation of the protective order has caused and continues to cause Defendants by striking the entirety of Plaintiffs' Ex Parte Application from the file.

**B.  Alternatively, the Court Should Strike the Portions of the Ex Parte Application Lodged Confidentially Under Seal and the Entirety of Documents That Include Material Filed in Violation of the Protective Order.**

Subsumed within the Court's inherent authority to strike the entire Ex Parte Application from its files is the power to strike portions of those papers.  *See Overstock*, 231 Cal. App. 4th at 500 ("when a party submits a tsunami of discovery materials subject to a protective order, the trial court should welcome a well-honed motion to strike to winnow down the material to that which is *relevant* to the contentions advocated by the proffering party").  "The public's right of access to court records … does not extend to irrelevant materials submitted to the court out of laziness in reviewing and editing evidentiary submissions, or worse, out of a desire to overwhelm and harass an opponent."  *Id.*  Here, as noted above and discussed in more detail below, none of the confidential materials are relevant because there was no legitimate issue in dispute in the first instance.  Therefore, all of those materials should be stricken, including the entirety of the documents containing information that Plaintiffs filed publicly in violation of the protective order.

Two days before the Ex Parte Application was filed, the parties met and conferred about a potential negotiated resolution.  Defendants expressed optimism about the ability to resolve Plaintiffs' concerns and followed up with an email targeting that Friday for further feedback.  The next morning, notwithstanding their acquiescence to further negotiations, Plaintiffs gave ex parte

6

notice that they intended to seek a temporary protective order. Defendants responded by saying that motion practice was unwarranted, asked Plaintiffs to hold their application, and confirmed that they still intended to provide an update that following morning that would move the parties toward the ultimate goal of a prompt negotiated resolution of the issue. Defendants also requested that Plaintiffs provide the set of papers they were planning to file as soon as possible, which would provide further opportunity to reach a resolution without motion practice. The next morning, within a 15-minute period starting at 9:15 a.m., Plaintiffs provided copies of the Ex Parte Application they intended to file and Defendants notified Plaintiffs of their proposal that would moot the requested relief. Plaintiffs nevertheless filed their Ex Parte Application at 10:21 a.m. By Monday, the parties agreed on a framework that would allow the Ex Parte Application to be taken off calendar and notified the Court of that agreement, leading the Court to take the Ex Parte Application off calendar without prejudice to its renewal. The Court also informed the parties that it had never considered the courtesy copies and would be disposing of them.

Under these circumstances, Plaintiffs should never have filed the Ex Parte Application. And they certainly should not have filed reams of confidential material without first giving Defendants an opportunity to minimize or eliminate the amount of confidential material being publicized. Whether out of "laziness," "a desire to overwhelm and harass" Defendants, or any other motivation, Plaintiffs' filing of an Ex Parte Application that was quickly mooted by the parties' mutual agreement renders the application irrelevant to any decision required from the Court. Indeed, the Court did not consider the Ex Parte Application. There is no reason to place confidential materials in support of that irrelevant Ex Parte Application into the public file.

Because Plaintiffs have already placed into the public file confidential material in violation of the protective order, it is also proper for the Court to strike the documents containing that confidential material to avoid drawing attention to them. Thus, if the Court is not inclined to strike the entire Ex Parte Application from the file, it should strike the Memorandum of Points and Authorities, the Hagey Declaration, and the Antonelli Declaration, all of which disclose Defendants' confidential information, either directly or indirectly.

**C.    At a Minimum, the Court Should Place the Ex Parte Application Under Seal.**

The sealed records rules do not apply to all motions and records filed or lodged with the Court. For example, rule 2.550 expressly provides that the "rules do not apply to discovery motions and records filed or lodged in connection with discovery motions or proceedings." Cal. Rules of Ct., rule 2.550(a)(3). Thus, discovery papers can be filed under seal and remain under seal without the holder of the confidential information making any type of showing. In explaining the distinction between discovery proceedings and substantive matters, the Advisory Committee Comment to rule 2.550 notes that the sealed record rules "recognize the First Amendment right of access to documents used at trial or *as a basis of adjudication*," but not to discovery matters. *Id.*, Advisory Committee Comment (emphasis added). While the First District has recognized that documents "submitted as a basis of adjudication" are subject to the sealed records rules, it did so in the context of a fully briefed and decided motion for summary judgment. *See Overstock*, 231 Cal. App. 4th at 492-97. And in doing so, that court narrowly held that this phrase "embraces discovery materials submitted in support of and opposition to substantive pretrial motions, regardless of *the ground on which the trial court ultimately rules*." *Id.* at 497 (emphasis added). Because the Court here did not rule on the Ex Parte Application at all, it should place those papers under seal in their entirety.

To be clear, there is no dispute that the Court never ruled on the Ex Parte Application. To the contrary, at the parties' request, the Court specifically took the application off calendar, without prejudice to its renewal, in light of the parties' negotiated resolution. Thus, the sealed record rules should not apply to the Ex Parte Application. The material lodged confidentially under seal should remain under seal. Moreover, the Memorandum of Points and Authorities, the Hagey Declaration, and the Antonelli Declaration, all of which disclose Defendants' confidential information, either directly or indirectly, should also be placed under seal.[2] Treatment of these papers, which were never considered or ruled upon by the Court, is consistent with rule 2.550 and the precedents upon which that rule is based. *See, e.g.*, *Matter of Krynicki*, 983 F.2d 74, 75–76

_____

[2] Assuming Plaintiffs have swapped out those three documents in their entirety for slip sheets indicating that they have been filed provisionally under seal, as Plaintiffs stated they would do shortly before this motion was filed, those three documents should remain under seal.

(7th Cir. 1992) (explaining that "[i]nformation that is used at trial or otherwise becomes the basis of decision enters the public record," and that "[s]ecrecy persists only if the court does not use the information to reach a decision on the merits"), *cited approvingly in NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 20 Cal. 4th 1178, 1209 n.25 (1999).

Finally, if the Court declines to grant any of the foregoing relief, Defendants request that the parties and non-parties that produced the confidential information at issue be given leave to make a further showing under rule 2.551 of the California Rules of Court, consistent with the Court's guidance at the CMC that it would not "automatically" unseal confidential documents. 10/16/20 Tr. at 46:16-47:17.

## IV.  CONCLUSION

For these reasons, the Court should (1) strike the entire Ex Parte Application from the record, (2) strike all material lodged confidentially under seal and the entire Memorandum of Points and Authorities, Hagey Declaration, and Antonelli Declaration; or (3) permanently seal the portions of the Ex Parte Application lodged confidentially under seal, and the entirety of the Memorandum of Points and Authorities, the Hagey Declaration, and the Antonelli Declaration.

Dated:  November 2, 2020                     JONES DAY


                                             By: */s/ Stephen D. Hibbard*
                                                  Stephen D. Hibbard

                                             Attorneys for Defendants
                                             HDR GLOBAL TRADING LIMITED and ABS
                                             GLOBAL TRADING LIMITED

Dated:  November 2, 2020                     AKIN GUMP STRAUSS HAUER & FELD LLP


                                             By: */s/ Peter I. Altman*
                                                  Pater I. Altman

                                             Attorneys for Defendant
                                             ARTHUR HAYES

# EXHIBIT 10

PARTIAL TRANSCRIPT OF YOUTUBE VIDEO

"Bitmex CEO Arthur Hayes Crypto Millionaire Explains How He Created A Multi Million Dollar Company"

November 5, 2018

https://www.youtube.com/watch?v=Ljw9ulT2NHE



| Time | Speaker | Audio Transcript |
|------|---------|------------------|
| 5:45 | Arthur Hayes | At that time bitcoin started to rally quite aggressively and in China you could actually sell bitcoin at a 40% premium to what you can buy it for on the international market outside of China. So, I got on a bus to Shenzhen, with my passport, and I faked an address and I got a bank account in China. And I opened exchange accounts all across China on major exchanges. |

# EXHIBIT 11

PARTIAL TRANSCRIPT OF YOUTUBE VIDEO

"The Tangle in Taipei with Arthur Hayes and Nouriel Roubini"

July 15, 2019

https://www.youtube.com/watch?v=qlZukhN_C6c



The Tangle in Taipei with Arthur Hayes and Nouriel Roubini

25,577 views • Jul 15, 2019 👍 566 👎 30 ➤ SHARE ≡+ SAVE •••

| Time | Speaker | Audio Transcript |
|------|---------|------------------|
| 9:15 | Arthur Hayes | Maybe U.S.-centric Roubini thinks that New York DFS and New York AG is the only game in town and we need to bow down and take [expletive] from the U.S. government, just because it is regulated ... that is really not my game, I did not want to sit on a bottom bunk with bobo all day, so I got out of that situation... |
| 9:41 | Andrew Neil | No, but you will understand that in the scale of global regulation: the SEC, New York, the regulatory authorities in London of in Frankfurt, are on a slightly different scale than regulatory authorities in the Seychelles. |

| 9:55 | Arthur Hayes | It just costs more to bribe them. |
|---|---|---|
| 9:57 | Andrew Neil | Costs more to bribe them?  ...  So, how much are you paying to bribe the Seychelles authorities? |
| 10:07 | Arthur Hayes | A coconut. |

# EXHIBIT 12

# Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

## Top 25 Traders by Notional

| Rank | | Name | Profit | | Is Real Name |
|------|---|------|--------|---|--------------|
| 1 | | Mercury-Wood-Sprite | 8,161.2198 XBT | | ✖ |
| 2 | | Quick-Grove-Mind | 8,047.8158 XBT | | ✖ |
| 3 | | Heavy-Autumn-Wolf | 7,574.4154 XBT | | ✖ |
| 4 | 1. Sunil Shah, 310 Lake St., Unit #310, | Alameda Research | 5,244.5830 XBT | | ✔ |
| 5 | Huntington Beach, CA 92648 | Hot-Relic-Fancier | 4,216.5159 XBT | | ✖ |
| 6 | 2. Bryce Gilleland, 1400 Calle De Las | coincidentcapitalltd | 2,610.2783 XBT | $31,000,000 Exhibits: | ✔ |
| 7 | Flores, San Dimas, CA 91773 | Skitter-Peridot-Raven | 2,329.1721 XBT | 6, 7, 8 | ✖ |
| 8 | 3. Wen Hou, 2253 Martin St. Apt 113, Irvine, CA 92612 | Honeysuckle-South-Rib | 2,111.6555 XBT | | ✔ |
| 9 | | CSW is a fraud | 2,086.7229 XBT | | ✔ |
| 10 | | Tree-Surf-Dragon | 2,053.2285 XBT | | ✖ |
| 11 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger-LeotankCapital | 1,764.5478 XBT | $21,000,000 Exhibits: 9, 10, 11 | ✔ |
| 12 | | alamedaresearchltd@gmail.com | 1,696.7039 XBT | | ✔ |
| 13 | | jade-Platinum-Legs | 1,675.8174 XBT | | ✖ |
| 14 | | Circle_Trade | 1,619.6382 XBT | | ✔ |
| 15 | | Winter-Pink-Fang | 1,542.1702 XBT | | ✖ |
| 16 | | daniel3 | 1,514.6067 XBT | | ✔ |
| 17 | | Cream-White-Ox | 1,476.3798 XBT | | ✖ |
| 18 | | xorq | 1,473.0086 XBT | | ✔ |
| 19 | | Disco-Solar-Fang | 1,452.1775 XBT | | ✖ |
| 20 | Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 | Roger_LeotankCapital | 1,441.3349 XBT | $17,000,000 Exhibits: 9, 10, 11 | ✔ |
| 21 | | Ebony-Fair-Bat | 1,390.0500 XBT | | ✖ |
| 22 | | aoa | 1,386.5926 XBT | | ✔ |
| 23 | | Quill-Rift-Hoof | 1,363.3790 XBT | | ✖ |
| 24 | | Brown-Peat-Myth | 1,248.5080 XBT | | ✖ |
| 25 | | Denim-Sun-Speaker | 1,218.5577 XBT | | ✖ |



Coincident Capital

Home   Our Team   Blog   Contact Us

# Our Team







## Bryce Gilleland

Chief Executive Officer

Bryce is a high energy business veteran and cryptocurrency expert. He has fulfilled various roles in Fortune 500 companies as a senior manager in investor relations and corporate strategy giving him the breadth and vision to guide Coincident. He also founded a cryptocurrency trading firm, serving as its CEO

## Wen Hou

Chief Investment Officer

Wen is a trading, finance, and cryptocurrency expert and enthusiast. Wen boasts over a decade of trading experience and an amazing six year track record in cryptocurrency. Wen is currently ranked on multiple exchange leaderboards and prides himself on making strategic, patient, and disciplined trades. Wen

## Sunil Shah

Chief Operating Officer

Sunil is an electrical and software engineer. Coming from various renewable energy startups he brings experience in software design, predictive analytics, economic forecasting, finance, and operations. He previously founded a company that used artificial intelligence to optimize battery energy storage operations.

