Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Sanjay Prasad, Esq. (SBN 191230)
APPLETON LUFF
221 Main Street, #496
Los Altos, CA 94023
United States of America
Telephone: (650) 918-7647
Email: prasad@appletonluff.com

Attorneys for Plaintiff
Anatoly Sorokin

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Anatoly Sorokin,<br><br>        Plaintiff,<br><br>v.<br><br>HDR Global Trading Limited (d/b/a BitMEX), ABS Global Trading Limited, Arthur Hayes and Samuel Reed,<br><br>        Defendants. | Case No. 3:21-CV-03576-WHO<br><br>**SECOND AMENDED COMPLAINT FOR UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200, et seq.); FALSE ADVERTISING (BUS. & PROF. CODE § 17500, et seq.); VIOLATION OF CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, et seq.); DECEIT; FRAUDULENT INDUCEMENT; NEGLIGENT MISREPRESENTATION; NEGLIGENCE; VIOLATION OF COMMODITY EXCHANGE ACT; RESTITUTION UNDER QUASI-CONTRACT AND VIOLATION OF CAL. PEN. CODE § 496**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Anatoly Sorokin ("Sorokin" or "Plaintiff"), by and through his undersigned

attorneys, for his Amended Complaint against Defendant HDR Global Trading Limited ("HDR"),

Defendant ABS Global Trading Limited ("ABS"), Defendant Arthur Hayes ("Hayes") and

Defendant Samuel Reed ("Reed") (collectively "Defendants"), alleges as follows.

**INTRODUCTION**

*"It just costs more to bribe them."  Defendant Arthur Hayes (about U.S. authorities).*

1. Defendant Hayes is a notorious fraudster, who has been criminally charged with

felony money laundering related offenses by the U.S. Department of Justice ("DOJ") and who is

currently released on bail pending his criminal trial set for March 28, 2022.  Attached as Ex. 1

and 2 are copies of the DOJ criminal indictment and Commodity Futures Trading Commission

("CFTC") enforcement action against Defendants and the corresponding announcements.

Defendant Hayes publicly admitted to bribery of foreign government officials and bank fraud and

even expressed pride in his actions.  Ex. 4 and 5 are true and correct copies of two sworn

declarations by two of the defrauded victims of the Defendants, Frank Amato and Elfio Guido

Capone, attesting, under oath, how Defendants defrauded them out of millions of dollars.

2. Defendants deliberately designed their cryptocurrency derivatives exchange

platform BitMEX ("BitMEX" or "BitMEX platform") to fraudulently induce unsuspecting

victims to deposit their bitcoins with Defendants and then rob them blind of all their property, Ex.

3.  In reality, BitMEX was a rigged casino, set up to use sensitive insider information of its

traders to automatically liquidate them and misappropriate their money, when it was particularly

profitable for Defendants to do so.  At the center of BitMEX's operation was an undisclosed

Insider Trading Desk ("ITD") managed by Gregory Dwyer with at least three key employees,

including Stuart Elkington and Nick Andrianov.  This ITD operated to persistently manipulate

markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including

derivatives of bitcoin and ether, in order to artificially induce liquidations of trader positions for

the benefit of BitMEX, Ex. 1, 2, 3.  In addition, Defendants enlisted notorious market

manipulators, including the infamous Ben Aabtc (A.K.A. "Ben ActualAdviceBitcoin"), provided

them with an unlimited number of anonymous document check-fee trading accounts, with high leverage and without trading and position limits[1], to manipulate markets on BitMEX, causing additional customer liquidations, which again profited Defendants.

3.      To entice their victims to trade on the rigged BitMEX platform and pay trading commissions to Defendants, Defendants engaged in fraudulent solicitation using a laundry list of material misrepresentations[2], half-truths and omissions.   Once victims were fraudulently induced by Defendants to open trading accounts on BitMEX, Defendants used a psychological phenomenon widely-known as "revenge trading" to keep them trading on their rigged platform. Revenge trading is a natural, emotional response after traders experience a quick or large loss, where the victims will continue trading to their detriment to try to win back the losses, until they are completely financially ruined.

## NATURE OF ACTION

4.      This is an action for unfair competition (Cal. Bus. & Prof. Code § 17200, et seq.); false advertising (Cal. Bus. & Prof. Code § 17500, et seq.); violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.); fraud and deceit; fraud by omission; fraudulent inducement; negligent misrepresentation; negligence; violation of CEA; restitution under quasi-contract; and violation of Cal. Pen. Code § 496, arising out of the wrongful and fraudulent liquidation of Plaintiff's margined swap contract on BitMEX cryptocurrency trading platform and conversion of Plaintiff's swap contract purchase "costs" in the amount of at least 1.81027681 bitcoins.

## PARTIES AND RELATED PERSONS

5.      Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

---

[1] Failure to implement position limits violates Sections 5(d)(5) and 5h(f)(6) of the CEA, 7 U.S.C. §§ 7(d)(5), 7b-3 (f)(6) (2018), 17 CFR §§ 37.600, 38.300-301.
[2] Among other, Defendants used a fraudulent solicitation that was similar to the one in *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), where SEC charged fraudsters with claiming to be "the largest Bitcoin exchange in euro volume and liquidity."  In the present case, Defendants fraudulently claimed to provide "1500% More Bitcoin/USD liquidity than any other platform," which is even more factual and capable of misleading consumers.  Defendants abruptly ceased to use this fraudulent solicitation only in March of 2021, after being sued for fraud.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

6.     Plaintiff Anatoly Sorokin is an individual, who resides in Russian Federation. Plaintiff Anatoly Sorokin is not a citizen or resident of the United Kingdom.  Plaintiff Anatoly Sorokin did not conduct any trading on BitMEX from the United Kingdom.

7.     Defendant HDR was created by individual Defendant Hayes in order to perpetrate fraud and dodge laws, regulation and civil liability and purports to be a Republic of Seychelles International Business Company.  Defendant HDR was organized by Defendant Hayes, who is the primary ultimate owner of HDR and its various subsidiaries, holding approximately a one-third ownership interest in Defendant HDR, in or about 2014.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the time period starting on June 1, 2019 and ending on July 31, 2019 ("Relevant Period"), out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  When asked about the reasons for incorporating Defendant HDR in the Republic of Seychelles, Defendant HDR's Chief Executive Officer (CEO) Defendant Hayes has publicly claimed, in July of 2019, that the government of Seychelles was cheaper to bribe than the government of the United States and when asked how much he had to pay Seychelles to bribe them, Defendant Hayes answered "a coconut", Ex. 11.

8.     Neither Defendant HDR nor Defendants ABS and Hayes have any staff, operations, data, assets, service providers, or presence in the U.K.  Moreover, on March 20, 2020, the U.K. Financial Conduct Authority (FCA) published a notice on its website, warning the public that it believes BitMEX has been providing services in the U.K. without its authorization: "[BitMEX] is not authorized by us and is targeting people in the UK. Based upon information we hold; we believe it is carrying on regulated activities which require authorization." (https://www.fca.org.uk/news/warnings/bitmex, last visited on September 25, 2021).

9.     When, in July of 2019, an early investor in BitMEX Elfio Guido Capone asked Defendant Hayes about a status of his investment in the BitMEX platform, Defendants responded with a meme image, comprising a photo of a smiling Defendant Hayes with overlaid lettering "incorporated in Seychelles, come at me bro," which cynically suggested Defendants' belief that

they could dodge their legal obligations to own early investors simply by using a shell company incorporated in the Seychelles to evade personal jurisdiction of American Courts.

10. In addition to publicly admitting to bribery of foreign government officials as alleged in the preceding paragraphs, Defendant Hayes has publicly admitted to perpetrating bank fraud by falsifying his residence address on bank account application documents with the purpose of opening a bank account in China, to which he, as a resident of Hong Kong, was not entitled, Ex. 10. The Chinese bank account was admittedly opened by Defendant Hayes using a fake Chinese residence address, which he personally falsified, in order to enrich himself on 40% premium in the price of bitcoin in China compared to the rest of the world, Ex. 10. In perpetrating the admitted bank fraud, Defendant Hayes was motivated by personal greed.

11. Admissions of multiple instances of personal greed-motivated illegal conduct as alleged in the previous paragraphs, attempting to dodge legitimate legal obligations to its own investors using sham offshore companies as well as the alleged patently illegal manner in which BitMEX platform operated, all establish a pattern of brazen lawlessness on part of Defendants.

12. Defendant HDR is controlled by Defendants Hayes and Reed, as well as Delo, who all hold themselves out as co-founders of BitMEX. In fact, name "HDR" is an abbreviation composed of first letters of last names of Defendants Hayes and Reed, as well as their associate Delo. Defendant Hayes serves as the CEO of Defendant HDR. Defendant Reed serves as the Chief Technology Officer (CTO) of Defendant HDR.

13. According to BitMEX's website (https://www.BitMEX.com) ("BitMEX



website"), its owner HDR Global Trading Limited maintains three offices throughout the world, located in San Francisco, Hong Kong and Singapore. BitMEX's Terms of Service ("Terms of

Consensus Law
CryptoCurrency
Attorneys

Service"), posted on the BitMEX website, provide that: "BitMEX (website:

https://www.BitMEX.com) is a Bitcoin-based trading platform that is wholly owned by HDR

Global Trading Limited."

14. The San Francisco office of Defendant HDR is the largest of all three by both the

employee headcount and technical staff headcount. Its address is 301 Battery Street, 4th Floor,

San Francisco, California 94111. Defendant HDR closed its other United States offices and

consolidated all of its United States personnel into an office location in San Francisco sometime

in April of 2019, as confirmed by Defendant Hayes in an email to Defendant HDR's early

investor Mr. Elfio Guido Capone stating, "Consolidation of people in one office in SF." The

employee headcount in the Hong Kong office of Defendant HDR is about half of the headcount in

Defendant HDR's San Francisco office. Singapore office of HDR is the smallest of all three.

15. Defendant HDR's affiliates and subsidiaries, including Defendant HDR's wholly-

owned subsidiary and alter ego Defendant ABS, are so organized and controlled, and their affairs

are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a

single unitary BitMEX enterprise ("BitMEX"). See *Las Palmas Assoc. v. Las Palmas Ctr.*

*Assoc.*, 235 Cal.App. 3d 1220, 1249 (1991). Each Defendant HDR affiliate or subsidiary is so

dominated in its finances, policies, and practices that these controlled corporations have no

separate mind, will, or existence of their own, and are but business conduits for their principal,

Defendant HDR, such that all of the affiliated corporations may be deemed to be a single business

enterprise. See *Toho-Towa Co., Ltd. v. Morgan Creek Prods.,* Inc., 217 Cal.App.4th 1096, 1107

(2013); *Greenspan v. LADT LLC* 191 Cal.App.4th 486, 514 (2010).

16. On information and belief, each entity in the BitMEX enterprise functions solely to

contribute to and develop the BitMEX.com commercial website, which revenues then flow solely

to Defendant HDR and its owners. These entities are analogous to departments within a single

corporation and are run as such. On information and belief, each sub-entity in the BitMEX

enterprise is funded solely by revenues provided by Defendant HDR.

17. Further, as Defendant Hayes has explained in a publicly filed sworn declaration, as

CEO of Defendant HDR, he is "advised by an advisory body currently comprised of twelve

individuals responsible for different <u>departments</u> within the HDR Group." (emphasis added). Hayes labels Defendant HDR and its affiliates collectively as the "HDR Group" as opposed to the BitMEX enterprise, but in function the entities operate as a single corporate enterprise, and they may be properly held to account for each other's wrongdoing.

18. Defendant Hayes himself has also admitted that the BitMEX enterprise entities are really a single entity. In a Monthly Report circulated on March 2, 2018, Defendant Hayes wrote "Ben [Delo], Sam [Reed], and myself are very excited to host the <u>entire company</u> at our Hong Kong <u>office</u> from March 12th – 25th. Given the rapid and continued growth in terms of headcount in 2017 and 2018, this offsite is our first chance to bond <u>as a company</u>." (emphasis added).

19. All of this notwithstanding that Defendant HDR has submitted in multiple public filings that its only offices are in the Seychelles. It claims the offices in Hong Kong belong to another BitMEX-affiliated entity.

20. On April 11, 2018, Defendant Hayes wrote again to say that the Hong Kong "company offsite was a resounding success. Ben, Sam, and I were delighted to meet many of you for the first time. We continue to be amazed at the quality of people that work for the organization. BitMEX is a collection of individuals who are all interesting." On information and belief, employees from all of the BitMEX enterprise's entities were present at the March 2, 2018 company-wide offsite, including those from San Francisco-based Defendant ABS.

21. Defendants' casual disregard of corporate form and their regular usage of shell companies is also apparent through their latest corporate conduct: on July 15, 2020, Defendant Hayes announced that a new entity, "100x,"[3] "will become the new holding structure for HDR Global Trading Limited" and all of BitMEX's other assets, "including the BitMEX platform." In turn, the "HDR Group" was also rebranded as the "100x Group." This re-labeling makes little difference to the continued functioning of the entities as a single enterprise, however; Defendant Hayes explained that "[t]he BitMEX platform, brand and legal structure remain entirely unchanged."

---

[3] The name 100x is a reference to traders' ability on the BitMEX platform to trade at 100 times the leverage of their deposited bitcoin.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

22. This further demonstrates that the unitary BitMEX enterprise consists of the various affiliates and subsidiaries worldwide, and that the enterprise and each of its constituent parts are fully dominated and controlled by Defendants Hayes and Reed, as well as Delo, and the other stakeholders as a single enterprise.

23. Defendant ABS is a California-based wholly owned subsidiary and alter ego of Defendant HDR, which designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within California. Defendant ABS purports to be a Delaware corporation, Delaware Secretary of State file number 6393256, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810. Defendant ABS was organized by Defendant Hayes on or about April 27, 2017. Name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendant Hayes as well as Delo and Reed, who ultimately own and control Defendant ABS. Defendant Hayes asserted that Defendant HDR owns the entire issued share capital of Defendant ABS, and that Defendant ABS has an office in San Francisco, California.

24. Specifically, Defendant ABS, which is a United State-based alter ego of Defendant HDR, has an office at 301 Battery St., 4th Fl., San Francisco, CA, 94111. Defendant Hayes as well as Delo and Reed continue to control Defendant ABS with Defendant Hayes serving as the President, CEO, Secretary and Chief Financial Officer thereof and Reed serving as a Chief Technology Officer of Defendant ABS.

25. Plaintiff is informed and believes and thereon alleges that Defendant HDR dominates and controls every aspect of Defendant ABS' operation and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations, such that Defendant ABS is a mere instrumentality of the BitMEX enterprise. In particular, all its operations are controlled by its principal and alter ego, Defendant HDR, wherein Defendant ABS provides development, software engineering, containerized application deployment, site reliability and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions take place. Thus, Defendants ABS and HDR

operate as a single business enterprise for the purpose of operating the BitMEX derivatives trading platform.

26. Plaintiff is informed and believes and thereon alleges that Defendant HDR funds all of Defendant ABS operations, including paying for all of its employees, overhead, and lease and rent obligations, and is Defendant ABS' sole source of income.

27. Defendant Hayes as well as Delo and Defendant Reed, collectively own a controlling interest in Defendant ABS through their ownership of Defendant HDR, which wholly owns Defendant ABS. Defendant Hayes is the sole director, president, secretary, and treasurer of Defendant ABS, and executes agreements on its behalf. Defendant Hayes runs Defendant ABS's activities without regard to its corporate form and for the sole benefit of Defendant HDR.

28. Defendant Hayes has created Defendant ABS as a false "shell" company as part of a broader United State federal and state law, regulation and tax dodge designed to tell regulators and tax authorities that BitMEX has no California or U.S. operations or investors.

29. However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations. Specifically, Defendant ABS handles the majority of the development of the BitMEX Platform, and it is both the heart of the BitMEX enterprise and its nerve center.

30. Plaintiff is informed and believes and thereon alleges that Defendants intentionally and specifically targeted California when locating and developing the nerve center of the operations of the BitMEX enterprise. This is because, from the beginning of BitMEX's existence, traders based in the United States accounted for the vast majority of the enterprise's revenues, and even presently United States and California traders, as described below, are the most active and lucrative traders on the BitMEX Platform. This is also due to the fact that California's Silicon Valley has some of the world's best engineers and developers, and as such, Defendant ABS houses the most engineering personnel out of any BitMEX entity.

31. Defendant ABS aided and abetted, authorized, ratified and controlled Defendant HDR illegal acts described herein.

32.     Defendants HDR and Hayes relied upon their domestic agents, employees and affiliates, including without limitation ABS, to help implement and conceal the illegal acts alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.

33.     Defendant ABS acted in the United States and abroad within the scope of its agency with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in carrying out the acts alleged herein.

34.     Defendants are individually sued as principals, participants, agents, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from each Defendant's engagement in all or part of the illegal acts alleged herein.

35.     Additional and other facts regarding Defendants' joint action, alter ego status and aiding and abetting of one another regarding the misconduct against Defendants is hidden from Plaintiff at this time. Such information is uniquely within Defendants' possession, custody and control.  Plaintiff accordingly reserve the right to supplement and amend these allegations if appropriate or necessary following completion of relevant fact discovery.

36.     Defendant HDR is the sole and exclusive owner of BitMEX brand, as evidenced, for example, by the Terms of Service and by numerous trademark filings for the protection of this brand made by Defendant HDR in the United States and throughout the world.

37.     Defendant Hayes is an individual, who is a United States citizen and who resides in South Florida.  Defendant Hayes is sued as *sui juris.*

38.     Defendant Reed is an individual, who is a United States citizen and who resides in Massachusetts.  Defendant Hayes is sued as *sui juris.*

39.     Plaintiff is informed and believes, and on the basis of that information and belief alleges, that at all times mentioned in this complaint, Defendants were the agents and employees of their codefendants, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.

40.     Despite all the claims to the contrary, Defendants HDR, Hayes and Reed maintain numerous close connections with the United States and this District.  Defendant HDR's own

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

website BitMEX.com lists San Francisco as the location of one of Defendant HDR's offices, where all the technology behind BitMEX has been and continues to be developed. Defendants use United States – based Amazon, Inc. AWS infrastructure, with offices in northern California, for storing all of its customer, trading and order data and for executing its order matching system to match trading orders and its liquidation engine. Moreover, Defendants use Redwood City, California – based SendGrid, Inc. for handling all their bulk email communications with its customers. Finally, Defendants' website BitMEX.com is a commercial website, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants HDR, Hayes, Delo and Reed conduct high-volume derivatives trading business with numerous individuals and companies residing in the United States, State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

41.    The following data providers store data and other evidence critical to this case:

|  | Provider to BitMEX | Services Provided to BitMEX | Location |
|---|---|---|---|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | Twilio, Inc. | Communications with all BitMEX users | San Francisco, California |
| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 4. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |

| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with all BitMEX users | San Francisco, California |
| 11. | ProofPoint, Inc. | Hosting of BitMEX's internal corporate email accounts, outbound data loss prevention, social media, mobile devices, digital risk, email encryption, electronic discovery, and email archiving. | Sunnyvale, California |
| 12. | Slack, Inc. | Internal communications and collaboration between BitMEX employees. | San Francisco, California |

## JURISDICTION AND VENUE

42. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

43. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(a). Specifically, this action arises under CEA, which presents a federal question.

44. This Court has jurisdiction over the statutory and common law claims of violations under California law pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) and 28 U.S.C. § 1332(a).

45. This Court has personal jurisdiction over Defendants, and each of them, pursuant to California long arm statute codified in Cal. Code Civ. Proc. § 410.10.

46. Defendant HDR conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

47. Defendant ABS conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

48. Defendant Hayes conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

49. Defendant Reed conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.

50. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1). Venue is

similarly proper pursuant to 7 U.S.C. § 25(c) in that this is a District wherein a defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.

## INTRADISTRICT ASSIGNMENT

51.     Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is the proper venue because substantial part of the events or omissions, which give rise to this action has occurred in San Francisco county, where Defendants' HDR and ABS principal offices are located.

## FACTS

52.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

53.     Defendants operated an undisclosed ITD managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. The ITD operated to persistently manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of bitcoin and ether, Ex. 14.

54.     The operators of the ITD had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open swap contracts.  They were also provided with automated systems, built by BitMEX, leveraging this highly sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

55.     The traders at the ITD had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations.

56. Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

57. The access to hidden information thus provided the operators of the ITD with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX ITD could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX. BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

58. To further facilitate and enable market manipulation activities of the ITD, Defendants designed the internal workings of their BitMEX platform to enable, encourage and benefit from market manipulation. It all has to do with accounts anonymity, lack of trading and position limits, high degree of contract leverage and how the index prices for bitcoin and ether swaps are calculated. Defendants deliberately designed these index prices to be based on bitcoin spot price on two or three illiquid "reference" bitcoin spot exchanges, including U.S.-based Coinbase Pro, Kraken and Bitstamp. Illiquid in this context means that, to precipitously move bitcoin price on those "reference" exchanges, relatively small market orders will suffice. Therefore, a relatively small market order on a "reference" spot exchange results in a relatively large bitcoin index price move on the relatively liquid BitMEX, which makes cross-market manipulation highly profitable.

59. Relying on only a small number of relatively illiquid "reference" exchanges provided BitMEX with an additional method of manipulating the prices of the derivatives it sold its customers. By making a series of orders to push the price up or down on a reference

exchange, Defendants' ITD could create short-lived price fluctuations on BitMEX. Defendants actively manipulated prices on reference exchanges in order to enable its ITD to profit by liquidating customer accounts.

60.     In order to facilitate this manipulation, BitMEX would transfer onto other exchanges bitcoins it had obtained through profitable trades on its own platform. Plaintiffs' expert, working with Chainalysis blockchain investigations software, identified six such large and highly irregular bitcoin transfers sent from BitMEX to its "reference" exchange Bitstamp, which will be described in detail in paragraphs below. BitMEX would then use those transferred funds to buy or sell the referenced crypto-commodities on its reference exchanges. These purchases would then cause the price of the derivative on BitMEX to move towards the manipulated price on the reference exchange. This effect would be short-lived, however, as market forces would correct the price on the reference exchange. Defendants could thus cause short spikes or dips in the prices of BitMEX derivatives by manipulating reference exchanges.

61.     BitMEX was uniquely positioned to benefit from these short fluctuations for at least two reasons. First, as discussed above, BitMEX has access to all of the hidden information of its customers and trades against them on BitMEX's platform. BitMEX can therefore calculate which market movements would be profitable, either by making BitMEX money on its internal trades or by liquidating customer accounts at a price that would be profitable for BitMEX. Because BitMEX had unique tools that allowed it to determine which market movements would profit BitMEX by liquidating its customers' contracts or advancing its trades against its customers, it alone knew exactly how to move its reference exchanges to maximize its profitability.

62.     Second, BitMEX's liquidation system enables it to profit from manipulation that would not be profitable to normal traders. A normal trader will struggle to profit from a series of purchases that temporarily increase the price of a crypto-commodity because, in selling the purchased asset to take advantage of the higher prices, the seller creates downward pricing pressure that deflates the prices. But BitMEX's liquidation system means that it can benefit from short-lived fluctuations. If BitMEX's ITD's undisclosed access into consumer accounts indicated

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

that there would be a profitable set of liquidations if the price of Bitcoin rose to $55,000 when it was currently at $54,000, then BitMEX could transfer funds to a reference exchange and pump the price of Bitcoin on that exchange. Even if BitMEX did not make money on the pump and dump itself, it would profit from the liquidations triggered by the price of Bitcoin briefly crossing that $55,000 threshold. Because BitMEX liquidates positions as soon as they cross a liquidation threshold, even short price swings can be profitable for BitMEX and harmful for its customers.

63.     Defendants' ITD manipulation can be detected through analysis of abnormal trading patterns on Bitstamp, one of the reference exchanges.  It was discovered that certain suspicious trading patterns were aligned with abnormal trading on BitMEX itself. Moreover, these instances occurred on days when BitMEX itself was particularly positioned to profit from them because Kraken, another reference exchange, was down for maintenance and unavailable for pricing derivatives on BitMEX.

64.     For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering. This flash crash followed a 15-minute period of particularly abnormal trading activity on Bitstamp and BitMEX. From approximately 2:55 to 3:10 AM (UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp. In contrast, during the previous day, only 83 bitcoins were sold every 15 minutes on average.

65.     This unusually large volume of sell orders caused the price of bitcoin on Bitstamp to fall precipitously from $7,730 to $6,178—a decline of 20 percent over the course of only 15 minutes. At 3:10 AM, the volume of sale orders suddenly normalized, leading to an abrupt reversal in the price of bitcoin, in which it recovered to $7,350, an increase of 19 percent, during the following 2 to 15 minutes.  This unusual trading activity on Bitstamp had an immediate and significant impact on the price of the XBTUSD Perpetual Contract on BitMEX, given that BitMEX uses Bitstamp as one of only three reference exchanges for the price of that contract.

66.     The short volume of the BitMEX XBTUSD Perpetual Contract spiked during this period, in a pattern highly similar to that observed with the Bitstamp sales volume. The volume of short sales on BitMEX began at about the same time as the aggressive sales on Bitstamp (2:55 AM), although the short volume on BitMEX was larger than on Bitstamp, and continued at that

high level up until 3:10 AM. On BitMEX, however, there was an abrupt halt to the shorting activity at 3:10:49 AM, before resuming at a significantly lower level at 3:12:33 AM, as the price of bitcoin and the XBTUSD Perpetual Contract recovered. During this 104-second period with no shorting activity on BitMEX, the price of bitcoin on Bitstamp immediately recovered to above $7,000, before temporarily falling back to $6,699, when a lower volume of shorting activity resumed on BitMEX. After that time, the price of bitcoin and the XBTUSD Perpetual Contract quickly recovered again to approximately $7,350 over the following 8 to 10 minutes. This pattern demonstrates a high degree of correlation, and likely coordination, between the shorting activity on BitMEX and Bitstamp.

67.     The relative timing of the short sales on BitMEX and the sell orders on Bitstamp also supports the conclusion that the trading likely involved cross-market manipulation. During this time period, a large increase in short positions on BitMEX was often followed by a large sell volume of Bitcoin on Bitstamp.

68.     The short position on BitMEX spiked at 3:08:13 AM; three seconds later, 12.5 bitcoin were sold on Bitstamp. Large volumes of BitMEX short sales also occurred at 03:08:26, 03:08:36, 03:08:47, 03:08:51, and 3:08:58. All of these sales were followed by large sell volumes of bitcoin on Bitstamp within a few seconds. This would be consistent with a trader placing short orders on BitMEX in order to profit from a drop in prices from their subsequent sales of bitcoin on Bitstamp. Within this single minute, more than 100 bitcoins (worth more than $600,000 at the time) were sold on Bitstamp, causing the price of bitcoin to drop by 2 percent.

69.     Because this manipulation led to high but short-lived volatility, most possible manipulators could not have benefitted. A regular trader, even assuming they had the resources to engineer such manipulation, would have struggled to benefit from the dip before it reversed itself.

70.     Instead, they would likely have lost money, having sold at a below-market price and unable to enter new orders in time to capitalize on the dip before it recovered.

71.     BitMEX, however, profited substantially from these manipulated market movements. The high volatility in the price of the XBTUSD Perpetual Contract on BitMEX resulting from this unusual trading behavior caused an unusually large volume of customers'

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

contract liquidations on BitMEX. As a consequence, the Insurance Fund increased by 750 bitcoins, with a value (at the time) of approximately $5.4 million. In comparison, the average daily increase in the Insurance Fund was 140 bitcoins during the week before the event, and 49 bitcoins on a daily average basis during the week after.

72.     BitMEX, through its Insurance Fund, was therefore uniquely positioned to earn large profits from the high volatility of bitcoin prices on Bitstamp that occurred over this 30-minute period on May 17, 2019, in addition to any trading profits that either BitMEX or its principals may have earned as a direct result of the price manipulation on the two exchanges.

73.     On other days during which when Kraken was undergoing scheduled maintenance, similarly suspicious trading activity occurred on Bitstamp and BitMEX. For example, on July 14, 2019, Kraken was down for maintenance—thus increasing the weight of Bitstamp on BitMEX's derivatives products. On that day, the price of ether dropped dramatically due to the sell order on Bitstamp by a single user, causing $164 million worth of liquidations on BitMEX. Again, only BitMEX was in a position to profit from this manipulation.

74.     Indeed, BitMEX has consistently profited from suspicious Bitstamp trading that triggered volatility and liquidations on BitMEX. For example, on September 24, 2019, the price of bitcoin on Bitstamp fell 14 percent, from $9,500 to $7,998, between approximately 6:00 PM and 7:45 PM. The fall was caused by the sudden appearance of an unusually large volume of sell orders on Bitstamp, including unusually large individual sale orders. For example, in a two second period at 6:34 PM, 88 bitcoin, worth more than $800,000, were sold on Bitstamp. This sale was followed 10 minutes later by an unusually large volume of short sales on BitMEX. After falling to a low of $7,998 at approximately 7:45 PM, the price of bitcoin rapidly recovered to $8,500 by 8:45 PM, and to $8,600 around 9:30 PM. The resulting volatility of bitcoin prices caused the BitMEX Insurance Fund to increase by 22.5 bitcoin, worth $193,000, on that day.