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively. ✕

# Secretary of State
## Statement of Information
(Limited Liability Company)

**FILED**

In the office of the Secretary of State
of the State of California

**JUL 10, 2020**

**This Space For Office Use Only**

**IMPORTANT —** Read instructions **before completing this form.**

**Filing Fee – $20.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

COINCIDENT CAPITAL GP, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201928710184 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |
| b. Mailing Address of LLC, **if different than item 4a**<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box<br>310 Lake St., Unit #310 | Huntington Beach | CA | 92648 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b<br>Sunil | Middle Name | Last Name<br>Shah | Suffix |
|---|---|---|---|
| b. Entity Name - Do not complete Item 5a | | | |

| c. Address<br>225 Copa De Oro Dr. | City (no abbreviations)<br>Brea | State<br>CA | Zip Code<br>92823 |
|---|---|---|---|

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL —** Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation)<br>Sunil | Middle Name | Last Name<br>Shah | Suffix |
|---|---|---|---|
| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box**<br>310 Lake St., Unit #310 | City (no abbreviations)<br>Huntington Beach | State<br>CA | Zip Code<br>92648 |

**CORPORATION —** Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company
Managing Firm

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| b. Address | City (no abbreviations) | State | Zip Code |

**9. The Information contained herein, including any attachments, is true and correct.**

| 07/10/2020 | Sunil Shah | Managing Partner | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name: ⌈ ⌉

Company:

Address:

City/State/Zip: ⌊ ⌋

**Attachment to Statement of Information** (Limited Liability Company)

**LLC-12A Attachment**

20-C75659

**A. Limited Liability Company Name**

COINCIDENT CAPITAL GP, LLC

This Space For Office Use Only

| B. 12-Digit Secretary of State File Number | C. State or Place of Organization (only if formed outside of California) |
|---|---|
| 201928710184 | CALIFORNIA |

**D. List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address. If the manager/member is an entity, enter the entity's name and address. Note: The LLC cannot serve as its own manager or member.

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| Bryce | | | Gilleland | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| 1400 Calle De Las Flores | | San Dimas | | CA | 91773 |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| Wen | | | Hou | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| 2253 MARTIN APT 113 | | Irvine | | CA | 92612 |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| | | | | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| | | | | | |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| | | | | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| | | | | | |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| | | | | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| | | | | | |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| | | | | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| | | | | | |

| First Name | | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| | | | | | |
| Entity Name | | | | | |
| Address | | City (no abbreviations) | | State | Zip Code |
| | | | | | |

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

CIK (Filer ID Number)

Previous Names [X] None

Entity Type

0001794657

Name of Issuer

Coincident Capital, LP

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2019
[ ] Yet to Be Formed

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

## 2. Principal Place of Business and Contact Information

Name of Issuer

Coincident Capital, LP

| Street Address 1 | | Street Address 2 |
|---|---|---|
| 310 LAKE STREET | | UNIT #310 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| HUNTINGTON BEACH | CALIFORNIA | 92648 | 949-633-6491 |

---

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| GILLELAND | BRYCE | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 310 Lake Street | Unit #310 | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Huntington Beach | CALIFORNIA | 92648 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager of General Partner

---

## 4. Industry Group

[ ] Agriculture

Health Care

[ ] Retailing

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

☒ Pooled Investment Fund

    ☒ Hedge Fund

    ☐ Private Equity Fund

    ☐ Venture Capital Fund

    ☐ Other Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    ☐ Yes      ☒ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☐ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | | ☒ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Investment Company Act Section 3(c)

    ☐ Section 3(c)(1)      ☐ Section 3(c)(9)

| | | |
|---|---|---|
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☒ Rule 506(b) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Rule 506(c) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| | ☐ Section 3(c)(7) | |

---

## 7. Type of Filing

☐ New Notice    Date of First Sale 2020-02-01 ☐ First Sale Yet to Occur

☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| ☐ Equity | ☒ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?    ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $100,000 USD

---

## 12. Sales Compensation

Recipient                            Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None      (Associated) Broker or Dealer CRD Number      ☒ None

Street Address 1                          Street Address 2

City                                   State/Province/Country             ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States    ☐ All States    ☐ Foreign/non-US

---

## 13. Offering and Sales Amounts

Total Offering Amount        USD   or ☒ Indefinite

Total Amount Sold          $2,700,000 USD

Total Remaining to be Sold          USD   or [X] Indefinite

Clarification of Response (if Necessary):

---

**14. Investors**

[X] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.   `22`

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:   `45`

---

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

---

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

---

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Coincident Capital, LP | /s/Bryce Gilleland | Bryce Gilleland | Manager of General Partner | 2020-08-10 |

**_Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number._**

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

---

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

---

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)                Previous Names    [X] None

0001794657

Name of Issuer
Coincident Capital, LP

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2019
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
Coincident Capital, LP

| Street Address 1 | Street Address 2 |
|---|---|
| 2 ANCHOR DR | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| EMERYVILLE | CALIFORNIA | 94608 | 949-633-6491 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| GILLELAND | BRYCE | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2 ANCHOR DR | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| EMERYVILLE | CALIFORNIA | 94608 |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Manager of General Partner

---

### 4. Industry Group

[ ] Agriculture            Health Care        [ ] Retailing

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

☒ Pooled Investment Fund

    ☒ Hedge Fund

    ☐ Private Equity Fund

    ☐ Venture Capital Fund

    ☐ Other Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    ☐ Yes       ☒ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☐ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | | ☒ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Investment Company Act Section 3(c)

    ☐ Section 3(c)(1)       ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(ii)
☐ Rule 504 (b)(1)(iii)
☒ Rule 506(b)
☐ Rule 506(c)
☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(2)
☐ Section 3(c)(3)
☐ Section 3(c)(4)
☐ Section 3(c)(5)
☐ Section 3(c)(6)
☐ Section 3(c)(7)

☐ Section 3(c)(10)
☐ Section 3(c)(11)
☐ Section 3(c)(12)
☐ Section 3(c)(13)
☐ Section 3(c)(14)

## 7. Type of Filing

☒ New Notice    Date of First Sale   ☒ First Sale Yet to Occur
☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $100,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None

(Associated) Broker or Dealer CRD Number   ☒ None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply) Check "All States" or check individual States

☐ All States   ☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount    USD   or ☒ Indefinite

Total Amount Sold         $0 USD

Total Remaining to be Sold      USD  or [X] Indefinite

Clarification of Response (if Necessary):

---

### 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:                                    [0]

---

### 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD  [ ] Estimate

Finders' Fees $0 USD  [ ] Estimate

Clarification of Response (if Necessary):

---

### 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  [ ] Estimate

Clarification of Response (if Necessary):

---

### Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Coincident Capital, LP | /s/ Bryce Gilleland | Bryce Gilleland | Manager of General Partner | 2019-11-20 |

***Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.***

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.



## Leotank Capital
Investment Management · New York, NY · 34 followers

Cryptocurrency Hedge Fund

**+ Follow**   **Visit website** ↗

| Home |
| About |
| Jobs |
| People |
| Insights  🔶 PREMIUM |

## Overview

Leotank Capital is an investment management company which manages Leotank Crypto Fund ("Leotank"), an institution quality multi-strategy cryptocurrency hedge fund focusing on highly scalable trading strategies in the digital asset space. Leotank is committed to generating superior risk-adjusted returns, while protecting clients' assets in the volatile crypto market. Leotank's strategy revolves around three strategies in particular, the: 1) Volatility Strategy, 2) Quantamental Strategy, and 3) Arbitrage Strategy. Leotank deploys these strategies on top exchanges all around the world to mitigate counterparty risks

| Website | http://www.leotank.com/ |
|---|---|
| Industry | Investment Management |
| Company size | 2-10 employees |
| | 2 on LinkedIn ⓘ |
| Headquarters | New York, NY |
| Type | Privately Held |
| Founded | 2018 |
| Specialties | Cryptocurrency, Hedge Fund, and Multi-Strategy |

## Locations (1)

Primary

250W 50th Street, apt 3d2, New York, NY 10019, US

Get directions ↗





Q Search

Home   My Network (32)   Jobs   Messaging

Message   More...

Roger Xu · 3rd ⓘn

Co-Founder at Leotank Capital

New York City Metropolitan Area · 55 connections · **Contact info**

⬛ Leotank Capital

🟥 Carnegie Mellon University

## About

No wire/telegram account. Don't be scammed.
Wouldn't look at DM, please email if necessary.

## Activity

58 followers

Posts Roger created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

## Experience

 **Co-Founder**
Leotank Capital
Mar 2020 – Present · 6 mos

 **Managing Partner**
Ivory Bay Capital
Jan 2019 – Mar 2020 · 1 yr 3 mos

 **Co-Founder**
Leotank Capital
Jul 2018 – Feb 2019 · 8 mos

## Education

 **Carnegie Mellon University**
Master's degree, Computer Software Engineering
2016 – 2018



**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 6923726 | Incorporation Date / Formation Date: | 6/8/2018 (mm/dd/yyyy) |
| Entity Name: | LEOTANK CAPITAL INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | NATIONAL REGISTERED AGENTS, INC. | | |
| Address: | 1209 ORANGE STREET | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-674-4089 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ◯ Status ◯ Status,Tax & History Information

Submit

# EXHIBIT 13

# Announcing the BitMEX User Verification Programme

**BitMEX**   14 Aug 2020

We will be launching our User Verification Programme at 00:00 UTC on 28 August 2020, where all customers will be asked to complete ID checks within the next 6 months. These new controls will enable us to create a more trusted and secure trading environment for all BitMEX users.

As part of this new initiative, we will also be unveiling details of a significant Trading Tournament in the coming weeks where users who have completed verification will be eligible to compete for sizable prizes.

**What new requirements can users expect?**

The User Verification Programme will require individual users to go through a four step process similar to ID checks on many other cryptocurrency exchanges. Individual users will be prompted to upload a photo ID and proof of address, take a selfie, as well as answer a few multiple choice questions about source of funds and trading experience. **It should take about five minutes to complete from start to finish.**

Corporate accounts will continue to go through the existing verification process, with our team ready to guide them through as quickly and efficiently as possible.

**When will the User Verification Programme kick off?**

The User Verification Programme will go live from 00:00 UTC on 28 August 2020. It will be mandatory for all BitMEX users to have completed identity verification by 12 February 2021 at 00:00 UTC in order to continue trading on our platform.

**Why the need for verification?**

Cryptocurrencies have come a long way in their 10 years of existence. Today, user identity verification is increasingly expected in order to meet evolving international regulatory standards, and is an important part of building trust in the cryptocurrency ecosystem. Practical customer security is greatly enhanced by identity verification, allowing BitMEX support personnel to reliably verify the actual owner of an account in the event of a dispute, hack, or incapacitation.

Further information will be made available on 28 August 2020 at the time of the User Verification Programme going live. If you have any questions in the meantime, please contact Support.