75.     Defendants actively concealed the wrongdoing perpetrated by their ITD. In addition to deliberately making all BitMEX accounts anonymous, which hindered pinpointing the ITD as the culprits behind the manipulative trading, and actively deleting critical records, including trader identity information, BitMEX deliberately used anonymous "burner" (e.g.

@gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their ITD with the BitMEX platform. This was done to cover up any remaining tracks of wrongdoing, so that the trading histories and illegal manipulation profits of the ITD could not be traced back to the BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.

76.     Financially ruined by Defendants' blatant fraud, some victimized traders were driven by Defendants into taking their own lives. For example, Defendants fraudulently induced Chinese trader Hui Yi to enter into a large short position on BitMEX, which BitMEX's ITD subsequently deliberately liquidated using Hui Yi's confidential information, confiscating 2,000 bitcoins of Hui Yi clients' money. The trader, who was the co-founder and CEO of cryptocurrency market analysis platform BTE.TOP, died by suicide on June 5, 2019.

77.     Being keenly aware of the CFTC and DOJ civil and criminal investigations and imminently forthcoming civil and criminal charges, and while preparing to go on a lam from the U.S. authorities, Defendant Hayes as well Delo and Defendant Reed siphoned about $440,308,400 of proceeds of various nefarious activities that took place on the BitMEX platform, from accounts of Defendant HDR, Ex. 6, 7, 8. The siphoned funds were divided among Defendants and their associate substantially in accordance with the following table, prepared on information and belief of Plaintiff, which belief was formed based on public records, Court records, U.S. DOJ indictment of Defendant Hayes, CFTC civil complaint against Defendants and information provided by former employees of Defendants:

|  | Shareholder of HDR Global Trading Limited | Equity Ownership Percentage | Distribution Amount |
|---|---|---|---|
| 1. | Arthur Hayes | 31.67% | $139,430,993.33 |
| 2. | Benjamin Delo | 31.67% | $139,430,993.33 |
| 3. | Samuel Reed | 31.67% | $139,430,993.33 |
| 4. | Sean O'Sullivan Ventures (SOSV) | 5% | $22,015,420.01 |
|  |  | **Total:** | **$440,308,400.00** |

78.    These fraudulent distributions of proceeds of illegal acts were made on the following dates, which are **after** Defendants learned about the Government investigations and **after** receiving a draft complaint in another civil action in 2019:

|   | Distribution Date |
|---|---|
| 1. | October 15, 2019 |
| 2. | November 19, 2019 |
| 3. | January 2020 |

79.    From this information, it appears that Defendants were actively and deliberately looting Defendant HDR and trying to make its funds unavailable for the collection of future judgments against it.  Specifically, the aforesaid profit distributions at a rate of $440,308,400.00 in just three months were clearly not performed in the ordinary course of business of Defendant HDR, as they represent $1,761,233,600 annual profit distribution rate, which money Defendant HDR simply does not earn.  Therefore, these extraordinarily large distributions were clearly designed to loot Defendant HDR of its assets and hinder Plaintiff's and Government's recovery of any future judgments.  Furthermore, such a remarkable surge in proceeds distributions may also indicate that Defendants are looting the so called BitMEX Insurance Fund, where BitMEX deposits bitcoin wrongfully misappropriated from its traders.

80.    As soon as Plaintiff's attorney became aware of the evidence of siphoning of $440,308,400 of funds from Defendant HDR by other Defendants, which appeared in public court filings in another civil action against Defendants filed in California Superior Court, Defendants urgently moved the Court to strike or seal the discovered evidence of asset dissipation telling the California Superior Court that the relevant documents were publicly filed in violation of a protective order in that case and that the revelations caused great damage to Defendants, Ex. 9.

81.    On October 1, 2020, Defendant Hayes as well as Delo and Defendant Reed were indicted by DOJ on felony charges of violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at BitMEX.  In announcing the indictment, Ex. 1, FBI Assistant Director William F. Sweeney Jr. said: "As we allege here today, the four defendants,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements. One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost just 'a coconut.' Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time." Reed was apprehended by the FBI in Boston, Massachusetts. Defendant Hayes and Delo have been released on bail pending their criminal trial on March 28, 2022.

82. On the same day, the CFTC announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging Defendants HDR, ABS, Hayes as well as Delo and Defendant Reed with operating an unregistered trading platform and violating multiple CFTC Regulations, including failing to implement required anti-money laundering procedures. The CFTC complaint is attached hereto as Ex. 2 and all allegations therein are made part hereof.

83. Among those charged were company owners Defendants Hayes and Reed, as well as Delo, who operated BitMEX's platform through a maze of corporate entities, including Defendants HDR and ABS. BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

84. Plaintiff became a customer of BitMEX when he first established an online trading account with BitMEX on or about June 24, 2019. Plaintiff was enticed to trade on BitMEX by means of Defendants' own predatory and false advertisements, directed at Plaintiff and traders like Plaintiff, wherein Defendants, for example, specifically advertised BitMEX as "Bitcoin's



CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

most advanced trading platform" with "industry-leading security" and with "0 Bitcoin Lost through Intrusion or Hacking," offering "Next generation of bitcoin trading products" with



"1500% more Bitcoin / USD Liquidity than any other platform" and with "BitMEX's XBTUSD market [being] the most liquid in the world."

85.     In addition, Defendants specifically advertised their perpetual swap contract as "the most traded bitcoin product ever."  Plaintiff justifiably relied on representations made by Defendants in the aforesaid advertisements.  However, in truth and in fact, the aforesaid representations in the Defendants' advertisements were intentionally and materially false.  In reality, Defendants had inferior security practices and procedures, which resulted in substantial security breaches and multimillion-dollar losses to traders.  Moreover, Defendants' claims of providing "1500% more Bitcoin / USD Liquidity than any other platform" were materially and deliberately false.

86.     A copy of the written Terms of Service ("Service Agreement") of BitMEX provided personally to Plaintiff via BitMEX front end interface on or about June 24, 2019 is attached hereto as Ex. 17 and incorporated herein.  Defendants' Service Agreement contained the following Warranty and Representation made by Defendants' personally to Plaintiff:

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow,

execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

87.     This Warranty and Representation was materially false. In truth and in fact, Defendants' ITD was specifically designed and specifically equipped with special automated tools built by BitMEX, to trade against Plaintiff using Plaintiff's own confidential information, by manipulating bitcoin and ether prices on "reference" spot exchanges. Moreover, BitMEX was routinely using fraudulent server freezes to prevent Plaintiff and traders like Plaintiff from escaping liquidations. Defendants' ITD was not subject to those server freezes and continued to liquidate BitMEX traders during the freeze times, thus receiving an undisclosed access and trading privileges not available to Plaintiff.

88.     Moreover, Defendants enlisted notorious cross-market manipulators, including the infamous Ben Aabtc, provided them with an unlimited number of anonymous document check-fee trading accounts on BitMEX, with high leverage and without trading and position limits, to manipulate markets on BitMEX and its "reference" spot exchanges, causing additional customer liquidations, which again profited Defendants at the expense of Plaintiff and other retail traders like Plaintiff.

89.     On or about July 5, 2019, Plaintiff purchased XBTUSD long swap contract and paid at least 0.78896761 bitcoins as the swap contract purchase cost. In addition, Plaintiff purchased ETHUSD long swap contracts and paid at least 1.0213092 bitcoins as the swap contract purchase cost. On July 11, 2019, both contracts were liquidated or otherwise closed and, as the result, Plaintiff sustained losses in the amount of at least 1.81027681 bitcoins, as follows:

| Date | Exchange | Order Book | Trade Type | Order | Loss Amount |
|------|----------|-----------|------------|-------|-------------|
| 07/11/2019 | BitMEX | XBTUSD Swap | Liquidation/ Closure | SELL MARKET ALL | 0.78896761 bitcoins |
| 07/11/2019 | BitMEX | ETHUSD Swap | Liquidation/ Closure | SELL MARKET ALL | 1.0213092 bitcoins |

90. On August 10, 2021, in Case 1:20-cv-08132-MKV (S.D.N.Y. 2021), Defendants HDR and ABS entered into a Consent order with CFTC and judicially admitted that "Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, operated a facility for the trading or processing of swaps without being registered as a swap execution facility or as a designated contract market and thus violated Section 5h(a)(1) of the [Commodity Exchange] Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2020)." In the same Consent Order, Defendants agreed to pay $100 million penalty for these violations. Therefore, in the Consent Order dated August 10, 2021, Defendants judicially admitted that they were obligated to register with CFTC as a swap execution facility or as a designated contract market and, consequently, were also obligated to comply with any and all provisions of the CEA and CFTC regulations established for these two types of entities.

91. In order to curb potential market manipulation and protect retail traders like Plaintiff, CFTC mandates, by regulation, the following actions to be taken by swap execution facilities and/or designated contract markets, which Defendants were admittedly required, but failed, to take: 1) implementing measures to properly safeguard swap contracts from malicious actions of market manipulators (17 CFR §§ 38.650-651); 2) implementing rules and procedures sufficient to ensure that the traded contracts were not readily susceptible to manipulation (Sections 5(d)(3) and 5h(f)(3) of the CEA, 7 U.S.C. §§ 7(d)(3), 7b-3(f)(3) (2018) and 17 CFR §§ 37.300-301, 38.200, see CFTC Complaint, Ex. 2 ¶¶ 27, 48); 3) implementing rules and procedures sufficient to ensure that market participants were prevented from engaging in manipulation or disruptive trading; and market participants who engaged in misconduct were subject to discipline (Section 5(d)(4) and 5h(f)(4)(B) of the CEA, 7 U.S.C. §§ 7(d)(4), 7b-3(f)(4)(B) (2018) and 17 CFR §§ 37.401, 38.651, 38.700-712, see CFTC Complaint, Ex. 2 ¶¶ 27, 48); imposing position limits on market participants, designed to reduce the potential for market manipulation or congestion (Sections 5(d)(5) and 5h(f)(6) of the CEA, 7 U.S.C. §§ 7(d)(5), 7b-3 (f)(6) (2018), 17 CFR §§ 37.600, 38.300-301); and securing adequate scalable computer server capacity for trading computer systems to prevent server freezes and system overloads that

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

adversely affected trading (17 CFR §§ 37.1400-1401 and 38.1051(a)(4)).  Therefore, Defendants

were negligent *per se* in failing to prevent manipulative activities of malicious third-party actors,

such as Ben Aabtc, and, therefore, are liable for any such third-party conduct, as well as all

customer losses due to server freezes on the BitMEX platform.

<u>COUNT I</u>
**"Unfair" Business Practices in Violation of California Unfair Competition Law (Cal. Bus. &
Prof. Code § 17200, et seq.) — Based on Misrepresentation of Liquidity on BitMEX
(Against All Defendants)**

92.    Plaintiff repeats and re-alleges the allegations contained in every preceding

paragraph as if fully set forth herein.

93.    The Cal. Bus. & Prof. Code § 17200 et seq. defines "unfair competition" to

include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive,

untrue or misleading" advertising as well as any violation of Cal. Bus. & Prof. Code § 17500.

Cal. Bus. & Prof. Code § 17200.

94.    The Cal. Bus. & Prof. Code § 17200 et seq. imposes strict liability. Plaintiff need

not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent

business practices – but only that such practices occurred.

95.    During the entire Relevant Period, in soliciting Plaintiff's bitcoin deposits, trading

orders, payment of swap contract purchasing "costs" and trading commissions, Defendants, and

each of them, personally represented to Plaintiff, through their commercial website

www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, that

Defendants' BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other

platform" (the "Liquidity Representation").  Ex. 16.  The foresaid representation regarding



**1500%**
More Bitcoin/USD liquidity than any
other platform. BitMEX's XBTUSD market
is the most liquid in the world.

available liquidity on BitMEX was made by Defendants, and each of them, by electronically

transmitting, through a computer network, a web page document from Defendants' Servers in San

Francisco, California directly to Plaintiff's computer. Defendants made the aforesaid

representation regarding available liquidity on BitMEX to Plaintiff on, for example, June 24, 26,

27, 28 and 29 and July 3, 4, 5, 6, 11, 2019.

96. The amount of liquidity on the BitMEX platform was highly material for

Plaintiff's decision to engage in cryptoderivative trading on BitMEX platform and in determining

whether or not to trade on BitMEX, as the amount of available liquidity determined the level of

financial risk associated with Plaintiff's open swap contracts as well as potential profits that

Plaintiff could realize from cryptoderivative trading. With higher available liquidity there is

lower price slippage[4] occurring upon execution of large market orders, which leads to higher

potential trading profit for Plaintiff. Also, with higher available liquidity, there are lower

magnitude of price swings and decreased associated financial risk of liquidation of Plaintiff's

purchased swap contract.[5] Therefore, Plaintiff made his decision to open account, make bitcoin

deposit(s) and trade on BitMEX because of his reliance on the truth of Defendants' representation

regarding the available liquidity on BitMEX being 1500% higher than competition.

97. However, in truth and in fact, the aforesaid representation regarding available

liquidity on BitMEX made by Defendants was intentionally and materially false during the entire

Relevant Period and on each of the specific days when Plaintiff made his bitcoin deposits with

Defendants and executed his trades on BitMEX.

98. Plaintiff understood the term "Bitcoin/USD liquidity" used by Defendants in

connection with the Liquidity Representation to refer to a market liquidity indicator measured

using a bid-ask price spread[6] for U.S. dollar-denominated bitcoin products traded on the

exchange. This understanding is consistent with the one generally used in the crypto industry by

---

[4] Price slippage, which results in diminished profits due to inability to fill market orders at the current market price, is inversely correlated with liquidity available on the platform.
[5] Liquidity operates to "absorb" market price swings, reducing their magnitude and, correspondingly, the financial risk of liquidation.
[6] A bid-ask spread is the difference between the highest price that a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept. The spread is the transaction cost. Price takers buy at the ask price and sell at the bid price, but the market maker buys at the bid price and sells at the ask price. The bid represents demand and the ask represents supply for an asset. The bid-ask spread is the *de facto* measure of market liquidity.

reasonable consumers engaged in crypto trading. The tighter is the bid-ask spread, the higher is the liquidity. To establish that Defendants' Liquidity Representation was false and that reasonable consumers were deceived by it, Plaintiff's counsel (i) purchased all necessary historical exchange price quote data for BitMEX, Binance and OKEX exchanges, from a reputable historical exchange data provider COINAPI LTD, D.B.A. Cryptotick.com, (ii) extracted the highest bid and lowest ask prices from each exchange price quote, (iii) calculated the spreads between bid and ask prices and (iv) then calculated the average daily bid-ask spreads (logically, ask price must be greater than bid price), for all the relevant days, when Plaintiff made deposits or traded on the BitMEX platform. The results of this bid-ask spread analysis are presented in the below table and clearly show that Defendants' claim of providing 1500% more Bitcoin / U.S. dollar liquidity than any other platform was false. As can be clearly seen from the below table, during the relevant days, liquidity on BitMEX, as measured by the bid-ask spread, was not any higher than that on OKEX, let alone 1500% or 16x higher. To the contrary, on all relevant days, the liquidity on BitMEX, as measured by the bid-ask spread, was either substantially the same, or even lower than the corresponding liquidity on OKEX. Even compared with the second exchange Binance, the BitMEX liquidity on most relevant days was not even 400% or 5x higher, let alone 1500% or 16x higher, as Defendants falsely claimed.

Bitcoin/U.S. Dollar Average Daily Bid-Ask Spreads, %
(tighter bid-ask spread means higher liquidity)

| Date | BitMEX XBT/USD Swaps[7] | Binance BTC/USD(T) Spot | OKEX BTC/USD Futures |
|------|------|------|------|
| 06/24/2019 | 0.005 | 0.020 | 0.002 |
| 06/26/2019 | 0.22 | 0.031 | 0.007 |
| 06/27/2019 | 0.025 | 0.044 | 0.015 |
| 06/28/2019 | 0.007 | 0.033 | 0.005 |
| 07/03/2020 | 0.006 | 0.026 | 0.009 |
| 07/04/2020 | 0.007 | 0.023 | 0.007 |
| 07/05/2020 | 0.007 | 0.024 | 0.007 |
| 07/06/2019 | 0.005 | 0.023 | 0.005 |
| 07/07/2019 | 0.005 | 0.021 | 0.004 |
| 07/08/2019 | 0.005 | 0.018 | 0.004 |
| 07/11/2019 | 0.004 | 0.027 | 0.008 |
| 07/13/2019 | 0.005 | 0.021 | 0.004 |

[7] While BitMEX also offers bitcoin futures products, its swap product is more liquid than the futures. Therefore, comparison is being made using bid-ask spread of more liquid swap product.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

99. Moreover, in their motion to dismiss papers filed on June 21, 2021, in a related action, *BMA et al. v. HDR Global Trading Limited et al.,* Case No. 3:20-cv-3345-WHO (N.D. Cal. 2021), Defendants judicially admitted that trading volume is also a measure of liquidity, more widely used than the above bid-ask spread analysis. Thus, for good measure, Plaintiff's counsel also conducted an exchange trading volume analysis which additionally and alternatively establishes that Defendants' claim of providing 1500% more Bitcoin / U.S. dollar liquidity than any other platform was false. Specifically, Plaintiff's counsel purchased trading volume data for U.S. dollar-denominated Bitcoin derivatives products of BitMEX and OKEX from a reputable historical exchange data provider Skew.com (a Coinbase.com company).

100. Because Defendants' promise of providing 1500% more Bitcoin / U.S. dollar liquidity than any other platform was unqualified, and used the broad term "platform," an ordinary consumer, such as Plaintiff, would understand and actually understood it to mean "liquidity across all bitcoin products on the entire platform, which are denominated in U.S. dollars." On the other hand, the purchased trading volume data for the corresponding U.S. dollar-denominated Bitcoin derivatives products of BitMEX and OKEX, presented in the below table,[8] clearly shows that Defendants' claim of providing 1500% more Bitcoin / U.S. dollar liquidity than any other platform was false, even if liquidity is measured using the trading volume data, the method that Defendants themselves suggested in their own motion to dismiss. As can be clearly seen from the below table, on the relevant days, liquidity on BitMEX, as measured by the trading volume, was *hardly* even 200% or 3x higher, let alone 1500% or 16x higher than that on OKEX.[9] Thus, the falsity of Defendants' Liquidity Representation is conclusively established using two alternative methods of measuring exchange liquidity, one of which is generally used in the industry and the other suggested by Defendants themselves in their motion to dismiss.

---

[8] During Relevant Period, from USD-denominated bitcoin financial products, meeting the term "Bitcoin / USD liquidity," BitMEX offered only bitcoin futures and swaps. Their aggregated daily trading volume is shown in column two of the table. OKEX offered only USD-denominated bitcoin futures. Their aggregated daily volume is shown in column three.
[9] BitMEX's trading volume is higher than OKEX's likely due to the wash trading by Defendants' ITD, which, according to the CFTC Complaint, Ex. 2 ¶ 50, is the largest volume trader on BitMEX. Therefore, the real trading volume on BitMEX is likely to be below OKEX's volume.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

### Bitcoin/U.S. Dollar Aggregated Daily Trading Volume, USD
### (higher trading volume means higher liquidity)

| Date | BitMEX XBT/USD Futures and Swaps Aggregated Daily Volume | OKEX BTC/USD Futures Aggregated Daily Volume |
|---|---|---|
| 06/24/2019 | 5,430,950,260 | 1,791,847,500 |
| 06/25/2019 | 5,370,699,001 | 2,163,458,400 |
| 06/26/2019 | 10,986,898,796 | 3,900,550,300 |
| 06/27/2019 | 14,112,138,582 | 7,432,527,700 |
| 06/28/2019 | 10,761,675,575 | 6,642,206,700 |
| 06/29/2019 | 6,896,838,522 | 3,178,607,600 |
| 07/03/2019 | 7,454,733,611 | 3,494,535,700 |
| 07/04/2019 | 5,844,775,506 | 2,540,417,000 |
| 07/05/2019 | 5,465,341,825 | 2,437,977,400 |
| 07/06/2019 | 5,023,429,394 | 2,232,377,200 |
| 07/07/2019 | 3,376,557,133 | 1,552,202,500 |
| 07/08/2019 | 3,360,797,378 | 1,750,565,400 |
| 07/09/2019 | 5,914,496,965 | 1,834,520,400 |
| 07/10/2019 | 5,405,837,484 | 4,616,710,300 |
| 07/11/2019 | 8,846,927,738 | 4,848,478,600 |
| 07/12/2019 | 5,528,767,581 | 3,202,424,600 |
| 07/13/2019 | 4,419,801,459 | 2,655,431,400 |

101.     Accordingly, Defendants' claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were grossly, materially and deliberately false during the entire Relevant Period and on the specific days Plaintiff made his bitcoin deposits with Defendants and executed his swap contract trades on BitMEX.[10] In fact, the aforesaid claims of providing "1500% [or 16 times] more Bitcoin / USD Liquidity than any other platform" were materially false even as of September or October of 2018, when they were first made by Defendants. Thus, Plaintiff and reasonable consumers were deceived by Liquidity Representation.

102.     The fact that liquidity on BitMEX was not any higher than on other competing exchanges, let alone 1500% (or 16 times) higher, as Defendants falsely represented to Plaintiff, was well known to Defendants themselves, who had a direct access to all relevant data and who

---

[10] In a fraudulent solicitation case *SEC v. Kristijan Krstic et al.*, Case No. 1:21-cv-00529 (E.D.N.Y. 2021), brought by SEC under Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], SEC charged defendants with fraudulently soliciting investors to trade digital asset securities by falsely claiming that their Start Options platform was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media." These fraudulent representations that formed the basis for the SEC action were very similar to Defendants' fraudulent claims of providing "1500% More Bitcoin/USD liquidity than any other platform," the latter being even more specific and factual.

nevertheless deliberately decided to use these fraudulent representations to entice unsuspecting traders, including Plaintiff, to trade on BitMEX to his financial loss and detriment. In making the false and fraudulent representations regarding available liquidity on BitMEX platform, Defendants were motivated by profit, including Plaintiff's bitcoin deposits, trading commissions paid by Plaintiff to Defendants, and Plaintiff's bitcoins confiscated by Defendants as the result of liquidations. Defendants Hayes and Reed, who each own 31.67% of the corporate Defendants HDR and ABS, had personal financial interest in making the aforesaid false and fraudulent representation regarding available liquidity on BitMEX platform in order to fraudulently solicit Plaintiff's business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in paragraphs above.

103. In other words, Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX having the best liquidity available in the industry, and 1500% higher than competition, when, in reality, he was not. Thus, Defendants' false representations misled Plaintiff into believing that he was getting something, namely cryptoderivative trading services from BitMEX having Bitcoin/USD liquidity 1500% higher than competition, that he was not getting. Therefore, Defendants' false representations regarding liquidity on BitMEX actually misled Plaintiff into believing something that was not true and were "likely to [so] mislead a reasonable consumer." Plaintiff did not want to use, and would not have used, cryptoderivative trading services if such services did not provide the Bitcoin/USD liquidity 1500% higher than competition.

104. BitMEX charges traders a "cost" of purchasing swap contracts, wherein the contract purchase "cost" depends on the swap contract size (number of contracts) as well as a financial risk associated with the swap contract, which is represented using a number called the "leverage". As illustrated in the below screenshots of BitMEX's user interface, the higher the contract leverage (e.g., 100x, 25x and 3x in the below three screenshots), the higher is the financial risk associated with the swap contract and the lower is the respective contract purchase "cost" (e.g., 0.0023 XBT, 0.0086 XBT and 0.0704 XBT for the long swap contract with the respective 100x, 25x and 3x leverages shown in the below screenshots). In other words, swap

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

contract risk is inversely related to contract purchase "cost," wherein riskier swap contract "costs"



less to purchase.   In case of a contract liquidation, the maximum trader's loss equals to the aforesaid swap contract purchase "cost" plus trading commissions paid.

105.    Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and would not have paid the swap contract purchase "costs" and trading commissions to Defendants had he known the true facts, as the true facts meant that due to insufficient liquidity, the odds of making any money on the BitMEX platform were stacked heavily against Plaintiff and the financial risk of liquidation of Plaintiff's swap contract was substantially higher than Plaintiff assumed, based on the misrepresented liquidity on BitMEX (higher liquidity operates to "absorb" market price swings, reducing their magnitude and, correspondingly, the financial risk of liquidation, while lower liquidity exacerbates price swings increasing the financial risk of liquidation).  In other words, because the swap contracts that Plaintiff purchased from Defendants were substantially riskier than they would have been if the Liquidity Representation was true, their purchasing "costs" should have been much lower than what Plaintiff has paid.

Consensus Law
CryptoCurrency
Attorneys

Second Amended Complaint for Unfair Competition          - 31 -          Anatoly Sorokin v. HDR et al.   Case No. 3:21-CV-03576-WHO

1    106.   Had Plaintiff known the true facts about the liquidity on BitMEX, Plaintiff would

2    have realized that, due to the lower actual liquidity than Defendants represented, BitMEX's swap

3    contracts were substantially riskier, and, consequently, less valuable, and he would not have paid

4    the amounts he paid as "costs" for opening (purchasing) these riskier and less valuable swap

5    contracts on BitMEX, but would have paid substantially less, if anything at all[11], to account for

6    this increased financial risk associated with lower liquidity than Defendants represented.

7    107.   Accordingly, at the time of the respective swap contract purchases, Defendants

8    overcharged Plaintiff for the "cost" of purchasing each such swap contract by using the false and

9    fraudulent representation, promising Plaintiff to provide 1500% more liquidity than any other



21   platform.  Due to overpaying for the "costs" of purchase of the riskier swap contracts, for

22   purchase of which Plaintiff would not have paid the amounts he paid, had he known the true facts

23   about BitMEX liquidity, Plaintiff suffered out-of-pocket losses in the form of the aforesaid

24   overpayment at the time he purchased each of his swap contracts.  The subsequent liquidation of

25   Plaintiff's swap contracts was a mere consequence of the higher financial risk (as well as other

26   substantial contributing factors, such as deliberate actions of the ITD) associated with them, but

27

28   [11] Financially safer swap contracts, carrying lesser risk of liquidation, generally cost more and
     riskier contracts cost less to purchase.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

the financial loss in the form of contract purchasing "cost" overpayment was suffered by Plaintiff at the time of the respective contract purchase. Even if the subsequent liquidation of Plaintiff's swap contracts was the consequence of the natural market forces (which it was not due to the deliberate actions of the ITD) Plaintiff still suffered losses in the form of the aforesaid swap contract purchase "cost" overpayment at the time the respective swap contract was purchased.

108. Because Plaintiff was misled by Defendants as to the liquidity state on the BitMEX platform, he was fraudulently induced to buy more risky (due to lower exchange liquidity) swap contracts than he thought he was buying based on Defendants' Liquidity Representation. More risky contracts "cost" less to purchase and the measure of Plaintiff's damages is the difference between the contract purchasing "cost" actually paid by Plaintiff and the amount Plaintiff would have paid, if anything, for purchasing those riskier contracts had he known the facts indicative of the real risk associated with them. This measure of damages is illustrated in the above figure and is capable of accurate determination using appropriate calculations and expert testimony.

109. Plaintiff opened an account on the BitMEX platform and used Defendants' cryptoderivative trading services offered and managed by Defendants from California based on reliance on the truth of Defendants' representations regarding liquidity on BitMEX being 1500% greater than available on any other platform. When opening his BitMEX trading account, depositing bitcoins therein, purchasing perpetual swap contracts on BitMEX platform and paying contract purchasing "cost" and trading commissions to Defendants, Plaintiff saw and carefully read Defendants' false representation regarding available liquidity on BitMEX and relied on the truth of this representation in deciding to open BitMEX trading account, deposit bitcoins therein, purchase swap contracts, pay contract purchasing "costs" and trading commissions to Defendants.

110. Plaintiff was deceived and fraudulently induced to open a BitMEX trading account, deposit bitcoins therein, purchase perpetual swap contracts from Defendants, pay contract purchasing "costs" and trading commissions and did in fact open a BitMEX trading account, deposited bitcoins therein and engaged in cryptoderivative trading on the BitMEX platform due to the reliance on Defendants' false representations regarding available liquidity on

BitMEX, which stated to Plaintiff that the BitMEX platform provided "1500% More
Bitcoin/USD liquidity than any other platform."

111. Plaintiff would not have opened a BitMEX trading account, deposited bitcoins
therein, purchased the swap contracts, paid the contract purchase "cost" and trading commissions
to Defendants that he paid, if he knew the true facts and, specifically that Defendants' XBTUSD
market did not provide "1500% More Bitcoin/USD liquidity than any other platform."

112. After Plaintiff opened a BitMEX trading account and deposited bitcoins therein,
Defendants provided Plaintiff with cryptoderivative trading services having liquidity, which was
below the promised "1500% More Bitcoin/USD liquidity than any other platform." In doing so,
Defendants deceived Plaintiff and caused him to use Defendants' cryptoderivative trading
services with insufficient liquidity, which he did not want. Defendants' false representations
regarding available liquidity on BitMEX caused Plaintiff to spend and lose the money he paid as
trading commissions and swap contract purchasing "costs."

113. Plaintiff has suffered injury and loss of valuable property, namely bitcoins, as a
result of Defendants' fraud and deceit, and namely as the result of the false representations
regarding available liquidity on BitMEX provided to Plaintiff.