---

## Platform Status

| Status | Name |
| --- | --- |

| Status | Name |
|---|---|
| ✅ Operational | BitMEX.Com |
| ✅ Operational | Testnet |
| ✅ Operational | Blog |
| ✅ Operational | E-Mails & Notifications Delivery |

View Status Page ↗

## Crypto Trader Digest:

## Bitcoin's most in-depth market analysis, commentary, and insights

Sign-up to receive the latest articles delivered straight to your inbox.

| Email | Subscribe |
|---|---|

# EXHIBIT 14

Get started    Open in app



# Matthew Collins

264 Followers   ·   About    Follow

# BitMEX insiders caught in a web of lies

 Matthew Collins  May 20, 2018  ·  7 min read



*Update May 24*

*Thanks to the 15k+ readers for for sharing tips and content. This story about greed and scandal is now getting picked up by mainstream media and translated into Russian, Japanese, and Korean.*

After months of rumours about misconduct behind the scenes, BitMEX founders Arthur Hayes, Samuel Reed and Ben Delo have finally admitted (well, not quite) to giving unfair trading advantages to insiders, a practice they had previously denied.

They have also been engaging in unprofitable trading to artificially inflate exchange volumes (aka wash trading), outlined below.

To understand how unscrupulous actors try to squeeze every extra buck out of retail customers and fool potential investors in the (unregulated) Wild West of crypto, read on…



Ain't that the truth

## Admission of guilt

Last week marked 2018's marquee cryptocurrency gathering / giant circle-jerkathon, Consensus. Arthur Hayes, BitMEX CEO, was snapped posing in front of a bright orange Lamborghini. Later that week, he was the face of CNBC's Fast Money.



BitMEX's rented Lambo / PR stunt

Two weeks earlier, the BitMEX team were in a huddle discussing how to slip under the radar an admission they'd been engaging in unethical and probably illegal activity.

On April 30, a groundbreaking post surfaced on the BitMEX blog, admitting that the exchange operates its own (previously undisclosed) for-profit trading arm. This subsidiary trades against customers on their own exchange, and enjoys unfair advantages not available to other customers.

> **BitMEX Market Making Desk**
>
> We have recently updated our Terms of Service to explicitly clarify the relationship between BitMEX the trading...
>
> blog.bitmex.com

The in-house trading arm and 'anchor market maker' vaguely referenced in the past, is staffed by their long-term friend and employee, Nick Andrianov.

## Who Runs The Desk?

The head trader is Nick Andrianov. He is a former Deutsche Bank equity flow and exotics options trader. Nick and I have known each other for over ten years. His integrity is unquestionable.

Nick's LinkedIn profile pegs him as the current BitMEX Business Development Manager.





TFW 'Business Development' is actually privileged insider trading

And of course we all remember Nick from back in November 2017 as part of the 'Deutsche Bank Connection'.

## Special trading privileges when you're on the inside

While making money trading against BitMEX's own customers, the anchor market maker received many *special trading privileges* that aren't available to other exchange users. Below are 3 concrete examples of this:

### The Deutsche Bank Connection

Bankers are flocking to the cryptocurrency industry as both principals and employees of crypto companies/funds.

blog.bitmex.com

### 1. Off-exchange cash kickbacks disguised as 'service fees'

*Bit...*

**Nick Andrianov**, Risk Management at BitMEX, member of the 2007 graduate class. He worked on the Flow and Exotic Index Volatility trading desk.

**How Do We Align Incentives?**

The trading entity is a for-profit operation. However, ==their earnings are comprised of a service fee paid by the business,== that is the BitMEX trading platform. In terms of trading PNL, the

*The truth is:*

If the BitMEX market maker loses money, the BitMEX exchange backdoors them cash payments (the economic equivalent of fee-free trading). This encourages the market maker to participate in unprofitable trading to artificially inflate exchange volume.

## 2. Unique status allowing them to short-sell options

*BitMEX claims:*

Because no leverage is offered to sellers, it is very expensive from a capital perspective to make a market. In order to guarantee tight spreads at sufficient size, ==the BitMEX affiliated anchor market maker will be the only entity allowed to sell options initially.==

Many of you may have concerns that the BitMEX affiliated entity is the sole market maker, however here are some points to consider:

*The truth is:*

They are indeed the only market participant allowed to short sell the new UP and DOWN option contracts. This is a hugely profitable advantage (in the order of tens of thousands of $$$ per day according to one source).

A recent newsletter from Deribit (competing crypto options exchange) outlined that the BitMEX options are 5–10x the fair market price. The insider market maker (the only person allowed to sell) is one plump hog!

## 3. Additional API request bandwidth denied to competitors

*BitMEX claims:*

**Does BitMEX have any market makers?**

BitMEX has an anchor market maker who continuously quotes large sizes on contracts that BitMEX offers. ==No special privileges are given to any of the market makers.==

https://www.bitmex.com/app/faq

*The truth is:*

A large market-maker and trading firm informed me that BitMEX repeatedly denied them increased API request allowances (how many orders-per-second their algo is allowed to send). Meanwhile, the privileged BitMEX market maker probably operates with far fewer order limit restrictions.

With all these special benefits, the BitMEX subsidiary and in-house market maker is in a fantastic position to fleece the exchange's customers. This Nick Andrianov guy (Arthur's old friend and BitMEX insider) is sitting on a gold mine! But at least we can rest easy knowing '[h]is integrity is unquestionable'.

## But why male models?

All of the information in the April 30 blog post is a revelation that runs contrary to the party line, which has always been a deny, deny, deny.

So naturally, we have to wonder what prompted the truth to spill out after months (years) of deceiving market participants.

## 2 days earlier...

It was a rainy afternoon in the Principality of Sealand when an anonymous tipster contacted me.

He was a young CS student trying to put his programming skills into practice by writing code to run a trading bot on BitMEX. But he noticed something odd in the data. There appeared to be another bot that was making consistently unprofitable trades, and could get orders in the market faster than anyone else during those dreadful exchange overloads.



The infamous '503 error'

I decided to dig a little deeper and hear what BitMEX had to say on the issue.



The initial request for truth

Straight from the horse's mouth…



Well, except for those pesky off-exchange cash payments. And the ability to go short. And increased throttle. Although technically, their own trading subsidiary isn't a 'customer'…

Given the timing of this email (2 days before the blog post), we have to wonder if BitMEX staffers were spooked (and / or obliged to consult legal counsel), thus leading to

their admission of guilt.

## The plot thickens

Yet more behaviour by BitMEX suggests they didn't want to bring attention to this blog post.

For example, the post did *not* appear on the RSS feed like most other posts. it also did *not* appear as an 'exchange announcement', which would alert users.



Additionally, while the April 30 blog post claims BitMEX have 'updated our Terms of Service', there is no mention of the privileged for-profit insider market making subsidiary anywhere on the ToS page.

**Terms of Service - BitMEX**

BitMEX is the world's most advanced P2P crypto-products trading platform and API. Trade with up to 100x leverage with...

www.bitmex.com

## Outrage on reddit

Understandably, angry posts have started appearing on reddit. Nettlesome 'customers' are asking for the same trading privileges as the BitMEX internal market-making desk… the nerve!

## Anchor Market Maker?

how does one become this on bitmex?

r/BitMEX • icedoutdopefiend • 2y ago
6 points • 5 comments



Our lead outside counsel is fully aware of the operation and advises us on best practices to ensure that we place the interests of BitMEX customers first.



This guy fucks

Wash trading illustrated. Without the special off-exchange 'service fee' kickbacks, this behaviour would be wildly unprofitable after fees

## Wrapping up

After the truth about the ethical standards of the BitMEX founders has been exposed, the CFTC / SEC will need to dig deeper before even considering US approval of the exchange.

*An immediate and obvious corrective action by BitMEX would be to remove all unfair trading privileges given to their friends and business partners*. Further, BitMEX should discontinue deceiving their customers, and discontinue entertaining the conflict-of-interest between the exchange vs in-house, for-profit trading arm.

*Please forward any further tips / info to mattcollburner@gmail.com*

*I've recently received information about BitMEX's market-making desk front-running OTC orders. More in the next article. @ BitMEX if you would like to respond on record, please get in touch.*

> ## BitMEX running insider trading division for a privileged few (market making)
>
> r/CryptoCurrency • The4ker • 2y ago
> 85 points • 27 comments

Read more about stop hunting here

Blockchain    Cryptocurrency    Bitcoin    Crypto    Trading

About   Help   Legal

Get the Medium app

 

# EXHIBIT 15

Terms of Service

Definitions

BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based virtual trading platform that is wholly owned by HDR Global Trading Limited. HDR Global Trading Limited (hereinafter referred to as BitMEX) was incorporated under the International Business Companies Act of 1994 of the Republic of Seychelles with a company number of 148707.

Use of this BitMEX website ("Website") and the service offered on the Website ("Service") are governed by the terms contained on this Terms and Conditions page ("Terms"). This agreement entirely constitutes the agreement between the parties. All other information provided on the Website or oral/written statements made are excluded from this agreement; the exchange policy is provided for guidance only and does not constitute a legal agreement between the parties.

By accessing, viewing or downloading information from the Website and using the Service provided by BitMEX you acknowledge that you have read, understand, and unconditionally agree to be bound by these Terms. BitMEX may at any time, without notice, amend the Terms. You agree to continue to be bound by any amended terms and conditions and that BitMEX has no obligation to notify you of such amendments. You acknowledge that it is your responsibility to check these Terms periodically for changes and that your continued use of the Website and Services offered by BitMEX following the posting of any changes to the Terms indicates your acceptance of any such changes.

The Website and the copyright in all text, graphics, images, software and any other materials on the Website is owned by BitMEX including all trademarks and other intellectual property rights in respect of materials and Service on the Website. Materials on this Website may only be used for personal use and non-commercial purposes.

You may display on a computer screen or print extracts from the Website for the above-stated purpose only provided that you retain any copyright and other proprietary notices or any BitMEX trademarks or logos, as shown on the initial printout or download without alteration, addition or deletion. Except as expressly stated herein, you may not without BitMEX's prior written permission alter, modify, reproduce, distribute or use in any other commercial context any materials from the Website.

You acknowledge that 'BitMEX' and the BitMEX logo are trademarks of HDR Global Trading Limited. You may reproduce such trademarks without alteration on material downloaded from this Website to the extent authorised above, but you may not otherwise use, copy, adapt or erase them.

You shall not in any circumstances obtain any rights over or in respect of the Website (other than rights to use the Website pursuant to these Terms and any other terms and conditions governing a particular service or section of the Website) or hold yourself out as having any such rights over or in respect of the Website.

Definitions
"Agreement"

means the Terms and Conditions of Use herein.

"BitMEX"

means HDR Global Trading Limited, a company founded in the Republic of Seychelles.

"Data"

means any data input by you or with your authority into the Website.

"Intellectual Property Rights"

means any registered or unregistered design rights, patents, copyright, database rights, data protection rights, trade marks, service marks, moral rights, know-how and any other intellectual or industrial property rights, anywhere in the world.

"Member"

means any current registered user of BitMEX.

"Service"

means all services made available (as may be changed or updated from time to time by BitMEX) via the Website.

"Website"

means any of the images, written material, databases, software or other material available on any website owned or operated by BitMEX.

1. Access Conditions
1.1: You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password.

1.2: When accessing and using the Service, You must:

a) not attempt to undermine the security or integrity of BitMEX's computing systems or networks or, where the Services are hosted by a third party, that third party's computing systems and networks;

b) not use, or misuse, the Services in any way which may impair the functionality of the Services or Website, or other systems used to deliver the Services or impair the ability of any other user to use the Services or Website;

c) not attempt to gain unauthorised access to the computer system on which the Website is hosted or to any materials other than those to which you have been given express permission to access;

d) not transmit or input into the Website any files that may damage any other person's computing devices or software; content that may be offensive; or material or Data in violation of any law (including Data or other material protected by copyright or trade secrets which you do not have the right to use);

e) not attempt to modify, copy, adapt, reproduce, disassemble, decompile or reverse engineer any computer programs used to deliver the Services or to operate the Website except as is strictly necessary to use either of them for normal operation.

f) You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password;

1.3: Use of the Service may be subject to limitations, including but not limited to transaction volumes and the number of calls permitted to be made against BitMEX's application programming interface. Any such limitations will be advised.