114. Plaintiff relied upon Defendants' false representations regarding available liquidity
on BitMEX and was induced to use Defendants' cryptoderivative trading services he did not want
and which were unsatisfactory to him, paying swap contracts purchasing "costs" and trading
commissions to Defendants and sustaining monetary losses. Defendants' deception caused
Plaintiff to open accounts on the BitMEX platform, deposit his bitcoins with Defendants and use
Defendants' cryptoderivative trading services he did not want, paying contract purchase "costs"
and trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiff
suffered injury in fact and lost money or property as a result of the alleged fraud and deception
perpetrated by Defendants using the false representations regarding available liquidity on
BitMEX.

115. The false Liquidity Representation was authored personally by Defendant Hayes
and ratified and approved by Defendant Reed, who also ordered it to be posted on BitMEX's

commercial website, for which he was responsible.  When the Defendants made the aforesaid

false representation regarding available liquidity on BitMEX to Plaintiff, they knew it to be

materially false, and these representations regarding available liquidity on BitMEX were made by

Defendants with the intent to defraud and deceive Plaintiff and with the intent to induce Plaintiff

to act in the manner herein alleged and specifically to open an account with BitMEX, deposit

bitcoins and trade Defendants' derivative products, pay contract purchasing costs and trading

commissions to Defendants, in order to wrongfully misappropriate Plaintiff's property.

Defendants had direct access to and first-hand personal knowledge of the liquidity information for

their own BitMEX platform as well as for all competing platforms, including Binance and

OKEX.  Therefore, they knew that their representation regarding available liquidity on BitMEX

made to Plaintiff was materially false and fraudulent.  In fact, Defendants' misrepresentation was

so blatant and so exaggerated, that persons in the position of Defendants, with full, unrestricted

access to all the pertinent data and with virtually unlimited human and financial resources, simply

could not have been ignorant about its falsity, as the cost for Defendants to order a detailed

computational study of comparative exchange liquidity would have been negligible.  Moreover, at

the end of 2018, a former high-ranking employee of BitMEX repeatedly informed Defendants

Hayes and Reed that the aforesaid representations regarding available liquidity on the BitMEX

platform were in fact false and requested their removal from the front page of the BitMEX

website, which Defendants Hayes and Reed deliberately refused to do, because they desired to

continue deceiving traders by promising them liquidity BitMEX did not have.  Furthermore, on or

about October 3, 2019, Defendants removed words "than any other platform," evidencing the fact

that Defendants deliberately tried to make the aforesaid representations regarding available

liquidity on BitMEX vaguer, which further establishes that Defendants knew that they were false

as written.  Yet furthermore, Defendants continued to use these false representations regarding

available liquidity on the BitMEX platform on the front page of their website, front and center,

until as late as March of 2021, by which time BitMEX fell to the number eight spot in

cryptoderivative exchange rankings in terms of trading volume, open interest and liquidity,

measured by the bid-ask spread, and abruptly removed those false representations promising

1500% more liquidity than other exchanges, only after they were mentioned in related Court cases. This further establishes that Defendants' deceit was willful and deliberate.

116. Plaintiff, at the time these representations regarding available liquidity on BitMEX were made by Defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations regarding available liquidity on BitMEX and believed it to be true. In reliance on these representations, Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading therein to his financial loss and detriment. For example, in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiff deposited with Defendants:

| Sorokin | June 24, 2019 | 0.50831625 bitcoins |
| Sorokin | June 26, 2019 | 0.03526 bitcoins |
| Sorokin | July 3, 2019 | 2.288000 bitcoins |
| Sorokin | July 4, 2019 | 4.28749672 bitcoins |

117. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiff incurred the following bitcoin loss of use damages associated with the fact that Plaintiff's bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiff not deposited his valuable bitcoins with BitMEX, as he did in reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, he would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. In addition to the loss of use damages, Plaintiff spent at least 0.001 bitcoin in bitcoin network transaction (miner) fees, for each bitcoin transfer he made from his personal bitcoin wallet to BitMEX (0.004 bitcoins in total for four transfers), in reliance on Defendants' false representations. Therefore, Defendant's false and fraudulent representations regarding available liquidity on BitMEX was a substantial factor in causing Plaintiff's bitcoin loss of use damages, as

well as the bitcoin network transaction fees damages, which were also a natural and foreseeable result of the Defendant's false and fraudulent representations regarding available liquidity on BitMEX, which were specifically calculated to fraudulently induce Plaintiff to deposit his bitcoins with Defendants, thereby causing the loss of use and bitcoin network fees damages. These bitcoin loss of use damages are, in effect, opportunity costs and are separate from and do not include any actual trading losses suffered by Plaintiff as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 47 | 0.50831625 bitcoins | 5.95% | 0.0030 bitcoins |
| Sorokin | June 26, 2019 | August 10, 2019 | 45 | 0.03526 bitcoins | 5.95% | 0.00025 bitcoins |
| Sorokin | July 3, 2019 | August 10, 2019 | 38 | 2.288 bitcoins | 5.95% | 0.014212 bitcoins |
| Sorokin | July 4, 2019 | August 10, 2019 | 37 | 4.28749672 bitcoins | 5.95% | 0.02593 bitcoins |
| | | | | | Total: | 0.043392 bitcoins |

118.    In reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX platform, on or about July 5, 2019, Plaintiff purchased from Defendants XBTUSD long swap contract and paid at least 0.78896761 bitcoins to Defendants as the swap contract purchase "cost". Moreover, on or about July 5, 2019, Plaintiff purchased ETHUSD long swap contract and paid at least 1.0213092 bitcoins as the swap contract purchase "cost". In addition to the swap contract purchase "cost", Plaintiff also paid at least 0.1 bitcoin in trading commissions to Defendants on that day. If Plaintiff knew that the Liquidity Representation was false, he would have realized that the swap contracts that Defendants sold him on or about July 5, 2019, were substantially riskier than what Defendants led him to believe by making the Liquidity Representation and, therefore, he would not have paid to Defendants 1.81027681 bitcoins as purchase "costs" of these long swap contracts, but would have paid substantially less, if anything

Consensus Law
Cryptocurrency
Attorneys

Second Amended Complaint for Unfair Competition        - 37 -        Anatoly Sorokin v. HDR et al.   Case No. 3:21-CV-03576-WHO

at all. Thus, at the time of the contracts purchase on or about July 5, 2019, Plaintiff was fraudulently induced by Defendants to overpay swap contracts purchase "costs" and, therefore, on or about July 5, 2019, Plaintiff sustained monetary damages in the amount he overpaid to Defendants as purchase "costs" for the riskier swap contracts, than what Defendants led him to believe, by making the false and fraudulent representations regarding available liquidity on the BitMEX platform.

119.    On or about July 11, 2019, Plaintiff's both XBTUSD and ETHUSD swap contracts were wrongfully liquidated or otherwise closed. As the result, on or about July 11, 2019, Plaintiff sustained monetary losses in the amount of at least 1.81027681 bitcoins, less the amount he overpaid to Defendants on July 5, 2019, as purchase "costs" for the riskier swap contracts, than Defendants led him to believe by making the false and fraudulent representation promising 1500% more Bitcoin / U.S. dollar liquidity than competition.

120.    The liquidation of Plaintiff's swap contacts was due to wild downward swings in the prices of XBTUSD and ETHUSD perpetual swap contracts on BitMEX, which were caused, in substantial part, by the insufficient buy (long) side liquidity on the BitMEX platform. Specifically, on or about July 11, 2019, liquidity on both sides of the market for XBTUSD and ETHUSD perpetual swaps essentially disappeared, leading to truly staggering price plunges, which precipitated liquidations of Plaintiff's contracts. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX, which induced Plaintiff to trade on margin on BitMEX, were a substantial factor in causing Plaintiff's trading losses. Another substantial factor was the downward swings in the price of the XBTUSD and ETHUSD perpetual swap contracts of BitMEX, which were exacerbated by the aforesaid buy (long) side liquidity shortages. Moreover, it was foreseeable for Defendants that the insufficient liquidity on BitMEX, which was fraudulently misrepresented by Defendants as being 1500% more than on any other platform, would naturally exacerbate downward price moves and result in staggering price plunges and, consequently, in the liquidation of Plaintiff's margined trading contract.[12]

---

[12] It is well-known that liquidity operates by absorbing and softening market price moves. The higher the liquidity, the more tempered price moves are. On the other hand, insufficient liquidity results in an increased amplitude of market price swings, which leads to more liquidations.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

Therefore, Plaintiff's trading loss incurred from liquidation of Plaintiff's margined swap contracts on BitMEX were within the foreseeable risk or harm created by the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. In other words, Plaintiff's trading loss incurred from liquidations of Plaintiff's margined swap contracts on BitMEX were reasonably expected to result from the Defendants' false and fraudulent representations regarding available liquidity on BitMEX.

121. Due to Plaintiff's decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, Plaintiff incurred the following monetary damages associated with trading commissions[13] paid by Plaintiff to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent representations regarding available liquidity on BitMEX was a substantial factor in causing Plaintiff's damages associated with trading commissions paid by Plaintiff to Defendants, which were also a natural and foreseeable result of the Defendants' false and fraudulent representations regarding available liquidity on BitMEX. These trading commissions paid by Plaintiff to Defendants are separate from and do not include any trading losses suffered by Plaintiff as the result of any market events, market manipulation or market conditions. Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.1 bitcoins, at the time he purchased his first swap contract on BitMEX, in reasonable reliance on Defendants' false and fraudulent representations regarding available liquidity on BitMEX, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 0.4 bitcoins |
| | | Total: | 0.4 bitcoins |

---

[13] BitMEX charges traders trading commissions (fees) in connection with purchasing, maintaining and selling swap contracts, irrespective of market moves or other events and irrespective of whether the contract is profitable or not. For example, the BitMEX trading commission for purchasing or selling a margined contract is 0.075% of the swap contract size.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

122.     Moreover, Defendants used their false Liquidity Representation to charge Plaintiff trading commissions substantially higher that any competing exchanges.  Plaintiff paid these exorbitant trading commissions[14] to Defendants because of his reliance on the truth of the Liquidity Representation.  Had Plaintiff known the truth about liquidity on BitMEX, he would not have paid the trading commission that Defendants charged, but would have paid substantially less, in line with what other competing exchanges charged their traders during Relevant Period.  Therefore, Plaintiff was additionally financially damaged by overpaying trading commissions to Defendants in reliance on the truth of the false Liquidity Representation and being ignorant of the true facts.  The trading commissions charged by Defendants and competing exchanges during Relevant Period are provided in the table below:

| Exchange | Taker Trading Commission | Taker Trading Commission After Discount |
|----------|--------------------------|------------------------------------------|
| Binance Futures | 0.04-0.017% | 0.036-0.0153% |
| BitMEX | 0.075% | 0.075% |
| OKEX | 0.05-0.03% | 0.05-0.03% |
| Huobi | 0.03% | 0.03% |

123.     Therefore, in addition to all the above damages, Plaintiff also suffered at least 0.24 bitcoins in damages due to overpayment of trading commissions to Defendants over other competing exchanges (e.g., Huobi) in reliance on the false and fraudulent Liquidity Representation.

124.     If Defendants truly provided 1500% (16x) more liquidity than any other trading platform, as they falsely represented to Plaintiff, such high liquidity would have absorbed sell orders and dampened the downward price moves, preventing the liquidations from taking place, and Plaintiff would not have sustained the trading loss he did.  Had Plaintiff known the actual facts about the liquidity, he would not have taken such actions, would not have deposited bitcoins, would not have purchased swap contracts that he purchased, would not have paid the

---

[14] Plaintiff paid "taker" trading commissions, while market makers paid "maker" commissions.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

swap contracts purchase "costs" he paid, would not have suffered the loss he suffered and would not have paid the trading commissions to Defendants that he paid.

125.     Plaintiff's reliance on the truth of Defendants' representations regarding available liquidity on BitMEX platform was justified because Defendants took extraordinary measures to keep tight control of the data pertaining to all aspects of operation of BitMEX platform, including available liquidity.  Similarly, operators of other crypto exchanges, such as Binance and OKEX also kept tight control of the data pertaining to all aspects of operation of their respective trading platforms, including available liquidity.

126.     According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform."  The front-end interface of the BitMEX platform includes the commercial website www.bitmex.com, which was used to provide the false and fraudulent representations regarding available liquidity on the BitMEX platform to Plaintiff.

127.     Defendant ABS Global Trading Limited, responsible, within the BitMEX enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California.  Therefore, the false and fraudulent representations regarding available liquidity on BitMEX platform made to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California.  Accordingly, California law applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

128.     An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco.  Therefore, the false and fraudulent representations regarding available liquidity on the BitMEX platform were perpetuated by Defendant ABS' staff and emanated from Defendant ABS' offices in San Francisco.

129.     A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

130.     Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive advertising that represented false and fraudulent statements as well as omissions of material fact, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to Plaintiff, for a fee, through the BitMEX online trading platform. Defendants' acts and practices offended an established public policy of transparency in operation of financial markets, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

131.     Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff has "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because he would not have opened a trading account, deposited his valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, purchased swap contracts, overpaid swap contract purchase "costs" and trading commissions to Defendants for substantially riskier swap contracts that he was led to believe by Defendants, but for his reasonable reliance on the truth of the alleged misleading and deceptive Liquidity Representation. The purchase of the swap contracts that Plaintiff would not otherwise have purchased, but for the alleged misleading and deceptive advertising by Defendants establishes an economic injury-in-fact for Plaintiff's claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

Cal. May 26, 2011). The misleading and deceptive advertising by Defendants included the false representations about available liquidity on BitMEX.

132.    The grave financial harm to Plaintiff outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unethical, unscrupulous, misleading and deceptive conduct described herein.

133.    By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to deprive Plaintiff of his bitcoin holdings in the amount of at least 1.81027681 bitcoins.

134.    By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been damaged in the amount of over 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

### COUNT II
**"Unfair" Business Practices in Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.) — Based on False Warranty and Representation (Against All Defendants)**

135.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

136.    On June 24, 2019, Defendants, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff to personally accept it by opening a trading account and using BitMEX platform.[15] The electronic document containing the Service Agreement was transmitted, via an electronic network

---

[15] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 17 and is incorporated herein in its entirety.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

transmission, from Defendants' servers located in San Francisco, California to Plaintiff's personal computer.

137.    The written Service Agreement incorporated the following specific Warranty and Representation expressly made by Defendants personally to Plaintiff:[16]

> 6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

138.    This express Warranty and Representation made by Defendants to Plaintiff in the Service Agreement was, in fact, deliberately and materially false during the entire Relevant Period.  In truth and in fact, during the entire Relevant Period, the ITD of BitMEX had what BitMEX internally referred to as "God Access" to all customer, order flow, execution and open position (contract) information of the BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all open positions (contracts) on the entire BitMEX platform.  On the other hand, this information was not available to Plaintiff and other platform users, with the exception of Defendants themselves.  The ITD used this very sensitive information to automatically trade against, and liquidate customers of BitMEX, including Plaintiff.

139.    In more detail, the ITD was managed by Gregory Dwyer with at least three key

---

[16] In addition to placing the Warranty and Representation into the Service Agreement, Defendants placed the same representation in their blog post, which constitutes an advertisement, which was available, during Relevant Period, at https://blog.bitmex.com/bitmex-market-making-desk/.

Consensus Law
CryptoCurrency
Attorneys

employees, including Stuart Elkington and Nick Andrianov. The ITD operated continuously throughout the Relevant Period to persistently manipulate markets on BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of bitcoin and ether. The traders at the ITD had a number of important and unfair technical, informational and trading advantages over Plaintiff that they exploited to profit BitMEX at the expense of Plaintiff and other traders like Plaintiff.

140. Specifically, throughout the Relevant Period, the traders at BitMEX's ITD Stuart Elkington and Nick Andrianov could view and exploit information hidden from other traders. BitMEX offered customers a number of different order types that purported to be "hidden." But these supposedly "hidden" orders were not in fact hidden from BitMEX and its insiders. The operators of the ITD were expressly granted by the computer system administrator of the BitMEX platform what BitMEX internally referred to as "God Access" permissions that allowed them to access, aggregate, analyze in real time, and view all of the information of any user account, including any hidden orders, leverages and the liquidation price points for all open orders. This term "God Access" used by BitMEX refers to superuser-type of data access privileges normally used in Linux and Unix-like computer systems. In such Linux and Unix-like systems, the superuser account, called 'root', is virtually omnipotent, with unrestricted access to all commands, files, metadata, directories, and all other system and information resources. Root can also grant and remove any permissions for other platform users. Thus, the traders at BitMEX's ITD had absolutely unrestricted, omnipotent access permissions to access, aggregate, analyze and read any and all data and information resources of the BitMEX platform, including all trading, order and user data without any limitations or restrictions whatsoever.

141. Moreover, BitMEX ITD traders Stuart Elkington and Nick Andrianov were also provided with custom automated software systems, specially designed and built by BitMEX programmers to enable their swap contract market manipulation, that told them how the swap contract market price was likely to move by assessing the impact of the hidden customer orders when they triggered. These automated software systems were also provided with unrestricted and omnipotent access permissions to access, aggregate, analyze and view all data and information

resources of the BitMEX platform, including all trading, order and user data without any limitations whatsoever.

142.   The aforesaid computer system access permissions providing for the ability of the traders at BitMEX's ITD Stuart Elkington and Nick Andrianov to access, see, aggregate and analyze in real time all hidden orders of all BitMEX users were combined with the access permissions providing for the ability to access, aggregate, analyze and view another crucial piece of hidden information of other BitMEX users: the leverage amounts and corresponding liquidation prices for all customers' open positions (swap contracts).  This information made it easy for BitMEX ITD traders Stuart Elkington and Nick Andrianov to profitably manipulate the swap contracts prices on BitMEX.  If, for example, BitMEX's ITD trader were to see that a number of long bitcoin swap contracts were near their liquidation point, the ITD trader could enter a large sell order. This order would cause the price of bitcoin on the BitMEX exchange to fall, triggering the liquidation of these distressed long swap contracts.  The resulting liquidation would create a sell order for each of the liquidated long swap contracts, further depressing the swap contract price.  Once this chain of liquidations had caused the price to fall far beyond the price at which the ITD made its initial sell, it could buy bitcoin at this cheaper price to fulfill the forced sell orders. Because these manipulative trades were automatic, submitted to the BitMEX trading engine using automated software of the ITD, the ITD automated system could execute this trade very quickly and with a high confidence of success.  To this end, the traders at the ITD of BitMEX also had automated software tools that aggregated and analyzed information on all hidden orders of all BitMEX users as well as information on liquidation price points for all customers' open positions across the entire BitMEX platform to generate computer output displayed to BitMEX's ITD traders Stuart Elkington and Nick Andrianov that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction.

143.   The access to hidden information, including information on all hidden orders of all BitMEX users as well as information on liquidation price points for all customers' open positions across the entire BitMEX platform, thus provided the operators of the ITD with a substantial,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

unfair and secret advantage over regular BitMEX customers, such as Plaintiff.  By aggregating

information about the hidden orders of all BitMEX users across the entirety of BitMEX's

platform and then analyzing the impact of these hidden orders as well as liquidation price points

for all open swap contracts in real time, BitMEX's ITD traders Stuart Elkington and Nick

Andrianov could determine when placing a large order would cause the hidden orders to trigger.

BitMEX could then assess whether these hidden orders would affect prices in a way that would

cause liquidations for the benefit of BitMEX.  These liquidations would very likely be profitable

to BitMEX—because the price shift would be driven by BitMEX's own manipulative trade rather

than legitimate market forces, it was likely to quickly reverse in time for BitMEX to sell at a

profit.

144.    Plaintiff as well as other ordinary BitMEX traders, like Plaintiff, enjoyed no

technical, informational or trading advantages described in the immediately preceding

paragraphs.  On the other hand, contrary to the Warranty and Representation, during the entire

Relevant Period, the ITD could access the following critical insider information of the BitMEX

trading platform not available to other traders, including Plaintiff:

a.    All of the information of each BitMEX user's account, including any hidden

orders and the liquidation price points for all orders;

b.    Information on how the market was likely to move in view of the impact of all

hidden orders when they triggered;

c.    The leverage amounts and corresponding liquidation prices for all customers' open

positions;

d.    Information on what liquidations would occur across the entirety of BitMEX's

platform if prices moved in any given direction;

e.    Information sufficient to determine when placing a large order would cause the

hidden orders to trigger; and

f.    Information sufficient to assess whether the hidden orders would affect prices in a

way that would cause liquidations profitable for Defendants.

145.    Accordingly, the statement in Section 6.3 of Defendants' Warranty and

Representation that "trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user" was materially false during the entire Relevant Period.

146.     Moreover, the express Warranty and Representation made by Defendants to Plaintiff in the Service Agreement was deliberately and materially false during the entire Relevant Period also because the ITD was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiff, who were frequently subject to server overload freezes and lockouts.  In fact, the ITD used the server overload lockouts offensively to liquidate regular traders including Plaintiff, while itself not being subject to such freezes and lockouts.

147.     Specifically, during the entire Relevant Period, BitMEX's ITD traders Stuart Elkington and Nick Andrianov were able to trade freely during BitMEX server freezes and customer lock-outs.  Even though BitMEX told its customers, including Plaintiff, that these server freezes and lock-outs were a consequence of technical limitations, these same limitations did not apply to traders trading at BitMEX's ITD.  While its customers, including Plaintiff, were unable to enter or withdraw orders, the ITD could trade freely.

148.     Even standing alone, this ability to trade during server freezes, when there are no competing traders, would represent a massive, unfair, and undisclosed trading advantage.  While ordinary traders, including Plaintiff, were unable to place or withdraw their offers and orders, BitMEX traders were able to exploit customers' open positions (contracts).  Moreover, BitMEX traders could also look to bitcoin and ether prices on non-frozen exchanges, knowing that BitMEX prices would converge on market prices when the server freeze ended.

149.     For example, suppose that BitMEX servers freeze when the price of Bitcoin was $55,000.  During the freeze, the price of Bitcoin on other exchanges falls to $54,000.  The ITD, able to trade during the freeze, can sell XBTUSD contracts that are valued at $55,000 to customers who cannot withdraw those offers in light of market movements. When the servers unfreeze, BitMEX would be holding XBTUSD contracts worth $105 to the detriment of the customers trapped in unfavorable positions as the result of the freeze.

150.     These three advantages enjoyed by the ITD—access to hidden information, including information on all hidden orders of all BitMEX users as well as information on liquidation price points for all customers' open positions across the entire BitMEX platform, the ability to aggregate and analyze this sensitive information in real time, and the ability to trade freely during freezes—compounded each other to allow its operators to dominate their platform, and former BitMEX employees have revealed that BitMEX exploited these advantages to profit itself at its customers' expense.  During a BitMEX server freeze, BitMEX's ITD traders Stuart Elkington and Nick Andrianov would use the automated software to aggregate and analyze the hidden positions and open orders of ordinary BitMEX customers, including Plaintiff, across the entire BitMEX trading platform, in order to determine which price moves on "reference" exchanges or on BitMEX itself would cause profitable liquidations. These insider traders could perform these calculations with a high degree of precision because other market participants were locked out of the platform and their orders and positions frozen; the only transactions during the freeze would emanate from the BitMEX insiders themselves and the triggered customer orders that they had analyzed.  Unfairly competing against transparent customer accounts frozen in time, BitMEX was able to handsomely profit at the expense of its ordinary customers, including Plaintiff.

151.     Therefore, the statement that "the trading arm receives access and trading privileges only on the same terms as are available to any other user" in the Warranty and Representation was also materially false during the entire Relevant Period.   Specifically, contrary to the Warranty and Representation, during the entire Relevant Period, the ITD received the following access and trading privileges not available to Plaintiff and other ordinary BitMEX traders:

a.     While its customers, like Plaintiff, were unable to enter or withdraw orders, the ITD could trade freely;

b.     BitMEX told its customers that these freezes were a consequence of technical limitations, however the same limitations did not apply to BitMEX's internal traders; and

c.     During a freeze, BitMEX insiders would analyze the hidden positions of normal

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

customers in order to determine which moves would cause profitable liquidations. These insiders could perform these calculations with a high degree of precision because other market participants were frozen; the only transactions during the freeze would result from the BitMEX insiders themselves and the triggered orders that they had analyzed. Competing against transparent customer accounts frozen in place, BitMEX was able to profit at the expense of its customers.

152.    The false Warranty and Representation was authored personally by Defendant Hayes, as evidenced by his own official blog post, https://blog.bitmex.com/bitmex-market-making-desk/ (last visited on October 7, 2021), dated April 30, 2018, which repeated the false Warranty and Representation almost verbatim.  Moreover, the false Warranty and Representation was ratified and approved by Defendant Reed, who also ordered it to be posted on BitMEX's commercial website, for which he was responsible.   In making the false Warranty and Representation, Defendants were motivated by profit, including Plaintiff's bitcoin deposits, trading commissions paid by Plaintiff to Defendants, and Plaintiff's bitcoins confiscated by Defendants as the result of liquidations.  Defendants Hayes and Reed, who each own 31.67% of the corporate Defendants HDR and ABS, had personal financial interest in making the aforesaid false Warranty and Representation in order to fraudulently solicit Plaintiff's business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in paragraphs above.

153.    In reliance on the aforesaid false Warranty and Representation, on or about July 5, 2019, Plaintiff purchased from Defendants XBTUSD long swap contract and paid at least 0.78896761 bitcoins to Defendants as the swap contract purchase cost.  In addition, Plaintiff purchased ETHUSD long swap contracts and paid at least 1.0213092 bitcoins as the swap contract purchase cost.  On July 11, 2019, both contracts were liquidated or otherwise closed and, as the result, Plaintiff sustained monetary losses in the amount of at least 1.81027681 bitcoins. Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and would not have paid the swap contract purchase "costs" and trading commissions to Defendants had he known the true facts, as

the true facts meant that due to manipulative activities and informational and trading advantages of the ITD, the odds of making any money on the BitMEX platform were stacked heavily against Plaintiff and in favor of the ITD and the financial risk of liquidation of Plaintiff's swap contracts was substantially higher than Plaintiff assumed, based on the Warranty and Representation. In other words, because the swap contracts that Plaintiff purchased from Defendants were substantially riskier than they would have been if the Warranty and Representation was true, their purchasing "costs" should have been much lower than what Plaintiff has paid for them.

154. Had Plaintiff known the true facts about the ITD on BitMEX, Plaintiff would have realized that, due to its manipulative activities and informational and trading advantages over Plaintiff, BitMEX's swap contracts were substantially riskier, and, consequently, less valuable, and he would not have paid the 1.81027681 bitcoins he paid as "costs" for purchasing these riskier and less valuable swap contracts on BitMEX, but would have paid substantially less, if anything at all, to account for this increased financial risk associated with the manipulative activities and informational and trading advantages of the ITD.

155. Accordingly, at the time of the respective swap contract purchase, Defendants overcharged Plaintiff for the "cost" of purchase of each such swap contract by using the false and fraudulent Warranty and Representation. Due to overpaying for the "costs" of purchase of the riskier swap contracts, for purchase of which Plaintiff would not have paid the amounts he paid, had he known the true facts about BitMEX ITD, Plaintiff suffered out-of-pocket losses in the form of the aforesaid overpayment at the time he purchased each of his swap contracts. The subsequent liquidation of Plaintiff's swap contracts was a mere consequence of the higher financial risk (as well as other substantial contributing factors, such as deliberate actions of the ITD) associated with them, but the financial loss in the form of contract purchasing "cost" overpayment was suffered by Plaintiff at the time of the respective contract purchase. Even if the subsequent liquidation of Plaintiff's swap contracts was the consequence of the natural market forces (which it was not due to the deliberate actions of the ITD) Plaintiff still suffered losses in the form of the aforesaid swap contract purchase "cost" overpayment at the time the respective swap contract was purchased.

156.     Because Plaintiff was misled by Defendants using the false Warranty and Representation as to the activities and advantages of the ITD, he was fraudulently induced to buy riskier (due to activities and advantages of the ITD) swap contracts than he thought he was buying based on Defendants' false Warranty and Representation.  Riskier contracts "cost" less to purchase and the measure of Plaintiff's damages is the difference between the contract purchasing "cost" actually paid by Plaintiff and the amount Plaintiff would have paid for purchasing those riskier contracts had he known the real risk associated with them.  This measure of damages is capable of accurate determination using appropriate calculations and expert testimony.  Therefore, Defendants' false and fraudulent Warranty and Representation actually misled Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

157.     In other words, because of the manipulative activities and informational and trading advantages of the ITD of BitMEX, the swap contracts that Defendants sold to Plaintiff carried substantially higher financial risk of liquidation and financial loss than Defendants led Plaintiff to believe by making the false and fraudulent Warranty and Representation.  Therefore, based on the substantially higher risk of liquidation, these swap contracts were substantially overpriced when sold to Plaintiff and Plaintiff substantially overpaid the purchase "costs" of these swap contracts that the time of the purchase.  Had Plaintiff known the true facts about the manipulative activities and informational and trading advantages of the ITD of BitMEX, he would have realized that the purchased swap contracts carried substantially higher financial risk of liquidation and, therefore, they should have been priced cheaper.  Thus, Plaintiff would not have paid the amount he paid as the purchase "cost" of these swap contracts, but would have paid Defendants substantially less, if anything at all.