1.4: By registering as a Member you represent and warrant:

a) that you have accepted the Terms; and

b) that you are at least 18 years of age and have the capacity to accept the Terms;

c) that you are the legal owner of the funds you add to your account with BitMEX and that the same funds derive from a legitimate source;

d) that using BitMEX services does not constitute a breach of your home jurisdictions' laws;

e) that you are aware of the risks in using the services provided by BitMEX. These risks include the high volatility risk of bitcoin itself, the fact that you may lose all of the funds in your trading account if the market moves against you;

f) that you will not be involved or initiate any form of market manipulation, including spoofing orders or otherwise;

g) that the information or documents you provide as part of any ID verification process are correct, genuine and up-to-date;

h) that any bitcoin withdrawal address you provide is your own and that you have full control over this address;

i) that you are not a resident of the United States of America or any other jurisdiction where the services offered by BitMEX are restricted. If it is determined that you have given false representation as to your place of residence, BitMEX reserves the right to close your account immediately and liquidate any open positions at the prevailing market price.

1.5: You can open an initial account by providing your email address and full name (Initial Account).

1.6: BitMEX reserves the right at any time to verify your identity for the purposes of complying with the Seychelles' Anti-Money Laundering Act 2006.

1.7: We impose certain trading limits before you are required to conduct Customer Due Diligence (CDD). You agree to cooperate with us in this process and will provide all documentation/information that we may require to satisfy ourselves of your identity and the purpose of the business relationship.

1.8: We may freeze any Account in the event that we suspect or have reason to believe you are engaged in suspicious trading or other activity or have breached any of the above warranties. This may result in the unwinding of any trades you have entered into. We expressly exclude any losses or profits you would have made as a result of us closing your trade positions early or you not being able to trade on BitMEX and you agree to indemnify us completely against any third party action resulting from your conduct or us having to close your positions early. Whilst your Account is frozen we will conduct an investigation and may require you to cooperate with our enquiries. During the investigation stage you will not be able to make deposits or withdrawals to your Account nor will you be able to trade. At the end of the investigation we may, at our own discretion, decide to close your Account for which we are not required to provide you with any reasons for the same.

1.9: We reserve the right at our own discretion to close your Account with 7 days notice. You will therefore have 7 days in which to close your positions. If at the expiry of that period your positions are still open we will force close them and return to you any remaining bitcoin left in your Account.

1.10: It is your responsibility entirely to provide us with correct details including your withdrawal address. We accept no liability resulting in you not receiving the bitcoin withdrawn due to you providing incorrect or out-of-date details.

1.11: It is our responsibility to maintain an orderly market and as such we may at our own discretion halt trading on the Website due to market disruption or other relevant external events. We exclude all liability for any claimed losses or profits lost as a result of us halting trading.

2. Intellectual Property Rights

2.1: All intellectual property rights relating to all the material used on the Website including, but not limited to, design, structure, layouts, graphical images and underlying source code belongs to BitMEX. All rights are reserved.

2.2: You acknowledge that, except as otherwise agreed between the parties in writing, all intellectual property rights of BitMEX and the Website shall remain with BitMEX.

2.3: By submitting content to any public area of the Website, including blogs, message boards, and forums, you grant BitMEX a royalty-free, perpetual, irrevocable, non-exclusive right and licence to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, communicate to the public, perform and display the content (in whole or in part) worldwide and to incorporate it in other works in any form, media, or technology now known or later developed, for the full term of any rights that may exist in such content. You also permit any subscriber to access, display, view, store and reproduce such content for personal use.

2.4: By submitting any content to the Website you warrant that you are entitled to and have all necessary intellectual property rights over that content.

3. Privacy Policy

3.1: Please see our separate Privacy Policy, which forms part of these terms.

4. Data Protection

4.1: BitMEX may place information concerning you on a database of internal use only. BitMEX will not disclose your details to any third party unless required by law, unless specifically instructed to the contrary by you.

5. Third Party Websites

5.1: BitMEX links to third party websites that are not affiliated or associated with BitMEX (although BitMEX branding, advertisements or links may appear on these websites) and BitMEX may send e-mail messages to you containing advertisements or promotions including links to third parties. BitMEX makes no representation as to the quality, suitability, functionality or legality of the material on third party websites that are linked to, or to any goods and services available from such websites. The material is only provided for your interest and convenience. BitMEX does not monitor or investigate such third party websites and BitMEX accepts no responsibility or liability for any loss arising from the content or accuracy of this material and any opinion expressed in the material should not be taken as an endorsement, recommendation or opinion of BitMEX.

5.2: Under no circumstances are you to create a hyperlink to any of the pages on the Website, unless BitMEX provides you with its prior consent to do so. If you do create a link to any of the pages on the Website, you acknowledge that you are responsible for all direct or indirect consequences of the link, and you indemnify BitMEX for all loss, liability, costs or expense arising from or in connection with the link.

6. Warranties and Representations
6.1: You acknowledge that:

a) You are authorised to access and use the Website; In particular, the jurisdiction where you reside, hold citizenship, or conduct business allows you to utilize BitMEX's services;

b) If you are using the Website on behalf of or for the benefit of any organisation then it is assumed that you have the right to do so. The organisation will be liable for your actions including any breach of these Terms;

c) Your use of the Website and the Service is at your own risk. You agree that BitMEX is not liable for any damage or harm arising out of your use of the Website and Service;

d) The information provided on the Website is for general information purposes only and is given in good faith. However, the information is selective and BitMEX may not verify all information, which may not be complete or accurate for your purposes and should not be relied upon without further enquiry. The information should not be construed as a recommendation to trade or engage the Service provided by BitMEX in a particular manner; and

e) BitMEX does not warrant that the use of the Website will be uninterrupted or error free. Among other things, the operation and availability of the systems used for accessing the Website, including public telephone services, computer networks and the Internet, can be unpredictable and may from time to time interfere with or prevent access to the Website. BitMEX is not in any way responsible for any such interference that prevents your access or use of the Website and the Service.

6.2: BitMEX gives no warranty about the Website. Without limiting the foregoing, BitMEX does not warrant that the Website will meet your requirements or that it will be suitable for your purposes. To avoid doubt, all implied conditions or warranties are excluded insofar as is permitted by law including, without limitation, warranties of merchantability, fitness for purpose, title and non-infringement.

6.3: You warrant and represent that you are acquiring the right to access and use the Website and agreeing to these Terms for the purposes of a business and that, to the maximum extent permitted by law, any statutory consumer guarantees or legislation intended to protect non-business consumers in any jurisdiction does not apply to the supply of the Website or these Terms.

7. Service Performance

7.1: BitMEX denies all liability for the timely operation of the Website when used within an Internet environment, where you or a third party is providing the computer equipment upon which the product is depend upon for any part of its functionality.

7.2: By using this service you confirm your understanding that the timely operation of the Internet and the World Wide Web is governed by constraints beyond the control of BitMEX. You accept that BitMEX is not liable for any perceived slow operation of the Website.

7.3: By using this service you accept that all trade executions are final and irreversible.

7.4: By using this service you accept that BitMEX reserves the right to liquidate any trades at any time regardless of the profit or loss position.

8. Indemnification

8.1: You agree to indemnify and hold harmless BitMEX, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to out of your violation this Agreement.

9. Limitation of Liability

9.1: In no event will BitMEX, or its suppliers or licensors, be liable with respect to any subject matter of this agreement under any contract, negligence, strict liability or other legal or equitable theory for: * i) any special, incidental or consequential damages; (ii) the cost of procurement or substitute products or services; (iii) for interruption of use or loss or corruption of data; or (iv) for any amounts that exceed the fees paid by you to BitMEX under this agreement during the twelve (12) month period prior to the cause of action. BitMEX shall have no liability for any failure or delay due to matters beyond their reasonable control. The foregoing shall not apply to the extent prohibited by applicable law.

10. Calculations

10.1: All calculations performed by the BitMEX trading engine and as verified by BitMEX are final. Our methodology is outlined here. As noted in clause 6.1, BitMEX does not warrant that the use of the Website will be uninterrupted or error free.

11. Termination & Remedies for Breach of these Terms by You

a) BitMEX reserves the right to seek all remedies available at law and in equity for violations of these Terms, including without limitation, the right to restrict, suspend or terminate your account or deny you access to the Website without notice; and

b) BitMEX shall be entitled to disclose your user identity and personal details if required or requested by a court of law, governmental agency or any other law enforcement authority in

such circumstances as BitMEX in its sole discretion considers reasonably necessary or appropriate.

## 12. Absence of Waiver

12.1: Any failure or delay by BitMEX to enforce any of the Terms or to exercise any right under the Terms will not be construed as a waiver to any extent of our rights.

## 13. Force Majeure

13.1: Neither party is liable for delay in meeting its obligations due to any cause outside its reasonable control including acts of god, riot, war, malicious acts of damage, fires, electricity supply failure, Government authority.

## 14. Survival

14.1: Should any provision of these Terms be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected. If any provision is determined to be unenforceable, you agree to an amendment by BitMEX of such provision to provide for enforcement of the provisions intent, to the extent permitted by applicable law.

## 15. Governing Law

The Terms are governed by and construed in accordance with English common law. The International Business Companies Act 1994 is the principal legislation that governs corporates in the Republic of Seychelles.

# EXHIBIT 16



# THE NEXT GENERATION OF BITCOIN TRADING PRODUCTS

Up to 100x leverage. Trading without expiry dates. Industry-leading security.

Welcome to Bitcoin's most advanced trading platform.

View Live Trading

Sign up takes less than 30 seconds and requires no personal information. Trade in minutes, deposits only require 1 confirmation. Want to try a simulated trading?

## Log In

Register

Email

Your Email

Password

Your Password

Two-Factor Token (if enabled)

Google Authenticator or Yubikey OTP

Could not connect to the reCAPTCHA service.
Please check your internet connection and
reload to get a reCAPTCHA challenge.

Log In

Need an Account? Register

Forgot Password or Two-Factor Device?

| $1.07B | $57.75B | $921.62B |
|---|---|---|
| 24 Hours | 30 Days | 365 Days |

| 1500% | 100 | 0 |
|---|---|---|
| More Bitcoin/USD liquidity than any other platform. BitMEX's XBTUSD market is the most liquid in the world. | Audits per second. BitMEX's engine constantly audits the balances and history of all accounts. | Bitcoin lost through intrusion or hacking. BitMEX keeps all funds in cold storage. |

### Unique Products

BitMEX offers up to 100x leverage on
Bitcoin and high leverage on Altcoin
contracts.

### Advanced API

Our trading engine was built using the
same technology used by investment
banks and hedge funds.

### Leading Security

BitMEX employs the latest in multi-factor
security, inside and out. Safety is our
primary concern.

# EXHIBIT 17

Terms of Service

Definitions

BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based virtual trading platform that is wholly owned by HDR Global Trading Limited. HDR Global Trading Limited (hereinafter referred to as BitMEX) was incorporated under the International Business Companies Act of 1994 of the Republic of Seychelles with a company number of 148707.

Use of this BitMEX website ("Website") and the service offered on the Website ("Service") are governed by the terms contained on this Terms and Conditions page ("Terms"). This agreement entirely constitutes the agreement between the parties. All other information provided on the Website or oral/written statements made are excluded from this agreement; the exchange policy is provided for guidance only and does not constitute a legal agreement between the parties.

By accessing, viewing or downloading information from the Website and using the Service provided by BitMEX you acknowledge that you have read, understand, and unconditionally agree to be bound by these Terms. BitMEX may at any time, without notice, amend the Terms. You agree to continue to be bound by any amended terms and conditions and that BitMEX has no obligation to notify you of such amendments. You acknowledge that it is your responsibility to check these Terms periodically for changes and that your continued use of the Website and Services offered by BitMEX following the posting of any changes to the Terms indicates your acceptance of any such changes.