158.     Plaintiff believed that he was getting access to cryptoderivative trading services from BitMEX, where the ITD did not receive special informational, technical and trading privileges and where it did not continuously and persistently manipulate the markets in order to liquidate Plaintiff's swap contracts, when, in reality, he was not.  Thus, Defendants' false representations misled Plaintiff into believing that he was getting something, namely

cryptoderivative trading services from BitMEX, where the ITD did not receive special informational, technical and trading privileges and where it did not continuously manipulate the markets in order to liquidate Plaintiff's swap contracts, that he was not. Plaintiff did not want to use, and would not have used, cryptoderivative trading services if such services included the ITD that received special informational, technical and trading privileges and continuously and persistently manipulated the markets in order to trade against Plaintiff and liquidate Plaintiff's swap contracts.

159. Plaintiff opened an account with the BitMEX platform and used Defendants' cryptoderivative trading services offered from California based on reliance on the Warranty and Representation contained in Defendants' Service Agreement. When opening his BitMEX trading accounts on June 24, 2019, depositing bitcoins therein, purchasing swap contracts, paying swap contracts purchase "cost" and trading commissions to Defendants, Plaintiff saw and carefully read Defendants' false Warranty and Representation and relied on the truth thereof.

160. Plaintiff was induced to open a BitMEX trading account, deposit bitcoins therein, engage in cryptoderivative trading on the BitMEX platform, purchase swap contracts, and pay swap contracts purchase "costs" and trading commissions to Defendants and did, in fact, open a BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on the BitMEX platform, purchased swap contracts, and paid swap contracts purchase "costs" and trading commissions to Defendants due to the reliance on the truth of the Warranty and Representation.

161. Plaintiff would not have opened a BitMEX trading account, deposited bitcoins therein, engaged in cryptoderivative trading on the BitMEX platform and paid trading commissions to Defendants if he knew the true facts and, specifically, that Defendants' exchange was rigged and the ITD trading against Plaintiff was provided with informational, access and trading advantages over Plaintiff and automated tools, built by BitMEX, to facilitate manipulation.

162. Upon opening a BitMEX trading account, depositing bitcoins therein and engaging in cryptoderivative trading on Defendants' BitMEX platform, Plaintiff was provided

with cryptoderivative trading services falsely represented by Defendants' Warranty and Representation to be fair and honest, deceiving Plaintiff and, in reality, causing him to use rigged cryptoderivative trading services he did not want. Defendants' false and fraudulent Warranty and Representation caused Plaintiff to spend and lose the money he paid as swap contract purchase "costs" and trading commissions.

163.     Plaintiff has suffered injury and loss of money or property as a result of Defendants' "unfair" business practices, and namely as the result of the false and fraudulent Warranty and Representation provided to Plaintiff.

164.     Plaintiff relied upon the truth of Defendants' representations contained in the Warranty and Representation and was induced to use Defendants' cryptoderivative trading services he did not want to use and which were unsatisfactory to him, paying trading commissions to Defendants and sustaining monetary losses. Defendants' deception caused Plaintiff to open an account on the BitMEX platform, deposit his bitcoins with Defendants and use Defendants' cryptoderivative trading services he did not want, paying trading commissions to Defendants and sustaining monetary losses. Therefore, Plaintiff suffered injury in fact and lost money or property as a result of the alleged fraud and deception perpetrated by Defendants by means of the false Warranty and Representation.

165.     When the Defendants made the aforesaid false and fraudulent Warranty and Representation to Plaintiff, they knew it to be materially false, as Defendants themselves created and controlled the ITD, and this Warranty and Representation was made by Defendants with the intent to defraud and deceive Plaintiff and with the intent to induce Plaintiff to act in the manner herein alleged and specifically to open an account with BitMEX, deposit bitcoins therein and trade Defendants' cryptoderivative products, in order to wrongfully confiscate and otherwise misappropriate Plaintiff's property. Therefore, in making the aforesaid false and fraudulent Warranty and Representation to Plaintiff, Defendants were motivated by profit.

166.     Plaintiff, at the time this Warranty and Representation was made by Defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' Warranty and Representation and believed it to be true. In reliance on these representations,

Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading therein to his financial loss and detriment. For example, in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff deposited with Defendants:

| Sorokin | June 24, 2019 | 0.50831625 bitcoins |
|---------|---------------|---------------------|
| Sorokin | June 26, 2019 | 0.03526 bitcoins |
| Sorokin | July 3, 2019 | 2.288 bitcoins |
| Sorokin | July 4, 2019 | 4.28749672 bitcoins |

167. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff incurred the following bitcoin loss of use damages associated with the fact that Plaintiff's bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiff not deposited his valuable bitcoins with BitMEX, as he did in reliance on Defendants' false and fraudulent Warranty and Representation, he would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. In addition to the loss of use damages, Plaintiff spent at least 0.001 bitcoin in bitcoin network transaction (miner) fees, for each bitcoin transfer he made from his personal bitcoin wallet to BitMEX (0.004 bitcoins in total for four transfers), in reliance on Defendants' false Warranty and Representation. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiff's bitcoin loss of use, and network fee damages. These bitcoin loss of use and network fees damages are separate from and do not include any actual trading losses suffered by Plaintiff as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|-----------|-----------------|---------------|--------------|----------------|------------|---------------------|
| Sorokin | June 24, 2019 | August 10, 2019 | 47 | 0.50831625 bitcoins | 5.95% | 0.0030 bitcoins |

| | | | | | | |
|---|---|---|---|---|---|---|
| Sorokin | June 26, 2019 | August 10, 2019 | 45 | 0.03526 bitcoins | 5.95% | 0.00025 bitcoins |
| Sorokin | July 3, 2019 | August 10, 2019 | 38 | 2.288 bitcoins | 5.95% | 0.014212 bitcoins |
| Sorokin | July 4, 2019 | August 10, 2019 | 37 | 4.28749672 bitcoins | 5.95% | 0.02593 bitcoins |
| | | | | | **Total:** | **0.043392 bitcoins** |

168.     In reliance on Defendants' false and fraudulent Warranty and Representation, on or about July 5, 2019, Plaintiff purchased from Defendants XBTUSD long swap contract and paid at least 0.78896761 bitcoins to Defendants as the swap contract purchase "cost".  Moreover, on or about July 5, 2019, Plaintiff purchased ETHUSD long swap contract and paid at least 1.0213092 bitcoins as the swap contract purchase "cost".  In addition to the swap contract purchase "cost", Plaintiff also paid at least 0.1 bitcoin in trading commissions to Defendants on that day.  If Plaintiff knew that the Warranty and Representation, was false, he would have realized that the swap contracts that Defendants sold him on or about July 5, 2019, were substantially riskier than what Defendants led him to believe by making the Warranty and Representation and, therefore, he would not have paid to Defendants 1.81027681 bitcoins as purchase "costs" of these long swap contracts, but would have paid substantially less, if anything at all.  Thus, at the time of the contracts purchase on or about July 5, 2019, Plaintiff was fraudulently induced by Defendants to overpay swap contracts purchase "costs" and, therefore, on or about July 5, 2019, Plaintiff sustained monetary damages in the amount he overpaid to Defendants as purchase "costs" for the riskier swap contracts, than what Defendants led him to believe, by making the false and fraudulent Warranty and Representation.

169.     On or about July 11, 2019, Plaintiff's both XBTUSD and ETHUSD swap contracts were wrongfully liquidated or otherwise closed.  As the result, on or about July 11, 2019, Plaintiff sustained monetary losses in the amount of at least 1.81027681 bitcoins, less the amount he overpaid to Defendants on July 5, 2019, as purchase "costs" for the riskier swap contracts, than Defendants led him to believe by making the false and fraudulent Warranty and Representation.

170.     Plaintiff's belief that it was Defendants' ITD, who manipulated prices on the

BitMEX platform and U.S -based "reference" spot exchanges BitStamp, Kraken and Coinbase Pro when Plaintiff sustained his losses, and actually caused the alleged losses to Plaintiff, is supported by two separate conclusions explained in detail below, as well as paragraphs 52-75.

171.     First, the fact that on July 11, 2019 prices on the U.S.-based "reference" spot exchanges BitStamp, Kraken and Coinbase Pro were intentionally and artificially manipulated is additionally supported the fact that on July 11, 2019, high volume market orders were executed on one or more relatively thinly traded "reference" exchanges during a short period of time, amounting to a relatively large fraction of the corresponding exchange's regular daily volume. Such large trades executed on relatively illiquid or thinly traded exchanges would normally result in a significant price slippage and a consequent financial loss for the executing trader, unless they were used with the purpose of profiting on BitMEX.  Because traders trading millions of dollars of cryptocurrency are very sophisticated, they would use over-the-counter (OTC) transactions in order to sell large amounts of cryptocurrency without affecting the market price and thereby avoid sustaining a financial losses due to price slippage.[17]  The fact that very sophisticated traders willingly sustained large and completely avoidable financial losses during Manipulation Times demonstrates that these large market orders were used for purposes of cross-market manipulation in order to benefit from the open derivatives positions on BitMEX, which uses BitStamp as one if its "reference" exchanges.  This forms the basis for Plaintiff's belief that on July 11, 2019, the "reference" markets for bitcoin and ether were artificially manipulated.  Therefore, the market moves that took place on July 11, 2019 were caused by manipulators with the purpose of cross-market manipulation and profiting on BitMEX.

_____

[17] For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering.  From approximately 2:55 to 3:10 AM (UTC), an unusually large volume of 3,071 bitcoin were sold on Bitstamp, which resulted in an avoidable financial loss for the trader of over $2,5000,000 due to price slippage.  In contrast, during the previous day, only 83 bitcoins were sold every 15 minutes on average.  As another example, on July 14, 2019, a sell order was placed on Bitstamp for 15,000 ETH causing the ether price to plummet from $270 to $190 and leading to a flash crash on that exchange, resulting in over $600,000 loss over the OTC price. This clearly intentional dump made up around $3.5 millions of ETH – some 15% of its entire ETH trading volume in just one trade.  Sophisticated traders would not choose to sustain such large and avoidable losses.

172.    The fact that it was Defendants' ITD and not an unidentified third party who intentionally manipulated bitcoin and ether prices on U.S.-based "reference" spot exchanges BitStamp, Kraken and Coinbase Pro during Manipulation Times is additionally supported by the following facts:

a.    Defendants' ITD and Its Custom Automated Market Manipulation Tools Developed by Bitmex.  Defendants operated an undisclosed ITD managed by Gregory Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. The ITD operated to continuously and persistently manipulate markets on the BitMEX platform and cause artificial prices for BitMEX derivatives, including derivatives of bitcoin and ether.  The operators of the ITD had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of all trader accounts, including any hidden orders, leverage amounts and liquidation points for all orders and all open positions. They were also provided with automated systems, built by BitMEX, leveraging this highly sensitive insider information to enable and automate their manipulation that told them how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.  The traders at the ITD had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations.  Once predetermined predicted profitability was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations. To prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time, BitMEX froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.  The access to hidden information thus provided the operators of the ITD with a substantial and secret advantage over BitMEX customers. By analyzing the impact of hidden trade orders and liquidation prices, BitMEX ITD could determine when placing a large order would cause the liquidations and

hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX. BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders. Defendants would not develop such sophisticated automated tools for no reason or "just to have them". The fact that Defendants were in possession of such sophisticated automated tools clearly establishes that they did in fact use them for their intended purpose, to cross-manipulate cryptocurrency markets and liquidate traders, including during the specific Manipulation Times.

b.      Defendants' ITD Automated Tools Operated on a 24 Hours a Day, 7 Days a Week Basis, including July 11, 2019. This establishes that on July 11, 2019, when Plaintiff suffered his loss, the automated tools of the Defendants' ITD were up and running and automatically looking for ways to liquidate BitMEX traders, including Plaintiff, to financially benefit Defendants.

c.      Presence of Server Freezes on July 11, 2019. As stated above, the server freezes were used by BitMEX to prevent the conditions of the order book from changing between the profitability prediction time and actual liquidation time. To accomplish this purpose, BitMEX routinely froze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted. Presence of server freezes and system overloads on July 11, 2019 clearly indicates that, in accordance with Defendants' modus operandi, the automated tools operated by BitMEX's ITD already estimated potential profitability of a market manipulation, automatically executed manipulative trades on the "reference" exchanges and deployed server freezes on BitMEX to prevent traders from escaping their positions and salvaging their funds before they could be liquidated, so that BitMEX would get the exact profit that was predicted by the ITD.

d.      Defendants' Exclusive Access to Sensitive Insider Information. Only Defendants' ITD and no third party had access to sensitive insider information of the BitMEX exchange, including all positions, leverage amounts, sizes, open orders, hidden orders, etc. This information is critical to profitably liquidating traders on BitMEX and without it, not such liquidations are

possible. This again points to BitMEX as culprit behind the market moves during the Manipulation Times.

e. **Defendants' Exclusive Ability to Open Large Positions on BitMEX.** Moreover, *only* Defendants were able to open sufficiently large ($100,000,000+) trading positions on BitMEX in order to capture the manipulation profits. For example, during market event on May 17, 2019, $2,500,000 was lost on BitStamp due to price slippage to move the .BXBT index down by 16%. In order for the perpetrator to break even, the corresponding swap position in BitMEX's winner account would need to be at least $15,625,000 ($15,625,000 x 16% = $2,500,000). And in order to make modest 1000% profit, the corresponding swap position in BitMEX's winner account would need to be at least $156,250,000 ($156,250,000 x 16% = $25,000,000). No other persons except for Defendants were able to open such large positions on BitMEX in order to make manipulation profitable.[18] Therefore, other parties would lose money on manipulation and it was Defendants who caused market manipulation events during the Manipulation Times.

f. **Defendants' Financial Motive.** Manipulating the .BXBT index of BitMEX is immensely profitable, with profit reaching 8000% (or 80x). Moreover, Defendant Hayes publicly admitted to committing bank fraud in connection with bitcoin transaction where the profit was just 40%, Ex. 10. For comparison, profit from manipulation using BitMEX .BXBT index at issue here is 8000%, which would be irresistible for someone who was risking jail time to make mere 40% profit. 8000% would be clearly too lucrative profit for Defendants to pass. Moreover, *half* of BitMEX's revenue comes from liquidations of traders like Plaintiff, creating a very strong incentive for Defendants to engage in a market manipulation resulting in liquidations of retail traders in order to increase their company revenue. It should be also noted that of all possible manipulators, BitMEX had the *highest* financial incentive to manipulate the .BXBT index. In other words, no third party financially benefits from the manipulation to the extent Defendants do. This is explained by the interplay between the exchange itself, the Insurance Fund and the ITD, all owned by Defendants. All three of those entities owned by Defendants benefit from

---

[18] CFTC regulations impose position limits on exchanges exactly for this reason, to prevent manipulation by making it unprofitable, see, for example, 17 C.F.R. 41.25. Defendants violated those regulations, which enabled and facilitated profitable manipulation on BitMEX.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

trader liquidations with the exchange collecting increased trading fees caused by spikes in trading volumes during liquidations, the ITD realizing profits associated with betting on the other side of (against) Plaintiff's trades, and the Insurance Fund collecting an excess portion of the confiscated Plaintiff's swap contract purchase costs, left after paying profits to the ITD. Thus, because Defendants own and control the exchange itself, the Insurance Fund and the ITD, they have triple incentive to engage in market manipulation and liquidate traders. In other words, due to BitMEX's design, when a trader is liquidated, the exchange itself, the Insurance Fund and the ITD divide all the trader's confiscated funds between themselves with no third party getting a dime.

g. **Defendants' Documented Conspiracy With Ben Aabtc.** It is well documented beyond any dispute that Defendants knowingly and willfully conspired with and aided and abetted the notorious and habitual market manipulator Ben Aabtc to cross-manipulate cryptocurrency markets, knowingly and willfully charged trading commissions on illegal manipulation profits and knowingly and willfully listed the known market manipulator on their own Leaderboard.

h. **Six Highly Suspicious Bitcoin Transfers Indicative of Manipulation By BitMEX.** Plaintiff's expert, working with Chainalysis blockchain investigations software, identified six large and highly irregular bitcoin transfers sent from BitMEX to its "reference" exchange Bitstamp, two of which took place on the exact day when Plaintiff suffered his losses, and when significant market manipulation occurred (July 11, 2019):

1. 9c2743abccb277973ad64b4d025881eb53360b9c82171ca2017c7d044d8454a6 2019-07-15 18:40:41 33CUNVxgqwEmc7WMpMg1JvpbpPJGhMvrP5 400 BTC

2. 64539493b70a890a631f72a998945f1a682355d0ed9339c2492edb8f35bb0ae1 2019-07-15 20:26:05 3DA5LQikAzZbvH4HQTpNkEg5oU4qtJBM7b 50 BTC

3. 4a645f92c1030e34c8af81b7dc3b420fead75b50967fef47d31ad2e0c6a9f315 2019-07-11 17:07:03 3Miu2aAu6UydbcAxTX6byp4bq9c4xDi6sH 151.60234102 BTC

4. e428e3d3348de616e51078a4a0a7734b03975e03661d05342702da8d5d68c6ad 2019-07-11 17:52:20 3LgkQgduzHGS96cu3HSiFUzev6Z8DB2syr 90 BTC

5.      2285a5280419137d45fe91164365790a7befc926f34dc049f6dea546a938a65c

2019-06-27  13:46:14  3HHZKFy44mi4RGedW1rrB1KRmM4JaTpqTC  200 BTC

6.      2467568447c8772c5157413fb08745dd115f459e4e7dca5a5167c8d4b06109e9

2019-06-27  14:03:07  3Miu2aAu6UydbcAxTX6byp4bq9c4xDi6sH  100 BTC

These six bitcoin transfers are highly suspicious for several reasons, including:

i.      These six bitcoin transfers were all sent at irregular times.  BitMEX processes customer withdrawals (broadcasts them to bitcoin network) strictly at 13:00 UTC, as described, for example, at: https://bitmex.freshdesk.com/en/support/solutions/articles/13000015791-where-is-my-withdrawal- (visited on September 7, 2021).  On the other hand, the above-identified six large transfers were all processed (first broadcast to bitcoin network) outside of BitMEX's customer withdrawal window (13:00 UTC), which indicates that they were transfers made by BitMEX's own ITD, which transferred bitcoin to highly illiquid Bitstamp in order to manipulate spot reference prices.  The irregular times of the above transfers cannot be explained by the bitcoin network con-gestion, because they reflect time points when the corresponding bitcoin network transactions were first broadcast to the bitcoin network, as opposed to were being confirmed by miners.

ii.      They were very large (each being in millions of dollars) and sufficient to cause appreciable price move on illiquid Bitstamp.

iii.      They were all sent to illiquid Bitstamp, which is not normally used by sophisticated parties to sell bitcoins due to its low liquidity, but is widely used for bitcoin price manipulation to influence bitcoin index prices on BitMEX.

iv.      They were sent on exact days when significant market manipulation occurred and when Plaintiff suffered his losses.

173.      Thus, for all the foregoing reasons, it was Defendants and not unidentified third parties, who manipulated prices on the BitMEX platform and "reference" spot exchanges BitStamp, Kraken and Coinbase Pro on July 11, 2019, causing specific trading losses to Plaintiff alleged herein.  For the same reasons, it was not natural market forces that caused Plaintiff's injuries.

174. Due to Plaintiff's decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, Plaintiff incurred the following monetary damages associated with trading commissions paid by Plaintiff to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' false and fraudulent Warranty and Representation was a substantial factor in causing Plaintiff's damages associated with trading commissions paid by Plaintiff to Defendants, which were also a natural and foreseeable result of the Defendants' false and fraudulent Warranty and Representation. These trading commissions paid by Plaintiff to Defendants are separate from and do not include any trading losses suffered by Plaintiff as the result of any market events, market manipulation or market conditions. Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.1 bitcoins, at the time he purchased his first swap contract on BitMEX, in reasonable reliance on Defendants' false and fraudulent Warranty and Representation, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 0.4 bitcoins |
| | | Total: | 0.4 bitcoins |

175. Plaintiff's reliance on Defendants' representations was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their ITD. For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its ITD with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' ITD.

176. According to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software

engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the false the fraudulent representations to Plaintiff.

177. Defendant ABS Global Trading Limited, responsible, within the BitMEX enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent statements made to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in San Francisco, California. Accordingly, Cal. Bus. & Prof. Code § 17200 applied to false and fraudulent statements and omissions perpetrated by Defendants in connection with BitMEX platform.

178. An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS's offices in San Francisco. Accordingly, Cal. Bus. & Prof. Code § 17200 applied to false advertising perpetrated by Defendants in connection with the BitMEX platform.

179. A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

180. Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive advertising that represented false and fraudulent statements as well as omissions of material fact, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to Plaintiff, for a fee, through the BitMEX online trading platform. Defendants' acts and practices offended an established public

policy of transparency in operation of financial markets, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

181. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff has "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because he would not have opened trading account, deposited his valuable bitcoins with BitMEX, traded derivatives on the BitMEX platform, sustained trading losses and paid swap contract purchase "costs" and trading commissions to Defendants, but for his reasonable reliance on the truth of the alleged misleading and deceptive representations and advertising by Defendants that incorporated false and fraudulent statements as well as omissions of material fact. The purchase of swap contracts that Plaintiff would not otherwise have purchased from Defendants for the amount he paid, but for the alleged misleading and deceptive advertising by Defendants establishes an economic injury-in-fact for Plaintiff's claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co.*, 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011). The misleading and deceptive advertising by Defendants included, without limitation, the false Warranty and Representation, as alleged above.

182. The grave financial harm to Plaintiff outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unethical, unscrupulous, misleading and deceptive conduct described herein.

183. By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to deprive Plaintiff of his bitcoin holdings in the amount of 1.81027681 bitcoins.

184. By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been damaged in the amount of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

<u>**COUNT III**</u>
**"Unfair" Business Practices in Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.) — Based on Omission of Material Facts**
**(Against All Defendants)**

185. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

186. On June 24, 2019, Defendants, through their commercial website www.bitmex.com, which constitutes a front-end interface of their BitMEX platform, personally presented Plaintiff with an electronic document containing updated written Terms of Service ("Service Agreement") for their online BitMEX trading platform and required Plaintiff to personally accept it by continuing to use the BitMEX platform.[19] The electronic document containing the Service Agreement was transmitted from Defendants' servers located in San Francisco, California to Plaintiff's personal computer.

187. The Service Agreement incorporated the following Warranty and Representation expressly made by Defendants personally to Plaintiff:

6.3: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in

---

[19] The electronic document containing the updated written Terms of Service was also located at: https://www.bitmex.com/app/terms and is attached hereto as Ex. 17 and is incorporated herein in its entirety.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

188.    However, during the Relevant Time Period, Defendants committed the following fraudulent omissions of material fact to Plaintiff, which went to the very center, very core and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading services that Defendants offered to Plaintiff, for a fee, through the BitMEX online trading platform and which Defendants, therefore, had a duty to disclose[20]:

a.    Failing to disclose to Plaintiff that Defendants were continuously operating the ITD, on a 24 hours a day, 7 days a week basis, which persistently manipulated prices on BitMEX and reference exchanges and enjoyed informational and trading priority privileges over Plaintiff, by being granted "God access" to highly sensitive and confidential insider information of Plaintiff and other BitMEX traders, including sizes and leverage amounts for all existing positions and orders, all liquidation prices, stop loss prices and even all parameters of all hidden orders.

b.    Failing to disclose to Plaintiff that Defendants provided the ITD with automated systems, built by BitMEX and Defendant ABS, leveraging this highly sensitive and confidential insider information of BitMEX traders, including Plaintiff, to enable and automate price manipulation that estimated how the market was likely to move by assessing the impact of the hidden orders and liquidations, when they triggered. Thus, based on the sensitive insider information of BitMEX traders, the automated system was able to predict a potential profit for BitMEX from liquidating its traders, triggered by a potential manipulation.

c.    Failing to disclose to Plaintiff that the traders at the ITD had tools that showed them which liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction, which was used to predict profitability of potential liquidations for BitMEX.

d.    Failing to disclose to Plaintiff that once predetermined predicted profitability for BitMEX was met, the manipulative trades were automatically executed by the BitMEX automated systems, resulting in trader liquidations.

---

[20] All the alleged omissions pertain to the entire Relevant Period.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

e.   Failing to disclose to Plaintiff that to prevent the conditions of the BitMEX order book from changing between the profitability prediction time and actual liquidation time, BitMEX was configured to intentionally freeze its servers, preventing traders from closing or changing their positions or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

f.   Failing to disclose to Plaintiff that the access to hidden information thus provided the operators of the ITD with a substantial, unfair and secret advantage over BitMEX customers, including Plaintiff.

g.   Failing to disclose to Plaintiff that, by analyzing the impact of hidden trade orders and liquidation prices, the BitMEX ITD could determine when placing a large order would cause the liquidations and hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations resulting in a profit for BitMEX.

h.   Failing to disclose to Plaintiff that the BitMEX automated system that operated 24 hours a day, 7 days a week was configured to automatically act based on the results of the prediction by placing manipulative trades on BitMEX and "reference" exchanges, when BitMEX servers were frozen for its traders.

i.   Failing to disclose to Plaintiff that Defendants used secret, anonymous accounts to trade against BitMEX customers, including Plaintiff.

j.   Failing to disclose to Plaintiff that Defendants granted privileged access to the BitMEX platform to the anonymized accounts, while customers, including Plaintiff, were locked out, and by misrepresenting that the ITD did not have such access.

k.   Failing to disclose to Plaintiff that Defendants' ITD was equipped and designed to and operated to continuously intentionally trigger automatic liquidations of trading positions of BitMEX traders, including Plaintiff, through customer lock-outs and by manipulating prices of underlying cryptocommodities for its swap cryptoderivative products on reference exchanges and, thus, on the BitMEX platform.

l.   Failing to disclose to Plaintiff that Defendants continuously allowed BitMEX insiders including Hayes, Delo and Reed to freely and continuously trade on the BitMEX

platform against BitMEX customers, despite their complete control of the BitMEX trading platform and their "God access" to confidential BitMEX client information, including customer positions, leverage amounts, liquidation points and orders and despite resulting clear conflict of interest, prohibited by CFTC regulations.

m. Intentionally misrepresenting to Plaintiff that Defendants were using and would continue to use commercially reasonable efforts to prevent customer lock-outs on the BitMEX platform, while failing to disclose to Plaintiff that these lock-outs were intentional and specifically designed to facilitate manipulation by Defendants' ITD.

n. Failing to disclose the susceptibility of the BitMEX platform to customer lock-outs and their predictable, negative effects on customers and beneficial effect for BitMEX, including through the operation of the Insurance Fund.

o. Failing to disclose to Plaintiff that Defendants had no rules or procedures whatsoever sufficient to ensure that: the contracts BitMEX offered to Plaintiff were not readily susceptible to manipulation; market participants were prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct were subject to discipline, all in violation of CFTC regulations.

p. Failing to disclose to Plaintiff that Defendants failed to maintain required records, and in fact has actively deleted required records including critical customer identification information, all in violation of CFTC regulations.

q. Failing to disclose to Plaintiff that Defendants had no rules whatsoever to minimize conflicts of interest and allowed insiders, including Defendants Hayes and Reed, as well as Delo, and numerous other BitMEX employees with access to confidential trader insider information, including sensitive Plaintiff's information, to continuously trade on the platform, and that BitMEX's own internal "market-making" desk was one of the largest traders on the platform.

189. Therefore, Defendants committed fraudulent omissions during the Relevant Period in at least three main respects.

190. *First*, Defendants committed fraudulent omissions regarding the nature and operations of the ITD.

a. BitMEX's updated Service Agreement on its website revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." Defendants did not disclose, however, that the ITD enjoys information, trading and technical advantages over BitMEX customers, described above, or that the ITD artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer liquidations.

191. Given that BitMEX trades against its own customers, Plaintiff would want to know facts bearing on how BitMEX conducts such trades and the extent to which BitMEX is likely to be successful in conducting such trades. Defendants had a common law duty to avoid making the above partial, misleading representations that effectively concealed material facts from Plaintiff. In addition, Defendants had a statutory duty to avoid making the above partial, misleading representations that effectively concealed material facts from Plaintiff under Cal. Civ. Code § 1710(3), which defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

192. Accordingly, pursuant to their common law and statutory duty under Cal. Civ. Code § 1710(3) to avoid making partial, misleading representations about the activity of the ITD, that effectively concealed material facts from Plaintiff, Defendants were obligated to (but did not) disclose the information, trading and technical advantages that ITD enjoys over Plaintiff and other BitMEX customers and that the ITD artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer, including Plaintiff's liquidations.

193. *Second*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and scope of the customer lock-outs on BitMEX.

a. In early 2019, BitMEX's website vaguely disclosed that undefined system overloads might disrupt access to the BitMEX platform. The website has further stated since that

time that the customer lock-outs are a result of technical limitations regarding the volume of trading the platform can accommodate.

b.   Defendants did not disclose, however, that any such technical limitations do not restrict the ITD, which remains able to trade against BitMEX customers during the lock-outs.

c.   Where BitMEX trades against its own customers, a reasonable BitMEX customer would conclude that a lock-out would suspend all trading on the platform, and the ITD's ability to use the platform during customer lock-outs provided BitMEX with a substantial advantage in trading against BitMEX customers.

d.   Accordingly, in order to avoid making partial, misleading representations that effectively concealed material facts from Plaintiff, about the nature and scope of lock-outs, Defendants were obligated to disclose that the lock-outs do not restrict the ITD.

e.   Since early 2019, moreover, referring to the "Services" available on its trading platform, BitMEX has at least recklessly and falsely claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that BitMEX "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

f.   In fact, BitMEX did not intend and has failed to use reasonable or commercially reasonable efforts to avoid customer lock-outs, and in knowingly or recklessly claiming otherwise, BitMEX deceived customers into trading on the platform.

g.   Indeed, on information and belief, for the reasons alleged above, Defendants knowingly or recklessly intended the customer lock-outs regularly to occur, in particular during periods of high volatility, to lock out BitMEX customers from their accounts during large market moves in order to increase the number of position liquidations.

h.   Accordingly, in order to make their statements about their purported intent to use reasonable or commercially reasonable efforts to avoid such lock-outs not partial, misleading representations that effectively concealed material facts from Plaintiff, Defendants were obligated to disclose their intent to use these lock-outs to their advantage.