The Website and the copyright in all text, graphics, images, software and any other materials on the Website is owned by BitMEX including all trademarks and other intellectual property rights in respect of materials and Service on the Website. Materials on this Website may only be used for personal use and non-commercial purposes.

You may display on a computer screen or print extracts from the Website for the above-stated purpose only provided that you retain any copyright and other proprietary notices or any BitMEX trademarks or logos, as shown on the initial printout or download without alteration, addition or deletion. Except as expressly stated herein, you may not without BitMEX's prior written permission alter, modify, reproduce, distribute or use in any other commercial context any materials from the Website.

You acknowledge that 'BitMEX' and the BitMEX logo are trademarks of HDR Global Trading Limited. You may reproduce such trademarks without alteration on material downloaded from this Website to the extent authorised above, but you may not otherwise use, copy, adapt or erase them.

You shall not in any circumstances obtain any rights over or in respect of the Website (other than rights to use the Website pursuant to these Terms and any other terms and conditions governing a particular service or section of the Website) or hold yourself out as having any such rights over or in respect of the Website.

Definitions
"Agreement"

means the Terms and Conditions of Use herein.

"BitMEX"

means HDR Global Trading Limited, a company founded in the Republic of Seychelles.

"Data"

means any data input by you or with your authority into the Website.

"Intellectual Property Rights"

means any registered or unregistered design rights, patents, copyright, database rights, data protection rights, trade marks, service marks, moral rights, know-how and any other intellectual or industrial property rights, anywhere in the world.

"Member"

means any current registered user of BitMEX.

"Service"

means all services made available (as may be changed or updated from time to time by BitMEX) via the Website.

"Website"

means any of the images, written material, databases, software or other material available on any website owned or operated by BitMEX.

1. Access Conditions
1.1: You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password.

1.2: When accessing and using the Service, You must:

a) not attempt to undermine the security or integrity of BitMEX's computing systems or networks or, where the Services are hosted by a third party, that third party's computing systems and networks;

b) not use, or misuse, the Services in any way which may impair the functionality of the Services or Website, or other systems used to deliver the Services or impair the ability of any other user to use the Services or Website;

c) not attempt to gain unauthorised access to the computer system on which the Website is hosted or to any materials other than those to which you have been given express permission to access;

d) not transmit or input into the Website any files that may damage any other person's computing devices or software; content that may be offensive; or material or Data in violation of any law (including Data or other material protected by copyright or trade secrets which you do not have the right to use);

e) not attempt to modify, copy, adapt, reproduce, disassemble, decompile or reverse engineer any computer programs used to deliver the Services or to operate the Website except as is strictly necessary to use either of them for normal operation.

f) You will ensure that all usernames and passwords required to access the Website are kept secure and confidential. You will immediately notify BitMEX of any unauthorised use of your passwords or any other breach of security and BitMEX will reset your password;

1.3: Use of the Service may be subject to limitations, including but not limited to transaction volumes and the number of calls permitted to be made against BitMEX's application programming interface. Any such limitations will be advised.

1.4: By registering as a Member you represent and warrant:

a) that you have accepted the Terms; and

b) that you are at least 18 years of age and have the capacity to accept the Terms;

c) that you are the legal owner of the funds you add to your account with BitMEX and that the same funds derive from a legitimate source;

d) that using BitMEX services does not constitute a breach of your home jurisdictions' laws;

e) that you are aware of the risks in using the services provided by BitMEX. These risks include the high volatility risk of Bitcoin itself, the fact that you may lose all of the funds in your trading account if the market moves against you;

f) that you will not be involved or initiate any form of market manipulation, including spoofing orders or otherwise;

g) that the information or documents you provide as part of any ID verification process are correct, genuine and up-to-date;

h) that any Bitcoin withdrawal address you provide is your own and that you have full control over this address;

i) that you are not a resident of the United States of America, Cuba, Crimea and Sevastopol, Iran, Syria, North Korea, Sudan, or any other jurisdiction where the services offered by BitMEX are restricted. If it is determined that you have given false representation as to your place of residence, BitMEX reserves the right to close your account immediately and liquidate any open positions at the prevailing market price.

1.5: You can open an initial account by providing your email address and full name (Initial Account).

1.6: BitMEX reserves the right at any time to verify your identity for the purposes of complying with the Seychelles' Anti-Money Laundering Act 2006.

1.7: We impose certain trading limits before you are required to conduct Customer Due Diligence (CDD). You agree to cooperate with us in this process and will provide all documentation/information that we may require to satisfy ourselves of your identity and the purpose of the business relationship.

1.8: We may freeze any Account in the event that we suspect or have reason to believe you are engaged in suspicious trading or other activity or have breached any of the above warranties. This may result in the unwinding of any trades you have entered into. We expressly exclude any losses or profits you would have made as a result of us closing your trade positions early or you not being able to trade on BitMEX and you agree to indemnify us completely against any third party action resulting from your conduct or us having to close your positions early. Whilst your Account is frozen we will conduct an investigation and may require you to cooperate with our enquiries. During the investigation stage you will not be able to make deposits or withdrawals to your Account nor will you be able to trade. At the end of the investigation we may, at our own discretion, decide to close your Account for which we are not required to provide you with any reasons for the same.

1.9: We reserve the right at our own discretion to close your Account with 7 days notice. You will therefore have 7 days in which to close your positions. If at the expiry of that period your positions are still open we will force close them and return to you any remaining Bitcoin left in your Account.

1.10: It is your responsibility entirely to provide us with correct details including your withdrawal address. We accept no liability resulting in you not receiving the Bitcoin withdrawn due to you providing incorrect or out-of-date details. It is also your responsibility to ensure transactions sent to BitMEX are well-formatted and denominated in the correct currency.

BitMEX excludes all liability for any incorrect transactions, including but not limited to Litecoin sent to Bitcoin addresses.

1.11: It is our responsibility to maintain an orderly market and as such we may at our own discretion halt trading on the Website due to market disruption or other relevant external events. We exclude all liability for any claimed losses or profits lost as a result of us halting trading.

## 2. Intellectual Property Rights

2.1: All intellectual property rights relating to all the material used on the Website including, but not limited to, design, structure, layouts, graphical images and underlying source code belongs to BitMEX. All rights are reserved.

2.2: You acknowledge that, except as otherwise agreed between the parties in writing, all intellectual property rights of BitMEX and the Website shall remain with BitMEX.

2.3: By submitting content to any public area of the Website, including blogs, message boards, and forums, you grant BitMEX a royalty-free, perpetual, irrevocable, non-exclusive right and licence to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, communicate to the public, perform and display the content (in whole or in part) worldwide and to incorporate it in other works in any form, media, or technology now known or later developed, for the full term of any rights that may exist in such content. You also permit any subscriber to access, display, view, store and reproduce such content for personal use.

2.4: By submitting any content to the Website you warrant that you are entitled to and have all necessary intellectual property rights over that content.

## 3. Privacy Policy

3.1: Please see our separate Privacy Policy, which forms part of these terms.

## 4. Data Protection

4.1: BitMEX may place information concerning you on a database of internal use only. BitMEX will not disclose your details to any third party unless required by law, unless specifically instructed to the contrary by you.

## 5. Third Party Websites

5.1: BitMEX links to third party websites that are not affiliated or associated with BitMEX (although BitMEX branding, advertisements or links may appear on these websites) and BitMEX may send e-mail messages to you containing advertisements or promotions including links to third parties. BitMEX makes no representation as to the quality, suitability, functionality or legality of the material on third party websites that are linked to, or to any goods and services available from such websites. The material is only provided for your interest and convenience. BitMEX does not monitor or investigate such third party websites and BitMEX accepts no responsibility or liability for any loss arising from the content or accuracy of this material and

any opinion expressed in the material should not be taken as an endorsement, recommendation or opinion of BitMEX.

5.2: Under no circumstances are you to create a hyperlink to any of the pages on the Website, unless BitMEX provides you with its prior consent to do so. If you do create a link to any of the pages on the Website, you acknowledge that you are responsible for all direct or indirect consequences of the link, and you indemnify BitMEX for all loss, liability, costs or expense arising from or in connection with the link.

6. Warranties and Representations
6.1: You acknowledge that:

a) You are authorised to access and use the Website; In particular, the jurisdiction where you reside, hold citizenship, or conduct business allows you to utilize BitMEX's services;

b) If you are using the Website on behalf of or for the benefit of any organisation then it is assumed that you have the right to do so. The organisation will be liable for your actions including any breach of these Terms;

c) Your use of the Website and the Service is at your own risk. You agree that BitMEX is not liable for any damage or harm arising out of your use of the Website and Service;

d) The information provided on the Website is for general information purposes only and is given in good faith. However, the information is selective and BitMEX may not verify all information, which may not be complete or accurate for your purposes and should not be relied upon without further enquiry. The information should not be construed as a recommendation to trade or engage the Service provided by BitMEX in a particular manner; and

e) BitMEX does not warrant that the use of the Website will be uninterrupted or error free. Among other things, the operation and availability of the systems used for accessing the Website, including public telephone services, computer networks and the Internet, can be unpredictable and may from time to time interfere with or prevent access to the Website. BitMEX is not in any way responsible for any such interference that prevents your access or use of the Website and the Service.

6.2: BitMEX gives no warranty about the Website. Without limiting the foregoing, BitMEX does not warrant that the Website will meet your requirements or that it will be suitable for your purposes. To avoid doubt, all implied conditions or warranties are excluded insofar as is permitted by law including, without limitation, warranties of merchantability, fitness for purpose, title and non-infringement.

6.3: BitMEX has a for profit trading business that, among other things, transacts in products traded on the BitMEX platform. The trading business primarily trades as a market maker. The

trading business is organised to be separate and distinct from the platform business. Specifically, no front office personnel are shared between the trading business and the platform, the trading business operates from a separate physical location, and the trading business does not have access to any platform order flow, execution, customer or other information on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific BitMEX product, the trading business receives access and trading privileges only on the same terms as are available to any other user.

6.4: You warrant and represent that you are acquiring the right to access and use the Website and agreeing to these Terms for the purposes of a business and that, to the maximum extent permitted by law, any statutory consumer guarantees or legislation intended to protect non-business consumers in any jurisdiction does not apply to the supply of the Website or these Terms.

7. Service Performance

7.1: BitMEX denies all liability for the timely operation of the Website when used within an Internet environment, where you or a third party is providing the computer equipment upon which the product is depend upon for any part of its functionality.

7.2: By using this service you confirm your understanding that the timely operation of the Internet and the World Wide Web is governed by constraints beyond the control of BitMEX. You accept that BitMEX is not liable for any perceived slow operation of the Website.

7.3: By using this service you accept that all trade executions are final and irreversible.

7.4: By using this service you accept that BitMEX reserves the right to liquidate any trades at any time regardless of the profit or loss position.

7.5: BitMEX does not warrant that the Service will meet your requirements; that the Service will be uninterrupted, timely, secure, or error-free; that the information provided through the Service is accurate, reliable or correct; that any defects or errors will be corrected, or that the Service will be available at any particular time or location. You assume full responsibility and risk of loss resulting from your use of the Service.

8. Indemnification

8.1: You agree to indemnify and hold harmless BitMEX, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to your violation of this Agreement.

9. Limitation of Liability

9.1: In no event will BitMEX, or its suppliers or licensors, be liable with respect to any subject matter of this agreement under any contract, negligence, strict liability or other legal or equitable theory for: * i) any special, incidental or consequential damages; (ii) the cost of

procurement or substitute products or services; (iii) for interruption of use or loss or corruption of data; or (iv) for any amounts that exceed the fees paid by you to BitMEX under this agreement during the twelve (12) month period prior to the cause of action. BitMEX shall have no liability for any failure or delay due to matters beyond their reasonable control. The foregoing shall not apply to the extent prohibited by applicable law.