194. *Third*, Defendants made fraudulent statements and committed fraudulent omissions regarding the supposedly "hidden orders" that Plaintiff may place on the BitMEX platform:

a. The BitMEX website stated throughout the Relevant Period that a "Hidden Order" is an order "that is not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

b. Defendants did not disclose to Plaintiff, however, that these orders are not hidden from BitMEX and its insiders.

c. Based on the information provided by Defendants, Plaintiff reasonably concluded that no one using the BitMEX platform would be able to trade based on the details of his so-called "hidden" orders and that so-called "hidden" orders would not provide BitMEX and its insiders with a substantial advantage in trading against Plaintiff. This conclusion was wrong because of fraudulent omission of critical information about so-called "hidden" orders by Defendants.

195. Accordingly, in order to make its description of a "hidden order" not partial, misleading representations that effectively concealed material facts from Plaintiff, Defendants were obligated to disclose to Plaintiff that hidden orders were not in fact hidden from BitMEX, and its insiders were obligated to disclose throughout the Relevant Period that BitMEX trades against its customers with knowledge of the details of Plaintiff's hidden orders. Defendants have failed to disclose this critical information to Plaintiff.

196. When the Defendants committed the aforesaid fraudulent omissions to Plaintiff, Defendants intentionally omitted a clear disclosure of the facts stated above because giving a clear explanation of how BitMEX platform really operated would have punctured the illusion of risk-free casino-style profits that Defendants promised Plaintiff. Defendants' fraudulent omissions to Plaintiff were made by Defendants with the intent to defraud and deceive Plaintiff and with the intent to induce Plaintiff to act in the manner herein alleged. The aforesaid fraudulent omissions to Plaintiff were made by Defendants and each of them acting with pecuniary motives. In making the aforesaid fraudulent omissions to Plaintiff, Defendants were

motivated by profit, including Plaintiff's bitcoin deposits, trading commissions paid by Plaintiff to Defendants, and Plaintiff's bitcoins confiscated by Defendants as the result of liquidations. Defendants Hayes and Reed, who each own 31.67% of the corporate Defendants HDR and ABS, had personal financial interest in making the aforesaid fraudulent omissions in order to fraudulently solicit Plaintiff's business, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in paragraphs above.

197.    Defendants knew of and intentionally perpetuated these misrepresentations, half-truths and omissions. BitMEX and the individual Defendant Hayes concealed facts that went to the very core of BitMEX's operation, integrity and profit model and could not reasonably have been unaware of these facts. Defendants intended that Plaintiff rely on these misrepresentations, half-truths and omissions, and Plaintiff reasonably did so, given that these statements concerned core aspects of BitMEX's business. Therefore, Defendants' misrepresentations, half-truths and omissions actually misled Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

198.    Plaintiff, at the time these fraudulent misrepresentations, half-truths and omissions were made by Defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the material facts fraudulently omitted by Defendants. In reliance on these misrepresentations, half-truths and omissions, Plaintiff was induced to and did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading thereon to his financial loss and detriment. For example, in reliance on Defendants' misrepresentations, half-truths and omissions, Plaintiff deposited with Defendants:

| Sorokin | June 24, 2019 | 0.50831625 bitcoins |
| Sorokin | June 26, 2019 | 0.03526 bitcoins |
| Sorokin | July 3, 2019 | 2.288 bitcoins |
| Sorokin | July 4, 2019 | 4.28749672 bitcoins |

199.    Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' fraudulent misrepresentations, half-truths and omissions, Plaintiff incurred the

following bitcoin loss of use damages associated with the fact that Plaintiff's bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiff not deposited his valuable bitcoins with BitMEX, as he did in reliance on Defendants' fraudulent misrepresentations, half-truths and omissions, he would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. In addition to the loss of use damages, Plaintiff spent at least 0.001 bitcoin in bitcoin network transaction (miner) fees, for each bitcoin transfer he made from his personal bitcoin wallet to BitMEX (0.004 bitcoins in total for four transfers), in reliance on Defendants' misrepresentations, half-truths and omissions. Therefore, Defendants' fraudulent misrepresentations, half-truths and omissions was a substantial factor in causing Plaintiff's bitcoin loss of use damages. These bitcoin loss of use and network fees damages are separate from and do not include any actual trading losses suffered by Plaintiff as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 47 | 0.50831625 bitcoins | 5.95% | 0.0030 bitcoins |
| Sorokin | June 26, 2019 | August 10, 2019 | 45 | 0.03526 bitcoins | 5.95% | 0.00025 bitcoins |
| Sorokin | July 3, 2019 | August 10, 2019 | 38 | 2.288 bitcoins | 5.95% | 0.014212 bitcoins |
| Sorokin | July 4, 2019 | August 10, 2019 | 37 | 4.28749672 bitcoins | 5.95% | 0.02593 bitcoins |
| | | | | | **Total:** | **0.043392 bitcoins** |

200. In further reliance on Defendants' misrepresentations, half-truths and omissions, on or about July 5, 2019, Plaintiff purchased from Defendants XBTUSD long swap contract and paid at least 0.78896761 bitcoins to Defendants as the swap contract purchase "cost". In addition, Plaintiff purchased ETHUSD long swap contracts and paid at least 1.0213092 bitcoins as the

swap contract purchase "cost". Yet additionally, Plaintiff paid at least 0.1 bitcoins in trading

commissions to Defendants on that day. Had Plaintiff known the actual facts, he would have

realized that the swap contracts that Defendants offered him on BitMEX were substantially riskier

than he thought and, therefore, he would not have paid Defendants 1.81027681 bitcoins for the

above two XBTUSD and ETHUSD swap contracts on July 5, 2019, but would have paid

substantially less, if anything at all. Thus, at the time of the contracts purchase on or about July 5,

2019, Plaintiff was fraudulently induced by Defendants to overpay swap contracts purchase

"costs" and, therefore, on or about July 5, 2019, Plaintiff sustained monetary damages in the

amount he overpaid to Defendants as purchase "costs" for the riskier swap contracts, than what

Defendants led him to believe, by making the misrepresentations, half-truths and omissions.

201.    On or about July 11, 2019, Plaintiff's both XBTUSD and ETHUSD swap contracts

were wrongfully liquidated or otherwise closed. As the result, on or about July 11, 2019, Plaintiff

sustained monetary losses in the amount of at least 1.81027681 bitcoins, less the amount he

overpaid to Defendants on July 5, 2019, as purchase "costs" for the riskier swap contracts, than

Defendants led him to believe by making the misrepresentations, half-truths and omissions. On

information and belief[21], these losses were sustained by Plaintiff on or about July 11, 2019, due to

Defendants' ITD having caused Plaintiff's perpetual swap contract on BitMEX to be liquidated,

using Plaintiff's own confidential information, to which the ITD had what BitMEX internally

referred to as "God Access," in direct violation of the Warranty and Representation.

202.    Due to Plaintiff's decision to trade on margin on Defendants' BitMEX platform,

made in reasonable reliance on Defendants' fraudulent omissions, Plaintiff incurred the following

monetary damages associated with trading commissions paid by Plaintiff to Defendants,

irrespective of any and all market moves, market events or market manipulation by Defendants.

Therefore, Defendants' fraudulent omissions of material facts was a substantial factor in causing

Plaintiff's damages associated with trading commissions paid by Plaintiff to Defendants, which

were also a natural and foreseeable result of the Defendants' fraudulent concealment of material

facts from Plaintiff. These trading commissions paid by Plaintiff to Defendants are separate from

---

[21] This belief is supported by the facts alleged in Count II above.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

and do not include any trading losses suffered by Plaintiff as the result of any market events, market manipulation or market conditions. Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.1 bitcoins, at the time he purchased his first swap contract on BitMEX, in reasonable reliance on Defendants' fraudulent omissions of material facts, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 0.4 bitcoins |
| | | Total: | 0.4 bitcoins |

203. Plaintiff's reliance on Defendants' fraudulent misrepresentations, half-truths and omissions was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their ITD from Plaintiff, other traders and regulators. For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for its ITD with the BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' ITD.

204. Defendants' fraudulent misrepresentations, half-truths and omissions allowed BitMEX to create the false impression with Plaintiff that if BitMEX was trading against Plaintiff and its own customers, it nevertheless was not doing so with substantial trading advantages over Plaintiff and the customers; that BitMEX would not be able to, and would not, take advantage of customer lock-outs to benefit BitMEX at the expense of Plaintiff and the customers; and that the prices of bitcoin and ether used to determine the value of bitcoin and ether derivative products traded on BitMEX were prices that BitMEX had not itself manipulated.

205. With these false impressions established, Defendants were able improperly and fraudulently to induce Plaintiff to use the BitMEX platform, to liquidate Plaintiff's swap contracts on BitMEX using Plaintiff's very sensitive insider information about Plaintiff's position and open

1   orders, to use the ITD to orchestrate disadvantageous trades for Plaintiff, and to manipulate the

2   price of bitcoin and ether on "reference" exchanges to orchestrate further disadvantageous trades

3   and swap contract liquidations for Plaintiff.

4          206.    Defendants generated ill-gotten gain from their fraud by collecting trading

5   commissions from Plaintiff for trading on the BitMEX platform that occurred as a result of the

6   fraud (Plaintiff would not have used the platform if he had known the truth); prevailing as the

7   counterparty against Plaintiff with respect to trading that occurred as a result of the fraud

8   (Plaintiff would not have used the platform or traded as he did if he had known the truth); and

9   increasing the size of the Insurance Fund through contract liquidations that occurred as a result of

10  the fraud (Plaintiff would not have used the platform or traded as he did if he had known the

11  truth).

12         207.    Plaintiff would not have deposited his bitcoins with BitMEX and would not have

13  traded on the BitMEX platform and would not have sustained trading losses and would not have

14  paid the swap contract purchase "costs" and trading commissions to Defendants had he known

15  the true facts, as the true facts meant that due to manipulative activities and informational and

16  trading advantages of the ITD, odds of making any money on BitMEX platform were stacked

17  heavily against Plaintiff and in favor of the ITD and the financial risk of liquidation of Plaintiff's

18  swap contracts was substantially higher than Plaintiff assumed, based on Defendants'

19  concealment of material facts from Plaintiff.  In other words, because the swap contracts that

20  Plaintiff purchased from Defendants were substantially riskier than what Defendants led Plaintiff

21  to believe using the concealment of material facts from Plaintiff, their purchasing "costs" should

22  have been much lower than what Plaintiff has paid for them.

23         208.    Had Plaintiff known the true facts concealed from Plaintiff by Defendants,

24  Plaintiff would have realized that BitMEX's swap contracts were substantially riskier, and,

25  consequently, less valuable, and he would not have paid the amounts he paid as "costs" for

26  purchasing these riskier and less valuable swap contracts on BitMEX, but would have paid

27  substantially less, if anything at all, to account for this increased financial risk associated with the

28

1    manipulative activities and informational and trading advantages of the ITD as well as other

2    omitted facts.

3         209.    Accordingly, at the times of the respective swap contract purchases, Defendants

4    overcharged Plaintiff for the "cost" of purchase of each such swap contract by way of

5    concealment of material facts from Plaintiff.  Due to overpaying for the "costs" of purchase of the

6    riskier swap contracts, for purchase of which Plaintiff would not have paid the amounts he paid,

7    had he known the true facts concealed by Defendants from him, Plaintiff suffered out-of-pocket

8    losses in the form of the aforesaid overpayment at the time he purchased each of his swap

9    contracts.  The subsequent liquidation of Plaintiff's swap contracts was a mere consequence of

10   the higher financial risk (as well as other substantial contributing factors, such as deliberate

11   actions of the ITD) associated with them, but the financial loss in the form of contract purchase

12   "cost" overpayment was suffered by Plaintiff at the time of the respective contract purchase.

13   Even if the subsequent liquidation of Plaintiff's swap contract was the consequence of the natural

14   market forces (which it was not due to the deliberate actions of the ITD) Plaintiff still suffered

15   losses in the form of the aforesaid swap contract purchase "cost" overpayment at the time the

16   respective swap contract was purchased.

17        210.    Because Plaintiff was misled by Defendants' fraudulent concealment of material

18   facts from Plaintiff, he was fraudulently induced to buy more risky (due to concealed facts) swap

19   contracts than he thought he was buying.  More risky contracts "cost" less to purchase and the

20   measure of Plaintiff's damages is the difference between the contract purchasing "cost" actually

21   paid by Plaintiff and the amount Plaintiff would have paid for purchasing those riskier contracts

22   had he known the real risk associated with them.  This measure of damages is capable of accurate

23   determination using appropriate calculations and expert testimony.

24        211.    Thus, it was a foreseeable and natural consequence of the purposes and goals of

25   Defendants' fraudulent concealment of material facts from Plaintiff, as described above, that

26   Plaintiff would overpay for the riskier swap contracts, pay trading commissions to Defendants

27   and suffer the net loss he suffered, and that Defendants would generate the ill-gotten gains they

28   did.  It was also entirely foreseeable that the undisclosed facts indicated that Plaintiff's swap

contracts carried with them a substantially higher risk of liquidation and that such liquidations would be more likely to occur, financially harming Plaintiff.

212. As a proximate result of Defendants' fraudulent misrepresentations and concealment of material facts from Plaintiff, Plaintiff deposited his bitcoins and purchased margined swap contracts on BitMEX platform, which were subsequently deliberately and wrongfully liquidated by the ITD operated by Defendants using Plaintiff's highly confidential and sensitive order and position information, wherein the ITD had priority access to the trading order queues and not subject to lockouts, by reason of which Plaintiff has been damaged in the sum of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

213. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

214. Cal. Civ. Code § 1710(3) defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

215. Defendants "[give] information of other facts which are likely to mislead for want of communication of that fact" by providing to Plaintiff the false Warranty and Representation without disclosing the informational, technical and trading privileges that the ITD enjoys over Plaintiff and other BitMEX customers and the fact that the ITD artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including Plaintiff's, liquidations. This made the Warranty and Representation at least misleading. Accordingly, Defendants' conduct constituted deceit under Cal. Civ. Code § 1710(3).

216. Moreover, California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the

defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

217.    Defendant had exclusive knowledge of material facts related to the informational, technical and trading privileges that the ITD enjoys over Plaintiff and other BitMEX customers and of material fact that the ITD artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customer, including Plaintiff's liquidations.  These material facts were not known to Plaintiff.  Therefore, Defendants were obligated to disclose this information to Plaintiff under prong 2) of *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

218.    Furthermore, Defendants took extraordinary and active measures to conceal the wrongdoing perpetrated by their ITD from Plaintiff.  First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts.  Second, according to the CFTC Complaint, Ex. 2, p. 16, ¶ 49, Defendants actively deleted required records, including user identities.  Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their ITD with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted.  Accordingly, Defendants engaged in active concealment of the true facts and their fraud.  Therefore, Plaintiff, through exercise of reasonable diligence, could not have known the true manner of operation of Defendants' ITD.  Therefore, Defendants were additionally obligated to disclose this information to Plaintiff under prong 3) of *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

219.    Moreover, Defendants "[made] partial representations [about the ITD] but also suppresses some material facts" regarding informational, technical and trading privileges that the ITD enjoys over Plaintiff and other BitMEX customers and the fact that the ITD artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as described above, in order to make its own trades profitable and to force customers, including

1  Plaintiff's liquidations. Therefore, Defendants were additionally obligated to disclose this

2  information to Plaintiff under prong 4) of *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997),

3  which they failed to do.

4       220.  Defendants' misrepresentations, half-truths and omissions constituted deceit under

5  Cal. Civ. Code §§ 1710(1) and (3) and actually deceived Plaintiff into altering his position by

6  opening BitMEX accounts, depositing bitcoins and engaging in cryptoderivative trading on a

7  rigged BitMEX platform.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709,

8  pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of

9  at least 1.81027681 bitcoins.

10      221.  A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if

11  it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or

12  substantially injurious to consumers, and that unfairness is determined by weighing the reasons,

13  justifications and motives of the practice against the gravity of the harm to the alleged victims.

14      222.  Defendants' actions constitute "unfair" business practices because, as alleged

15  above, Defendants engaged in omissions of material fact, which went to the very center, very core

16  and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative

17  trading services that Defendants offered to Plaintiff, for a fee, through the BitMEX online trading

18  platform.  Defendants' acts and practices offended an established public policy of transparency in

19  operation of financial markets, and engaged in immoral, unethical, oppressive, and unscrupulous

20  activities that are substantially injurious to consumers.

21      223.  Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff has "suffered injury in fact

22  and … lost money or property as a result of the unfair competition" by Defendants, because he

23  would not have opened a trading account, deposited his valuable bitcoins with BitMEX, traded

24  derivatives on the BitMEX platform, sustained trading losses and paid swap contract purchase

25  "costs" and trading commissions to Defendants, but for his reasonable reliance on the truth of the

26  alleged misleading and deceptive representations and advertising by Defendants that incorporated

27  false and fraudulent statements as well as omissions of material fact.  The purchase of swap

28  contracts that Plaintiff would not otherwise have purchased from Defendants for the amount he

paid, but for the alleged misleading and deceptive advertising by Defendants establishes an economic injury-in-fact for Plaintiff's claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at \*6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at \*2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, \*4 (N.D. Cal. May 26, 2011).

224.    The grave financial harm to Plaintiff outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unethical, unscrupulous, misleading and deceptive conduct described herein.

225.    By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to deprive Plaintiff of his bitcoin holdings in the amount of 1.81027681 bitcoins.

226.    By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been damaged in the amount of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT IV
**"Unfair" Business Practices in Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.) — Based on Aiding and Abetting Known Market Manipulators and Failure to Disclose it**
**(Against All Defendants)**

227.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

228.    In addition to using a laundry list of fraudulent solicitations and omissions of material fact as alleged above, Defendants enlisted notorious market manipulators, including the infamous Ben Aabtc, provided them with an unlimited number of anonymous document check-

free trading accounts on BitMEX, with high leverage, no KYC and AML verification of any kind

and without any trading and position limits[22], to manipulate markets on BitMEX as well as its

"reference" spot exchanges, causing additional customer liquidations, which again profited

Defendants at the expense of Plaintiff and other retail traders like Plaintiff.  Defendants were

under a legal obligation pursuant to California law to disclose this fact to Plaintiff because they

were in exclusive possession of the relevant information that went to the core and center of the

integrity of the cryptoderivative trading services, which they provided to Plaintiff for a hefty fee.

Specifically, the fact that Defendants made their trading platform BitMEX readily available to the

known and notorious market manipulators and actively assisted them, greatly increased financial

risk to Plaintiff's open perpetual swap contracts on BitMEX.  This increased financial risk

involved the risk of liquidation of Plaintiff's swap contracts stemming from pumps and dumps,

stop loss hunting, triggering of liquidation cascades, spoofing, use of price suppression bots and

other illicit price manipulation techniques routinely utilized by the cross-market manipulators on

BitMEX.  Had Plaintiff known the true facts about presence of notorious market manipulators on

BitMEX platform, acting in concert with Defendants and being aided and abetted by them, he

would not have traded on BitMEX, would not have paid swap contract purchase "costs" and

trading commissions to Defendants and would not have sustained the trading losses he did.

229.    Cross-market manipulation occurs when a manipulator trades in one market for the

purpose of manipulating the price of an asset in another market, capitalizing off the price-moving

effects thus generated, instead of with the bona fide intent of profiting off the trade itself.

230.    For example, in *SEC v. Lek Securities Corp.*, 276 F. Supp. 3d 49, 57 (S.D.N.Y.

2017) the SEC alleged a cross-market manipulation scheme, wherein "Avalon purchased and sold

U.S. stock at a loss to move the prices of corresponding options, so that Avalon could make a

profit by trading those options at prices that it would not otherwise have been able to obtain. The

profits that Avalon achieved through its options trading more than offset the losses it sustained on

its allegedly manipulative trading of stock. The SEC alleges that Avalon engaged in over 600

---

[22] Failure to implement position limits violates Sections 5(d)(5) and 5h(f)(6) of the CEA, 7 U.S.C. §§ 7(d)(5), 7b-3 (f)(6) (2018), 17 CFR §§ 37.600, 38.300-301.

instances of cross-market manipulation through Lek between August 2012 and December 2015.
The complaint describes in detail a specific example of Avalon's cross-market manipulation
activity." *Id*.

231. A similar cross-market manipulation scheme was described by the CFTC in the *In re Davis Ramsey*, CFTC No. 18-49, 2018 WL 4772228 (Sept. 27, 2018) (consent order)
("*Ramsey*"). *Ramsey* stated: "[d]uring the Relevant Period, Ramsey routinely purchased and sold
Binary Contracts that referenced Futures as the Underlying through an account he held with
Nadex, as well as through a second account that was held by a family member (the "Second
Nadex Account" and collectively "Nadex Accounts"). In the Nadex Accounts, Ramsey traded,
among other products, the US 500 Binary Contract, the Tech 100 Binary Contract, the Gold
Binary Contract, and the Silver Binary Contract… On hundreds of occasions, Ramsey, while
holding a position in one or more Binary Contracts, just prior to a Binary Contract Expiration,
also placed trades in the corresponding Underlying Futures on CME. Ramsey entered into these
transactions with the intent to influence the Futures prices that would be used to calculate the
relevant Binary Contract Expiration Value."

232. Defendants' close associate and co-conspirator Ben Aabtc engaged in well-
documented cross-market manipulation activities on BitMEX (first market) and price-forming
"reference" spot exchanges (second market). Specifically, Ben Aabtc "pumped" and "dumped"



**Romano** @RNR_0 · Apr 30, 2020 ···

In the end surely BTC is programmed to go up. But price can be manipulated

I was in **Thailand**, sitting in @ActualAdviceBTC room and actually see him **pump** BTC up several hundred dollars, liquidating bears and laughing

All that while knowing he had to attend a funeral in few hours

💬 4      ↻ 4      ♡ 47      ⬆

bitcoin price on "reference" spot exchanges while holding multiple open $30,000,000 perpetual
swap positions on BitMEX, in order to benefit those related open positions.

← **Thread**

**TheBoot**
@TheBootMex
···

RIP @ActualAdviceBTC . You are always in my memory–
back in April 2018 I was ultra rekt left with only 0.6btc
followed by best winning streak ever – went from 0.6 to
60btc in 10 days. At the time aabtc was trying to pump
the market with all the force he had. I bought in and...

3:21 PM · May 19, 2020 · Twitter Web App

**Oliver Knight**
@KnightCoinRivet
···

Sad to hear that @ActualAdviceBTC has passed away at
such a young age. One of the few personalities on crypto
Twitter I enjoyed following over the past five years.

His orchestrated pump from $6,800 in 2018 while
posting $30m positions on BitMEX was heroic.

What a great shame.

**Romano** @RNR_0 · May 19, 2020
I'll miss you @ActualAdviceBTC

You left your footprints here with glory.
You were a legend & real cult figure in crypto.
Show this thread

My best friend here @ActualAdviceBTC died
today.

He was a legend & a real cult figure in crypto.
But he was also like the older brother I never had.

We've been friends since 2013, back when I was
16/17-year-old nobody, and things instantly
clicked when I met him in real life in 2017 in
Amsterdam.

He helped me with trading, Viacoin, and other

4:28 PM · May 19, 2020 · Twitter Web App

233.    The use of cross-market manipulative trading strategies similar to that employed

by respondents in the above-cited SEC and CFTC actions as well as Defendants and Ben Aabtc,

i.e., engaging in a significant amount of trading activity (e.g. "pumping" and "dumping" bitcoin

price on "reference" spot exchanges), at specific times, for the purpose of benefitting a related

position (e.g. multiple $30,000,000 perpetual swap positions on BitMEX furnished to Ben Aabtc by Defendants), has been previously recognized as a manipulative device in violation of the Commodity Exchange Act and regulations promulgated thereunder. See, e.g., *In re Total Gas & Power North America, Inc*., CFTC No. 16-03, 2015 WL 8296610, at *9 (Dec. 7, 2015) (consent order) (finding "Respondents intentionally employed a manipulative device by purchasing and/or selling large volumes of fixed-price natural gas at the relevant hubs before and during bid-week that were intended to benefit . . . related financial positions"); *In re JPMorgan Chase Bank, N.A*., CFTC No. 14-01, 2013 WL 6057042, at *11 (Oct. 16, 2013) (consent order) (finding respondents used a manipulative device where "[t]he size and timing of [the] traders' transactions during [a] concentrated period was calculated to defend the position of [a portfolio] just prior to [a] month-end review"); *DiPlacido*, 2008 WL 4831204, at *46 (affirming ALJ findings that respondent engaged in manipulation and attempted manipulation in violation of Sections 6(c) and 9(a)(2) of the act by trading of electricity futures contracts during the settlement period to influence the settlement price of the contracts and benefit a related position.); *In re Davis Ramsey*, CFTC No. 18-49, 2018 WL 4772228 (Sept. 27, 2018) (consent order) (finding respondent used a manipulative device where to achieve his ultimate goal of causing certain binary contract expiration values (first market) to be calculated in his favor, respondent engaged in trading activity on CME (second market) with the objective and specific intent to cause a favorable price impact in the futures market).

234. Therefore, for all the foregoing reasons, Ben Aabtc, with the assistance of Defendants, "use[d] or employ[ed], in connection with [a] swap, ... [a] manipulative or deceptive device or contrivance" in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2019).

235. Defendants undeniably knew of and actively participated in and actively aided and abetted this cross-market manipulation scheme.

236. First, all two individual Defendants as well as their associate Delo, marked in the below photograph, provably closely combined, conspired and confederated with Ben Aabtc face to face and even described him to be their "true friend" and a "legend." This clearly shows that this well-known, open and notorious market manipulator was part of their "inner circle" or so





called "BitMEX cartel," as Defendants referred to themselves.

237.    Second, acting with full knowledge of Ben Aabtc's illicit cross-market manipulation activities, Defendants actually opened multiple $30,000,000 perpetual swap positions for him on BitMEX, which would necessarily require an approval at the very top of BitMEX, and likely of Defendant Hayes himself, in disregard of all position limits imposed by CFTC regulations.  This shows that Defendants clearly knew exactly what type of illicit trading Ben Aabtc was engaged in on BitMEX.  The below screenshot of BitMEX's trading user



interface, which Ben Aabtc himself published, shows Ben Aabtc's $30,873,844 open perpetual

Consensus Law
Cryptocurrency
Attorneys

Second Amended Complaint for Unfair Competition          - 87 -          Anatoly Sorokin v. HDR et al.   Case No. 3:21-CV-03576-WHO

swap positions on BitMEX opened for him by Defendants.

238. Third, Defendants placed Ben Aabtc on their leaderboard advertising him to other traders as one of BitMEX's top traders with full knowledge that his remarkable "trading success" was actually the result of the illegal cross-market manipulation in violation of the CEA.

239. In view of this overwhelming evidence, Defendants' denials of the knowledge of and participation in the illicit cross-market manipulation scheme run by Ben Aabtc are simply implausible. In fact, it appears as if the entire Twitter community knew that Ben Aabtc was "heroically" "pumping" and "dumping" markets on BitMEX, while being called a "legend" and "true friend" by Defendants. In view of all this evidence, it shakes the conscience and stretches credibility to argue that Defendants suspected nothing illegal.