10. Calculations

10.1: All calculations performed by the BitMEX trading engine and as verified by BitMEX are final. Our methodology is outlined here. As noted in clause 6.1, BitMEX does not warrant that the use of the Website will be uninterrupted or error free.

11. Termination & Remedies for Breach of these Terms by You

a) BitMEX reserves the right to seek all remedies available at law and in equity for violations of these Terms, including without limitation, the right to restrict, suspend or terminate your account or deny you access to the Website without notice; and

b) BitMEX shall be entitled to disclose your user identity and personal details if required or requested by a court of law, governmental agency or any other law enforcement authority in such circumstances as BitMEX in its sole discretion considers reasonably necessary or appropriate.

12. Absence of Waiver

12.1: Any failure or delay by BitMEX to enforce any of the Terms or to exercise any right under the Terms will not be construed as a waiver to any extent of our rights.

13. Force Majeure

13.1: Neither party is liable for delay in meeting its obligations due to any cause outside its reasonable control including acts of god, riot, war, malicious acts of damage, fires, electricity supply failure, Government authority.

14. Survival

14.1: Should any provision of these Terms be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected. If any provision is determined to be unenforceable, you agree to an amendment by BitMEX of such provision to provide for enforcement of the provisions intent, to the extent permitted by applicable law.

15. Governing Law

The Terms are governed by and construed in accordance with English common law. The International Business Companies Act 1994 is the principal legislation that governs corporates in the Republic of Seychelles.

# EXHIBIT 18

## DEFENDANTS' EXTENSIVE CONTACTS WITH THE UNITED STATES AND CALIFORNIA

1.      ABS is qualified to do business in California and has appointed an agent for service of process in this State.  Despite all the claims to the contrary, HDR, Hayes as well as Delo and Reed maintain numerous close connections with the United States and State of California.

2.      HDR and ABS were established by individual Defendant Hayes as well as accomplices Delo and Reed due to seed funding provided by at least two United States-based entities – Ohio-based RGB COIN LTD. and a startup accelerator SOSV with offices in San Francisco and New York.

3.      Defendant HDR is managed by Defendant Hayes as well as accomplices Delo and Reed with advice of an advisory board consisting of 12 members, three of which are located in the United States.

4.      Due to his role as the President, CEO, Secretary and Chief Financial Officer of Defendant ABS and his CEO position with Defendant HDR, Defendant Hayes manages and directs operations of both Defendants HDR and ABS in the United States and in California.

5.      On the most recent California Secretary of State Statement of Information form filed by Defendant ABS with the State of California on or about August 22, 2019, Defendant Hayes' address in the State of California is listed as: 340 Brannan Street, 2nd Floor, San Francisco, California 94107.

| Names and Complete Addresses of the Following Officers (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.) | | | | |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/ <br> ARTHUR  HAYES | ADDRESS <br> 340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | STATE | ZIP CODE |
| 8.  SECRETARY <br> ARTHUR  HAYES | ADDRESS <br> 340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | STATE | ZIP CODE |
| 9.  CHIEF FINANCIAL OFFICER/ <br> ARTHUR  HAYES | ADDRESS <br> 340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | CITY | STATE | ZIP CODE |

6.      Due to his role as the CTO of both Defendants HDR and ABS and his supervisory involvement in the software development of the BitMEX platform, Reed, who resides in Wisconsin, manages and directs operations of both Defendants HDR and ABS in the United

States and in California, where the majority of the software developers and engineers working on the BitMEX platform are located.

7.    As evidenced by BitMEX website, on or about April 27, 2018, Reed stated: "We serve customers <u>all over the world</u>, in five languages, and have become the premier platform for Bitcoin price discovery and liquidity" (emphasis added).  This statement constitutes an admission that Defendants knowingly serve customers in the United States and the State of California.



8.    BitMEX website www.BitMEX.com/careers/ lists San Francisco as the location of one of the Defendant HDR's offices, where all the technology behind BitMEX is being developed. Defendant HDR actively recruited individuals for this office using recruiting websites such as GlassDoor.com, Angel.co and LinkedIn.com. According to professional network

LinkedIn, BitMEX's owner Defendants HDR has at least 74 current and former employees in the United States, most of which are residents of California.

9. In a publicly released and publicly available video first aired on CNBC news channel, Defendant Hayes can be seen broadcasting from the San Francisco office of CNBC, on



or about July 19, 2018.

10. United States residents can freely trade on BitMEX platform from the United States because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States demonstrates, accessing

BitMEX is trivially easy from the United States using widely available and inexpensive virtual private network (VPN) software that masks trader's geographical location. This is because Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism. Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a VPN. Defendants have exploited this loophole to avail themselves of United States and California markets. Defendant Hayes stated in a January 2019 interview that BitMEX users can mask their location using VPNs to assign their computer an IP address from other countries, bypassing filters put in place. In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN. This is done purposefully in order to entice United States persons to trade on the BitMEX platform. If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

11. In fact, in an interview in January of 2019, Defendant Hayes himself publicly taunted the fact that users from banned jurisdictions like the United States can easily bypass the cryptocurrency exchange's geoblock by using the VPN service, thereby directly encouraging United States traders to trade on the BitMEX platform in violation of its own Terms of Service.

12.     Defendant HDR uses United States based Amazon, Inc.'s Amazon Elastic



Kubernetes Service ("Amazon EKS"), which combines Amazon Web Services ("Amazon AWS") with managed high-availability Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data.  Amazon AWS has offices in San Francisco, California.  San Francisco office of Defendant HDR employs at least five Kubernetes engineers who interact with Amazon AWS in California on a daily basis.



13.    Moreover, the recent email data leak of BitMEX has shown that Defendant HDR uses San Francisco, California – based Twilio Inc. and its subsidiary SendGrid, Inc., with offices at 889 Winslow St., Redwood City, California 94063, United States, for handling all of its bulk



```
Received: by
filter0531p1iad2.sendgrid.net with SMTP
id filter0531p1iad2-4029-5DBBDCE6-6
     2019-11-01 07:21:10.616650033
+0000 UTC m=+26944.349590420
Received: from ODk1MzUzNw
(135-180-78-178.fiber.dynamic.sonic.net
[135.180.78.178]) by
ismtpd0001p1sjc2.sendgrid.net (SG) with
HTTP id frqfqjARTVqlHIKEaRFB-g Fri, 01
Nov 2019 07:21:10.387 +0000 (UTC)
Content-Transfer-Encoding: quoted-
printable
Content-Type: text/html; charset=UTF-8
Date: Fri, 01 Nov 2019 07:21:18 +0000
(UTC)
From: BitMEX <noreply@bitmex.com>
```

email communications with its customers. Twilio Inc. and its subsidiary SendGrid, Inc. as well as Intercom, Inc. store a database of all BitMEX users in California, including email addresses and all other contact information of all users, which BitMEX uses for all its customer communications.

14.     Defendants use ReCAPTCHA service provided by Google, Inc., headquartered in California to provide human verification for the users of the BitMEX's platform.

15.     Defendants further use YubiKey device and YubiCloud service provided by Palo Alto-based YubiKey, located in California, to provide 2-factor authentication capability to the users of BitMEX's platform.

16.     Defendants further use service operated by Jumio Netverify, based in Palo Alto, California, through which Jumio collects personal data from BitMEX users directly, including photos of user's faces and ID documents and performs identity verification of the users for BitMEX platform.

17.     Defendants further use Freshdesk service provided by Palo Alto-based FreshWorks, headquartered in California, for handling all customer support queries, notes and replies associated with the BitMEX platform.

18.     Defendants further use segment.io service provided by San-Francisco based Segment.io, Inc., and Google Analytics service provided by Google, Inc., both of which are headquartered in California, for gathering data collected on BitMEX.com servers and generating visitor statistics for BitMEX platform.

19.     Defendants further use services provided by San Francisco-based Functional Software, Inc. (Sentry.io), San Francisco-based Pagerduty and Austin, Texas-based Solarwinds (Papertrail) to monitor all site and service issues associated with the BitMEX platform.

20.     Defendants further use services provided by Google Firebase and Amazon SNS platforms, operated by Google, Inc. and Amazon Web Services, Inc., respectively, both of which are headquartered in California, to deliver mobile push notifications to all user devices.

21.     The above-alleged facts clearly show that the vast majority of the vital services used by BitMEX platform are provided by United States vendors located in California and that without such services of United States and California origin, BitMEX platform would not have existed in its present form.  Therefore, BitMEX is able to operate its platform only due to its connections with the service providers located in the United States and California.

|  | Service Provider to BitMEX | Services Provided to BitMEX | Service Provider Location |
|---|---|---|---|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | Twilio, Inc. | Communications with all BitMEX users | San Francisco, California |

| | | | |
|---|---|---|---|
| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 4. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with all BitMEX users | San Francisco, California |
| 11. | ProofPoint, Inc. | Hosting of BitMEX's internal corporate email accounts, outbound data loss prevention, social media, mobile devices, digital risk, email encryption, electronic discovery, and email archiving. | Sunnyvale, California |
| 12. | Slack, Inc. | Internal communications between employees at BitMEX | San Francisco, California |

22.     Furthermore, Plaintiff is informed and believe and thereon allege that San Francisco, California-based quant trading firm Galois Capital freely trades on BitMEX from

California generating millions of dollars of business for Defendant HDR.  This trading is done with the knowledge, permission, approval, assistance and encouragement of Defendants.

23.     Defendants knowingly and willfully permitted United States citizens and residents of California as well as United States based companies to freely trade on the BitMEX exchange because of the lucrative business relationships between Defendants and the aforesaid individuals and companies, which financially benefitted Defendants.

24.     Moreover, Defendant's HDR website BitMEX.com is a commercial website, in English language, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants conduct substantial business with the residents of the United States, the State of California and California and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).   Instead of performing a proper document check before allowing users to open an account on BitMEX.com, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.  Using the aforesaid commercial website operated by Defendants, residents of the United States, the State of California and California are able to place binding trading orders of virtually unlimited monetary size, enter into binding derivative purchase and sale contracts, and transfer virtually unlimited amount of funds anywhere in the world.

25.     Moreover, Defendants deliberately made their commercial website BitMEX.com accessible from the United States even without using VPN software in violation of BitMEX's own Terms of Service ("Terms of Service") in order to entice United States residents to trade on the BitMEX's platform.  Specifically, BitMEX's Terms of Service provide: "[y]ou are not

> ⊘ **Note on Restricted Jurisdictions**
>
> At this time, BitMEX cannot serve customers in Puerto Rico. You may still create an account, but you will be unable to deposit or trade. If you wish to try simulated trading, please try our BitMEX Testnet. Access to the BitMEX Testnet is not for trading purposes, and is not intended as investment advice or as a solicitation to engage in any form of trading activity and should not be construed as such.

allowed to access or use the Services or the Trading Platform if you are located, incorporated or otherwise established in, or a citizen or resident of: (i) the United States of America… 'Services' means websites, applications and any services provided by any member of the HDR Group, including: a) … the BitMEX Testnet Platform."  However, BitMEX.com website specifically induces United States resident users to try BitMEX Testnet Platform, by clearly stating: "please try our BitMEX Testnet."  This is not an innocent mistake, it is intentionally done by Defendants in order to entice United States traders to subsequently trade on the BitMEX Trading Platform in direct violation of the prohibition contained in its own Terms of Service.  In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN.  This is purposefully done to entice United States persons to trade on the BitMEX platform.  If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

26.     Therefore, any and all provisions contained in the Terms of Service prohibiting United States users from using the BitMEX's platform were in fact sham provisions and lacked any meaningful enforcement by Defendants.  In fact, Defendants' own actions clearly demonstrated complete disregard of the provisions of their own Terms of Service.  Moreover, Defendants willfully and deliberately used IP country blocking, which has been proven utterly ineffective for its intended purpose and easily subverted, to leave a back door for the United States residents to trade on the BitMEX platform.