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Hot-Relic-Fancier | 4,196.9329 XBT | ✗ |
| 2 | Heavy-Autumn-Wolf | 3,596.7630 XBT | ✗ |
| 3 | Green-Sky-Whip | 1,101.4551 XBT | ✗ |
| 4 | Cream-White-Ox | 906.6117 XBT | ✗ |
| 5 | Thorn-Moor-Braid | 878.7421 XBT | ✗ |
| 6 | Xzcxcxz | 828.6553 XBT | ✓ |
| 7 | Silent-Plume-Otter | 669.8737 XBT | ✗ |
| 8 | Truth-Bitter-Runner | 586.1175 XBT | ✗ |
| 9 | Almond-Cookie-Soarer | 541.1664 XBT | ✗ |
| 10 | aabtc | 534.3252 XBT | ✓ |
| 11 | Splash-Petal-Jackal | 510.5438 XBT | ✗ |
| 12 | Coffee-Brown-Thorn | 481.2309 XBT | ✗ |
| 13 | ahhereLIO | 461.2755 XBT | ✓ |
| 14 | Taylor | 452.7239 XBT | ✓ |
| 15 | Cedar-Spice-Fisher | 407.6904 XBT | ✗ |
| 16 | Rag-Equinox-Eater | 403.1834 XBT | ✗ |
| 17 | Paint-Mercury-Face | 384.9927 XBT | ✗ |
| 18 | Prism-Fate-Slicer | 370.1898 XBT | ✗ |
| 19 | daniel3 | 345.6583 XBT | ✓ |
| 20 | Marble-Hollow-Seeker | 336.6878 XBT | ✗ |
| 21 | Navy-Midnight-Servant | 335.6627 XBT | ✗ |
| 22 | Quick-Grove-Mind | 316.1076 XBT | ✗ |
| 23 | Silent-Hurricane-Guardian | 311.5210 XBT | ✗ |
| 24 | Grove-Cosmic-Bite | 307.4127 XBT | ✗ |
| 25 | Neon-Marsh-Raver | 304.3723 XBT | ✗ |

240. What Ben Aabtc was doing on BitMEX and its "reference" exchanges is a classic example of a cross-market manipulation scheme in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2019), which involved the use by Defendants and their co-conspirator of a manipulative device or contrivance. See, for example: *In re Avista Energy, Inc.*, CFTC No. 01-21, 2001 WL 951736 (Aug. 21, 2001) (Avista Energy held over-the-counter derivative contracts, the value of which was based on the settlement price of electricity futures contracts on the last day of options trading for the contracts. The CFTC alleged that Avista Energy created artificial settlement prices

in the futures contracts in order to benefit its holdings by (i) placing large orders to sell futures contracts at prices less than the prevailing bids during the last two minutes of trading on the last day of options trading for the contracts and (ii) placing large orders to buy futures contracts at prices higher than the prevailing offers during the last two minutes of trading on the last day of options trading. Avista Energy agreed to a settlement based on charges of attempted manipulation, manipulation, non-competitive trading, and recordkeeping violations (neither admitted nor denied), pursuant to which it paid a civil monetary penalty of $2.1 million.); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F.Supp. 2d 523 (S.D.N.Y. 2008) (The CFTC sued a hedge fund that traded both natural gas futures contracts and over-the-counter natural gas swaps, alleging that the defendant sought to profit from large short positions on natural gas swaps – the prices of which depended on the closing price of natural-gas futures – by manipulating the closing price of natural-gas futures. The defendant allegedly purchased a substantial number of futures contracts leading up to the closing range on expiration day and then sold those contracts several minutes before the close. The goal was to create artificial prices of natural-gas futures contracts by deliberately selling a substantial number of futures contracts during the close on expiration day. Amaranth agreed to a settlement based on charges of attempted manipulation and making material misrepresentations in violation of CEA §§ 6(c), 6(d) and 9(a)(2) without admitting nor denying and to pay a civil monetary penalty of $7.5 million.).

241. In *SEC v. Lek Securities Corp.*, 276 F. Supp. 3d 49, 57 (S.D.N.Y. 2017) the Court held: "The SEC adequately alleges that the … Defendants violated § 20(e) by aiding and abetting Avalon's violations of § 9(a)(2)… SEC also adequately alleges that the … Defendants had knowledge of Avalon's layering and cross-market activities and provided Avalon substantial assistance." In the present case too, Defendants clearly had knowledge of the Ben Aabtc's cross-market manipulation activities and "provided [Ben Aabtc] substantial assistance." Thus, Defendants violated 7 U.S.C. § 25(a)(1).

242.    Verified statements from both Ben Aabtc and BitMEX, the authenticity of which cannot reasonably be questioned, clearly establish that the market manipulation conspiracy between them was very close, long-running and admittedly illicit.  Ben Aabtc openly referred to himself as one of BitMEX's first "shills" and even told the public that Defendant Hayes could

🍦 **Actual Advice Bitcoin** @ActualAdviceBTC · Oct 8, 2018    ···
Replying to @Cryptocean and @BitMEX
what do u mean suddenly, I was one of **bitmex**'s first shills go ask @CryptoHayes . plus i dont think 2017 counts as suddenly

💬 1          ⟲          ♡          ↑

verify this fact.  "A shill, also called a plant or a stooge, is a person who publicly helps or gives credibility to a person or organization without disclosing that they have a *close relationship* with said person or organization." (Emphasis added).  Wikipedia, https://en.wikipedia.org/wiki/Shill, visited on July 5, 2021.  "Shill" is also "an accomplice of a hawker, gambler, or swindler who acts as an enthusiastic customer to *entice or encourage others*" who are subsequently swindled or defrauded.  (Emphasis added).  Google Definition of "Shill", https://www.google.com/search?q=Shill+definition, visited on July 5, 2021.

243.    This admission by Ben Aabtc is consistent with previously submitted witness

🍦 **Actual Advice Bitcoin** @ActualAdviceBTC · Jul 20, 2018    ···
"If you don't love me at my dump you don't deserve me at my pump"

-Marilyn Monroe

@CryptoCobain
**@CryptoHayes**
@abrkn
@cuntycakes123

💬 5          ⟲ 11          ♡ 126          ↑

**Orange pill popper** @BitcoinOO7 · Jul 20, 2018    ···
Preach it **AABTC**

💬          ⟲          ♡          ↑

statements and photographic evidence that Ben Aabtc was Defendants' *close* co-conspirator who was intentionally orchestrating artificial "pumps and dumps" on BitMEX, to first encourage unsuspecting victims to open long positions with Defendants by luring them with his price "pumps" and then using sudden "dumps" to liquidate victims' trading positions, whereby the victims' collateral would be wrongfully confiscated by Defendants in violation of the CEA (Ben Aabtc, who posted under Twitter handle "@ActualAdviceBTC", himself boasted his "pumps and dumps" manipulative activities by stating: "if you don't love me at my dump you don't deserve me at my pump," and specifically tagging Defendant Hayes).

244. Moreover, verified posts from BitMEX's own twitter account establish that this illicit relationship, wherein Ben Aabtc would lure unsuspecting traders to BitMEX with his artificial price "pumps" and then let Defendants liquidate them and misappropriate their funds with his artificial "dumps" started as early as 2015.



245. This is what Defendant Hayes himself wrote about market manipulator Ben Aabtc in one of his own public blog posts dated August 14, 2018, which again confirms a close relationship between the two:

It all started in Feb 2017 on a beach in southern Thailand. Thailand's king passed a few months prior, so the party atmosphere was subdued. Accompanied by a good friend of mine and one of the best shitcoin traders in the game, we headed down the beach in search of a party. One of his big shitcoin positions at the time was Pepe Cash. This was the precursor to Crypto Kitties. For those not in the know, PepeCash is "rare pepe" memes hashed onto a blockchain. The next killer app to be sure. Pepe Cash was on a mini run, and my boy constantly monitored the market. We didn't find a poppin' party, but we did find special shakes. The bartender didn't think we were sideways enough so he went in the back to get the real stuff. Over the next few hours we walked for miles, met interesting

tourists and locals, and waxed philosophical about shitcoins. On our ride back to our hotel, I noticed something strange. Our Tuk Tuk driver was wearing a trucker hat with a Pepe the Frog logo on it. Not trusting my eyes, I nudged my friend to confirm what I saw. He concurred that our driver was sporting a Pepe hat. My friend immediately whipped out his phone to check the market. Perhaps they saw what we did. Pepe Cash was pumping and he bought some more. We both looked at each other and knew it was a sign that something special would happen in 2017. What actually happened was far beyond what we could have ever imagined.

246. Ben Aabtc himself acknowledged that he was the "good friend" of Defendant Hayes that Defendant Hayes mentioned in the above story:



247. According to disinterested witnesses with no motivation to fabricate, Ben Aabtc simultaneously maintained six BitMEX accounts, furnished by Defendants, and actively engaged in all forms of illicit market manipulation in violation of the CEA, including stop loss hunting ("hitting retail stops like a karate master") and intentionally triggering liquidation cascades, all to the financial ruin of retail traders like Plaintiff.


**Bitcoin Obsessions** @BTC_Obsessions · May 19, 2020
Rumor has it @ActualAdviceBTC could operate 6 **Bitmex** accounts simultaneously, hitting retail stops like a Karate Master blindfolded.

248.   Furthermore, Ben Aabtc himself openly taunted his manipulation of bitcoin prices to deliberately liquidate other retail traders, like Plaintiff, (e.g., positing "miss me bears?" next to a BitMEX Liquidation notice) and have their collateral wrongfully confiscated by Defendants in violation of the CEA:



249.   Moreover, Ben Aabtc actively used "price suppression bots," which is yet another form of illicit market manipulation involving automated software programs designed to create

and maintain artificially low prices of assets such as bitcoin, not reflective of the true supply and demand conditions on the market, all while holding open and "flashing" to others $30 million perpetual swap positions furnished by Defendants.

**human person** @pips_and_pops · May 22, 2020
Replying to @RNR_0 and @ActualAdviceBTC
R u typoing? U mean 3mm or 30mm?

💬 1    ⟲    ♡    ⬆️

**blaster33** @blastered33 · May 22, 2020
it was 30M. I saw it too. **aabtc** always had 20M+ position on **bitmex**

💬 1    ⟲    ♡ 1    ⬆️

250.    Numerous witnesses observed Ben Aabtc engaging in artificially moving the

**stoplost** @marianr2d2 · Sep 2, 2018
Replying to @Crypto_n_derivs
Bad trading is a loss for the account that placed x mill dollars levereged shorts. It is a profit for the other side, the house, bitfinex. No, it was not normal, they make it look like it.

💬 1    ⟲    ♡    ⬆️

**Cryptocurrency & derivatives🏦🔊EIP1559🏴...** · Sep 2, 2018
The other side is a large buyer, not the house

I don't think #Bitfinex faked that buy, they are subpoenaed by US government, lots of eyes on them

If you think that buy was out of order - it was mere 10-20kBTC, 70-140m, not much

**ActualAdviceBTC** flashes 30m positions on **#Bitmex**

💬    ⟲    ♡    ⬆️

**skynet** @skynetcap · May 19, 2020
I'm hearing that **aabtc** passed away. He was a big player on **Bitmex**. I remember he'd be flashing his seven-figure longs in the trollbox. Didn't know the guy. But I always remember his bio, trading boutique cryptocurrencies and slamming Arthur's websockets, or something like that.

💬    ⟲    ♡    ⬆️

market prices by creating artificial prices of bitcoin for the benefit of Defendants and at the expense of retail traders like Plaintiff, all in violation of the CEA:



**Tristan** @penokee1773 · Apr 3, 2018

Replying to @BigCheds

It's one or two guys moving the market.  Mainly **aabtc** on **bitmex**

  💬 1       🔁       ♡ 1       ⬆️

251.    Ben Aabtc himself acknowledged that BitMEX bitcoin swap markets were being artificially manipulated by "machine elves that make the number go up and down," clearly referring to automated manipulative software tools used by BitMEX's ITD:



252.    As evidenced by his social media posts, Ben Aabtc continued to persistently manipulate markets on BitMEX throughout 2019 and up until May 18, 2020.  For example, on May 29, 2019, Ben Aabtc posted the following message, which included a screenshot of BitMEX trading user interface showing a 30,873,844 open long perpetual swap position on BitMEX,

which indicated that he was persistently "pumping" the market price for bitcoin up and was

actively enticing other traders on BitMEX to follow him with his price "pump":



253. Defendants financially benefitted from these illicit cross-market manipulation

activities of Ben Aabtc and other notorious market manipulators operating on BitMEX.

Specifically, every time their actions resulted in a liquidation of a trader; Defendants received a

profit which was deposited into their "Insurance Fund." The Insurance Fund of Defendants,

containing proceeds of wrongful trader liquidations, now stands at 37,783 bitcoins or

$1,813,584,000. Therefore, Defendants' relationship with Ben Aabtc as well as other notorious

market manipulators was immensely profitable for Defendants. Plaintiff is informed and believes

and thereof alleges[23] that Ben Aabtc as well as other notorious market manipulators persistently

manipulated perpetual swap contact markets on BitMEX and its "reference" exchanges during the

entire Relevant Period, engaging in pumps and dumps and other illicit activities, and directly and

proximately caused the price moves that resulted in the liquidation of Plaintiff's swap contracts.

In aiding and abetting Ben Aabtc, Defendants were motivated by profit, including Plaintiff's

---

[23] This belief is based on the facts contained in the preceding paragraphs.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

bitcoin deposits, trading commissions paid by Plaintiff to Defendants, and Plaintiff's bitcoins confiscated by Defendants as the result of liquidations. Defendants Hayes and Reed, who each own 31.67% of the corporate Defendants HDR and ABS, had personal financial interest in aiding and abetting Ben Aabtc and in hiding this fact from Plaintiff, in order to fraudulently misappropriate Plaintiff's bitcoins, as the resultant ill-gotten profits collected by Defendant HDR were siphoned by them directly to their personal bank accounts as alleged in paragraphs above.

254. A business act or practice is "unfair" under the Cal. Bus. & Prof. Code § 17200 if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

255. Defendants' actions constitute "unfair" business practice because, as alleged above, 1) during the Relevant Period, Defendants made their trading platform BitMEX readily available to known cross-market manipulators with the intent to financially profit from their illicit activities (through retail trader liquidations); and 2) during the Relevant Period, Defendants fraudulently concealed from Plaintiff and other retail traders, like Plaintiff, material facts related to the highly risky activities of known market manipulators on BitMEX. Specifically, the fact that Defendants knowingly made their trading platform BitMEX readily available to the known and notorious market manipulators and actively assisted them, greatly increased financial risk to Plaintiff's open perpetual swap contracts that he purchased on BitMEX. This increased financial risk involved the risk of liquidation of Plaintiff's swap contracts stemming from pumps and dumps, stop loss hunting, triggering of liquidation cascades, spoofing, use of price suppression bots and other illicit price manipulation techniques routinely utilized by the cross-market manipulators on BitMEX. Had Plaintiff known the true facts about presence of notorious market manipulators on BitMEX platform, acting in concert with Defendants and being aided and abetted by them, he would not have traded on BitMEX, would not have paid swap contract purchase "costs" and trading commissions he paid to Defendants and would not have sustained the trading losses he did.

256. Defendants' acts and practices in 1) making their trading platform BitMEX readily available to known cross-market manipulators, actively assisting them and financially profiting from their illicit activities (through retail trader liquidations they caused); and 2) fraudulently concealing the illicit activities of Ben Aabtc and other notorious market manipulators who operated on BitMEX from Plaintiff and other retail traders like Plaintiff offended an established public policy of integrity and transparency in operation of financial markets. Thus, during the Relevant Period, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

257. When the Defendants committed the aforesaid fraudulent omissions to Plaintiff, Defendants intentionally omitted a clear disclosure of the facts related to operation of known market manipulators on BitMEX, and active assistance provided to them by Defendants, alleged above, because giving a clear explanation of who was really trading on BitMEX platform would have punctured the illusion of risk-free casino-style profits that Defendants promised Plaintiff. Defendants' fraudulent omissions to Plaintiff were made by Defendants with the intent to defraud and deceive Plaintiff and with the intent to induce Plaintiff to act in the manner herein alleged.

258. Defendants knew of and intentionally perpetuated these fraudulent omissions. BitMEX and the individual Defendant Hayes concealed the above facts related to the use of the BitMEX platform by Ben Aabtc and other known cross-market manipulators, and how Defendants profited off their manipulative actions aimed at inducing artificial liquidations of retail traders like Plaintiff. These fraudulently concealed facts went to the very core of BitMEX's operation, integrity and profit model and Defendants could not reasonably have been unaware of these facts. Defendants intended that Plaintiff would rely on these fraudulent omissions, and Plaintiff reasonably did so, given that these facts concerned core aspects of BitMEX's business. Therefore, Defendants' fraudulent omissions actually misled Plaintiff into believing something that was not true and was "likely to [so] mislead a reasonable consumer."

259. Plaintiff, at the time these fraudulent omissions were made by Defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the material facts fraudulently omitted by Defendants. In reliance on these fraudulent omissions, Plaintiff was induced to and

did in fact deposit his valuable bitcoins with Defendants' platform and engaged in derivative trading thereon to his financial loss and detriment. For example, in reliance on Defendants' fraudulent omissions, Plaintiff deposited with Defendants:

| | | |
|---|---|---|
| Sorokin | June 24, 2019 | 0.50831625 bitcoins |
| Sorokin | June 26, 2019 | 0.03526 bitcoins |
| Sorokin | July 3, 2019 | 2.288 bitcoins |
| Sorokin | July 4, 2019 | 4.28749672 bitcoins |

260. Due to the aforesaid deposits of bitcoins with Defendants, made in reliance on Defendants' fraudulent omissions, Plaintiff incurred the following bitcoin loss of use damages associated with the fact that Plaintiff's bitcoins were deposited in interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market, at the time, from reputable and financially stable companies including U.S.-based Celsius and BlockFi, which paid 5.95% APY on bitcoin deposits. Had Plaintiff not deposited his valuable bitcoins with BitMEX, as he did in reliance on Defendants' fraudulent omissions, he would have deposited them with either Celsius or BlockFi and earned 5.95% APY thereon. In addition to the loss of use damages, Plaintiff spent at least 0.001 bitcoin in bitcoin network transaction (miner) fees, for each bitcoin transfer he made from his personal bitcoin wallet to BitMEX (0.004 bitcoins in total for four transfers), in reliance on Defendants' fraudulent omissions. Therefore, Defendants' fraudulent omissions were a substantial factor in causing Plaintiff's bitcoin loss of use, and bitcoin network fees damages. These bitcoin loss of use damages are separate from and do not include any actual trading losses suffered by Plaintiff as the result of any market events, market manipulation, market conditions or liquidations.

| Plaintiff | Deposit Started | Deposit Ended | Deposit Days | Deposit Amount | Market APY | Loss of Use Damages |
|---|---|---|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 47 | 0.50831625 bitcoins | 5.95% | 0.0030 bitcoins |
| Sorokin | June 26, 2019 | August 10, 2019 | 45 | 0.03526 bitcoins | 5.95% | 0.00025 bitcoins |

| | | | | | | |
|---|---|---|---|---|---|---|
| Sorokin | July 3, 2019 | August 10, 2019 | 38 | 2.288 bitcoins | 5.95% | 0.014212 bitcoins |
| Sorokin | July 4, 2019 | August 10, 2019 | 37 | 4.28749672 bitcoins | 5.95% | 0.02593 bitcoins |
| | | | | | **Total:** | **0.043392 bitcoins** |

261.    In further reliance on Defendants' fraudulent omissions regarding activities of known market manipulators on BitMEX alleged above and aiding and abetting these activities by Defendants, on or about July 5, 2019, Plaintiff purchased from Defendants XBTUSD long swap contract and paid at least 0.78896761 bitcoins to Defendants as the swap contract purchase "cost." In addition, Plaintiff purchased ETHUSD long swap contracts and paid at least 1.0213092 bitcoins as the swap contract purchase "cost." Yet additionally, Plaintiff paid at least 0.1 bitcoins in trading commissions to Defendants on that day. Had Plaintiff known the true facts about the activities of Ben Aabtc and other notorious market manipulators operating on BitMEX, aided and abetted by Defendants, he would have realized that the swap contracts that Defendants offered him on BitMEX were substantially riskier than he thought and, therefore, he would not have paid Defendants 1.81027681 bitcoins for the above two XBTUSD and ETHUSD swap contracts on or about July 5, 2019, but would have paid substantially less, if anything at all. Thus, at the time of the contracts purchase on or about July 5, 2019, Plaintiff was fraudulently induced by Defendants to overpay swap contracts purchase "costs" and, therefore, on or about July 5, 2019, Plaintiff sustained monetary damages in the amount he overpaid to Defendants as purchase "costs" for the riskier swap contracts, than what Defendants led him to believe, by making the fraudulent omissions regarding activities of known market manipulators on BitMEX and aiding and abetting these activities by Defendants.

262.    On or about July 11, 2019, Plaintiff's both XBTUSD and ETHUSD swap contracts were wrongfully liquidated or otherwise closed. As the result, on or about July 11, 2019, Plaintiff sustained monetary losses in the amount of at least 1.81027681 bitcoins, less the amount he overpaid to Defendants on July 5, 2019, as purchase "costs" for the riskier swap contracts, than Defendants led him to believe by making the material omissions of fact regarding activities of

market manipulators on BitMEX, aided and abetted by Defendants. On information and belief, these losses were sustained by Plaintiff due to market manipulators, such as notorious Ben Aabtc, having caused Plaintiff's perpetual swap contracts on BitMEX to be liquidated.

263. Due to Plaintiff's decision to trade on margin on Defendants' BitMEX platform, made in reasonable reliance on Defendants' fraudulent omissions, Plaintiff incurred the following monetary damages associated with trading commissions paid by Plaintiff to Defendants, irrespective of any and all market moves, market events or market manipulation by Defendants. Therefore, Defendants' fraudulent omissions of material facts was a substantial factor in causing Plaintiff's damages associated with trading commissions paid by Plaintiff to Defendants, which were also a natural and foreseeable result of the Defendants' fraudulent concealment of material facts from Plaintiff. These trading commissions paid by Plaintiff to Defendants are separate from and do not include any trading losses suffered by Plaintiff as the result of any market events, market manipulation or market conditions. Plaintiff paid at least a portion of the below trading commissions, in the amount of at least 0.1 bitcoins, at the time he purchased his first swap contract on BitMEX, in reasonable reliance on Defendants' fraudulent omissions of material facts, and before any market move or other market event.

| Plaintiff | Trading Started | Trading Ended | Trading Commissions Damages |
|---|---|---|---|
| Sorokin | June 24, 2019 | August 10, 2019 | 0.4 bitcoins |
| | | **Total:** | **0.4 bitcoins** |

264. Plaintiff's reliance on Defendants' fraudulent omissions was justified because Defendants took extraordinary measures to conceal the wrongdoing perpetrated by Ben Aabtc and other known market manipulators operating on BitMEX. This was accomplished by Defendants by making all BitMEX trading accounts anonymous, destroying critical records, including trader identity information, and way of blatant violation of the mandatory know your customer and anti-money laundering procedures, for which Defendant Hayes has been criminally indicted. Therefore, Plaintiff, through exercise of reasonable diligence, could not have known the true facts about the activities of known market manipulators on BitMEX.

265. Defendants generated ill-gotten gain from their fraud by collecting trading commissions from Plaintiff for trading on the BitMEX platform that occurred as a result of the fraud (Plaintiff would not have used the platform if he had known the truth); prevailing as the counterparty against Plaintiff with respect to trading that occurred as a result of the fraud (Plaintiff would not have used the platform or traded as he did if he had known the truth); and increasing the size of the Insurance Fund through contract liquidations that occurred as a result of the fraud (Plaintiff would not have used the platform or traded as he did if he had known the truth).

266. Plaintiff would not have deposited his bitcoins with BitMEX and would not have traded on the BitMEX platform and would not have sustained trading losses and would not have paid the swap contract purchase "costs" and trading commissions to Defendants had he known the true facts, as the true facts meant that due to illicit manipulative activities of known market manipulators, odds of making any money on BitMEX platform were stacked heavily against Plaintiff and the financial risk of liquidation of Plaintiff's swap contracts was substantially higher than Plaintiff assumed, based on Defendants' concealment of material facts from Plaintiff. In other words, because the swap contracts that Plaintiff purchased from Defendants were substantially riskier (due to the activities of the manipulators aided and abetted by Defendants) than what Defendants led Plaintiff to believe using the concealment of material facts from Plaintiff, their purchasing "costs" should have been much lower than what Plaintiff has paid for them.

267. Had Plaintiff known the true facts concealed from Plaintiff by Defendants, Plaintiff would have realized that BitMEX's swap contracts were substantially riskier (due to the activities of the manipulators aided and abetted by Defendants), and, consequently, less valuable, and he would not have paid the amounts he paid as "costs" for purchasing these riskier and less valuable swap contracts on BitMEX, but would have paid substantially less, if anything at all, to account for this increased financial risk associated with the manipulative activities of known market manipulators on BitMEX and Defendants' aiding and abetting thereof.

268.     Accordingly, at the times of the respective swap contract purchases, Defendants overcharged Plaintiff for the "cost" of purchase of each such swap contract by way of concealment of material facts from Plaintiff.  Due to overpaying for the "costs" of purchase of the riskier swap contracts, for purchase of which Plaintiff would not have paid the amounts he paid, had he known the true facts concealed by Defendants from him, Plaintiff suffered out-of-pocket losses in the form of the aforesaid overpayment at the time he purchased each of his swap contracts.  The subsequent liquidation of Plaintiff's swap contracts was a mere consequence of the higher financial risk (as well as other substantial contributing factors, such as deliberate actions of the market manipulators) associated with them, but the financial loss in the form of contract purchase "cost" overpayment was suffered by Plaintiff at the time of the respective contract purchase.  Even if the subsequent liquidation of Plaintiff's swap contract was the consequence of the natural market forces (which it was not due to the deliberate actions of the ITD) Plaintiff still suffered losses in the form of the aforesaid swap contract purchase "cost" overpayment at the time the respective swap contract was purchased.

269.     Because Plaintiff was misled by Defendants' concealment of material facts from Plaintiff, he was fraudulently induced to buy more risky (due to the activities of the manipulators aided and abetted by Defendants) swap contracts than he thought he was buying.  More risky contracts "cost" less to purchase and the measure of Plaintiff's damages is the difference between the contract purchasing "cost" actually paid by Plaintiff and the amount Plaintiff would have paid for purchasing those riskier contracts had he known the real risk associated with them.  This measure of damages is capable of accurate determination using appropriate calculations and expert testimony.

270.     Thus, it was a foreseeable and natural consequence of the purposes and goals of Defendants' fraudulent concealment of material facts from Plaintiff, as described above, that Plaintiff would overpay for the riskier swap contracts, pay trading commissions to Defendants and suffer the net loss he suffered, and that Defendants would generate the ill-gotten gains they did.

271. As a proximate result of Defendants' fraudulent misrepresentations and concealment of material facts from Plaintiff, Plaintiff deposited his bitcoins and purchased margined swap contracts on BitMEX platform, which were subsequently deliberately and wrongfully liquidated, by reason of which Plaintiff has been damaged in the sum of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

272. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

273. Cal. Civ. Code § 1710(3) defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

274. California law recognizes four circumstances in which an obligation to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

275. Defendant had exclusive knowledge of material facts related to the manipulative activities of known market manipulators on BitMEX and Defendants' aiding and abetting thereof. These material facts were not known to Plaintiff. Therefore, Defendants were obligated to disclose this information to Plaintiff under *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997), which they failed to do.

276. Defendants' omissions of material facts relayed manipulative activities of known market manipulators on BitMEX and Defendants' aiding and abetting thereof, constituted deceit under Cal. Civ. Code §§ 1710(3) and actually deceived Plaintiff into altering his position by opening BitMEX accounts, depositing bitcoins and engaging in cryptoderivative trading on a rigged BitMEX platform. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709,

pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of

at least 1.81027681 bitcoins.

277. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff has "suffered injury in fact

and … lost money or property as a result of the unfair competition" by Defendants, because he

would not have opened a trading account, deposited his valuable bitcoins with BitMEX, traded

derivatives on the BitMEX platform, sustained trading losses and paid swap contract purchase

"costs" and trading commissions to Defendants, but for his reasonable reliance on the omissions

of material fact by Defendants. The purchase of swap contracts that Plaintiff would not otherwise

have purchased from Defendants for the amount he paid, but for the alleged fraudulent omission

of material facts by Defendants, establishes an economic injury-in-fact for Plaintiff's claims

under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217 (2013);

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co.*,

752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co.*, 340

Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co.*, 2012 WL 5471153, at *6 (N.D.

Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D.

Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL

2111796, *4 (N.D. Cal. May 26, 2011).

278. The grave financial harm to Plaintiff outweighs the utility of Defendants'

practices. There were reasonably available alternatives to further Defendants' legitimate business

interests other than the unethical, unscrupulous, misleading and deceptive conduct described

herein.

279. By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and

other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal.

Bus. & Prof. Code § 17200 et seq. by consummating an unfair business practice, designed to

deprive Plaintiff of his bitcoin holdings in the amount of 1.81027681 bitcoins.

280. By reason of the foregoing and as a proximate result of Defendants', and each of

them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been

damaged in the amount of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

**COUNT V**
**Deceit (Fraudulent Solicitation)**
**(Against All Defendants)**

281. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

282. Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

283. Cal. Civ. Code § 1710(1) defines deceit as a "suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Cal. Civ. Code § 1710(2) further defines deceit to include an "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." Cal. Civ. Code § 1710(3) further defines deceit as a "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

284. Defendants did not perform any actual calculations of liquidity on BitMEX and competing exchanges during the Relevant Period in order to verify that the Liquidity Representation was true. Therefore, Defendants "has no reasonable ground for believing" that the Liquidity Representation was true at the times when they made this representation to Plaintiff. Accordingly, Defendants' Liquidity Representation constituted deceit under Cal. Civ. Code § 1710(2).

285. Defendants' false and fraudulent representation regarding available liquidity on the BitMEX platform being 1500% higher than competition constituted deceit under Cal. Civ. Code § 1710(1) or (2) and actually deceived Plaintiff into altering his position by opening BitMEX account, depositing bitcoins, paying swap contracts purchase "costs" and trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of at least 1.81027681 bitcoins.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

286.     Moreover, Defendants' false and fraudulent Warranty and Representation also constituted deceit under Cal. Civ. Code § 1710(1) or (2) and actually deceived Plaintiff into altering his position by opening BitMEX account, depositing bitcoins, paying swap contacts purchase "costs" and trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of at least 1.81027681 bitcoins.