27.     Furthermore, Defendants purposefully invoked the benefits and protections of the United States Federal laws when they filed for and obtained from the United States government official Notices of Allowance for seven (7) United States trademark applications all relating to

**Current Search: S2: (HDR GLOBAL TRADING)[OW] docs: 7 occ: 21**

|   | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

BitMEX's platform that is the subject of this Complaint.

28.     For example, trademark applications serial Nos. 87856272 and 87607952, both for mark "BITMEX" were filed by Defendants in connection with "[d]ownloadable software for trading crypto-products and providing crypto-currency information" and "exchanging money, financial management, futures brokerage, capital investment, electronic funds transfer, providing financial information via a website, financing services, investment of funds, business liquidation services, financial services, namely, operation and management of hedge funds, commodity pools and other collective investment vehicles, and trading for others of cryptocurrency,

decentralized application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets, securities, options, futures, derivatives, debt instruments and commodities," respectively, which are BitMEX's core services. Invoking benefits and protections of the United States Federal laws clearly made it foreseeable for Defendants that they would end up in a United States Court.

29.     In the aforesaid trademark filings with the United States Patent and Trademark Office, Defendant HDR swore, under penalty of perjury, that it "has a continued bona fide intention, and is entitled, to use the mark[s] in commerce [in the United States] on or in connection with all of the goods/services listed in the Notice of Allowance or as subsequently modified for this specific class."

30.     In a recent legal filing, Defendant Hayes swore that: "[i]n my capacity as CEO, I am advised by an advisory body currently comprised of twelve individuals responsible for different departments within the HDR Group. A majority of the HDR Group's advisory committee has always been located in Hong Kong, and nine of the twelve members currently on the committee are located outside of the United States." Therefore, three out of 12 members of the advisory committee of Defendant HDR are located in the United States.

31.     Professional network LinkedIn, as well as other information available on the Internet, provides publicly available evidence of dozens of individuals, who reside in the United States and in California and who identify themselves as cryptocurrency derivative traders on the BitMEX platform. Forty-three examples of the Unites States resident BitMEX traders, who trade on BitMEX through the aforesaid commercial website BitMEX.com, are provided in the below table:

|  | BitMEX Trader Name | BitMEX Trader Residence |
|---|---|---|
| 1. | Scrembo Paul | Los Angeles, California |
| 2. | Aaron Aloyan | Greater San Diego, California, Area |

| | | |
|---|---|---|
| 3. | Christopher Smitherman | Atlanta, Georgia |
| 4. | Daniel Spivak | Greater Chicago Area |
| 5. | Harrison Davis | Greater New York City Area |
| 6. | Vesko P. | Greater Los Angeles Area |
| 7. | Matthew Wellman | Lexington, Kentucky |
| 8. | Uriel Scott | Chicago, Illinois |
| 9. | Sahand Akbari | Sacramento, California Area |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City Area |
| 14. | Andres Santana | Greater New York City Area |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |
| 17. | Phillip James | St. Cloud, Minnesota Area |
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell | Laguna Beach, California |
| 21. | Jiale (Etta) Qin | Cupertino, California |
| 22. | Bokmoon Jung | Boise, Idaho |
| 23. | Lionel Girardin | Greater Chicago Area |
| 24. | Arijit Santra | Berkeley, California |
| 25. | Sankha Banerjee | Greater New York City Area |
| 26. | Connor Van Dorpe | Madison, Wisconsin |
| 27. | Ryan Rim | San Francisco Bay Area |
| 28. | Gianny R. Banda | Miami, Florida |
| 29. | Michael Peterson | Syracuse, New York Area |
| 30. | Anthony Agrait | Tempe, Arizona |
| 31. | Dustin G. | Burlington, Vermont Area |
| 32. | Kevin Cotugno | Phoenix, Arizona |

| 33. | Calvin Leung | Santa Monica, California |
|-----|--------------|-------------------------|
| 34. | Anthony Wittemann | Santa Monica, California |
| 35. | Catherine Wood | Greater New York City Area, New York |
| 36. | Ryan Gill | Delaware, Ohio |
| 37. | Eric J. Waidergorn | Greater Chicago Area, Illinois |
| 38. | Eric Crown | Hillsboro, Oregon |
| 39. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area |
| 40. | Edward Ornelas | Albuquerque, New Mexico |
| 41. | Richard Bae | United States |
| 42 | Roger Xu | Brooklyn, New York |
| 43. | Wen Hou | Irvine, California |

32.     Professional network LinkedIn as well as other Internet resources further provide evidence of at least fourteen companies, which are incorporated and based in the United States and which trade derivatives using Defendant's HDR commercial website BitMEX.com:

| | Name of U.S. Company Trading on BitMEX | Company Address |
|---|---------------------------------------|-----------------|
| 1. | CMT Capital Markets Trading | 156 N Jefferson St., Suite 102, Chicago, IL 60661 |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY 12207 |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |
| 6. | Swing Trade Pros | 1600 S. Indiana Ave, Chicago, IL 60616 |

| 7. | FalconX | 66 Bovet Rd #380, San Mateo, CA 94402 |
|---|---|---|
| 8. | Cumberland DRW | 540 W Madison St Chicago, IL 60661 |
| 9. | Circle Partners | 1395 Brickel Avenue, Suite 913 Miami, FL 33131 |
| 10. | Fund3 Capital LP/Fund3 LLC | 11244 Huntley Place, Culver City, CA 90230 |
| 11. | South Lake Computers | 82 W Highway 50, Clermont, FL 34711 |
| 12. | ARK Investment Management LLC | 3 East 28th Street, 7th Floor, New York, NY 10016 |
| 13. | Coincident Capital | 310 Lake Street, Huntington Beach, CA 92648 |
| 14. | Leotank Capital | 250W 50th Street, Apt. 3d2, New York, NY 10019 |

33.     Adaptive Fund I, LP, which is a Delaware limited partnership, funded primarily by investors who are United States residents, as the result of market manipulation which took place on BitMEX's platform on or about March 13, 2020, lost 60% of its equity, or roughly $12,000,000.  These catastrophic monetary losses were suffered by numerous Unites States residents who invested in that fund.  In communications to investors following the losses, fund manager Murad Mahmudov admitted to personally executing trades on BitMEX's platform with United States investors' money.  Due to the high profile of the fund and fund managers involved, Defendants clearly knew of the United States origin of the money that the Adaptive Fund I, LP was trading on BitMEX platform and Defendants deliberately and willfully allowed such trading to proceed.

34.     Internet video portal YouTube is replete with video evidence of traders residing in the United States and in California freely placing high dollar bets through Defendant's HDR commercial website BitMEX.com.  The following table identifies just 40 examples of such video evidence:

| | BitMEX Trader's YouTube Account User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United States | 02/25/2020 | How Wales Manipulate Bitcoin Using Spoofing on Bitmex (Live $400,000 Short Trade) |
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitcoin Leverage Trading - Afternoon Trading Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollbox + New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 6. | Scrembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutorial For Beginners Bitcoin |
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Binance Futures, Bybit, & Bitmex Bitcoin & Crypto |
| 8. | Crypto Gnome | United States | 05/14/2019 | How to Automate Your Trades on Bitmex & Deribit |
| 9. | Crypto Gnome | United States | 09/25/2019 | Goat Alerts - TradingView Bot & Shadow Trading for Bybit & Bitmex |
| 10. | Crypto Gnome | United States | 08/12/2018 | How to Set a STOP LOSS on BitMEX |
| 11. | Crypto Gnome | United States | 11/29/2018 | How to use a Trailing Stop on BitMEX - MORE PROFITS! |

| 12. | Crypto Gnome | United States | 07/25/2018 | How to Short Bitcoin on Bitmex |
|---|---|---|---|---|
| 13. | Crypto Gnome | United States | 08/11/2018 | How to Save on Fees When Trading on BitMEX |
| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United States | 07/30/2018 | Free Profit Tracking Spreadsheet for Trading on Bitmex |
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On NinjaTrader; www.SlingshotFutures.com |
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |
| 23. | Bitcoin Trading Challenge | United States | 01/08/2019 | Scalping Bitmex Liquidations |
| 24. | Digital Millionaire | United States | 10/31/2019 | BitMEX Tutorial For Beginners - How To LONG AND SHORT Bitcoin With LEVERAGE! |

| 25. | Patrick Corsino | United States | 01/13/2020 | Beginner Method: $100-$1000/Day Passive Cryptocurrency Trading 2020! Bitcoin Bitmex, Binance, Bybit |
| --- | --- | --- | --- | --- |
| 26. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 27. | Crypto Corny | United States | 01/31/2019 | 70% DOWN, 9930% TO GO... 0.1 To 10 BITCOIN TRADING CHALLENGE – Bitmex |
| 28. | MiningTrades | United States | 01/23/2018 | My Algorithmic Trading BOT trades $XBT Bitcoin Futures LIVE! \| BitMex Jan 23rd 2018 |
| 29. | Crypto Minds | United States | 09/07/2018 | How to Long and Short Bitcoin and Altcoins on Bitmex |
| 30. | Jaydn's Crypto Channel | California, United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 31. | Crypt0W1SE | Michigan, United States | 12/30/2018 | Live BitMEX trading!!! 1 to 100 btc challenge! |
| 32. | ORACLE CRYPTO AVENGER! | United States | 02/08/2020 | $100,000 1 DAY PROFIT LEVERAGE TRADING BITSEVEN BYBIT BITMEX |
| 33. | ORACLE CRYPTO AVENGER! | United States | 10/15/2018 | BITMEX WATCH A SHORT TRADE THE ENDED OVER 103% WIN! |
| 34. | ORACLE CRYPTO AVENGER! | United States | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER 98% ROI -WHY YOU CAN'T DO THIS. |
| 35. | ORACLE CRYPTO AVENGER! | United States | 11/07/2018 | BCH MARKET MANIPULATION - MANIPULATE BITMEX TO PROFIT! |

| | | Gainesville, | | |
|---|---|---|---|---|
| 36. | Alexander Lorenzo | FL, United States | 01/26/2019 | Scavenger Bot Bitmex SCAM |
| 37. | Swing Trade Pros | 1600 S. Indiana Ave. Chicago, IL 60616 | 03/09/2020 | Live Bitcoin Trading on Bitmex with Swing Trade Pros Indicators! |
| 38. | Sell The Spike | Burlington, Vermont Area | 07/03/2019 | How to use a TRAILING STOPLOSS on Bitmex |
| 39. | Sell The Spike | Burlington, Vermont Area | 06/09/2018 | Bitmex Tutorial - Placing Orders, Setting Stoplosses and Targets, Leverage and Margin, Walkthrough |
| 40. | Bitcoin for Beginners | United States | 12/22/2018 | How To Use BitMEX Exchange For Beginners! (BitMEX Tutorial) |

35.      "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  This number is consistent with the evidence available on YouTube and LinkedIn.