287.     Furthermore, Defendants' misrepresentations, half-truths and omissions also constituted deceit under Cal. Civ. Code § 1710(1), (2) or (3) and actually deceived Plaintiff into altering his position by opening a BitMEX account, depositing bitcoins, paying swap contacts purchase "costs" and trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of at least 1.81027681 bitcoins.

288.     Yet furthermore, Defendants' failure to disclose aiding and abetting known market manipulators, such as Ben Aabtc, also constituted deceit under Cal. Civ. Code § 1710(1), (2) or (3) and actually deceived Plaintiff into not taking a corrective action, resulting in a financial loss for Plaintiff of at least 1.81027681 bitcoins.  Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of at least 1.81027681 bitcoins.

289.     In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT VI
### Fraudulent Inducement
### (Against Defendants HDR and ABS)

290.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

291.    As alleged in paragraphs above, the Service Agreement between Defendants and Plaintiff was induced by and procured by Defendants through the fraud, misrepresentations and fraudulent omissions of material fact by Defendants.

292.    Plaintiff entered into the Service Agreement in justifiable reliance on fraudulent misrepresentations and fraudulent omissions of material fact by Defendants as alleged in paragraphs above.

293.    As the consequence thereof, the Service Agreement is voidable.[24] Plaintiff intended and intends that his original Complaint and this Amended Complaint serve as notice of voiding of the Service Agreement.

294.    Plaintiff has been damaged by fraudulent misrepresentations and fraudulent omissions of material fact by Defendants as alleged in paragraphs above in the sum of over 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

**COUNT VII**
**Negligent Misrepresentation**
**(Against All Defendants)**

295.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

296.    At the time Defendants made the Warranty and Representation and representations regarding available liquidity on BitMEX referenced above to Plaintiff, they had no reasonable grounds to believe that these representations were true and made them without adequate investigation about their veracity.

297.    Cal. Civ. Code § 1710(2) defines deceit as a "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true."

298.    Therefore, making of the Warranty and Representation and representations regarding available liquidity on BitMEX by Defendants to Plaintiff, for which Defendants had no

---

[24] In addition to being voidable for fraud in the inducement, the Service Agreement is also unenforceable against Plaintiff because it is both procedurally and substantively unconscionable. Specifically, it is an utterly one-sided and highly oppressive adhesion agreement.

reasonable grounds to believe that these representations were true, constituted deceit under Cal. Civ. Code § 1710(2).

299.     Cal. Civ. Code § 1709 provides: "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

300.     Defendants' false and fraudulent Warranty and Representation and representations regarding available liquidity on BitMEX constituted deceit under Cal. Civ. Code § 1710(2) and actually deceived Plaintiff into altering his position by opening BitMEX accounts, depositing bitcoins and engaging in cryptoderivative trading on a rigged BitMEX platform, suffering losses, as the result, and paying swap contacts purchase "costs" and trading commissions to Defendants. Therefore, Defendants' conduct violated Cal. Civ. Code § 1709, pursuant to which Defendants are liable to Plaintiff for Plaintiff's damages in the total amount of at least 1.81027681 bitcoins.

301.     As a direct and proximate result of these negligent misrepresentations made by Defendants to Plaintiff, Plaintiff has been damaged in the sum of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT VIII
### Rescission for Negligent Misrepresentation
### (Against Defendants HDR and ABS)

302.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

303.     As alleged in paragraphs above, the Service Agreement between Defendants and Plaintiff was induced and procured by Defendants through negligent misrepresentations made by them to Plaintiff, including the false Warranty and Representation and false representations regarding available liquidity on BitMEX referenced above.  Therefore, Plaintiff's consent to the Service Agreement was not real, mutual or free in that it was obtained through negligent misrepresentations.

304.     As a proximate result of the negligent misrepresentations made by Defendants to Plaintiff, Plaintiff was induced to enter into the Service Agreement and further conduct himself as

herein alleged to his detriment. As the consequence thereof, the Service Agreement is voidable.[25]

Plaintiff intended and intends that his original Complaint and this Complaint serve as notice of voiding of the Service Agreement.

305.    Plaintiff had been damaged by negligent misrepresentations of Defendants in the sum of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

**COUNT IX**
**False Advertising in Violation of Cal. Bus. & Prof. Code § 17500 et seq.**
**(Against Defendants HDR and ABS)**

306.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

307.    Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to … perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto … to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning … those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading... Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

---

[25] In addition to being voidable for fraud and/or negligent misrepresentation in the inducement, the Service Agreement is also unenforceable against Plaintiff because it is both procedurally and substantively unconscionable.  Specifically, it is an utterly one-sided and highly oppressive adhesion contract.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

308.    An April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, *marketing, including advertising*, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco.  Therefore, false advertising perpetrated by Defendants was perpetuated by Defendant ABS' staff and emanated from Defendant ABS's offices in San Francisco.  Accordingly, Cal. Bus. & Prof. Code § 17500 applied to false advertising perpetrated by Defendants in connection with BitMEX platform.

309.    During the Relevant Period, Defendants' cryptoderivative trading services, which defendants offered through the commercial website www.bitmex.com constituted "services" within the meaning of Cal. Bus. & Prof. Code § 17500.

310.    The "intent" required by Cal Bus. & Prof. Code § 17500 is the intent to perform services, and not the intent to mislead the public in the performing of such services.

311.    Defendants misled Plaintiff and other consumers by making at least the following untrue and misleading statements:

a.    Stating on their commercial website www.bitmex.com, maintained from Defendant ABS's offices in San Francisco, that "HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user."  This statement was deliberately and materially false.  In truth and in fact, the ITD of BitMEX had "God assess" to all customer, order flow, execution and open position information of the BitMEX Trading Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all parameters of hidden orders, including

leverage amounts, as well as sizes and liquidation prices of all open positions on the entire BitMEX platform. On the other hand, this information was not available to Plaintiff and other ordinary platform users, with the exception of Defendants themselves. The ITD used this very sensitive information to automatically trade against, and liquidate customers of BitMEX, including Plaintiff. Moreover, the ITD was not subject to server overload freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users, including Plaintiff, who were frequently subject to server overload freezes and lockouts. In fact, the ITD used the server overload lockouts offensively to liquidate traders including Plaintiff, while itself not being subject to such freezes and lockouts. Plaintiff would not have deposited his 1.81027681 bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts, as the true facts meant that odds of making any money on BitMEX platform were stacked heavily against Plaintiff and in favor of the ITD of BitMEX.

b.      Stating, during Relevant Period, on their commercial website www.bitmex.com, maintained from Defendant ABS's offices in San Francisco, that Defendants' cryptoderivative trading services provided "1500% More Bitcoin/USD liquidity than any other platform," see Ex. 16. These statements were materially false as alleged in detail in previous paragraphs. Plaintiff would not have deposited his 1.81027681 bitcoins with BitMEX and would not have traded on the BitMEX platform had he known the true facts.

312.    Defendants misled Plaintiff and other consumers by making at least the above untrue and misleading statements and making other false statements and material omissions of fact as alleged in paragraphs above.

313.    As a direct and proximate result of Defendants' misleading and false advertisements, Plaintiff has suffered injury in fact and has lost 1.81027681 bitcoins. As such, Plaintiff requests that this Court order Defendants to restore this bitcoin, in kind, to Plaintiff, and to enjoin Defendants from continuing these unfair practices in violation of the Cal Bus. & Prof. Code § 17500 in the future. Otherwise, Plaintiff and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

<u>COUNT X</u>
**Violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.)**

**(Against All Defendants)**

314.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

315.    During the Relevant Period, Plaintiff was a "consumer" as defined by Cal. Civ. Code § 1761(d).

316.    During the Relevant Period, Defendants' cryptoderivative trading services, which Defendants offered through the commercial website www.bitmex.com constituted "services" as defined by Cal. Civ. Code § 1761(b).  Defendants themselves specifically referred to cryptoderivative trading services provided by BitMEX as "services" and used this specific term 94 times in the BitMEX Service Agreement, Ex. 17.  Moreover, trading account services provided by financial institutions are properly within the scope of the Consumer Legal Remedies Act, see *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal. App. 3d 758 (CLRA applies to fees charged in connection with a self-directed IRA trading account); *Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 587 (finding violations of the CLRA in connection with fees charged for maintaining an IRA trading account).

317.    During the Relevant Period, each Defendant constituted a "person" as defined by Cal. Civ. Code § 1761(c).

318.    At all relevant times, Plaintiff's acceptance of the Service Agreement as well as the use of Defendants' cryptoderivative trading services provided by BitMEX platform for a fee, by way of purchasing swap contracts and paying contract purchase "cost" to Defendants constituted a "transaction" as defined by Cal. Civ. Code § 1761(e).

319.    The Cal. Civ. Code § 1770 provides that it is unlawful to: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

320.     Defendants' acts alleged in paragraphs above violate the Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

321.     Pursuant to Cal. Civ. Code § 1782(a), on October 7, 2021, Plaintiff's counsel notified Defendants in writing by certified mail, return receipt requested, of the particular violations of Cal. Civ. Code § 1770 and demanded that Defendants rectify the problems associated with the actions detailed above.

322.     If Defendants fail to respond to Plaintiff's letter, fail to agree to rectify the problems associated with the actions detailed above within 30 days of the date of written notice, as prescribed by Cal. Civ. Code § 1782, Plaintiff will amend this Complaint, without leave of Court, to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendants.  As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

## COUNT XI
### "Fraudulent" Business Practices in Violation of California Unfair Business Practices Act
### (Cal. Bus. & Prof. Code § 17200, et seq.)
### (Against All Defendants)

323.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

324.     A business act or practice is "fraudulent" under the Cal. Bus. & Prof. Code § 17200 if it is likely to deceive members of the consuming public.

325.     Allegations of specific acts constituting fraud and deceit and fraud by omission set forth in paragraphs above are incorporated as if fully set forth herein.  These acts constitute "fraudulent and deceptive" acts for purposes of Cal. Bus. & Prof. Code § 17200 et seq.

326.     Defendants' "fraudulent and deceptive" acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff and are highly likely to deceive members of the consuming public.  Plaintiff relied on Defendants' fraudulent and deceptive representations and omissions regarding the functionality, integrity, profit model and available liquidity of Defendants' cryptoderivative trading services.  These misrepresentations and omissions played a substantial role in Plaintiff's decision to deposit his valuable bitcoins with BitMEX platform, engage in trading thereon, and pay trading commissions to Defendants, and

Plaintiff would not have deposited his bitcoins, would not have traded on BitMEX and would not have paid fees without Defendants' misrepresentations and omissions.

327.     Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff had "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because he would not have opened trading accounts, deposited his valuable bitcoins with BitMEX, traded derivatives contracts on the BitMEX platform, paid swap contracts purchase costs and trading commissions to Defendants, but for his reasonable reliance on the alleged fraudulent and deceptive representations and omissions regarding the functionality, integrity, profit model and available liquidity of Defendants' cryptoderivative trading services.  The purchase of cryptoderivative swap contracts that Plaintiff would not otherwise have purchased and payment of the trading commissions that he would not otherwise have paid, but for the alleged fraudulent and deceptive representations and omissions by Defendants, establishes an economic injury-in-fact for Plaintiff's claims under Cal. Bus. & Prof. Code § 17200. *Chapman v. Skype Inc*., 220 Cal. App. 4th 217 (2013);  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co*., 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co*., 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011).

328.     By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal. Bus. & Prof. Code § 17200 et seq. by consummating a fraudulent business practice, designed to deprive Plaintiff of his bitcoin holdings in the amount exceeding 1.81027681 bitcoins.

329.     By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been damaged in the amount exceeding 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

## COUNT XII

## "Unlawful" Business Practices in Violation of California Unfair Business Practices Act (Cal. Bus. & Prof. Code § 17200, et seq.)
### (Against All Defendants)

330. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

331. A business act or practice is "unlawful" under the Cal. Bus. & Prof. Code § 17200 if it violates any other law or regulation. "The 'unlawful' practices prohibited by Cal. Bus. & Prof. Code § 17200 et seq. are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, (C.D. Cal 2001) 178 F. Supp. 2d 1099, 1120; *People v. McKale*, (1979) 25 Cal. 3d 626.

332. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive scheme. The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a).

333. California law expressly prohibits false advertising schemes run by Defendants. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17501.

334. Moreover, the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770 prohibits: (i) represent that services have uses, benefits, or quantities that they do not have; (ii) represent that services are of a particular standard, quality, or grade, if they are of another; (iii) advertise services with the intent not to sell them as advertised; or (iv) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (14).

335. A violation of any law constitutes an "unlawful" business practice under the Cal. Bus. & Prof. Code § 17200.

336. As detailed herein, Defendants' acts and practices alleged in paragraphs above were intended to or did result in violations of the CEA, CFR, FTCA, the FAL, and the CLRA.

337.    Defendants' practices, as set forth in paragraphs above, have misled Plaintiff and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the Cal. Bus. & Prof. Code § 17200.

338.    Defendants' violation of the Cal. Bus. & Prof. Code § 17200, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that the public will be deceived.  Pursuant to the Cal. Bus. & Prof. Code § 17200, Plaintiff is entitled to preliminary and permanent injunctive relief and an order commanding Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all Defendants' revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

339.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff has "suffered injury in fact and … lost money or property as a result of the unfair competition" by Defendants, because he would not have opened a trading account, deposited his valuable bitcoins with BitMEX, purchased swap contracts, paid high swap contracts purchase costs and trading commissions to Defendants, but for his reasonable reliance on the truth of the alleged false advertising, which violated the CEA, CFR, FTCA, the FAL, and the CLRA.  The purchase of cryptoderivative swap contracts that Plaintiff would not otherwise have purchased, but for the alleged unlawful false advertising by Defendants that violated FTCA, the FAL, and the CLRA, establishes an economic injury-in-fact for Plaintiff's claims under Cal. Bus. & Prof. Code § 17200.  *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217 (2013); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010); *Chaves v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359, 360-61 (9th Cir. 2009); *Kashin v. Hershey Co.*, 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159381, at *2-3 (N.D. Cal. Jan. 10, 2011); *Astiana v. Ben & Jerry's Homemade, Inc.* ("Ben & Jerry's"), 2011 WL 2111796, *4 (N.D. Cal. May 26, 2011).

340.    By reason of Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants, and each of them, have violated Cal.

Bus. & Prof. Code § 17200 et seq. by consummating an unlawful business practice, designed to deprive Plaintiff of his bitcoin holdings in the amount of 1.81027681 bitcoins.

341. By reason of the foregoing and as a proximate result of Defendants', and each of them, violation of Cal. Bus. & Prof. Code § 17200 et seq. as herein alleged, Plaintiff has been damaged in the amount of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

**COUNT XIII**
**Negligence and Negligence *Per Se***
**(Against All Defendants)**

342. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

343. The California Supreme Court recognized an exception to the economic loss rule in *J'Aire Corporation v. Gregory*, wherein the rule does not prevent recovery in tort if a special relationship exists between the plaintiff and the defendant. *J'Aire Corporation v. Gregory,* 24 Cal. 3d 799, 804 (1979). The exception applies to cases involving contracts for *services* "where the parties are in contractual privity." *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 783 (1997). The *J'Aire* exception is available if there is a special relationship between plaintiff and defendant.

344. The Services Agreement is one for provision of cryptoderivative trading *services* and not goods. Therefore, the *J'Aire* exception is available in the present case. Court cases have extended the application of *J'Aire* to situations where the parties are in contractual privity.

345. California Courts examine six factors to determine whether a special relationship between plaintiff and defendant exists:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

346.     As alleged herein, and to the extent that it is determined to be applicable to certain claims, Plaintiff had a "special relationship with Defendants" as defined in *J'Aire Corporation v. Gregory*, 24 Cal. 3d 799, 804 (1979). Plaintiff undoubtedly had a contract for provision of cryptoderivative trading services with Defendants where they and Defendants were in contractual privity. The services consisted of the provision of access to the BitMEX trading platform, including the ability to place orders, open and close positions and use margin.

347.     The transaction between Defendants and Plaintiff was undoubtedly meant to benefit Plaintiff by providing him the ability to use the cryptoderivative trading services provided by Defendants through their BitMEX platform for all of the purposes which Plaintiff expected and which were intended by Defendants. See *J'Aire*, 24 Cal. 3d at 804.

348.     Moreover, it was entirely foreseeable to Defendants that Plaintiff would be harmed if he would not longer to be able to access cryptoderivative trading services provided by Defendants due to a server freeze, which would result in Plaintiff's inability to close open trading positions and open new ones.  For example, if Plaintiff is unable to timely close his positions during a market move, his open positions would likely be liquidated, resulting in a financial loss to Plaintiff.  Moreover, it was entirely foreseeable to Defendants that Plaintiff would be harmed if Defendants failed to ensure that the bitcoin swap contracts Defendants offered to Plaintiff were not readily susceptible to manipulation, exposing Plaintiff's open swap contracts to malicious actions of third-party manipulators, operating on the BitMEX platform.  Furthermore, it was entirely foreseeable to Defendants that Plaintiff would be harmed if Defendants failed to implement rules or procedures sufficient to ensure that malicious market participants, such as Ben Aabtc trading on BitMEX, were prevented from engaging in manipulation or disruptive trading; and market participants who engaged in misconduct were subject to discipline.

349.     In the present case, Plaintiff certainly suffered injury by being deprived of his 1.81027681 bitcoins, which was caused by his inability to timely close his open trading positions due to server freezes that occurred on July 11, 2019.  On information and belief, market manipulative activities of malicious actors, such as the notorious market manipulator Ben Aabtc,

1   who freely operated on the BitMEX platform pursuant to Defendants' permission, was a

2   substantial factor in causing the injury suffered by Plaintiff.

3       350.    As required by *J'Aire*, there is also a close connection between Defendants'

4   conduct and the injury suffered by Plaintiff.  But for Defendants' allowing the servers of BitMEX

5   to freeze, Plaintiff would have timely closed their positions and would not have suffered

6   liquidations resulting in the loss of 1.81027681 bitcoins.  Moreover, on information and belief, if

7   Defendants properly reigned in their own employees' insider trading on the BitMEX platform

8   using highly confidential "insider" information of Plaintiff and other BitMEX customers, harm to

9   Plaintiff would not have occurred.  Furthermore, on information and belief, if Defendants

10  adequately ensured that their swap contracts were not readily susceptible to manipulation and did

11  not allow notorious market manipulators to freely trade on their platform, their malicious actions

12  would not have caused Plaintiff's financial injury and ruin.

13      351.    Defendants' conduct also involves moral blame. Aware of the vulnerability of its

14  customers in having their positions liquidated due to server freezes, Defendants have done

15  nothing to prevent that practice, including providing extra server capacity or re-writing BitMEX's

16  high availability software to provide additional protection to its customers' trading positions

17  during market moves.  As one of the world's most profitable cryptoderivative exchanges, which

18  generated at least billion dollars in profits for Defendants, Defendants have all the resources to do

19  better and yet they turn an indifferent eye to the widespread server freezes resulting in devastating

20  financial losses for their customers.  Moreover, the evidence summarized above shows that

21  Defendants financially benefit from such sever freezes, which is especially reprehensible conduct

22  in view of the financial devastation that they inflict on retail traders.  Defendants are also morally

23  culpable in failing to reign in their own employees' insider trading on the BitMEX platform using

24  highly confidential "insider" information of Plaintiff and other BitMEX customers. Furthermore,

25  Defendants are also morally culpable in failing to ensure that their financial products, which they

26  offered to general public for a fee, were nor readily subject to manipulation by malicious third

27  parties and the bad actors were prevented from trading on BitMEX to financial detriment of retail

28

traders. Moreover, Defendants received a financial benefit from such malicious actions, which is a reprehensible conduct.

352. Plaintiff's lawsuit fulfills the policy of preventing future harm. *J'Aire*. Plaintiff's complaint against Defendants has received widespread publicity and has publicized the server freezes and other unconscionable conduct occurring on the BitMEX platform. Because the CFTC is apparently not taking an active role in policing Defendants' violations of the CEA, it is up to private parties like Plaintiff in this action through lawsuits to help stem Defendants' culpable involvement in practices that is leading to widespread harm to consumers.

353. Thus, for all the foregoing reasons, a special relationship between Defendants and Plaintiff existed in this case and Defendants owed a duty to Plaintiff to maintain a functional and fair cryptoderivatives trading marketplace, for access to which they charged Plaintiff hefty trading commissions. *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders). In a related case *Kanyshev et al. v. HDR Global Trading Limited et al.,* No. CGC-20-584483 (S.F. Sup. Court), in Order on Defendants' demurrer, dated August 27, 2021, Hon. Judge Massullo specifically found, on similar facts, that a special relationship between Defendants and plaintiffs in that action existed and Defendants owed a duty to plaintiffs to maintain a functional and fair cryptoderivatives trading marketplace.

354. In the Consent Order dated August 10, 2021, in Case 1:20-cv-08132-MKV, (S.D.N.Y. 2021), Defendants judicially admitted that "[b]y the conduct described above, Settling Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, operated a facility for the trading or processing of swaps without being registered as a swap execution facility or as a designated contract market and thus violated Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2020)." In the same Consent Order, Defendants agreed to pay a $100 million penalty for these violations. Therefore, in the Consent Order dated August 10, 2021, Defendants judicially admitted that they were obligated to register with CFTC as a swap execution facility or

as a designated contract market and, consequently, were also obligated to comply with any and all provisions of the CEA and CFTC regulations established for these two types of entities.

355. Defendants, and each of them, failed to fulfill the legal duty to Plaintiff to maintain a functional and fair cryptoderivatives trading marketplace by:

a. failing to prevent notorious market manipulators, including the infamous Ben Aabtc, from trading on BitMEX and providing them with an unlimited number of anonymous document check-fee trading accounts on BitMEX, with high (100x) leverage, no KYC and AML verification of any kind and without any trading and position limits, who manipulated markets on BitMEX as well as its "reference" spot exchanges, causing, on information and belief of Plaintiff, liquidation of Plaintiff's swap contract, in violation of 17 CFR § 37.600.

b. failing to properly safeguard Plaintiff's swap contracts opened on BitMEX from malicious actions of notorious market manipulators, such as Ben Aabtc, in violation of 17 CFR §§ 38.650-651.

c. failing to implement rules or procedures sufficient to ensure that the bitcoin swap contracts Defendants offered to Plaintiff were not readily susceptible to manipulation, in violation of Sections 5(d)(3) and 5h(f)(3) of the CEA, 7 U.S.C. §§ 7(d)(3), 7b-3(f)(3) (2018) and 17 CFR §§ 37.300-301, 38.200, see CFTC Complaint, Ex. 2 ¶¶ 27, 48.

d. failing to implement rules or procedures sufficient to ensure that market participants, such as Ben Aabtc trading on BitMEX, were prevented from engaging in manipulation or disruptive trading; and market participants who engaged in misconduct were subject to discipline, all in violation of Section 5(d)(4) and 5h(f)(4)(B) of the CEA, 7 U.S.C. §§ 7(d)(4), 7b- 3(f)(4)(B) (2018) and 17 CFR §§ 37.401, 38.651, 38.700-712, see CFTC Complaint, Ex. 2 ¶¶ 27, 48.

e. failing to impose position limits on market participants, such as Ben Aabtc, designed to reduce the potential for market manipulation or congestion, in violation of Sections 5(d)(5) and 5h(f)(6) of the CEA, 7 U.S.C. §§ 7(d)(5), 7b-3 (f)(6) (2018), 17 CFR §§ 37.600, 38.300-301.

f.       failing to secure adequate scalable computer server capacity for BitMEX trading computer systems to prevent server freezes and system overloads that adversely affected Plaintiff's trading, in violation of 17 CFR §§ 37.1400-1401 and 38.1051(a)(4).

356.    Plaintiff is informed and believes and thereof alleges[26] that Ben Aabtc as well as other notorious market manipulators persistently manipulated perpetual swap contact markets on BitMEX and its "reference" exchanges during the entire Relevant Period, engaging in "pumps and dumps" and other illicit activities, and directly and proximately caused the price moves that resulted in the liquidation of Plaintiff's swap contracts. The violation of the above-identified Federal statutes and regulations by Defendants was a substantial factor in bringing about the harm to Plaintiff from the malicious actions of the infamous Ben Aabtc as well as other notorious market manipulators. Therefore, Defendants were negligent *per se* in failing to prevent manipulative activities of malicious third-party actors, such as Ben Aabtc, and, therefore, are liable for any such conduct, as well as server freezes on the BitMEX platform.

357.    Moreover, Defendants, and each of them, failed to fulfill the above legal duty to Plaintiff to maintain a functional and fair cryptoderivative marketplace by failing to prevent server freezes, which occurred on July 12 and 14, 2019, by failing to secure necessary scalable computer server capacity, in violation of 17 CFR §§ 37.1400-1401 and 38.1051(a)(4), as alleged herein above, despite BitMEX generating over a billion dollars in profit for Defendants. Irrespective of the origin of the market events on July 12 and 14, 2019, this negligent operation of Defendants' BitMEX platform prevented Plaintiff from taking a timely corrective action on July 12 and 14, 2019, which he unsuccessfully attempted to take, to close his open positions, resulting in the wrongful liquidation of Plaintiff's leveraged long XBTUSD and ETHUSD perpetual swap positions by Defendants and wrongful confiscation of Plaintiff's 1.81027681 bitcoins.

358.    Irrespective of the origin of the market events of July 12 and 14, 2019, Defendants' failing to properly maintain a functional BitMEX platform www.bitmex.com and secure necessary scalable computer server capacity, in violation of 17 CFR §§ 37.1400-1401 and 38.1051(a)(4), was a substantial factor in causing the injury to Plaintiff in that Plaintiff was

---

[26] This belief is based on the facts alleged in Count IV above.

prevented from taking a corrective action to timely close his open positions, resulting in

Defendants' liquidation thereof, and suffered his trading losses from such liquidation.

Defendants' conduct in failing to properly maintain a functional BitMEX platform

www.bitmex.com and secure necessary scalable computer server capacity, in violation of 17 CFR

§§ 37.1400-1401 and 38.1051(a)(4), was a substantial factor in causing Plaintiff's trading losses.

Therefore, Defendants were negligent *per se* in failing to prevent these losses, by failing to ailing

to secure necessary scalable computer server capacity, in violation of 17 CFR §§ 37.1400-1401

and 38.1051(a)(4) and, therefore, are legally liable for this loss to Plaintiff.

359. According to a sworn Declaration of Defendant Hayes dated February 27, 2020,

Defendant "ABS Global Trading Limited, … provides software development, software

engineering, and digital security services to HDR Global Trading Limited… including by

developing the front-end interface of the BitMEX platform." Defendant ABS Global Trading

Limited, responsible, within the BitMEX enterprise, for the reliability of BitMEX trading

platform, including commercial website www.bitmex.com, was and continues to be located in

San Francisco, California. Therefore, the negligent failure to prevent system overloads and server

freezes on the Defendants' BitMEX platform www.bitmex.com took place in Defendant's ABS'

offices in San Francisco, California.

360. All three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna,

personally responsible for the server freezes on the BitMEX platform, are located in California.

Therefore, California is the location where the breach of Defendants' duty to Plaintiff to maintain

a functional and fair cryprtoderivative trading marketplace has occurred. As BitMEX enterprise

principals, Defendants HDR, ABS, Hayes and Reed are liable for the negligent conduct of their

agents, engineers Jerry Aldrich, Scott H. and Armando Cerna, who acted, during Relevant Period,

within the scope of their agency and employment.

361. As a result of Defendants' negligence, Plaintiff has been damaged in the amount of

1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages

would be manifestly unjust due to bitcoin appreciation.

**COUNT XIV**

**Fraudulent Solicitation In Violation Of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1
— Based On Fraudulent Representations, Half-Truths And Omissions
(Against All Defendants)**

362.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

363.    7 U.S.C. § 9(1), makes it unlawful, in relevant part, for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, … any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] …

364.    Rule 180.1, 17 C.F.R. § 180.1(a) (2019), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, … to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person …

365.    Bitcoin and ether swaps[27] traded by all Plaintiff are "swaps" as defined by Section 1a(47)(A) of the CEA, 7 U.S.C. § 1a(47)(A) (2018).  Therefore, these bitcoin and ether swaps are also "swaps" within the meaning of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2019).

---

[27] On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD Perpetual Swap" ("XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract").  BitMEX claims its XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract is "the most traded cryptocurrency product of all time."  See CFTC Complaint, Ex. 2 ¶ 125, "products that have traded on BitMEX, including "Perpetual Swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47)."  Therefore, Plaintiff can pursue their claims under CEA, 7 USC § 25(a)(1)(D), which specifically covers "swaps."

366. Section 22 of the CEA provides for a private right of action for a plaintiff who made "any swap" through a person or entity whose violation of the CEA resulted in actual damages to the plaintiff, 7 U.S.C. § 25(a)(1)(B), or who placed through such person or entity "an order for the purchase or sale of ... a swap," id. § 25(a)(1)(C)(iv).

367. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiff by fraudulently soliciting Plaintiff through fraudulent representations, half-truths and omissions to use BitMEX to trade in Perpetual Swaps and thereby pay trading commissions to Defendants and suffer trading losses to benefit BitMEX at the expense of Plaintiff.