36.      YouTube is also replete with dozens of videos teaching how to access Defendant's HDR commercial website BitMEX.com from the United States using inexpensive and widely available VPN software to avoid Internet protocol (IP) address blocking.  Below are 11 examples of such videos:

| | BitMEX Trader's YouTube User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|

| 1. | Crypto Gnome | United States | 08/09/2018 | How to Sign Up for BitMEX in the US |
|---|---|---|---|---|
| 2. | Bot Mentality | Atlanta United States | 03/22/2018 | How to use Bitmex in the United States |
| 3. | Jaydn's Crypto Channel | California United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 4. | CryptoJunkies | United States | 08/15/2019 | How To Trade Bitmex In America! |
| 5. | Crypto Guru | United States | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator |
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? \| Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |
| 9. | Casey Watkins | United States | 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | ***MEX Millionaire*** EVERYTHING You Must Know!- ***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

37. Defendant HDR assigns a six-symbol alphanumeric affiliate codes to all BitMEX account holders and uses these affiliate codes to pay compensation to its users for enticing other users, including United States residents, to open accounts on BitMEX.com commercial website by posting a URL pointing to the BitMEX registration page and incorporating the aforesaid assigned affiliate code. The so assigned affiliate code uniquely identifies the corresponding account holder and its BitMEX account. Thus, presence of the affiliate code indicates that a person who invites others to register with Defendant's HDR commercial website by way of an affiliate link himself has a BitMEX account. Table below provides 22 examples of BitMEX affiliate codes being assigned to the United States residents for receiving compensation for enticing other United States residents to join the BitMEX platform:

|  | BitMEX Trader's Name or Alias | Trader Residence | BitMEX Assigned Affiliate Code (identifies trader's BitMEX account) |
|---|---|---|---|
| 1. | Tone Vays | United States | cMvHXg |
| 2. | Flood | United States | ir2Xqa |
| 3. | Crypto Corny | United States | 0rsCIx |
| 4. | Krown's Crypto Cave | Hillsboro, Oregon, United States, United States | ou4vcl |
| 5. | Crypto Hippo Trading | United States | gZ0Y10 |
| 6. | Edward Ornelas | Albuquerque, New Mexico, United States | kpdzGl |
| 7. | CryptoSailor | United States | AOIyp0 |
| 8. | MiningTrades | United States | i110zC |
| 9. | Crypto Minds | United States | OIv1fe |
| 10. | Moonin Papa | United States | GG2kor |

| | | | |
|---|---|---|---|
| 11. | Josh Olszewicz | Washington DC-Baltimore Area, United States | s7sqNI |
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | New York, New York, United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | lf9P89 |
| 16. | ORACLE CRYPTO AVENGER! | United States | WXNej9 |
| 17. | Swing Trade Pros | New York, New York, United States | G4cfM4 |
| 18. | Bitcoin for Beginners | United States | 5i7rOb |
| 19. | Crypto Gnome | United States | EOsLBm |
| 20. | Sell The Spike | Burlington, Vermont Area | KO33NC |
| 21. | Scrembo Paul | Los Angeles, California | BlQzsA |
| 22. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area | 9e4hqj |

38. Professional network LinkedIn provides publicly available evidence of 74 individuals, who are United States residents and who identify themselves as present and former employees of Defendant HDR, located in the United States and in California:

| | LinkedIn Member Name | Position at BitMEX | Residence |
|---|---|---|---|
| 1. | Max Shapiro | Associate at BitMEX Ventures | New York, New York |

| 2. | Kumar Dandapani | Head of BitMEX Ventures | San Francisco Bay Area |
|---|---|---|---|
| 3. | Alena Gilevskaya | Senior Software Engineer at BitMEX | San Francisco, California |
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |
| 8. | Niroj Shankhadev | Web Developer at BitMEX | San Francisco, California |
| 9. | Samuel Reed | Co-Founder and CTO at BitMEX | United States |
| 10. | Eric Zinnikas | Security Engineer at BitMEX | San Francisco, California |
| 11. | Molly Lubow | Talent Acquisition Specialist at BitMEX | San Francisco Bay Area, California |
| 12. | Evan Ricketts | Senior Software Engineer at BitMEX | Milwaukee, Wisconsin |
| 13. | Michael Carlson | Security Engineering Manager, Application Security at BitMEX | San Francisco, California |
| 14. | Monzer Aldimassi | Technical Program Manager (TPM) at BitMEX | Campbell, California |
| 15. | Patrick Fiscina | Vice President Of Engineering at BitMEX | San Francisco Bay Area, California |
| 16. | Allison Sommers | Security Engineer at BitMEX | San Francisco Bay Area, California |
| 17. | Conner McNicholas | Data Engineering at BitMEX | San Francisco, California |
| 18. | Brandon Schlenker | Engineering Manager at BitMEX | San Francisco, California |

| 19. | Riley Hutchinson | Director, People at BitMEX | San Francisco, California |
|-----|------------------|---------------------------|--------------------------|
| 20. | Benson Wong | Senior IT Support Engineer at BitMEX | San Carlos, California |
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |
| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX (Powering the world's largest cryptocurrency trading platform with Kubernetes, at the edge of financial and infrastructure technologies. Scaling BitMEX's infrastructure, culture and practices from 10 employees to 150 employees, from $1B to $11B traded daily, and 150x more trades.) | San Francisco, California |
| 27. | Maus Stearns | Security Engineering Manager at BitMEX | San Francisco, California |
| 28. | Andrew MacPherson | Security Engineer - Detection and Response at BitMEX | San Francisco, California |
| 29. | Chris Gates | Director of Offensive Security at BitMEX | Washington, DC Metro Area |
| 30. | Supriya Premkumar | Software Engineer - Kubernetes at BitMEX (Working on | San Francisco, California |

| | | building Kubernetes Infrastructure that can handle tens of thousands of low latency transactions per second at one of the world's largest crypto exchanges.) | |
|---|---|---|---|
| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the world's highest volume Cryptocurrency exchange. Building a world class Security team to protect our customers, assets and brand.) | Palo Alto, California |
| 34. | Javier Marcos de Prado | Staff Security Engineer at BitMEX | San Francisco, California |
| 35. | Shivali Singh | Senior Manager Security Assurance at BitMEX | San Francisco, California |
| 36. | Felipe Loyola Andrade | Software Engineer at BitMEX | San Francisco, California |
| 37. | Felix Böhm | Senior Software Engineer at BitMEX (Tech lead for the institutional side of BitMEX) | San Francisco, California |
| 38. | Neel Patel | Engineering Leader, Lead Data Engineer at BitMEX | Burlingame, California |
| 39. | Taylor Hesselgrave | Senior Software Engineer at BitMEX | San Francisco, California |

| 40. | Alisa Isovic | Product Manager at Bitmex at BitMEX | San Francisco, California |
|---|---|---|---|
| 41. | Armando Cerna | Site Reliability Engineer at BitMEX (Primary on call in a high traffic production environment.) | San Francisco, California |
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |
| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |
| 46. | Jinny Wong | Product Designer at BitMEX | San Francisco, California |
| 47. | Claire F. | Information Technology Management at BitMEX | San Francisco, California |
| 48. | Can Selcik | Senior Software Engineer at BitMEX | San Francisco, California |
| 49. | Eoghan McKee | Threat Intelligence, Insider Threat, Incident Response at BitMEX | San Francisco, California |
| 50. | Lawson Kight | Head of User Experience at BitMEX | San Francisco, California |
| 51. | Shawhin M. | Project Manager at BitMEX | San Francisco, California |
| 52. | Ladi D. | Platform Security Engineer at BitMEX | San Francisco, California |
| 53. | Neil Eads | Quality Assurance (QA) Manager at BitMEX | San Francisco, California |
| 54. | Michael Curry | Vice President, Head of Product at BitMEX | Oakland, California |

| 55. | Joshua Philippe | Principal Visual Designer, User Experience at BitMEX | San Francisco, California |
|---|---|---|---|
| 56. | Tim L. | IT Infrastructure Engineer at BitMEX | San Francisco, California |
| 57. | Hunter Shaw | Communication Director and BitMEX | San Francisco, California |
| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |
| 63. | Uday Shankar | Product Manager at BitMEX (My average week at BitMEX involves product research, market research, data analysis, scouring through support tickets, watching social channels for opportunities in terms of new features and improvements to existing features collaborating with Engineering, Program, QA, Security, Legal and Compliance teams. I manage expectations across Design, Engineering and Management orgs and ensuring the product ideas and solutions are communicated, wireframed and pitched in the right fidelity | San Francisco, California |

| | | to get all stakeholders onboard and scope our short term and long term roadmaps for each projects.) | |
|---|---|---|---|
| 64. | Victor Levasseur | Principal / Lead senior software engineer at BitMEX focused on a product driven approach and with great business | San Francisco, California |
| 65. | Jason Bond Pratt | Former Executive Vice President of Product and Engineering (Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a team of 40 during a period of 100x growth. BitMEX was then and remains the largest crypto exchange, by volume, in the world.)<br>• Grew product and engineering team from 1 to 40 across 5 operational groups, and hired or developed hiring managers for each of them.<br>• Established a culture that valued diversity, respect, inclusion and appreciation, emphasizing team-first principles and a humble, servant leadership ethic throughout our organization. | San Francisco, California |

| | | • Hired or developed global leads for Security, DevOps, Recruiting, IT, UX, Mobile, and API/Web Engineering, and led the first D&I initiatives at the company. Secured long term Class A space in the FiDi.<br>• Served on the global exec team and coordinated regularly with peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.) | |
|---|---|---|---|
| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and Business Development at BitMEX | New York, New York |
| 67. | Tim Tickel | Head of Security at BitMEX (Securing cryptocurrency exchange infrastructure) | San Mateo, California |
| 68. | Chenqi 'Ashley' X. | Data Science Manager at BitMEX | San Francisco, California |
| 69. | Kev Zettler | Former Senior Software Engineer at BitMEX | Oakland, California |
| 70. | Cynthia P. | Former Art Director at BitMEX (Led a cross-functional rebrand project with Marketing, Product, and Brand collaborators to build the BitMEX brand for institutional and retail audiences. Deliverables included brand and style guidelines, | New York, New York |

| | | visual assets, content strategy, digital and print editorial campaigns.) | |
|---|---|---|---|
| 71. | Natalie Case | Technical Writer at BitMEX | Walnut Creek, California |
| 72. | Deb Baratz | Former Content Manager at BitMEX | New York, New York |
| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | Indianapolis, Indiana |

39.     Based on the publicly available LinkedIn data, while 74 of Defendant HDR employees are located in the United States, only 34 are located in Hong Kong, which is the home for second largest Defendant HDR office.  Therefore, more than two thirds of Defendant HDR employees worldwide are residing in the United States and in California.  Moreover, the vast majority of the 74 United States employees of Defendant HDR are engaged in software development and engineering, while in Hong Kong, there are only six software developers and engineers employed by Defendant HDR.  Moreover, all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, personally responsible for the fraudulent system overloads and server freezes, are located in California.  Therefore, the United States and, specifically, California is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is

operated and managed by Defendants and where the illegal acts alleged in this Complaint took place.

40.     In addition, BitMEX website lists 17 job openings for Defendant HDR San Francisco office.  For comparison, the other two offices of Defendant HDR – Hong Kong and Singapore list 14 and two job openings, respectively.  Furthermore, out of 17 advertised job openings in Defendant HDR San Francisco office, 15 are openings in engineering and software development.  On the other hand, in Hong Kong office, only four job openings are in software development and engineering.  This fact further supports the conclusion that the United States and, specifically, California is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed and where the illegal acts alleged in this Complaint took place.

41.     BitMEX conducts offsites for the entire company hosted at its San Francisco office location, at least one of which occurred in November of 2017, in which Defendant Hayes and the rest of BitMEX's employees globally came to San Francisco and the San Francisco office.

42.     Because the vast majority of BitMEX personnel, as alleged in Paragraph 116, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, as alleged in Paragraph 117, and almost all vital external service providers to BitMEX, as alleged in Paragraph 99, are located in California, and because Defendant ABS, which develops, operates, enables, supports and services BitMEX platform is located in California, California is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts alleged in this complaint took place, including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed

money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the CEA, 7 U.S.C. §§ 1 et seq. (2018) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2019). Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS. Furthermore, the illegal acts alleged herein were all perpetrated by Defendants through their commercial website BitMEX.com, accessible, via widely available and inexpensive VPN software, by users located in the United States and California. Defendants knew that users located in the United States and California were accessing their commercial website BitMEX.com.

43. Numerous citizens and residents of the United States and California conducted and continue to conduct a high-volume derivative trading on the BitMEX platform using Defendants' commercial website BitMEX.com.

44. The same commercial website BitMEX.com was used by Defendants to perpetrate all the illegal acts alleged in this Complaint, resulting in injuries to Plaintiff, for which Plaintiff seeks redress in this Complaint. Accordingly, Defendants' connections with the United States and California through the commercial website BitMEX.com, used by the United States residents and residents of California, are directly related to the causes of action asserted by Plaintiff in this Complaint.

45. For the above reasons, BitMEX is a domestic United States cryptocurrency exchange.