368. Defendants' fraudulent representations, half-truths and omissions alleged in the preceding paragraphs constituted the use of a "manipulative or deceptive device or contrivance" under 7 U.S.C. § 9(1), and "manipulative device, scheme, or artifice to defraud," including "untrue or misleading statement of a material fact or [omission of] a material fact necessary in order to make the statements made not untrue or misleading" and "act, practice, or course of business, which operates or would operate as a fraud or deceit upon" Plaintiff, under Rule 180.1, 17 C.F.R. § 180.1(a) (2019). Defendants' fraudulent representations, half-truths and omissions actually deceived Plaintiff into altering his position by opening BitMEX accounts, depositing bitcoins, paying trading commissions to Defendants and engaging in cryptoderivative trading on margin on a rigged BitMEX platform. Therefore, Defendants' conduct violated 7 U.S.C. § 9(1) and Rule 180.1, 17 C.F.R. § 180.1(a) (2019), and, pursuant to 7 U.S.C. §§ 25(a)(1)(B), (C)(iv), Defendants are liable to Plaintiff for damages in the total amount of at least 1.81027681 bitcoins.

**COUNT XV**
**Use of Manipulative Device or Contrivance in Violation of 7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1 — Operating ITD With Undisclosed Informational And Trading Privileges**
**(Against All Defendants)**

369. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

370. During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiff by operating

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

the ITD, which had special access to hidden customer information and priority access to trading queues. Defendants combined these undisclosed and unlawful advantages with algorithmic tools that displayed in real time which price movements would cause the greatest number of profitable liquidations for BitMEX. Defendants then used the ITD to place orders that moved the market, harming customers and profiting themselves during Relevant Period, including July 11, 2019, when Plaintiff suffered the alleged losses.

371. Defendants further employed manipulative devices by inducing artificial prices and price movements on U.S.-based third-party "reference" exchanges, including Coinbase Pro, Bitstamp, and Kraken, and using such price movements to force liquidations of customer swap positions on BitMEX, including during customer lock-outs caused by server freezes while the ITD was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations of Plaintiff.

372. During the Relevant Period, in which Defendants persistently manipulated the prices on BitMEX for bitcoin and ether derivative products, Plaintiff transacted in Bitcoin or ether derivative products on the BitMEX platform at artificial and unlawful prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these artificial prices, and as a direct result thereof suffered actual damages.

373. Plaintiff would not have traded on the BitMEX platform, and thus paid the trading commissions and suffered his net losses from such trading, if he had known the actual facts.

374. The automated software tools built by Defendants and operated by Defendants' ITD, using Plaintiff's highly sensitive and confidential information, continuously and persistently manipulated cryptoderivative markets traded by Plaintiff on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including July 11, 2019, when Plaintiff sustained his loss. Operation of these automated tools by Defendants' ITD deliberately caused automatic liquidations of Plaintiff's respective swap positions on BitMEX platform and confiscation of Plaintiff's respective

collateral from his BitMEX account on July 11, 2019, resulting in a cumulative loss of 1.81027681 bitcoins by Plaintiff.

375. The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' ITD on July 11, 2019 to deliberately liquidate Plaintiff's positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiff has no realistic way of obtaining this evidence without the benefit of discovery. Plaintiff will amend this complaint once he obtains such documentary evidence through the Court's discovery process.[28]

376. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their ITD from Plaintiff, other traders and regulators. First, Defendants deliberately made all accounts on BitMEX platform anonymous, which hindered specifically pinpointing the origin of manipulation and other illegal acts. Second, according to the CFTC Complaint, Ex. 2, p. 16, ¶ 49, Defendants actively deleted required records, including user identities. Third, Defendants deliberately used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their ITD with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Accordingly, Defendants engaged in active concealment of the true facts and their fraud. Therefore, Plaintiff, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' ITD automated market manipulation tools on July 11, 2019.

377. Defendants were fully aware of and intended these price manipulations. Defendants specifically sought and secured the creation of the technical system that gave the ITD its advantages and controlled the manipulation of prices on the reference exchange. Defendants' manipulation was designed to and did in fact create persistently artificial prices for bitcoin and ether derivative products on BitMEX.

---

[28] Defendants have a vastly superior knowledge of the facts relevant to the automated software tools developed by BitMEX, market manipulation and the operation of the ITD, the confidential trader information it used, as well as the trading privileges it enjoyed, and are in exclusive possession of the relevant evidence.

378.    On July 11, 2019, Plaintiff thus entered into bitcoin and ether derivative products through BitMEX and suffered actual damages from trading such swaps as a result of Defendants' use or employment, in connection with the swaps, of a manipulative device and contrivance in violation of the CEA and Rule 180.1, 17 C.F.R. § 180.1(a) (2019).

379.    Plaintiff sustained and is entitled to actual damages pursuant to 7 U.S.C. § 25(a) for the violations of the CEA alleged herein, in the amount to be proved at trial.

### COUNT XVI
**Use Of Manipulative Device Or Contrivance In Violation Of 7 U.S.C. §§ 9(1), 25(A)(1)(B), (C)(Iv), And Rule 180.1 — Triggering Intentional Server Freezes And System Overloads — (Against All Defendants)**

380.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

381.    During the Relevant Period, Defendants used a deceptive device or contrivance and fraudulent course of business to benefit themselves at the expense of Plaintiff by intentionally orchestrating server freezes and system overloads on the BitMEX platform during market moves aimed at preventing traders from escaping their positions during market volatility.  On July 11, 2019, Plaintiff tried to place trading orders to close or hedge his open contracts during these server freezes but was unable to do so.  As the result, Plaintiff was unable to salvage his collateral as the proximate and natural consequence of the intentional server freezes and system overloads orchestrated by Defendants during periods of market volatility, including on July 11, 2019, when Plaintiff sustained his losses alleged herein.  Defendants froze BitMEX servers to prevent the conditions of the BitMEX order book from changing between the time when Defendants' automated manipulation tools predicted profitability of potential liquidations of Plaintiff and the actual liquidation time, preventing Plaintiff from closing or changing his swap contracts or placing new orders that could interfere with the manipulation, so that BitMEX would get the exact profit that was predicted.

382.    If Defendants did not freeze their servers on July 11, 2019, at least a portion of Plaintiff's collateral would have been preserved and not confiscated from Plaintiff.  Therefore, the server freezes, intentionally orchestrated by Defendants on July 11, 2019, constituted a deceptive

device or contrivance and fraudulent course of business, and were a substantial factor in Plaintiff's financial losses alleged herein.

383.     Plaintiff sustained and is entitled to actual damages pursuant to 7 U.S.C. § 25(a) for the violations of the CEA alleged herein, in the amount to be proved at trial.

## COUNT XVII
### Price Manipulation in Violation of 7 U.S.C. §§ 9(3), 25(a)(1)(B), (C)(iv), and Rule 180.1
### (Against All Defendants)

384.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

385.     Section 6(3) of the CEA states in relevant part that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity." 7 U.S.C. § 9(3).

386.     Section 22(a)(1)(D)(ii) of the CEA, referring back to Section 22(a)(1)(D)(i), makes unlawful the "manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D)(ii).

387.     During the Relevant Period, Defendants, using automated software tools that BitMEX specially developed for its ITD and which operated 24 hours a day 7 days a week, created persistently artificial prices for their bitcoin and ether Perpetual Swap products. Defendants' ITD persistently and regularly engaged in trading on their own platform and on U.S.-based third-party "reference" exchanges, including Coinbase Pro, Bitstamp, and Kraken, that was designed to and did manipulate prices of these bitcoin and ether derivative products in order to cause liquidations and profit Defendants.

388.     Defendants' undisclosed ITD had special access to hidden customer information and priority access to trading queues. Defendants combined these undisclosed and unlawful advantages with algorithmic tools that would display in real time which price movements would cause the greatest number of profitable liquidations for BitMEX. Defendants would then use their ITD to place orders that would move the market, harming customers and profiting themselves.

389.     Defendants further manipulated prices of their derivative products by inducing artificial prices and price movements for bitcoin and ether on U.S.-based third-party "reference"

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

exchanges, including Coinbase, Bitstamp, and Kraken, and using such price movements to force liquidations of customer swap and futures positions on BitMEX, including during customer lock-outs while the ITD was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations.

390. During the Relevant Period, Defendants manipulated U.S.-based third-party "reference" exchanges and thus caused artificial prices on the BitMEX platform because, as alleged above, some of these third-party exchanges were relatively thinly traded exchanges on which relatively small market orders would cause relatively large price movements. Defendants in fact traded sufficient volumes of bitcoin and ether on these exchanges to cause price movements; and the prices of bitcoin and ether on BitMEX for bitcoin and ether derivative products was directly tied to the prices on these third-party exchanges.

391. During the Relevant Period, Defendants specifically intended to cause artificial prices for bitcoin and ether derivative products on the BitMEX platform in order to liquidate their customers, including Plaintiff. Defendants thus acted with the purpose and conscious objective of causing and affecting prices that did not reflect the legitimate forces of supply and demand.

392. Defendants possessed the motive and opportunity to cause these artificial prices because they would benefit from them, profiting from both disadvantageous trades for BitMEX customers and from liquidations of customer trading positions resulting from these price movements, and because Defendants possessed sufficient amounts of bitcoin (over 37,300 bitcoins) and ether to cause such price movements.

393. Strong circumstantial evidence of Defendants' conscious misbehavior exists in that, among other such evidence, BitMEX has admitted to trading against its customers for financial advantage, and large trades on the U.S.-based third-party reference exchanges, in volumes of bitcoin and ether that the overwhelming majority of traders did not use to trade, frequently caused BitMEX immediately to benefit from the resulting price movements.

394. Defendants manipulated prices during the Relevant Period from Defendants' offices in San Francisco, California; New York, New York and Milwaukee, Wisconsin, and

transmitted wire signals from those locations to the computer servers of U.S.-based third-party "reference" exchanges.

395.    During the Relevant Period, in which Defendants persistently manipulated prices of their bitcoin and ether derivatives, Plaintiff transacted in these derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trades, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages alleged herein.

396.    During the Relevant Period, Plaintiff thus entered into Perpetual Swaps through BitMEX, and suffered actual damages from such swaps as a result of, in connection with the swaps, Defendants' manipulation of the price of derivatives of bitcoin and ether offered on BitMEX, in violation of the CEA.

397.    As the result of Defendants' wrongful conduct alleged hereinabove, Defendants took the Plaintiff's property amounting to 1.81027681 bitcoins from Plaintiff's possession by way of creating artificial prices for bitcoin and ether Perpetual Swaps and wrongfully liquidating Plaintiff's margined position.

398.    Specifically, automated software tools built by Defendants and operated by Defendants' ITD, using Plaintiff's highly sensitive and confidential information, continuously manipulated cryptoderivative markets traded by Plaintiff on BitMEX platform, as well as price-determining spot markets on reference exchanges, on a 24 hour a day, 7 days a week basis, including the specific dates and times when Plaintiff suffered his bitcoin losses, and namely July 11, 2019.   Operation of these automated tools by Defendants' ITD deliberately caused automatic liquidations of Plaintiff's respective swap positions on BitMEX platform and confiscation of Plaintiff's respective collateral from his BitMEX account on July 11, 2019, resulting in a cumulative loss of 1.81027681 bitcoins by Plaintiff.

399.    The documentary evidence of the operation of the aforesaid automated software tools, used by Defendants' ITD on July 11, 2019 to deliberately liquidate Plaintiff's positions, is in sole and exclusive possession, custody and control of Defendants and Plaintiff have no realistic way of obtaining this evidence without the benefit of discovery.   Plaintiff will amend

this complaint once he obtains such documentary evidence through the Court's discovery process.

400. Defendants took extraordinary measures to conceal the wrongdoing perpetrated by their ITD from Plaintiff, other traders and regulators. For example, Defendants used anonymous "burner" (e.g. @gmail.com) email addresses, as opposed to "official" BitMEX email addresses (e.g. @bitmex.com), to open trading accounts for their ITD with BitMEX exchange, to cover up the tracks of wrongdoing so the trading histories and illegal manipulation profits cannot be traced back to BitMEX. The "burner" accounts were periodically recycled and corresponding trading records deleted. Therefore, Plaintiff, through exercise of reasonable diligence, could not have obtained documentary evidence of operation of Defendants' ITD automated market manipulation tools on July 11, 2019.

401. On July 11, 2019, Defendants, using the automated market manipulation tools continuously executed by the ITD, took the above-mentioned property, including Plaintiff's valuable bitcoin holdings of 1.81027681 bitcoins, deposited in respective Plaintiff's BitMEX trading accounts from Plaintiff's possession and converted the same to their own use. As BitMEX enterprise principals, Defendants HDR, Hayes and Reed are liable for the unlawful conduct of their agents, operators of the BitMEX ITD Gregory Dwyer, Stuart Elkington and Nick Andrianov, who acted, during Relevant Period, within the scope of their agency and employment, when they utilized ITD automated market manipulation tools on July 11, 2019, to artificially liquidate Plaintiff's trading positions on BitMEX.

402. Plaintiff sustained and is entitled to actual damages pursuant to 7 U.S.C. § 25(a) for the violations of the CEA alleged herein, in the amount to be proved at trial.

**COUNT XVIII**
**Principal Agent Liability Under CEA**
**(Against All Defendants)**

403. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

404. The CEA provides in relevant part that the "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

1  trust within the scope of his employment or office shall be deemed the act, omission, or failure of

2  such individual, association, partnership, corporation, or trust, as well as of such official, agent, or

3  other person." 7 U.S.C. § 2(a)(1)(B).

4  405.   As BitMEX enterprise principals, Defendants HDR, Hayes and Reed are liable for

5  the unlawful conduct of their agents, operators of the BitMEX ITD Dwyer, Elkington and

6  Andrianov, who acted, during Relevant Period, within the scope of their agency and employment

7  with Defendants HDR, Hayes and Reed, when they utilized ITD automated market manipulation

8  tools on July 11, 2019, to artificially liquidate Plaintiff's trading positions on BitMEX.

9  406.   In addition, as BitMEX enterprise principals, Defendants HDR, Hayes and Reed

10  are liable for the unlawful conduct of their agents and employees, who acted, during Relevant

11  Period, within the scope of their agency and employment with Defendants HDR, Hayes and Reed,

12  when they assisted with transmitting fraudulent solicitations to Plaintiff as alleged herein.

13  407.   Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §

14  2(a)(1)(B), for the fraudulent and manipulative acts of their agents, representatives, and/or other

15  persons acting for them in the scope of their employment.

16  408.   Plaintiff sustained and is entitled to actual damages pursuant to 7 U.S.C. § 25(a)

17  for the violations of the CEA alleged herein, in the amount to be proved at trial.

18  
## COUNT XIX
**Aiding and Abetting Manipulation Of Bitcoin Swaps And Cash Bitcoin In Violation Of 7**
**U.S.C. § 25(a)(1)**
**(Against All Defendants)**

21  409.   Plaintiff repeats and re-alleges the allegations contained in every preceding

22  paragraph as if fully set forth herein.

23  410.   Defendants, and each of them, knowingly aided, abetted, counseled, induced

24  and/or procured the violations of the CEA by Gregory Dwyer, Stuart Elkington and Nick

25  Andrianov, the notorious market manipulator Ben Aabtc and unknown third persons as alleged

26  herein.  In addition, Defendant ABS knowingly aided, abetted, counseled, induced and/or

27  procured the violations of the CEA by Defendants HDR, Hayes and Reed.  Each Defendant did so

28  with knowledge of other Defendants', Ben Aabtc's and unknown third persons' manipulation of

cryptocurrency prices through manipulative trades, and substantially and willfully intended to assist these manipulations to cause artificial prices, during the Relevant Period, in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a) and 25(a)(1).

411. For example, Defendant HDR knowingly aided and abetted Gregory Dwyer, Stuart Elkington and Nick Andrianov, the notorious market manipulator Ben Aabtc and unknown third persons in violation of the CEA by enabling the price manipulators to open unlimited number of anonymous trading accounts on HDR exchange and thereby hindering detection of said manipulation. Each of the Defendants HDR, Hayes and Reed was responsible for implementing this policy on the BitMEX exchange. Moreover, Defendant HDR knowingly aided and abetted Gregory Dwyer, Stuart Elkington and Nick Andrianov, the notorious market manipulator Ben Aabtc and unknown third persons in violation of the CEA by providing high leverage, by deliberately designing BitMEX indexes based on price data for cryptocurrencies from just three U.S.-based exchanges - BitStamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX and by using deliberate server freezes and fraudulent "system overloads" events to accept some trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations to benefit Defendants. Moreover, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Defendants HDR, Hayes and Reed by furnishing to said Defendants software tools designed to cause deliberate server freezes alleged hereinabove using services of at least three Site Reliability Engineers: Jerry Aldrich, Scott H. and Armando Cerna, who created those tools and who all reside in and operate from this District.

412. For example, Defendants knew that Ben Aabtc was a notorious market manipulator, who misappropriated bitcoins from Plaintiff by way of market manipulation as alleged herein. Defendants aided the market manipulator Ben Aabtc in misappropriating Plaintiff's property by, without limitation, providing him with extremely high trading leverage (up to 100x), using .BXBT index price for liquid swap contracts calculated based on prices of two or three illiquid spot exchanges to enhance the ability of the manipulator to cause large market price swings, enabling the manipulator to avoid detection by providing him with the ability to open

unlimited number of anonymous document check-free trading accounts without any KYC and AML compliance checks and without any trading and withdrawal limits, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations and by deleting evidence of manipulator's identity and manipulator's trading records under the pretense of "right to be forgotten," as well as by failing to comply with specific CFTC regulations enumerated in paragraphs above. The alleged intentional actions of Defendants resulted at least in the alleged loss of 1.81027681 bitcoins by Plaintiff on or about July 11, 2019.

413. As a proximate result of the Defendants' actions as alleged herein, Plaintiff sustained concrete monetary cryptocurrency Domestic Injury in the amount to be proven at trial.

414. Therefore, Defendants, and each of them, are liable, jointly and severally, to Plaintiff pursuant to 7 U.S.C. § 25(a), in the amount to be proven at trial.

## COUNT XX
### Restitution Under Quasi-Contract
### (Against All Defendants)

415. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

416. As a result of the unlawful actions of Defendants set forth hereinabove, Defendants, and each of them, have received a financial benefit at the expense of Plaintiff.

417. Defendants, and each of them, had knowledge of the alleged benefit.

418. Defendants, and each of them, voluntarily accepted and retained the benefit obtained.

419. The circumstances render Defendants' retention of the benefit inequitable unless Defendants, and each of them, pay to Plaintiff the value of the benefit.

420. Defendants, and each of them, have been unjustly enriched at the expense of Plaintiff.

421. Plaintiff is entitled to damages as a result of Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants, and each of them, from Plaintiff.

422.    Plaintiff is entitled to restitution from Defendants, under California quasi-contract theory, as a result of Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Defendants, and each of them, from Plaintiff. *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015), wherein the Ninth Circuit stated that "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana*, 783 F.3d at 762 (citations omitted).

423.    As a result of the actions of Defendants, and each of them, set forth hereinabove, Defendants, and each of them, became unjustly enriched, and as a result thereof, Plaintiff is entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of the Plaintiff factually (directly) and legally (proximately) caused by Defendants', and each of them, unlawful conduct.

## COUNT XXI

### (Violation of Cal. Pen. Code § 496 — Against All Defendants)

424.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

425.    Cal. Pen. Code § 496(a) provides "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." Cal. Pen. Code § 496(c) provides that "Any person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

426.    Defendants, and each of them, violated Cal. Pen. Code § 496(a) by receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding property stolen from the rightful owner – Plaintiff by the ITD, which is set up as a corporate entity, Shine Effort

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

Ltd., separate and distinct from Defendants HDR and ABS, in the form of 1.81027681 bitcoins, knowing the property was stolen or obtained in a manner constituting theft.

427. Alternatively, Defendants, and each of them, violated Cal. Pen. Code § 496(a) by receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding property stolen from the rightful owner – Plaintiff by infamous market manipulator Ben Aabtc as well as other notorious market manipulators, who were encouraged by Defendants to trade on BitMEX platform in violation of CEA and CFTC regulations and were actively aided and abetted by Defendants, in the form of 1.81027681 bitcoins, knowing the property was stolen or obtained in a manner constituting theft.

428. Defendants and each of them knew that the property, in the form of 1.81027681 bitcoins, was stolen or had been obtained in a manner constituting theft from Plaintiff.

429. As a result of Defendants' conduct, Plaintiff has been damaged in the amount of 1.81027681 bitcoins, which Plaintiff demands to be returned to him in kind, as monetary damages would be manifestly unjust due to bitcoin appreciation.

430. The conduct of Defendants, an each of them, was a substantial factor in causing Plaintiff's damages.

431. In doing the wrongful acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

432. Pursuant to Section 496(c), Plaintiff seeks three times the amount of actual damages sustained, costs of suit, and reasonable attorney's fees.

## **PRAYER**

By reason of the foregoing, Plaintiff Anatoly Sorokin respectfully requests that this Court:

(a) enter a judgment that Defendants, and each of them, have used deceptive or manipulative device in connection with swap contracts, in violation of 7 U.S.C. § 9(1);

(b) enter a judgment that Defendants, and each of them, have manipulated prices of swap contracts in violation of 7 U.S.C. §§ 9(3) and 13(a)(2);

(c) enter a judgment that Defendants, and each of them, have aided and abetted

manipulation of prices of swap contracts, by the other Defendants and third persons;

(d)     enter a judgment that Defendants, and each of them, have perpetrated deceit upon Plaintiff in violation of Cal. Civ. Code §§ 1709 and 1710(1) and (3) by fraudulently soliciting Plaintiff to make bitcoin deposits, pay trading commissions and engage in trading on BitMEX;

(e)     enter a judgment that Defendants, and each of them, have perpetrated deceit by negligent misrepresentation upon Plaintiff in violation of Cal. Civ. Code §§ 1709 and 1710(2);

(f)     enter a judgment that Defendants, and each of them, have engaged in unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.;

(g)     enter a judgment that Defendants, and each of them, have engaged in false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq.;

(h)     enter a judgment that Defendants, and each of them, violated Cal. Civ. Code § 1770(a), and preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of Cal. Civ. Code § 1770(a);

(i)     enter a judgment that the Service Agreement is null and void as having been procured by fraud and deceit;

(j)     enter a judgment that the Service Agreement is null and void as having been procured by deceit by negligent misrepresentation;

(k)     enter a judgment that Defendants, and each of them, because unjustly enriched at the expense of Plaintiff;

(l)     enter judgment that Defendants, and each of them, acted with malice, fraud and oppression and award punitive damages against Defendants in the amount of $50,000,000;

(m)     award compensatory damages to Plaintiff Sorokin and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial;

(n)     award to Plaintiff and against all Defendants, and each of them, jointly and severally, damages associated with the loss of use of Plaintiff's bitcoins, in the amount of at least 0.043392 bitcoins, and bitcoin network fees damages of at least 0.004 bitcoins, be paid in kind, or

such other amounts to be determined by the Court, to be paid in kind, as monetary damages

would be manifestly unjust due to bitcoin appreciation;

(o)     award to Plaintiff and against all Defendants, and each of them, jointly and

severally, damages associated with amounts paid by Plaintiff as swap contract purchase "costs" to

Defendants, in the amount of at least 1.81027681 bitcoins, or such other amounts to be

determined by the Court, to be paid in kind;

(p)     award to Plaintiff and against all Defendants, and each of them, jointly and

severally, damages associated with trading commissions wrongfully collected by Defendants

from Plaintiff, in the amount of at least 0.4 bitcoins, to be paid in kind, or such other amounts to

be determined by the Court, to be paid in kind;

(q)     pursuant to Cal. Pen. Code § 496(c), award Plaintiff three times the amount of

actual damages sustained, in the amount of at least 6.76 bitcoins, to be paid in kind, as monetary

damages would be manifestly unjust due to bitcoin appreciation;

Dated:  October 27, 2021                          Respectfully submitted,

By: _/s/ Pavel I. Pogodin_____
          Pavel I. Pogodin, Esq.

CONSENSUS LAW
Attorneys for Plaintiff Anatoly Sorokin

# DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff Sorokin demands trial by jury of all issues triable to a jury.

Dated:  October 27, 2021

Respectfully submitted,

By: /s/ Pavel I. Pogodin
        Pavel I. Pogodin

CONSENSUS LAW
Pavel I. Pogodin, Ph.D., Esq.
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io
Attorneys for Plaintiff Anatoly Sorokin

Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io


Sanjay Prasad, Esq. (SBN 191230)
APPLETON LUFF
221 Main Street, #496
Los Altos, CA 94023
United States of America
Telephone: (650) 918-7647
Email: prasad@appletonluff.com


Attorneys for Plaintiff
Anatoly Sorokin

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Anatoly Sorokin, | Case No. 3:21-CV-03576-WHO |
| Plaintiff, | **DECLARATION OF PAVEL POGODIN** |
| v. | |
| HDR Global Trading Limited (d/b/a BitMEX), ABS Global Trading Limited, Arthur Hayes and Samuel Reed, | |
| Defendants | |

I, Pavel I. Pogodin, state and declare as follows:

1. I am an attorney of record in this action for Plaintiff Anatoly Sorokin. I am a member in good standing of the Bar of the State of California, and I am admitted to practice before this Court. I have personal knowledge of the matters set forth in this declaration, except for the matters stated on information and belief, which I believe to be true, and if called upon to do so, I would willingly and competently testify as to those matters.

2. The Complaint in this action is being filed in the proper place for trial under Civil Code Section 1780(d) in that County of San Francisco is a county in which Defendant(s) reside, have principal place of business and/or are doing business.

3. On information and belief, according to a sworn Declaration of Defendant Hayes dated February 27, 2020, Defendant "ABS Global Trading Limited, … provides software development, software engineering, and digital security services to HDR Global Trading Limited… including by developing the front-end interface of the BitMEX platform." The front-end interface of the BitMEX platform includes commercial website www.bitmex.com, which was used to provide the Service Agreement containing the fraudulent Warranty and Representation as well as other fraudulent representations and false advertisements to Plaintiff Anatoly Sorokin.

4. On information and belief, Defendant ABS Global Trading Limited, responsible, within the BitMEX enterprise, for the commercial website www.bitmex.com, was and continues to be located in San Francisco, California. Therefore, the false and fraudulent Warranty and Representation, as well as other fraudulent representations and false advertisements, provided to Plaintiff by Defendants through the commercial website www.bitmex.com, emanated from Defendant's ABS' offices in County of San Francisco.

5. On information and belief, an April 27, 2017 Service Agreement between HDR and ABS rendered Defendant ABS' staff responsible for BitMEX's business development, marketing, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco. Marketing generally includes advertising. Therefore, the false and fraudulent representations regarding available

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

1  liquidity on the BitMEX platform as well as other false representations and

2  advertisements were perpetuated by Defendant ABS' staff and emanated from Defendant

3  ABS' offices in County of San Francisco.

4  6.     On information and belief, Defendant ABS Global Trading Limited, responsible, within

5       the BitMEX enterprise, for the commercial website www.bitmex.com, was and continues

6       to be located in San Francisco, California.  Therefore, the false and fraudulent

7       representations regarding available liquidity on BitMEX platform made to Plaintiff

8       Anatoly Sorokin by Defendants through the commercial website www.bitmex.com,

9       emanated from Defendant's ABS' offices in San Francisco, California.

10 7.     Accordingly, substantial portion of Defendants' fraud, false advertising and other

11      wrongful conduct alleged in the Complaint emanated from Defendant's ABS offices

12      located in the County of San Francisco.

13 8.     On or about September 26, 2021, I executed the following command from a terminal of

14      my personal Mac computer located in Puerto Rico: $ping bitmex.com.

15 9.     In response to the execution of the $ping bitmex.com command, I received substantially

16      the following result:

```
[pavelpogodin@PAVELs-Mac-mini 20200207 % ping bitmex.com
PING bitmex.com (65.8.246.22): 56 data bytes
64 bytes from 65.8.246.22: icmp_seq=0 ttl=240 time=41.169 ms
64 bytes from 65.8.246.22: icmp_seq=1 ttl=240 time=40.769 ms
64 bytes from 65.8.246.22: icmp_seq=2 ttl=240 time=36.879 ms
64 bytes from 65.8.246.22: icmp_seq=3 ttl=240 time=37.967 ms
64 bytes from 65.8.246.22: icmp_seq=4 ttl=240 time=45.093 ms
64 bytes from 65.8.246.22: icmp_seq=5 ttl=240 time=42.032 ms
64 bytes from 65.8.246.22: icmp_seq=6 ttl=240 time=37.156 ms
64 bytes from 65.8.246.22: icmp_seq=7 ttl=240 time=45.037 ms
64 bytes from 65.8.246.22: icmp_seq=8 ttl=240 time=44.250 ms
64 bytes from 65.8.246.22: icmp_seq=9 ttl=240 time=38.686 ms
^C
--- bitmex.com ping statistics ---
10 packets transmitted, 10 packets received, 0.0% packet loss
round-trip min/avg/max/stddev = 36.879/40.904/45.093/3.016 ms
pavelpogodin@PAVELs-Mac-mini 20200207 %
```

10. I used Internet service https://whatismyipaddress.com/ to determine the location of the IP address 65.8.246.22 as follows:



11. The server location for IP address 65.8.246.22 was in Lake Worth, Florida.

12. To the extent the attached complaint borrows information from other court actions, I have performed inquiry reasonable under the circumstances, pursuant to Fed. R. Civ. P. 11(b), as to such information.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 27, 2021, in Carolina, Puerto Rico.

By: /s/ Pavel I. Pogodin
Pavel I. Pogodin