1   Stephen D. Hibbard (State Bar No. 177865)        Douglas K. Yatter (State Bar No. 236089)
    sdhibbard@jonesday.com                           douglas.yatter@lw.com
2   Matthew J. Silveira (State Bar No. 264250)       LATHAM & WATKINS LLP
    msilveira@jonesday.com                           1271 Avenue of the Americas
3   Eric Tung (State Bar. No. 275063)                New York, NY 10020
    etung@jonesday.com                               Phone: (212) 906-1200
4   Dennis F. Murphy, Jr. (State Bar No. 301008)
    dennismurphy@jonesday.com                        Matthew Rawlinson (State Bar No. 231890)
5   JONES DAY                                        matt.rawlinson@lw.com
    555 California Street, 26th Floor                 LATHAM & WATKINS LLP
6   San Francisco, CA  94104                         140 Scott Drive
    Telephone:   +1.415.626.3939                     Menlo Park, CA
7   Facsimile:   +1.415.875.5700                     Phone: (650) 328-4600

8   Attorneys for Defendants                         Attorneys for Defendant
    HDR GLOBAL TRADING LIMITED and ABS               SAMUEL REED
9   GLOBAL TRADING LIMITED

10  Peter I. Altman (State Bar No. 285292)
    paltman@akingump.com
11  Marshall L. Baker (State Bar No. 300987)
    mbaker@akingump.com
12  Jessica H. Ro (State Bar No. 329737)
    jro@akingump.com
13  AKIN GUMP STRAUSS HAUER & FELD LLP
    1999 Avenue of the Stars, Suite 600
14  Los Angeles, CA  90067-6022
    Phone: (310) 229-1000
15
    Attorneys for Defendant
16  ARTHUR HAYES

17              **UNITED STATES DISTRICT COURT**

18             **NORTHERN DISTRICT OF CALIFORNIA**

19                **SAN FRANCISCO DIVISION**

20  ANATOLY SOROKIN,                          Case No. 3:21-cv-03576-WHO

21              Plaintiff,                     **DECLARATION OF STEPHEN D.
                                               HIBBARD IN SUPPORT OF
22     v.                                      DEFENDANTS' REQUEST FOR
                                               JUDICIAL NOTICE**
23  HDR GLOBAL TRADING LIMITED (d/b/a
    BitMEX); ABS GLOBAL TRADING               Date:        March 2, 2022
24  LIMITED; ARTHUR HAYES; and                Time:        2:00 p.m.
    SAMUEL REED,                              Judge:       Hon. William H. Orrick
25                                            Courtroom:   2
                Defendants.
26                                            Complaint Filed:  May 12, 2021
                                              SAC Filed:        November 11, 2021
27

28

I, Stephen D. Hibbard, declare as follows:

1.    I am a member in good standing of the State Bar of California and a partner of the law firm Jones Day, attorneys of record for defendants HDR Global Trading Limited and ABS Global Trading Limited (together, "Defendants") in this matter.  I submit this declaration in support of Defendants' Request for Judicial Notice.  I believe the facts stated herein to be true based upon my own personal knowledge or upon my review of the records and files maintained in my firm's files.  I could and would testify competently thereto if called and sworn as a witness.

2.    Attached hereto as Exhibit A is a true and correct copy of the BitMEX Terms of Service, as captured by the Internet Archive's Wayback Machine on June 28, 2019.  As of December 17, 2021, these Terms of Service were available at https://web.archive.org/web/20190628022645/https://www.bitmex.com/app/terms, as was an identical version captured on April 25, 2019 (available at https://web.archive.org/web/20190425165700/https://www.bitmex.com/app/terms).

3.    In May 2020, counsel for Plaintiff filed the lawsuit entitled *Kanyshev v. HDR Global Trading Limited*, No. CGC-20-584483, in the Superior Court of California in the County of San Francisco.  Attached hereto as Exhibit B is a true and correct copy of the August 27, 2021 court order sustaining the *Kanyshev* defendants' demurrer to the third amended complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of December, 2021 at San Francisco, California.

_/s/ Stephen D. Hibbard_____
Stephen D. Hibbard

# EXHIBIT A

📢 **ATTENTION - IMPORTANT NOTICE**

⬍ All • XBT Trade (/web/20190628022645/https://www.bitmex.com/app/trade/XBTUSD) • Funding: **01:29:16** @ 0.3159% • Time: **7:30:44 PM** ⌄

Contracts (/web/20190628022645/https://www.bitmex.com/app/seriesGuide/XBT) •
References (/web/20190628022645/https://www.bitmex.com/app/tradingOverview) •
Register (/web/20190628022645/https://www.bitmex.com/register)
Log In (/web/20190628022645/https://www.bitmex.com/login)

# Terms of Service

*These terms were prepared in the English language and the English language version shall prevail in the event of any conflict, discrepancy or ambiguity between translations.*

- 1. Access Conditions
- 2. Fees
- 3. Intellectual Property Rights
- 4. Privacy Notice
- 5. Third Party Websites
- 6. Warranties and Representations
- 7. Accuracy and Availability of Services
- 8. Indemnification
- 9. Limitation of Liability
- 10. Calculations
- 11. Termination and Remedies for Breach of these Terms by You
- 12. Confidentiality
- 13. Absence of Waiver
- 14. Force Majeure
- 15. Survival
- 16. Governing Law
- 17. Dispute Resolution

BitMEX (website: https://www.BitMEX.com (https://web.archive.org/web/20190628022645/https://www.bitmex.com/)) is a Bitcoin-based trading platform that is wholly owned by HDR Global Trading Limited. HDR Global Trading Limited (hereinafter referred to as "**HDR**") was incorporated under the International Business Companies Act of 1994 of the Republic of Seychelles with a company number of 148707.

These terms of services, together with any other addenda, terms and conditions or documents expressly incorporated herein constitute the entire agreement between the parties (together, the "**Terms**"). In the event of any inconsistency between these terms of services and any of the other addenda, terms and documents, the provisions of these terms of services shall prevail to the extent of such inconsistency. All other information provided on the Trading Platform or oral/written statements made are excluded from these Terms and do not constitute a legal agreement between the parties. Use of the Trading Platform and the Services is governed by these Terms.

By accessing, viewing or downloading information from the Trading Platform and using the Services provided by the HDR Group, you acknowledge that you have read and considered, and you understand and unconditionally agree to be bound, by these Terms. HDR may, at any time, without notice, amend the Terms. You agree to continue to be bound by any such amended Terms and that HDR has no obligation to notify you of such amendments. You acknowledge that it is your responsibility to check these Terms periodically for changes and that your continued use of the Trading Platform and Services offered by the HDR Group following the posting of any changes to the Terms indicates your acceptance of any such changes.

The Trading Platform and the copyright in all text, graphics, images, software and any other materials on the Trading Platform are owned by HDR, including all trademarks and other Intellectual Property Rights in respect of materials and Services on the Trading Platform. Materials on the Trading Platform may only be used for personal use and non-commercial purposes.

You may display on a computer screen or print extracts from the Trading Platform for the above-stated purposes only provided that you retain any copyright and other proprietary notices or any of HDR's trademarks or logos, as shown on the initial printout or download without alteration, addition or deletion. Except as expressly stated herein, you may not without HDR's prior written permission alter, modify, reproduce, distribute or use in any other commercial context any materials from the Trading Platform.

You acknowledge that 'BitMEX' and the BitMEX logo are trademarks of HDR. You may reproduce such trademarks without alteration on material downloaded from the Trading Platform to the extent authorised above, but you may not otherwise use, copy, adapt or erase them.

You shall not in any circumstance obtain any rights over or in respect of the Trading Platform (other than rights to use the Trading Platform pursuant to these Terms and any other terms and conditions governing a particular service or section of the Trading Platform) or hold yourself out as having any such rights over or in respect of the Trading Platform.

You are not allowed to access or use the Services or the Trading Platform if you are located, incorporated or otherwise established in, or a citizen or resident of: (i) the United States of America, the province of Québec in Canada, Cuba, Crimea and Sevastopol, Iran, Syria, North Korea or Sudan; (ii) any state, country or other jurisdiction that is embargoed by the United States of America; (iii) a jurisdiction where it would be illegal according to Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services or the Trading Platform; or (iv) where the publication or availability of the Services or the Trading Platform is prohibited or contrary to local law or regulation, or could subject any member of the HDR Group to any local registration or licensing requirements (together, the **"Restricted Jurisdictions"**). HDR may, in its sole discretion, implement controls to restrict access to the Services or the Trading Platform in any of the Restricted Jurisdictions. If HDR determines that you are accessing the Services or the Trading Platform from any Restricted Jurisdiction, or have given false representations as to your location of incorporation, establishment, citizenship or place of residence, HDR reserves the right to close any of your accounts immediately and liquidate any open positions.

*Definitions*

In these Terms:

**"APIs"** means Application Programming Interfaces;

**"Applicable Law"** means all civil and common laws, statutes, subordinate legislation, treaties, regulations, directives, decisions, by-laws, ordinances, codes, orders, notices, demands, decrees, injunctions, resolutions, rules and judgments of any government, quasi-government, statutory, administrative or regulatory body, court, agency or association by which any member of the HDR Group or you are bound in any jurisdiction applicable to the receipt or performance of the Services.

**"BitMEX Mobile Application"** means the mobile trading application developed, published and distributed by the HDR Group (as updated from time to time).

**"BitMEX Testnet Platform"** means the Testnet coin-based trading platform operated by HDR which is largely based upon the Trading Platform and is accessible at the following webpage: https://testnet.bitmex.com/ (https://web.archive.org/web/20190628022645/https://testnet.bitmex.com/).

**"HDR Group"** means HDR and its subsidiaries from time to time.

**"Intellectual Property Rights"** means any registered or unregistered design rights, patents, copyright, database rights, data protection rights, trade marks, service marks, logos, trade names, rights in domain names, rights in undisclosed or confidential information (such as know-how, trade secrets and inventions (whether or not patentable)) moral rights and any other similar intellectual or industrial property rights (whether registered or not) and applications for such rights as may exist anywhere in the world.

**"Member"** means any current registered user of the Trading Platform.

**"Services"** means websites, applications and any services provided by any member of the HDR Group, including:

- a) the Trading Platform and the BitMEX Testnet Platform;
- b) any downloadable material from HDR's websites;
- c) any information, content or other material published or provided by any member of the HDR Group in any way with respect to any subject matter (including any research materials, market data or blogs); and
- d) any features, content or services from any person that may be ancillary to any of the above.

**"Trading Platform"** means the Bitcoin-based trading platform on https://www.bitmex.com (https://web.archive.org/web/20190628022645/https://www.bitmex.com/) and subdomains, mobile applications (including the BitMEX Mobile Application), APIs and other media owned by the HDR Group relating to that trading platform.

# 1. Access Conditions

**1.1**: When accessing and using the Service, you must:

- a) not carry out any activity that: (i) involves proceeds from any illegal or unlawful activity (including activities relating to cryptocurrency tumblers, darknet markets, money laundering or terrorism financing); (ii) publishes, distributes or disseminates any illegal or unlawful material or information; or (iii) otherwise violates, or could violate, any Applicable Law;

- b) not attempt to undermine the security or integrity of the HDR Group's computing systems or networks or, where the Services are hosted by a third party, that third party's computing systems and networks;

- c) not use, or misuse, the Services in any way which may impair the functionality of the Services or Trading Platform, or other systems used to deliver the Services or impair the ability of any other user to use the Services or Trading Platform;

- d) not attempt to gain unauthorised access to the computer system on which the Trading Platform is hosted or to any materials other than those to which you have been given express permission to access;

- e) not transmit or input into the Trading Platform any files that may damage any other person's computing devices or software; content that may be offensive; or material or data in violation of any law (including data or other material protected by copyright or trade secrets which you do not have the right to use);

- f) not attempt to modify, copy, adapt, reproduce, disassemble, decompile or reverse-engineer any computer programs used to deliver the Services or to operate the Trading Platform except as is strictly necessary to use either of them for normal operation;

- g) ensure that all usernames and passwords required to access the Trading Platform are kept secure and confidential; and

h) immediately notify HDR of any unauthorised use of your password(s) or any other breach of security and HDR will reset your password(s) upon such notification.

**1.2**: Use of the Services may be subject to limitations, including but not limited to transaction volumes and the number of calls permitted to be made against the relevant application programming interface. Any such limitations will be advised.

**1.3**: By accessing the Trading Platform, using the Services or registering as a Member, you represent, warrant and undertake that:

a) you have accepted the Terms;

b) you are at least 18 years of age and have the capacity to accept the Terms;

c) you are the legal owner (or an appropriately authorised representative of the legal owner) of the funds you add to your account with HDR and that the same funds derive from a legitimate source;

d) your use of the Services does not constitute a breach of Applicable Law;

e) you are aware of the risks in using the Services provided by the HDR Group and have the necessary experience and knowledge to understand the risks involved in relation to each Service provided by the HDR Group. These risks include the high volatility risk of Bitcoin itself, and that you may lose all of the funds in your trading account if the market moves against you;

f) you acknowledge and agree that the Services should only be used by you if you:

- i) have knowledge and experience in highly volatile markets;
- ii) are trading with Bitcoin you can afford to lose; and
- iii) have a high risk tolerance;

g) you will not be involved or initiate any form of market manipulation, including spoofing orders or otherwise;

h) the information or documents you provide as part of any ID verification process are correct, genuine and up to date;

i) any Bitcoin withdrawal address you provide is your own and that you have full control over this address;

j) you are not allowed to access or use the Services if you are located in, incorporated or otherwise established in, or a citizen or resident of any Restricted Jurisdiction, and that HDR reserves the right to close any of your accounts immediately and liquidate any open positions if you are accessing the Services from any Restricted Jurisdiction or have given false representations as to your location, place of incorporation or establishment, citizenship or place of residence;

k) you have not; (i) violated; (ii) been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; (iii) received any oral or written notice from any government concerning actual or possible violation by you under; or (iv) received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to anti-money laundering laws, counterterrorism financing laws, anti-corruption laws or economic sanctions laws); and

l) neither you nor any of your affiliates is: (i) itself, or owned or controlled by, a sanctioned person; (ii) involved in any transaction, transfer, or conduct, whether or not by using or receiving the Services or the Trading Platform, that is likely to result in you or your affiliates becoming a sanctioned person; or (iii) located in, incorporated or otherwise established in, or a citizen or resident of, a Restricted Jurisdiction.

**1.4**: You can open an initial account by providing your email address and full name.

**1.5**: HDR reserves the right at any time to verify your identity for the purposes of complying with the Seychelles' Anti-Money Laundering Act 2006 or any other Applicable Law.

**1.6**: We impose certain trading limits before you are required to conduct Customer Due Diligence (CDD). You agree to cooperate with us in this process and will provide all documentation/information that we may require to satisfy ourselves of your identity and the purpose of the business relationship.

**1.7**: You agree that any trading or other instructions received or undertaken through your account are deemed to be final and conclusive, and that HDR may act upon such instructions without any liability or responsibility attached to it. In connection with any APIs offered on or through the Trading Platform, you acknowledge and agree that:

a) HDR is permitted to share your data with any third parties that possess your unique API key, and
b) HDR may rely and act upon the instructions (including, but not limited to, instructions relating to order placement or the closing of positions) of any third parties that possess your unique API key, and the HDR Group accepts no responsibility or liability for any loss arising from the foregoing.

**1.8**: We may freeze any account in the event that we suspect or have reason to believe you are engaged in suspicious trading or other activity or have breached any of the above warranties or other provisions of these Terms. This may result in the unwinding of any trades you have entered into. We expressly exclude any losses or profits you would have made as a result of us closing your trade positions early or you not being able to trade on the Trading Platform and you agree to indemnify us completely against any third party action resulting from your conduct or us having to close your positions early. Whilst your account is frozen we will conduct an investigation and may require you to cooperate with our enquiries. During the investigation stage you will not be able to make deposits or withdrawals to your account nor will you be able to trade. At the end of the investigation we may, at our own discretion, decide to close your account for which we are not required to provide you with any reasons for the same.

**1.9**: We reserve the right at our own discretion to close your account at any time.

**1.10**: By using the Services, you accept that HDR reserves the right to liquidate any trades at any time regardless of the profit or loss position.

**1.11**: It is your responsibility entirely to provide us with correct details including your withdrawal address. We accept no liability resulting in you not receiving the Bitcoin withdrawn due to you providing incorrect or out-of-date details. It is also your responsibility to ensure that instructions, orders or transactions sent to HDR are well-formatted, clear and denominated in the correct currency. HDR excludes all liability for any incorrect transactions, including, but not limited to, Litecoin sent to Bitcoin addresses.

**1.12**: It is our responsibility to maintain an orderly market and as such we may at our own discretion halt trading on the Trading Platform due to market disruption or other relevant external events. We exclude all liability for any claimed losses or profits lost as a result of us halting trading.

## 2. Fees

**2.1**: You acknowledge and agree that, by using the Services, fees will apply.

**2.2**: Details of these fees are set forth on this webpage: https://www.bitmex.com/app/fees (/web/20190628022645/https://www.bitmex.com/app/fees).

**2.3**: HDR has the right to revise and update the applicable fees at any time at its sole discretion. Any such revision or updates to the fees will apply prospectively to any Services (including any transactions on the Trading Platform) that take place following the effective time that the fee revision or update is published on the Trading Platform.

## 3. Intellectual Property Rights

**3.1**: All Intellectual Property Rights relating to the Trading Platform, all the material used on the Trading Platform and the Services including, but not limited to, design, structure, layouts, graphical images and underlying source code belong to the HDR Group. All rights are reserved.

**3.2**: You acknowledge that, except as otherwise agreed between the parties in writing, all Intellectual Property Rights of the HDR Group in the Trading Platform and the Services shall remain with the HDR Group.

**3.3**: You are not granted any right to use, and may not use, any of the HDR Group's Intellectual Property Rights other than as set out in these Terms and subject to the following conditions:

- a) you may only view and use the Services and the Trading Platform (or any part of it or its contents) for your own personal use and may not copy, reproduce, republish, upload, repost, modify, transmit, distribute or otherwise use the Services and the Trading Platform (or any part of it or its content) in any way for non-personal, public or commercial use without the prior written consent of HDR. All restrictions relating to use of the Services and the Trading Platform in these Terms shall apply to data available through any APIs;

- b) you may not remove or modify any copyright, trademark or other proprietary notices that have been placed in any part of the Services; and

- c) you may not use any data mining, robots or similar data-gathering or extraction methods.

**3.4**: By submitting your content directly or indirectly to or through the Trading Platform in any way, including, but not limited to, blogs, message boards, forums and APIs (whether or not submitted through a third party), you grant the HDR Group a royalty-free, perpetual, irrevocable, transferable, sublicensable, non-exclusive right and licence to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, communicate to the public, perform and display all of your content (in whole or in part) worldwide and to incorporate it in other works in any form, media, or technology now known or later developed, for the full term of any rights that may exist in such content. The HDR Group shall be the sole owner of any derivative work produced by the HDR Group based on, or in any way connected with, your content, and shall have the right to use such derivative work for any purpose, commercial or otherwise, without any further obligation to you. You also permit any other users of the Trading Platform to access, display, view, store and reproduce such content for personal use. You waive (and to the extent you cannot waive, agree irrevocably not to assert) any and all moral rights to which you may be entitled anywhere in the world in respect of such content. HDR has the right, but not the obligation, to monitor all conduct and content submitted to or through the Trading Platform, and may in its sole discretion: (i) refuse to publish, remove or modify content or disable access to content that it considers breaches these Terms; or (ii) suspend or discontinue your opportunity to submit, post or upload content.

**3.5**: By submitting any content to the Trading Platform you warrant that you are entitled to, and have all necessary Intellectual Property Rights over, that content to submit it on the Trading Platform in accordance with these Terms.

**3.6**: HDR reserves the right to disclose your identity to any third party who claims that any content posted or uploaded by you to the Trading Platform constitutes a violation of their Intellectual Property Rights or of their right to privacy.

## 4. Privacy Notice

**4.1**: For more details about HDR's privacy and data protection practices, please refer to our Privacy Notice available at the following webpage: https://www.bitmex.com/app/privacyPolicy (/web/20190628022645/https://www.bitmex.com/app/privacyPolicy).

## 5. Third Party Websites

**5.1**: HDR links to third party websites that are not affiliated or associated with the HDR Group (although branding, advertisements or links relating to the Trading Platform or any Services may appear on these websites) and HDR may send e-mail messages to you containing advertisements or promotions including links to third parties. The HDR Group makes no representation as to the quality, suitability, functionality or legality of the material on third party websites that are linked to, or to any goods and services available from such websites. The material is only provided for your interest and convenience. The HDR Group does not monitor or investigate such third party websites and the HDR Group accepts no responsibility or liability for any loss arising from the content or accuracy of this material and any opinion expressed in the material should not be taken as an endorsement, recommendation or opinion of any member of the HDR Group.

**5.2**: Under no circumstances are you to create a hyperlink to any of the pages on the Trading Platform, unless HDR provides you with its prior consent to do so. If you do create a link to any of the pages on the Trading Platform, you acknowledge that you are responsible for all direct or indirect consequences of the link, and you indemnify each member of the HDR Group immediately upon demand for all loss, liability, costs or expense arising from or in connection with the link.

## 6. Warranties and Representations

**6.1**: You represent, warrant and undertake that:

- a) you are authorised to access and use the Services and the Trading Platform. In particular, each jurisdiction where you are located in, incorporated or otherwise established in, or of which you are a citizen or resident, allows you to utilise the Services and the Trading Platform;

- b) if you are using the Trading Platform on behalf of or for the benefit of any person or organisation, you must be authorised to do so. The relevant person or organisation will be liable for your actions, including any breach of these Terms; and

- c) your use of the Trading Platform and the Services is at your own risk. You agree that the HDR Group is not liable for any damage or harm arising out of your use of the Trading Platform and Services.

**6.2**: You acknowledge and agree that:

- a) the information provided on the Trading Platform is for general information purposes only and is given in good faith. However, the information is selective and HDR may not verify all information, which may not be complete or accurate for your purposes and should not be relied upon without further enquiry. The information and Services should not be construed as an offer or a recommendation to trade or engage the Services provided by the HDR Group in a particular manner and the information does not take into account the investment objectives or financial situation of any particular person; and

- b) HDR does not warrant that the use of the Trading Platform will be uninterrupted or error-free. Amongst other things, the operation and availability of the systems used for accessing the Trading Platform, including public telephone services, computer networks and the internet, can be unpredictable and may from time to time interfere with or prevent access to the Trading Platform. HDR is not in any way responsible for any such interference that prevents your access or use of the Trading Platform and the Services.

**6.3**: HDR has a trading arm that, amongst other things, transacts in products traded on the Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is organised to be separate and distinct from the business of the Trading Platform. Specifically, no front office personnel are shared between the trading arm and the Trading Platform, the trading arm's staff are physically separated from the Trading Platform's staff while performing trades, and the trading arm does not have access to any order flow, execution, customer or other information of the Trading Platform on terms that are not otherwise available to any other platform user. In addition, unless otherwise set forth in the terms of a specific product of HDR, the trading arm receives access and trading privileges only on the same terms as are available to any other user.

**6.4**: You warrant and represent that you are acquiring the right to access and use the Trading Platform and agreeing to these Terms for the purposes of a business and that, to the maximum extent permitted by law, any statutory consumer guarantees or legislation intended to protect non-business consumers in any jurisdiction does not apply to the supply of the Trading Platform or these Terms.

## 7. Accuracy and Availability of Services

**7.1**: You acknowledge, agree and understand that none of the Services amount to investment advice or any marketing, or promotion or offer of any product or investment to you or any third party. You are solely responsible for any losses, damages or costs resulting from your reliance on any data or information that the HDR Group may provide in connection with your use of the Services. You will make your own independent decision to access or use the Services.

**7.2**: To the maximum extent permitted under Applicable Law, the Services and any product, service or other item provided by or on behalf of the HDR Group are provided on an "as is" and "as available" basis and the HDR Group expressly disclaims, and you waive, any and all other warranties of any kind, whether express or implied, including implied warranties of merchantability, fitness for a particular purpose, title or non-infringement or warranties arising from course of performance, course of dealing or usage in trade. Without limiting the foregoing, the HDR Group does not represent or warrant that the Services are accurate, complete, reliable, current or error-free, or free of viruses or other harmful components.

**7.3**: HDR shall make reasonable efforts to ensure that the Services are available to you. However, access to the Services may be disrupted from time to time due to necessary maintenance, technical issues, network and system overloads or events outside of HDR's control. HDR will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours, but assumes no liability (whether for trading-related losses or otherwise) if the Services or any part thereof are unavailable at any time or for any period.

**7.4**: You acknowledge and agree that:

- a) the HDR Group shall not have any liability, contingent or otherwise, to you or to any third parties, for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services (including the Trading Platform) or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between the HDR Group and you, regardless of cause;

- b) the HDR Group shall not have any liability or be responsible in any way for your use of the internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced. You shall be responsible for any fees incurred in order to connect to the internet for the purpose of using or accessing the Services;

- c) you are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. The HDR Group will not be liable to you in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason.

**7.5**: You must immediately notify HDR in the event that you become aware of any of the Services malfunctioning or a trading error occurring or if you otherwise experience any material malfunction or other connectivity problem that adversely affects your access to or use of any Services.

**7.6**: You acknowledge, agree and understand that if you travel to any Restricted Jurisdiction, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Trading Platform or monitor any existing orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

**7.7**: You acknowledge and agree that there are a series of inherent risks with the use of mobile trading technology such as the BitMEX Mobile Application including, but not limited to, latency in the prices provided. The HDR Group shall not be liable for any and all circumstances in connection with your use of the BitMEX Mobile Application in which you experience a delay in price quotation or an inability to trade caused by network circuit transmission problems or any other problems outside our direct control, which include but are not limited to the strength of the mobile signal, cellular latency, or any other issues that may arise between you and any internet service provider, phone service provider or any other service provider. Furthermore, some of the features available on the Trading Platform may not be available on the BitMEX Mobile Application. Users may also be required to download and install updates to the BitMEX Mobile Application so as to maintain provision of the Services. Your failure to do so might lead to certain parts of the Services (including trading functions) becoming temporarily inaccessible to you until such update has been downloaded and installed.

**7.8**: You acknowledge, agree and understand that certain of the Services (including any software that may be produced, developed or published by the HDR Group from time to time) may be beta versions being tested at the time of release (a "Development Service"). Consequentially, such Development Services may be unstable and may change from time to time. The HDR Group does not warrant that the functionality of Development Services will meet your requirements or that the operation of Development Services will be uninterrupted or error-free. HDR reserves the right, at any time and for any reason, to discontinue, redesign, modify, enhance or change any Services (including the Development Services).

**7.9**: You acknowledge, agree and understand that:

- a) BitMEX Testnet is provided for informational and testing purposes, and not for educational purposes;

- b) whilst BitMEX Testnet uses the same market data and indices as the Trading Platform, there may be discrepancies between the BitMEX Testnet and the Trading Platform; and

- c) any past performance and experience on and with BitMEX Testnet is not a reliable indicator of future returns, performance and experience with the Trading Platform.

## 8. Indemnification

**8.1**: You agree to indemnify and hold harmless each member of the HDR Group and their respective directors, officers, employees, agents, contractors and licensors (together, the **"Associated Parties"**) immediately upon demand from and against any and all claims, demands, lawsuits, actions, proceedings, investigations, liabilities, damages, losses, costs or expenses, including reasonable attorneys' fees, in any way arising out of, in relation to or in connection with, directly or indirectly, your or your authorised representatives':

- a) use of, or conduct in connection with, the Services;

- b) breach of these Terms or any other policy of the HDR Group; or

- c) violation of any Applicable Law or the rights of any other person or entity.

## 9. Limitation of Liability

**9.1**: Nothing in these Terms shall exclude or restrict the HDR Group's or any of the Associated Parties' liability for:

- a) fraud; or

- b) any other matter that cannot be excluded or limited under Applicable Law.

**9.2**: Subject to the foregoing, to the maximum extent permitted by Applicable Law:

- a) in no event shall the HDR Group or any of the Associated Parties be liable for any:
  - i) indirect or consequential loss; or
  - ii) loss of profit, business opportunity, revenue or goodwill, in each case, whether arising from breach of contract, tort (including negligence), breach of statutory duty or otherwise, arising out of or in connection with authorised or unauthorised use of the Services or these Terms, even if an authorised representative of the HDR Group or any of the Associated Parties has been advised of, knew of or should have known of the possibility of such damages; and

- b) the HDR Group's and the Associated Parties' aggregate liability in contract, tort or otherwise (including any liability for any negligent act or omission) howsoever arising out of or in connection with the performance of its obligations under these Terms in respect of any one or more incidents or occurrences shall be limited to the total net amount of Bitcoin received by HDR from you by way of trading fees in connection with your use of the Trading Platform in the six-month period immediately prior to the date of the incident, or the first incident of a series of connected incidents, giving rise to a claim made by you under these Terms.

## 10. Calculations

**10.1**: All calculations performed by the Trading Platform's trading engine and as verified by HDR are final. As noted in Clause 7, the HDR Group does not warrant that the use of the Trading Platform will be uninterrupted or error-free.

## 11. Termination and Remedies for Breach of these Terms by You

**11.1**: The HDR Group reserves the right to seek all remedies available at law and in equity for violations of these Terms, including without limitation, the right to restrict, suspend or terminate your account or deny you access to the Trading Platform without notice; and

- a) The HDR Group shall be entitled to disclose information (including, but not limited to, your user identity and personal details) when cooperating with law enforcement enquiries (whether or not such enquiries are mandatory under Applicable Law) or where permitted under or otherwise compliant with Applicable Law.

## 12. Confidentiality

**12.1**: You undertake not to disclose to any person or persons any Confidential Information that you may acquire in the course of your use of the Trading Platform.

**12.2**: For the purposes of these Terms, **"Confidential Information"** shall mean any written information (including information provided in electronic form) or oral information which is confidential or a trade secret or proprietary and which is clearly identified as confidential at the time of disclosure or would be assumed by a reasonable person to be confidential under the circumstances surrounding the disclosure. Notwithstanding the foregoing, Confidential Information shall not include information which is: (i) already known by you prior to receipt from us; (ii) publicly known or becomes publicly known through no wrongful act of you; (iii) rightfully received from a third party without you having knowledge of a breach of any other relevant confidentiality obligation; or (iv) independently developed by you. The obligations of this clause do not prevent you from disclosing Confidential Information either: (A) to a third party pursuant to a written authorisation from us; or (B) to satisfy a requirement of, or demand by, a competent court of law or other tribunal or governmental, or administrative or regulatory or self-regulatory body or listing authority or any Applicable Law, provided that HDR is notified prior to such disclosure to the extent permitted by Applicable Law.

## 13. Absence of Waiver

**13.1**: Any failure or delay by the HDR Group to enforce any of the Terms or exercise any right under the Terms will not be construed as a waiver to any extent of our rights.

## 14. Force Majeure

**14.1**: Neither party is liable for delay in meeting its obligations due to any cause outside its reasonable control including acts of God, riot, war, malicious acts of damage, fires, electricity supply failures and government authority and edicts.

## 15. Survival

**15.1**: Should any provision of these Terms be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected. If any provision is determined to be unenforceable, you agree to an amendment by HDR of such provision to provide for enforcement of the provisions intent, to the extent permitted by applicable law.

## 16. Governing Law

The Terms and any non-contractual obligations arising out of or in connection with them are governed by and construed in accordance with English law. The International Business Companies Act 1994 is the principal legislation that governs corporates in the Republic of Seychelles.

## 17. Dispute Resolution

Subject to the Applicable Law of your jurisdiction, the courts of England have non-exclusive jurisdiction to settle any dispute arising from or connected with these Terms (including a dispute relating to the existence, validity or termination of these Terms or the consequences of their nullity or any non-contractual obligation arising out of or in connection with these Terms).



BitMEX is a P2P crypto-products trading platform.

BitMEX and the mobile apps issued under BMEX are wholly owned and operated by HDR Global Trading Limited, a Republic of Seychelles incorporated entity or its relevant authorised affiliates.

Cryptocurrency charts by TradingView. (https://web.archive.org/web/20190628022645/https://www.tradingview.com/ideas/cryptocurrency/)

| About | Data | References |
|---|---|---|
| About the Team (/web/20190628022645/https://www.bitmex.com/app/about) | Fees (/web/20190628022645/https://www.bitmex.com/app/fees) | API (/web/20190628022645/https://www.bitmex.com/app/apiOverview) |
| Affiliate Program (/web/20190628022645/https://www.bitmex.com/app/affiliate) | Bitcoin / USD (/web/20190628022645/https://www.bitmex.com/app/trade/XBTUSD) | FAQ (/web/20190628022645/https://www.bitmex.com/app/faq) |
| Careers at BitMEX (/web/20190628022645/https://www.bitmex.com/careers) | Ethereum Futures (/web/20190628022645/https://www.bitmex.com/app/trade/ETH) | Futures Guide (/web/20190628022645/https://www.bitmex.com/app/futuresGuide) |
| Privacy Notice (https://web.archive.org/web/20190628022645/https://www.bitmex.com/app/privacyPolicy) | | Knowledge Base (https://web.archive.org/web/20190628022645/https://bitmex.freshde... |

Security
(/web/20190628022645/https://www.bitmex.com/app/security)

Terms of Service
(https://web.archive.org/web/20190628022645/https://www.bitmex.com/app/terms)

Perpetuals Guide
(/web/20190628022645/https://www.bitmex.com/app/perpetualContra

Trading on BitMEX
(/web/20190628022645/https://www.bitmex.com/app/tradingOverview

## Contact Us

Contact
(/web/20190628022645/https://www.bitmex.com/app/support/contact)

PGP Communication
(/web/20190628022645/https://www.bitmex.com/app/pgp/webChat)

## Social

BitMEX Blog
(https://web.archive.org/web/20190628022645/https://blog.bitmex.com/)

IRC
(https://web.archive.org/web/20190628022645/https://webchat.freenode.net/?channels=bitmex)

Reddit
(https://web.archive.org/web/20190628022645/https://www.reddit.com/r/BitMEX/)

Twitter
(https://web.archive.org/web/20190628022645/https://twitter.com/BitMEXdotcom)

# EXHIBIT B



FILED

San Francisco County Superior Court

AUG 27 2021

CLERK OF THE COURT

BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

ALEKSANDR KANYSHEV, NIKITA
LUZHBIN, and MIGUEL VILLAGRA,

                 Plaintiffs,

      v.

HDR GLOBAL TRADING LIMITED (d/b/a
BitMEX), ABS GLOBAL TRADING
LIMITED, ARTHUR HAYES, AND DOES 1-
10.

                 Defendants.

Case No. CGC-20-584483

ORDER RE DEFENDANTS' DEMURRER
TO PLAINTIFFS' THIRD AMENDED
COMPLAINT

## **INTRODUCTION**

The above-entitled matter came on regularly for hearing on August 24, 2021.[1]  Counsel for the

parties were present.  A tentative ruling was issued by the Court before oral argument.  The appearances

are as stated in the record.  Having reviewed and considered the argument and written submissions of all

---

[1] In connection with the demurrer, Plaintiffs filed a motion for leave to file a sur-reply on August 12,
2021, and a notice of supplemental authority in support of the opposition, filed August 13, 2021. To the
extent Plaintiffs' sur-reply was to respond to a case cited by Defendants on reply and not in the moving
papers, the Court considered Plaintiffs' argument.  The motion is otherwise denied.  Plaintiffs'
supplemental authority was not relevant for purposes of demurrer and was not authorized by the Court.

parties and being fully advised, the Court sustains the demurrer with leave to amend.[2]

## BACKGROUND

Plaintiffs' Third Amended Complaint marks their fourth attempt to assert claims against HDR Global Trading Limited ("HDR"); one of its co-founders and its former CEO, Arthur Hayes; and HDR's U.S. subsidiary, ABS Global Trading Limited (collectively, "Defendants").

Plaintiffs originally filed this lawsuit on May 19, 2020, alleging Defendants engaged in conduct that Plaintiffs claimed constituted market manipulation. Defendants demurred and Plaintiffs mooted that demurrer by filing a First Amended Complaint ("FAC") that was likewise predicated on accusations that Defendants engaged in market manipulation. At base, the FAC claimed that Plaintiffs lost bitcoin from trading cryptocurrency derivatives on BitMEX on three specific dates—June 27, 2019 (Villagra), July 11, 2019 (Luzhbin), and July 15, 2019 (Kanyshev)—because of Defendants' alleged "market manipulation on that day." (FAC, ¶¶ 378–80.) Plaintiffs asserted that Defendants accomplished the purported market manipulation by executing trades of unspecified size on other platforms, which in turn impacted the price of the cryptocurrency derivatives traded by Plaintiffs on BitMEX. (*Id.* at ¶ 341.)

On February 25, 2021, the Court sustained Defendants' demurrer to the FAC. The Court dismissed Plaintiffs' fraud claim because (1) "Plaintiffs' allegations based on 'information and belief' that Plaintiffs sustained losses as a result of Defendants' actions on other (unknown) bitcoin [spot] exchanges on June 27, 2019, July 11, 2019, and July 15, 2019," did not satisfy California's heightened pleading standards," and (2) Plaintiffs' "fraud on the market" theory of reliance has been rejected by the California Supreme Court. (Feb. 25, 2021 Order, 9.) Also, Plaintiffs lacked standing to pursue their UCL claim because Plaintiffs failed to "state facts showing the loss of money or property as a result of the unfair competition" that Plaintiffs alleged. (*Id.* at 11.)

---

[2] Defendants' unopposed requests for judicial notice are granted. (See Defendants' RJN, Exs. A-D; Cal. Evid. Code § 452(d),(h).) The Court takes judicial notice of the existence of the documents, but not the truth of their contents. (See *Kerner v. Superior Ct.* (2012) 206 Cal.App.4th 84, 94 n.3 [taking judicial notice of complaint filed in separate action]; *City & Cty. of San Francisco v. HomeAway.com* Inc. (2018) 21 Cal.App.5th 1116, 1123 n.2 [taking judicial notice of existence of website to show its contents could have been viewed, but not of truth of contents]; see also *Von Saher v. Norton Simon Museum of Art at Pasadena* (9th Cir. 2010) 592 F.3d 954, 960 [taking judicial notice of existence of publications "solely as an indication of what information was in the public realm at the time"]; *Duke v. City Coll. of San Francisco* (2020) 445 F.Supp.3d 216, 224 [taking judicial notice of "the availability of information on" a website].)

1    The Court dismissed Plaintiffs' remaining California common law claims for similar reasons.  The

2    Court held that Plaintiffs failed to establish both "that Defendants' alleged negligence caused Plaintiffs'

3    purported loss" and "the existence of a special relationship between themselves and Defendants that

4    would give rise to a duty of care" to support a negligence claim.  (*Id.* at 12.)  The Court likewise deemed

5    Plaintiffs' conversion claim to be deficient because it was predicated "entirely on the fraud-based market

6    manipulation allegations that Plaintiffs failed to plead with particularity."  (*Id.* at 14.)  And the Court

7    dismissed Plaintiffs' remaining claims—for civil conspiracy, unjust enrichment, constructive trust, and

8    accounting—because Plaintiffs failed to plead prima facie claims supporting those dependent causes of

9    action.  (*Id.* at 14-16.)

10    The Court granted Plaintiffs leave to amend all of their claims except for those predicated on

11    Corporations Code § 29536.  For Plaintiffs' claims predicated on fraud, the Court made clear that

12    Plaintiffs must "plead facts with more specificity and amend the allegation of 'reliance' on a

13    misrepresentation that is not predicated on a 'fraud on the market' theory."  (*Id.* at 9.)  More generally, the

14    Court cautioned that, rather than copying allegations from other lawsuits alleging federal causes of action,

15    Plaintiffs' amended complaint should "allege only the substantive factual allegations which would

16    sufficiently apprise the Defendants of the claims in this case."  (*Id.* at 6.)

17    Plaintiffs filed their Second Amended Complaint on March 15, 2021.  Defendants demurred, but

18    later agreed to allow Plaintiffs to file a Third Amended Complaint ("TAC").  The TAC was filed on May

19    13, 2021.

20    The TAC shifts the focus from market manipulation and alleges new allegations that Defendants

21    fraudulently induced them to trade via misrepresentations in the BitMEX Terms of Service and on its

22    website.  On the basis of those new allegations, Plaintiffs assert 19 causes of action under California law,

23    including causes of action for fraud, negligence, unfair business practices, false advertising, restitution,

24    constructive trust, conversion, and accounting, among others.  (See TAC, ¶¶ 430-659.)

25    Defendants demur to Plaintiffs' Third Amended Complaint as follows:  (1) The Amended

26    Complaint fails to state facts sufficient to constitute a cause of action, including for fraud, negligent

27    misrepresentation, negligence, conversion, aiding and abetting, quasicontract, constructive trust,

28

1   restitution, replevin, and accounting, and under California Penal Code § 496.  (2) Plaintiffs lack standing

2   to assert claims under California's Consumers Legal Remedies Act (Cal. Civ. Code § 1750), California's

3   False Advertising Law (Cal. Bus. & Prof. Code § 17500), and California's Unfair Competition Law (Cal.

4   Bus. & Prof. Code § 17200, et seq.).  (3) The Amended Complaint fails to state facts sufficient to

5   constitute a cause of action under California's Consumers Legal Remedies Act, California's False

6   Advertising Law, and California's Unfair Competition Law.  (Notice of Motion, 2-3.)

7                                **DISCUSSION AND ANALYSIS**

8   **I.      Preliminary Matters**

9        **1.       Sham Pleading**

10          As an initial matter, Defendants argue that Plaintiffs' shift to claims that Plaintiffs suffered losses

11  because Defendants induced Plaintiffs to trade on BitMEX through misrepresentations, rather than the

12  claim that they suffered losses because Defendants manipulated the price of cryptocurrency derivatives,

13  contradicts their prior pleadings and publicly available sources.

14          The Court does not find the TAC to be a sham pleading.  As discussed in this tentative, the Court

15  views Plaintiffs' claims for market manipulation (and these allegations remain) part and parcel of

16  Plaintiffs' claims for misrepresentation and concealment.  To the extent that any allegations underlying

17  their claims are inconsistent with previous claims, the Court addresses those inconsistencies in this Order.

18       **2.       Plaintiffs' TAC**

19          In its prior order, this Court cautioned Plaintiffs that, rather than copying allegations from other

20  lawsuits alleging federal causes of action, the amended complaint should "allege only the substantive

21  factual allegations which would sufficiently apprise the Defendants of the claims in this case."  (Feb. 25,

22  2021 Order, 6.)  Plaintiffs' TAC is a 247-page (not including exhibits), 659-paragragh complaint that

23  continues to waste much space describing other actions brought against defendants and other unnamed

24  parties, including an indictment filed against the founders and a recent Commodity Futures Trading

25  Commission ("CFTC") civil enforcement suit.

26          The Court is granting leave to amend the complaint, but again cautions Plaintiffs to allege only

27  relevant facts, and to support their conclusory assertions with supporting factual allegations.

28

## II.    Legal Standard

"A demurrer tests the sufficiency of the complaint as a matter of law, and it raises only questions of law," with the Court assuming that material facts alleged are properly pled. (*Weimer v. Nationstar Magazine LLC* (2020) 47 Cal.App.5th 341, 352.)  In evaluating the strength of the complaint courts employ a "reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*)

## III.    Intentional Fraud Claims (Counts I – IV)

Counts 1 through 4 of the TAC assert common law claims predicated on various misrepresentations and omissions purportedly made by Defendants.  In contrast to the market manipulation fraud count alleged in the FAC, the TAC largely relies on new allegations that Defendants made misrepresentations in the BitMEX Terms of Service and on the website.  Those allegations also form the backbone for nearly all the TAC's remaining claims.

For the reasons that follow, the demurrer as to Plaintiff's fraud claims is sustained with leave to amend to plead the allegations with more specificity, specifically the elements falsity and causation.

### 1.    Background Law

"The elements of common law fraud in California are (1) a misrepresentation of material fact (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 259.)

In California, fraud must be pled with particularity. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)  This necessitates pleading facts that show how, when, where, to whom, and by what means the representations were tendered. (*Ibid.*)  The rationale for this requirement is that allegations of fraud involve a serious attack on character, so fairness to the defendant demands that the defendant receive the fullest possible details about the charge to prepare a defense. (*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73.)  Less specificity in pleading fraud is required when it appears from the nature of the allegations that the defendant must necessarily possess full information regarding the facts of the controversy. (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469.)  "[F]raud may arise from conduct that is designed to mislead, and not only from verbal or written statements." (*Tenet Healthsystem*

1  *Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 839.)

2      **2.      Falsity**

3      The "misstatements" giving rise to Plaintiffs' fraud claims in the TAC fall into two broad

4  categories.  First, Plaintiffs claim that Section 6.3 of BitMEX's Terms of Service contained numerous

5  misstatements and material omissions regarding BitMEX's "Insider Trading Desk[3]."  (See TAC, ¶¶ 433–

6  35 (Count I); ¶¶ 493–94 (Count III); ¶ 527 (Count IV).)  Second, Plaintiffs assert that BitMEX's website

7  misrepresented material facts about the platform's liquidity.  (TAC, ¶ 461 (Count II).)

8      **a.      The Terms of Service**

9      According to the TAC, Plaintiffs were each provided with an electronic document containing

10  written Terms of Service (the "Service Agreement") that disclosed BitMEX's "Insider Trading Desk."

11  (TAC, ¶¶ 432, 433, 492, 493; Ex. 17, § 6.3.)  Section 6.3 of the Service Agreement provides:

12      HDR has a trading arm that, amongst other things, transacts in products traded on the
        Trading Platform. The trading arm primarily trades as a market-maker. The trading arm is
13      organised to be separate and distinct from the business of the Trading Platform.
        Specifically, no front office personnel are shared between the trading arm and the Trading
14      Platform, the trading arm's staff are physically separated from the Trading Platform's staff
        while performing trades, and *the trading arm does not have access to any order flow,*
15      *execution, customer or other information of the Trading Platform on terms that are not*
        *otherwise available to any other platform user. In addition, unless otherwise set forth in*
16      *the terms of a specific product of HDR, the trading arm receives access and trading*
17      *privileges only on the same terms as are available to any other user.*

18  (*Ibid.* [emphasis added].)

19      Plaintiffs allege Defendants' representations with respect to their Insider Trading Desk was

20  deliberately and materially false during the entire relevant period.  (TAC, ¶¶ 434, 494.)  During the entire

21  relevant period, the Insider Trading Desk allegedly had what BitMEX internally referred to as "God

22  Access" to all customer, order flow, execution and open position information of the BitMEX Trading

23  Platform, including, without limitation, all order sizes, leverage amounts and liquidation prices, all

24  parameters of hidden orders, including leverage amounts, as well as sizes and liquidation prices of all

25  open positions on the entire BitMEX platform.  (*Id.* at ¶¶ 434, 494, 496(a).)  On the other hand, this

26  _____

27  [3] As explained below, HDR has a trading arm that, among other things, transacts in products traded on the
    BitMEX Trading Platform.  The term "Insider Trading Desk" is used in the TAC to refer to BitMEX's
    trading arm.  Plaintiffs acknowledge this is their term.  The Court refers to BitMEX's trading arm as the
28  "Insider Trading Desk" for purposes of demurrer only.

- 6 -

1    information was not available to Plaintiffs and other platform users, as represented in the Service

2    Agreement. (*Id.* at ¶ 434.) Additionally, the Insider Trading Desk was not subject to server overload

3    freezes and lockouts, thus receiving access and trading privileges not available to other BitMEX users,

4    including Plaintiffs, who were frequently subject to server overload freezes and lockouts. (*Id.* at ¶ 435.)

5           Defendants contend the TAC lacks any well-pled facts establishing that Defendants made any

6    actionable misstatements, i.e., that anything in Defendants' Service Agreement was false during the

7    relevant period. The Court agrees.

8           Plaintiffs' first theory of falsity is predicated on unsupported conclusions of fact. The allegations

9    suggest the basis for Plaintiffs' claims alleging "God Access" and trading privileges is revelations made

10   by Defendants' former employees. (See TAC, ¶ 226.) According to the TAC, former BitMEX

11   employees have revealed that between 2015 and 2016, Defendant Hayes approached Liquidbit, an over-

12   the-counter crypto trading platform, about the possibility of building into the BitMEX platform a hidden

13   trading desk that would be able to utilize functionality not available to other customers. (*Id.* at ¶ 227.)

14   The TAC further alleges that sometime thereafter, BitMEX reengineered BitMEX's foundational software

15   to empower the operation of what it internally dubbed "Risk Management," i.e., the "Internal Trading

16   Desk." (*Ibid.*)[4]

17          The most fundamental problem with Plaintiffs' recitation of former employee revelations is that

18   they are vague. None of the employees' revelations support Plaintiffs' particularized allegations that the

19   Insider Trading Desk enjoyed "God Access" and trading privileges not otherwise available to Plaintiffs.

20   Plaintiffs vaguely recount revelations of a platform with "reengineered" "foundational software" and a

21   trading desk with "functionality not available to other customers." The employees do not reveal any

22   specific information, such as alleged access to trading during server overload freezes and lockouts or

23   traders' information. Accordingly, the allegations, such as they are, do not support a reasonable inference

24   that the representations made by Defendants in the Service Agreement were false during the relevant time

25   period.[5]

26   _____

27   [4] Plaintiffs claim that the revelations by former employees came to light after the filing of the First
     Amended Complaint, which explains any discrepancies in the allegations relating market manipulation
     and the operation of the Insider Trading Desk. (See TAC, ¶ 227, fn. 7.)

28   [5] If Plaintiffs can allege sufficient facts supporting Plaintiffs' belief that the trading desk had access to

b. **Liquidity**

Plaintiffs allege that prior to opening trading accounts with BitMEX, each Plaintiff was specifically looking for an exchange with the highest liquidity in the industry to trade on, and, therefore, the amount of liquidity on the BitMEX platform was highly material to each Plaintiff's decision to engage in cryptoderivative trading on the BitMEX platform, as the amount of available liquidity determined the potential profits that Plaintiffs could realize from cryptoderivative trading. (TAC, ¶ 462.)

Plaintiffs allege that during the relevant time period, Defendants represented, through their commercial website, that the BitMEX platform provides "1500% More Bitcoin/USD liquidity than any other platform," and that "BitMEX's XBTUSD market is the most liquid in the world." (TAC, ¶ 461, Ex. 16.) Plaintiff Kanyshev was presented with this representation on May 17, May 24, and July 15, 2019; Plaintiff Luzhbin was presented with this representation on May 8, May 9, and July 11, 2019; and Plaintiff Villagra was presented with this representation on June 2 and June 27, 2019. (*Ibid.*)[6]

Defendants argue the TAC fails to adequately allege a misrepresentation regarding the available liquidity on BitMEX's platform. The Court agrees.

In order to support its allegations of falsity, Plaintiffs conducted a "bid-ask spread" data analysis of the "average bid-ask spread" on other exchanges. (See TAC, ¶ 463.) According to Plaintiffs, "[l]iquidity on an exchange is inversely related to a bid-ask spread," and a "bid-ask spread" is the customary form of measurement for liquidity. (*Id.* at fn.22.) The analysis allegedly shows that OKEX had an "average" "bid-ask spread" of -0.14% during the relevant period. (*Id.* at ¶ 463.) This average was higher than BitMEX's average of -0.51%. And analysis of Binance's bid-ask spread showed that liquidity was at least as high as that on BitMEX. (*Ibid.*)

---

information and trading privileges not otherwise offered to users such as Plaintiffs, the Court may be able to draw a reasonable inference that access continued during the relevant time period. But that puts the cart before the horse. Plaintiffs have not sufficiently alleged facts supporting Plaintiffs' particularized allegations of "God Access" and trading privileges.

[6] Plaintiffs acknowledge that the First Amended Complaint in this action alleged that BitMEX "is the most liquid," though they now appear to take a contrary position. Plaintiffs explain that when Plaintiffs filed their First Amended Complaint on October 23, 2020, they were still relying on the alleged fraudulent statements and false advertising on Defendants' website which still existed at the time, until it was removed by Defendants on March 9, 2021. Therefore, according to Plaintiffs, there is no inconsistency between this allegation and the allegations relying on those statements in the First Amended Complaint. The Court is satisfied with Plaintiff's' explanation.

These allegations, by themselves, are insufficient[7] to support Plaintiffs' claim that liquidity on BitMEX was not 1500% (or 16 times) higher than on any other exchange for two important reasons. As a general matter, Plaintiffs provide no facts explaining the steps Plaintiffs took in conducting their analysis or the specific information the analysis took into consideration.[8] Second, an "average" spread analysis of the entire relevant period does not necessarily support a fraudulent misrepresentation, especially in light of other allegations suggesting that liquidity on cryptoderivative exchanges is constantly changing. (See, e.g., TAC, ¶ 211 [alleging that BitMEX only profited from liquidations "as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin"]; ¶ 476 [alleging "wild downward swings" and "staggering price plunges" affecting liquidity].) Plaintiffs must allege facts showing that liquidity was higher on other platforms at the specific times Plaintiffs made deposits with BitMEX or traded on the platform. This requires Plaintiffs to, at a minimum, provide the "bid-ask spread" data used in their analysis for each exchange.

### 3. Causation

#### a. Background Law

The causation aspect of actions for damages for fraud and deceit involves three distinct elements: (1) actual reliance, (2) damage resulting from such reliance, and (3) right to rely or justifiable reliance. (*Panoutsopoulos v. Chambliss* (2007) 157 Cal.App.4th 297, 308.) In a fraud case, justifiable reliance is the same as causation, thus, actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his or her legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the contract or other transaction. (*Hall v. Time Inc.* (2008) 158 Cal.App.4th 847.)

It is also stated, however, that the elements of reliance and proximate causation in a fraud action are distinct; although the facts establishing their existence are often intertwined. (*OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 871.) Nonetheless, in a

---

[7] At the hearing, Plaintiffs asked the Court to draw an inference of falsity based on Defendants' partial and complete removal of the representations on October 3, 2019 and March 2021. (See, TAC ¶ 473.) But Defendants' subsequent conduct in October 2019 and in March 2021 cannot support a reasonable inference of falsity for representations made in May, June, and July of 2019, though it may support an inference of knowledge, which is what those facts were initially pled to show. (See *ibid.*)

[8] Plaintiffs should provide a detailed and step-by-step discussion of their process.

fraud cause of action the defendant's misrepresentation must have caused the plaintiff to take a detrimental course of action, and second, the detrimental action taken by the plaintiff must have caused the plaintiff's alleged damage. (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1062.)  In particular, the plaintiff asserting fraud by misrepresentation is obliged to establish a complete causal relationship between the alleged misrepresentations and the harm claimed to have resulted therefrom, which requires a plaintiff to allege specific facts not only showing the plaintiff actually and justifiably relied on the defendant's misrepresentations, but also how the actions taken in reliance on the defendant's misrepresentations caused the alleged damages. (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1499.)

### b.   Plaintiffs' Damages

Plaintiffs allege three categories of damages: "loss of use damages," "trading losses," and "trading commissions." (TAC, ¶¶ 442, 445-448, 475-477, 506-508, 529.)  According to the TAC, each Plaintiff deposited an initial amount of bitcoins into interest-free BitMEX accounts and not in interest-bearing accounts widely available on the market. (*Id.* at ¶¶ 446, 475, 506.)  Plaintiffs claim that had they not deposited their bitcoins with BitMEX, as they did in reliance on Defendants' false representations, they would have deposited them with financial institutions such as Celsius or BlockFi and earned interest at 5.95% APY (the "loss of use" damages). (*Ibid.*)

Plaintiffs also suffered "trading losses" due to Defendants' Insider Trading Desk having caused each Plaintiff's long perpetual swap position on BitMEX to be liquidated, using each Plaintiff's own confidential information in direct violation of the representations made in the Service Agreement. (*Id.* at ¶¶ 447, 476, 507.)  BitMEX also charges "trading commissions" in connection with opening, maintaining, and closing trading positions. (*Id.* at ¶ 448, fn.19.)  Had each Plaintiff known the actual facts, he would not have deposited bitcoins and traded perpetual swaps and would not have paid trading commissions to Defendants. (*Id.* at ¶¶ 447-448, 477, 508.)

Defendants argue the TAC fails to establish any causal link between Defendants' purported conduct and Plaintiffs' claimed losses.  Specifically: (1) Plaintiffs' trading losses were not caused by their reliance on any alleged misrepresentations or omissions because Plaintiffs increased their holding through

gain on the trading platform before intervening market events led to the liquidation of Plaintiffs' holdings. (2) Plaintiffs' trading commissions and loss of use damages are "benefit of the bargain" damages that are not recoverable in a California fraud action. (3) Plaintiffs were looking for an exchange to trade on, and therefore cannot claim to be harmed by way of "loss of use damages" because they could have pursued an alternative and far more conservative investment strategy. (*Ibid.*)

### i. Loss of Use Damages

The Court agrees with Defendants that the facts do not support a causal connection between the alleged misrepresentations or concealment and their alleged "loss of use" damages. Although Plaintiffs claim they would not have opened a BitMEX trading account had they known about the alleged illiquidity on the platform or the Insider Trading Desk's access and advantage over Plaintiffs, Plaintiffs allege that they were nonetheless looking for an exchange "to trade on." (See TAC, ¶ 462.) They do not allege that their Bitcoins were already in interest-bearing accounts prior to trading on BitMEX. Nor do they allege that other *trading exchanges* provided traders with interest-bearing accounts. The loss of interest is the result of Plaintiffs' decisions to trade in the cryptoderivative marketplace, not on the alleged conduct by the Defendants.

### ii. Trading Commissions

As the Court understands it, trading commissions are paid to Defendants in connection with opening, maintaining, and closing trading positions. (See TAC, ¶ 448, fn.19.)

According to the TAC, Defendants made fraudulent statements and committed fraudulent omissions in at least three ways: (1) By misrepresenting and failing to disclose that the Insider Trading Desk (i) enjoyed "God Access" to highly sensitive and confidential insider information, (ii) had an automated system that was able to predict a potential profit for BitMEX from liquidating its traders by estimating how the market was likely to move based on the impact of the hidden orders and liquidations, and (iii) was not subject to lock-outs or server freezes, (TAC, ¶ 494); (2) By misrepresenting the available liquidity on the BitMEX website, (*id.* at ¶ 463); and (3) By misrepresenting to each Plaintiff in 2019 that Defendants were using and would continue to use commercially reasonable efforts to prevent customer lockouts on the BitMEX platform, (*id.* at ¶ 499).

Plaintiffs allege, generally, that but for BitMEX's misrepresentations and omissions, Plaintiffs would not have opened an account and traded perpetual swaps on the exchange and paid the trading commissions associated with those actions.   (See e.g., *id*. at ¶¶ 447, 448, 505.)

Here, none of the alleged misrepresentations or omissions, save maybe number 3 listed above, support a sufficient nexus between the alleged misrepresentations or concealment and the alleged economic harm.

Plaintiffs claim that Defendants' misrepresentations fraudulently induced Plaintiffs to use the BitMEX platform. (See TAC, ¶ 511.)  While it may be the case that Plaintiffs' reliance on Defendants' statements relating to the Insider Trading Desk and the available liquidity on the platform *caused* Plaintiffs to use BitMEX, Plaintiffs' use of the platform did not, in itself, cause the injury.  Plaintiffs were looking for an exchange "to trade on." (See *id*. at ¶ 462.)  Trading commissions are the cost incurred to actually trade on cryptocurrency exchanges, or at least on BitMEX.  By paying the trading commissions, Plaintiffs received the benefit of their bargain by gaining access to the platform and by opening, maintaining and closing trading positions.  Plaintiffs do not allege they could have or would have traded on a different exchange that did not charge trading commissions to open, maintain, and close trading positions or that the cost to trade on other platforms was less. (See *Goehring v. Chapman Univ.* (2004) 121 Cal.App.4th 353, 365 ["Assuming … a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes."].)

Plaintiff may, however, be able to demonstrate that Defendants' misrepresentations regarding the nature and scope of the customer lock-outs on BitMEX caused injury.  From what is gathered from the TAC, there were at least three instances where Plaintiffs were locked out[9] of the platform and could not open, maintain, or close their positions.  (TAC, ¶ 601.)  Defendants allegedly disclosed in early 2019 that overloads might disrupt access to the BitMEX platform, but represented that it would "make reasonable efforts to ensure that the Services [were] available" and that BitMEX "w[ould] use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours." (*Id*. at ¶ 499 (a), (e).)  Allegedly, these representations were false because the lockouts were "intentional" and specifically

---

[9] Plaintiffs have not differentiated a "lock-out" from a "server freeze."  As the Court understands it, Plaintiffs are "locked-out" of the platform *as a result* of a "server freeze."

1   designed to facilitate manipulation by Defendants' Insider Trading Desk" who had trading access during

2   these lock-outs. (*Id.* at ¶ 494 (m).) Plaintiffs also allege that Defendants "creat[ed] custom software

3   programs and scripts for ...implementing server freezes." (*Id.* at ¶ 406.)

4         In theory, to the extent that Plaintiffs relied on Defendants' representations and subsequently paid

5   trading commissions, but due to a lock-out were unable to open, maintain, or close a trading position,

6   there is a potential causal connection between Plaintiffs' actions taken in reliance on Defendants'

7   representations and Plaintiffs' losses. The Court, however, declines to reach the issue of causation

8   because there are insufficient allegations supporting this theory. To start, it is unclear whether Plaintiffs

9   are alleging that they suffered the loss of trading commissions, or trading losses, or both "by their

10  inability to timely close their open trading positions due to server freezes that occurred on June 27, 2019,

11  July 11, 2019 and July 15, 2019." (See TAC, ¶ 601; see also ¶¶ 494(e),(m), 499(g), 501.) This should be

12  clearer. Second, there are no facts supporting Plaintiffs' allegations that (i) the lockouts were

13  "intentional," as opposed to being the result of "technical limitations"[10] or (ii) Plaintiffs actually relied on

14  Defendants' representations in 2019 regarding the lock outs.[11]

15                        **iii.    Trading Losses**

16        Plaintiffs allege injury in the form of trading losses as a result of the same misrepresentations and

17  omissions that allegedly caused Plaintiffs' loss of their trading commissions. (See TAC, ¶ 455, 470, 476,

18  507, 513.)

19  _____

[10] See TAC, ¶¶ 406, 494(e),(m), 499(g).

20  [11] In their moving papers, Defendants make a passing reference to *Alliance Mortgage Co. v. Rothwell*
    (1995) 10 Cal.4th 1226 in support of their argument that "trading commissions" were "benefit-of-the-

21  bargain" damages, as opposed to "out-of-pocket" losses, and therefore not recoverable in California fraud
    cases. In *Alliance Mortgage,* the California Supreme Court explained the two measures of damages for

22  fraud: out of pocket and benefit of the bargain. "The 'out-of-pocket' measure of damages is directed to
    restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus

23  awards the difference in actual value at the time of the transaction between what the plaintiff gave and
    what he received. The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying

24  the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if
    the false representation relied upon had been true; it awards the difference in value between what the

25  plaintiff actually received and what he was fraudulently led to believe he would receive." (10 Cal.4th at
    1240.)

26  On reply, Defendants summarily conclude that the trading commissions Defendants received for the
    transactions attempts to "satisfy[] the expectancy interest of the defrauded plaintiff by putting him in the

27  position he would have enjoyed if the false representation relied upon had been true." The Court is not so
    sure. Nor is the Court convinced that this issue is even relevant at this stage in the proceedings. Without

28  further supporting authority or explanation, the Court is not persuaded by Defendants' argument.

1      Defendants argue it was the "liquidation" of Plaintiffs' positions that caused Plaintiffs' losses and

2    not any purported misrepresentations inducing their use of BitMEX.  Defendants contend Plaintiffs' claim

3    therefore fails because Plaintiffs cannot plead facts showing that any inducement proximately caused their

4    claimed losses, citing *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807 ("*Clorox*").

5      In *Clorox*, the court dismissed a complaint for fraudulent inducement to contract where the

6    plaintiff alleged it was induced to enter into a contract, and suffered losses in performing it, based on the

7    defendant's misrepresentations that the workers would remain non-unionized.  (*Id.* 44 Cal.App.4th at

8    1818-19.)  The court explained that the expenses plaintiff incurred in preparing to perform its contractual

9    duty, though allegedly responsive to Clorox's promise, were essential to its subsequent performance of

10    the service agreement and therefore could not have been considered detrimental.  (*Ibid.*)  It was only when

11    Clorox terminated the parties' contractual relationship that plaintiff could have perceived its reliance

12    expenses as "losses."  (*Id.* at 1819.)  Thus, it was the termination, not the misrepresentation, that resulted

13    in the alleged harm.  (*Ibid.*)

14      The *Clorox* court however distinguished a situation wherein a fraudulent misrepresentation was

15    "an integral part of the parties' contractual relationship."  The court explained:  "In *Lazar v. Superior*

16    *Court* (1996) 12 Cal.4th 631, for example, the employer's misrepresentations were an integral part of the

17    parties' contractual relationship; the plaintiff required assurances of job security and a profitable future as

18    a condition of accepting the position, because it required uprooting his family and giving up a stable

19    income.  Had the employer performed its contractual obligations, these expenses would not have

20    constituted fraud damages because no misrepresentation would have occurred."  (*Clorox*, 44 Cal.App.4th

21    at 1818.)

22      The Court does not find either case on point, but agrees with Plaintiffs that, to the extent the cases

23    provide the Court with some guidance, this case is more analogous to *Lazar* than *Clorox*.  Like the

24    representations made in *Lazar*, BitMEX's "Warranty and Representation" regarding BitMEX's Insider

25    Trading Desk was "an integral part of the parties' contractual relationship."  The Service Agreement

26    disclosed BitMEX's for-profit trading arm but represented to its traders that it traded on an equal playing

27    field of information and privileges.  Plaintiffs relied on Defendants' representations in their decision to

28

1    use the BitMEX platform.  But contrary to those representations, the Insider Trading Desk allegedly had

2    access that allowed them to see all of the information of a trader's account, including any hidden orders

3    and the liquidation points for all orders, providing it with a significant advantage over all traders.  (TAC, ¶

4    230.)  Furthermore, the Insider Trading Desk was allegedly equipped with automated systems that

5    analyzed the impact of hidden trade orders and liquidation prices.  This allegedly allowed Defendants to

6    determine when placing a large order would cause hidden orders to trigger, and assess whether these

7    hidden orders would affect prices in a way that would cause liquidations.  (See *id.* at ¶¶ 230-232, 248.)

8         At bottom, Defendants were allegedly using traders' confidential order and position information to

9    plan and initiate market manipulation.  (See TAC, ¶¶ 230-232, 398, 406, 424, 447, 507.)  To the extent the

10    trading losses were caused by market moves and market manipulation, and such moves and manipulation

11    were perpetrated by Defendants using trading privileges and information Defendants represented they did

12    not have access to, a causal connection between Plaintiffs' trading losses and their reliance on

13    Defendants' misrepresentations potentially exists.[12]

14         However, this causal connection depends on Plaintiffs' claim that the Insider Trading Desk had

15    access to Plaintiffs' trading information and in some manner used the information on June 27, 2019, July

16    11, 2019, and July 15, 2019 to cause liquidation of Plaintiffs' positions.  The complaint is lacking in this

17    respect.  (See *Hill v. Wrather*, *supra*, 158 Cal.App.2d at 825 [Deception without resulting loss is not

18    actionable fraud.].)  Specifically, Plaintiffs have not pled facts to support Plaintiffs' particularized

19    allegations that the Insider Trading desk (i) had access to Plaintiffs' information, including hidden orders

20    and the liquidation points for all orders, (ii) was equipped with automated systems that analyzed the

21    impact of hidden trade orders and liquidation prices that allowed Defendants to determine when placing a

22    large order would cause hidden orders to trigger, and assess whether these hidden orders would affect

23    prices in a way that would cause liquidations, and (iii) placed large orders one or more "reference"

24

25    [12] In their briefing, Defendants suggest that Plaintiffs' market manipulation claims are a separate theory of liability.  However, in the Court's view, Plaintiffs' manipulation claims are part and parcel of Plaintiffs' claims for misrepresentation and concealment.  Defendants were allegedly using Plaintiffs' confidential

26    trade information to manipulate the market for their benefit.  If, as Plaintiffs allege, Defendants caused the liquidation of Plaintiffs' positions using trading privileges and information, contrary to Defendants'

27    representations, the market manipulation provides the necessary nexus between Plaintiffs' reliance on Defendants' representations and Plaintiffs' losses.

28

1    exchanges on June 27, 2019, July 11, 2019, and July 15, 2019.[13]  Plaintiffs allegations, as is, are

2    insufficient to infer that Defendants' conduct caused Plaintiffs' losses, as opposed to other market moves

3    by third-parties.  (See TAC, ¶¶ 398, 507.)

4        Lastly, Plaintiffs' claims that Defendants' misrepresentations regarding liquidity and server lock-

5    outs *caused* Plaintiffs to suffer trading losses are not supported by sufficient allegations.  (See TAC, ¶¶

6    470, 476-78, 499, 513.)  Furthermore, the complaint must reconcile its somewhat conflicting positions

7    regarding what caused Plaintiffs' injury.[14]

8    **4.    Reliance**

9        Plaintiffs sufficiently allege actual reliance on Defendants' representations with respect to the

10   Insider Trading Desk and liquidity.[15]  (See TAC, ¶¶ 432, 438, 443, 461-463.)

11       Defendants argue it was not reasonable for Plaintiffs to rely on Defendants' representations based

12   on other information allegedly available to them, including real time access to multiple indicators of

13   liquidity on BitMEX and a May 20, 2018 blog post that reported on HDR's April 30, 2018 disclosure of

14   its trading arm.  But the blog itself contains no details of the informational and trading privileges available

15   to the Insider Trading Desk; nor do Plaintiffs claim to have seen it.  Furthermore, even if Defendants are

16   suggesting that Plaintiffs could have gone on the BitMEX website and know in real time the available

17   liquidity, it is not clear that any of the "indicators" of liquidity contradicted any representations alleged by

18   _____

19   [13] Plaintiffs allege that, on information and belief, high volume market orders were executed on one or
     more "reference exchanges" during a short period of time.  (TAC, ¶ 398,fn.11.)  Plaintiffs attribute these
     large market orders to the Insider Trading Desk.  (*Id.* at ¶ 398.)  Plaintiffs fail to explain what information

20   they relied on to form their belief.
     [14] On the one hand, Plaintiffs claim throughout the complaint that it was Defendants' misrepresentations

21   regarding access to Plaintiffs' confidential information that caused the liquidation of Plaintiffs' positions
     and the resulting trading losses.  (See e.g., TAC, ¶¶ 398, 442, 455, 447, 507, 516.)  On the other hand,

22   Plaintiffs' claim that "liquidations" would never have taken place "if Defendants truly provided 1500%
     (16x) more liquidity ... [because] such high liquidity would have absorbed sell orders and dampened the

23   downward price moves."  (*Id.* at ¶ 478.)  It follows then that no amount of access to confidential
     information could cause liquidation if there is sufficient liquidity on BitMEX.  In that case it would

24   appear that, illiquidity, not Defendants' access to information, was the proximate cause of Plaintiffs'
     trading losses.  Similarly, Plaintiffs' claim that they sustained losses because of "server freezes" is also, at

25   least in some respects, inconsistent with the other causation allegations.
     The Court is not suggesting that Plaintiffs' theories are *entirely* inconsistent with one another, but rather

26   that they must reconcile their theories of liability and allege a coherent and complete causal relationship
     between the alleged misrepresentations and the harm claimed to have resulted therefrom.

27   [15] With respect to the server lock-outs, while Plaintiffs plead, generally, that they relied on Defendants'
     "representations and omissions," (see TAC, ¶ 504), they stop short of alleging that they *actually* relied on

28   Defendants' representations in 2019 regarding the sever freezes that were occurring.

- 16 -

Plaintiffs. Furthermore, the Court does not resolve factual disputes at this stage, and therefore, Defendants' contention that BitMEX had "real time indicators" on its website is not appropriately addressed on demurrer.

## IV. Negligent Misrepresentation (Count V)

The essential elements of a count for negligent misrepresentation are the same as the essential elements of a count for intentional misrepresentation except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-31; *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 792.) Because a negligent misrepresentation claim sounds in fraud, it must be pled with specificity. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1166.)

According to the TAC, Defendants' false and fraudulent Warranty and Representation and representations regarding available liquidity on BitMEX constituted deceit under Cal. Civ. Code § 1710(2), and actually deceived Plaintiffs into altering their positions by opening BitMEX accounts and engaging in cryptoderivative trading on the platform, resulting in trading losses and paying trading commissions to Defendants. (See TAC, ¶ 536.)

The parties discuss the negligent representation claim together with the intentional fraud claims. (Demurrer, 17 [mentioning Count V only in connection with fraud claims]; Opposition, 12-13 [identifying legal standard for negligent representation claims]; Reply, 5-24 [no direct reference to negligent misrepresentation theory].) As pled, the Court interprets the negligent misrepresentation claim to be an effort to address the possibility that Defendants made representations regarding available liquidity on BitMEX and the Insider Trading Desk, described in paragraphs 461 and 433, respectively, but had no reasonable grounds for believing those facts to be true. (See TAC, ¶ 532.) For the reasons the Court sustains the demurrer to the intentional fraud claims, the Court sustains the demurrer to Count V for negligent misrepresentation.

## V. Negligence (Count XII)

A cause of action for negligence requires four elements: duty, breach, causation, and damages.

1  (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 529.)  Defendants argue (1) Plaintiffs failed to plead

2  facts establishing the prerequisites for a special relationship under the *Biakanja* factors; (2) Plaintiffs have

3  not identified an independent duty from Defendants' contractual obligations to maintain a functional

4  marketplace; and (3) Plaintiffs' allegations that server freezes caused Plaintiffs' losses are directly

5  contrary to other causation allegations in the TAC.

### 1.    The Economic Loss Rule

#### a.    Background Law

8  Generally, the economic loss rule "bars tort claims based on contract breaches." (*UMG*

9  *Recordings, Inc. v. Global Eagle Entm't* (2015) 117 F.Supp.3d 1092, 1103.)  In California, "[t]he

10  economic loss rule requires a purchaser to recover in contract for purely economic loss due to

11  disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual

12  promise." (*Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979, 988.)  Under the rule, a

13  plaintiff may recover in tort only where they can allege personal injury or damage to property other than

14  the product itself. (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 483.)

15  However, the economic loss rule does not prevent recovery in tort if (1) a "special relationship"

16  exists between the plaintiff and the defendant, (*J'Aire Corporation v. Gregory* (1979) 24 Cal.3d 799, 804;

17  *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650), or (2) the conduct "violates a duty independent of the

18  contract arising from principles of tort law," (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551), i.e., that

19  some other common law exception such as fraud or intentional misrepresentation, applies.[16]

### 2.    Special Relationship Exception

21  According to the TAC, Defendants are liable for negligence because they breached the Service

22  Agreement by failing to provide Plaintiffs access to BitMEX or the ability to place orders, open, and close

23  positions and use margins. (TAC, ¶ 598.)  Specifically, Defendants owed a duty to Plaintiffs to maintain

24  a functional cryptocurrency derivatives marketplace, which they breached by failing to prevent server

25  freezes, which occurred on June 27, 2019, July 11, 2019, and July 15, 2019. (*Id.* at ¶¶ 606-607.)

26  Plaintiffs were prevented from accessing BitMEX's trading services during the server freezes, which

---

[16] At the outset, the Court notes that Plaintiffs identify or discuss "a duty independent of the contract" in their pleadings.  However, Plaintiffs discuss the *J'Aire* factors at length in their TAC.

resulted in Plaintiffs' inability to close open trading positions and open new ones. (*Id.* at ¶ 600.)

When determining whether a special relationship exists under *J'aire* between parties that are in privity of contract, California courts have drawn a distinction between contracts involving goods and contracts involving services. In *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, the California Court of Appeal held that when the parties are in privity of contract, the *J'aire* exception applies if the contracts are for services. (*Id.* at 783.) In contrast, in contracts for goods or products, *J'aire* can be properly applied "*only* when there is an *absence* of privity." (*North American Chemical*, 59 Cal.App.4th at 783–84 [emphasis added]; *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.* (2018) 313 F.Supp.3d 1113, 1131-32 ["Although Defendants argue that the 'special relationship' exception never applies when the plaintiff and the defendant are in privity ... this Court has previously rejected that argument."]; see also *Terpin v. AT&T Mobility, LLC* (2019) 399 F.Supp.3d 1035, 1048 [rejecting argument that exception does not apply because plaintiff has a contractual relationship with defendant and is not a third party to the contract].)

Defendants argue that the *J'Aire* exception does not apply because Plaintiffs have a contractual relationship with Defendants and are not third parties to the contract. Defendants further argue that "Plaintiffs' argument that *North American Chemical* permits liability for negligent breach of contractual duties" has been squarely rejected, citing *Aas v. Super. Ct.* (2000) 24 Cal.4th 627, 643. (See TAC, ¶ 595.) But as discussed above, a contractual relationship does not foreclose application of *J'Aire* when services are involved; and contrary to Defendants' position, the California Supreme Court has not directly addressed the issue of *J'aire*'s application where the parties are in privity of contract.

In *Aas v. Super. Ct.*, the California Supreme Court applied *J'aire* to determine whether homeowners and homebuilders had a special relationship that would allow the homeowners to sue in negligence for defects in their homes. (24 Cal.4th at 643.) The *Aas* Court found no special relationship because the homeowners were unable to show with certainty that the plaintiffs suffered injury, the third *J'aire* factor. (*Ibid.*) In the course of its analysis, the *Aas* Court noted that lower courts had expanded *J'aire* and *Biakanja* to circumstances where the parties were in privity, but did not approve or disapprove of that expansion. (*Ibid.*, citing *Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, *North American*

*Chemical*, 59 Cal.App.4th 764, and *Pisano v. Am. Leasing* (1983) 146 Cal.App.3d 194, 197.) Although the *Aas* case did involve an "uncertain number" of plaintiffs who were in privity with the defendants, the *Aas* Court did not explicitly address whether the *J'aire* factors apply to parties in privity. (See *id.* at 642–43, 645–53.)

Accordingly, this Court does not see why the *J'Aire* exception should be foreclosed in this case since it involves a contract for services where the parties are in contractual privity. Therefore, the *J'Aire* exception is available if plaintiffs adequately plead a special relationship. (See *In re Yahoo!*, 313 F.Supp.3d at 1132.)

Relying on *J'Aire*, Plaintiffs allege Defendants owed a duty of care on the following public policy factors: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. (See *J'Aire*, 24 Cal.3d at 804 ["Courts examine six factors to determine whether a special relationship exists."].)

According to the TAC, the transactions between Defendants and Plaintiffs were intended to benefit Plaintiffs by providing them the ability to use the cryptoderivative trading services provided by Defendants through their BitMEX platform. The services consisted of access to the BitMEX trading platform, including the ability to place orders, open and close positions and use margin. (TAC, ¶¶ 598, 599.) Plaintiffs allege it was entirely foreseeable that Plaintiffs would be harmed if they would no longer to be able to access cryptoderivative trading services due to a server freeze, which would result in Plaintiffs' inability to close open trading positions and open new ones. For example, if traders are unable to timely close their positions during a market move because of a server freeze, a slight move in the market could cause their open positions to be liquidated, resulting in a financial loss. (See *id.* at ¶ 600.) Plaintiffs suffered injury by being deprived of their 9.45 bitcoins, which was caused by their inability to timely close their open trading positions due to server freezes that occurred on June 27, 2019, July 11, 2019 and July 15, 2019. (*Ibid.*)

Plaintiffs allege Defendants' conduct also involves moral blame. (TAC, ¶ 603.) Defendants have

1    done nothing to prevent server freezes, including providing extra server capacity or re-writing BitMEX's

2    high availability software to provide additional protection to its customers' trading positions during

3    market moves. (*Ibid.*) Moreover, Defendants are allegedly financially benefiting from such sever freezes.

4    (*Id.* at ¶ 603.) While Defendants allegedly claim that technical issues in BitMEX's server locks out users

5    at crucial times, BitMEX continues to profit during these lock outs by liquidating customer accounts that

6    could not trade. (*Id.* at ¶ 212.)

7         Plaintiffs explain that "BitMEX's risk-management process, which performs the system's

8    automatic liquidations, must check the entire system whenever the price of a future changes. This process,

9    although sometimes completed quickly, is the supposed cause of BitMEX's servers freezing on average

10   between two and three times a day. During these server freezes, customers are locked out of their

11   accounts and lose the ability to trade until the servers unfreeze." (TAC, ¶ 213.) When BitMEX's servers

12   are frozen, preventing customers from executing any trades, the prices of the derivative contracts are not

13   frozen — trades and liquidations occur even while customers are locked out of their accounts, and

14   BitMEX continues processing previously placed transactions. (*Id.* at ¶ 214.) "This means that a trader

15   can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the

16   price at which they sought to transact is no longer available. Traders can also find that an offer they had

17   made before the freeze but sought to retract during it has since been accepted." (*Ibid.*)

18        BitMEX allegedly benefits from the server freezes through automatic liquidations because

19   liquidations continue to occur during the freeze. (TAC, ¶ 215.) For example, a customer who has a 100X

20   leveraged position on 1 bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980 would

21   be expected to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the remaining

22   capital of $2,500. If the frozen servers prevent this sale from transpiring, however, the customer will lose

23   all of her capital when the price hits $3,980. Such a scenario profits BitMEX, which pockets the capital.

24   (*Ibid.*) Plaintiffs claim BitMEX's server freezes and lock-outs are not a result of unavoidable technical

25   limitations, but rather the result of intentional conduct. (*Id.* at ¶¶ 217-220.) BitMEX could prevent users

26   from suffering from periods of denied access to a moving market by prohibiting its system from

27   processing any transactions during these freezes. Instead, BitMEX has deliberately built a system that

28

1  profits from the liquidations that predictably occur while its customers are unable to escape unfavorable

2  positions.  (*Id.* at ¶ 216.)

3       Finally, Plaintiffs allege this lawsuit fulfills the policy of preventing future harm because private

4  parties like Plaintiffs help stem Defendants' culpable involvement in practices that is leading to

5  widespread harm to consumers.  (*Id.* at ¶ 604.)

6       Here, the Court finds the *J'Aire* exception available to Plaintiffs, and further, that they have pled

7  sufficient facts in support of each *Biakanja* factor.  Based on Plaintiffs' allegations, the Court finds that

8  the factors favor imposition of a legal duty.  Defendants, for their part, do not challenge any one particular

9  factor in their briefing.[17]

10      The issue of duty aside, the Court does not find that Plaintiffs have adequately alleged facts

11  establishing that Defendants' conduct caused Plaintiffs' losses on June 27, 2019, July 11, 2019, and July

12  5, 2019.  Specifically, the TAC fails to provide any factual allegations regarding server outages on those

13  specific dates, or the context surrounding Plaintiffs' trades immediately prior to the lock-out and after the

14  servers were restored.  (See e.g., TAC, ¶¶ 262, 267 [providing particularized details regarding a server

15  outage].)  Moreover, as already explained above, their claims that they sustained losses because of "server

16  freezes" is, at least in some respects, inconsistent with other causation allegations in the TAC that allege

17  Plaintiffs sustained losses because of Defendants' misrepresentations and trading activity on other

18  platforms on those three dates.  (See TAC, ¶¶ 398, 455, 476-477.)

19  **VI.   California Statutory Claims (Counts VII-XI)**

20      Plaintiffs assert claims for False Advertising, Cal Bus. & Prof. Code § 1750 (Count VII); Unfair,

21  Fraudulent, and Unlawful Business Practices, Cal. Bus. & Prof. Code § 17200 (Count IX-XI); and

22  violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 (Count VIII).  (TAC, ¶¶ 542-593.)

23      Plaintiffs' claims under the CLRA and FAL are based on the alleged misstatements from

24  BitMEX's Service Agreement and its website, while their UCL claims are predicated on violations of the

25

26  [17] At the hearing, Defendants argued that the Service Agreement contractually waives any responsibility
27  on the part of Defendants with respect to service interruptions, and therefore Plaintiffs assumed full
    responsibility and risk. But Defendants provide no authority that a waiver, by itself, releases Defendants
28  from responsibility where, as here, Plaintiffs are alleging that Defendants were *intentionally* causing the
    server outages for their benefit.

CLRA and FAL, the Federal Trade Commission Act ("FTCA"), and their claims that Defendants engaged in "unfair" and "fraudulent" business practices.

Defendants' demurrer to the statutory causes of action is sustained with leave to amend.

### 1.    Standing

As an initial matter, Defendants argue that Plaintiffs lack standing under the UCL, FAL, and CLRA to pursue claims based on statements from BitMEX's Service Agreement and website.  Defendants argue that Plaintiffs' failure to demonstrate actual reliance or tie their bitcoin losses back to any conduct by Defendants bars those clams.

In order to assert a claim under the UCL or FAL, a person must have "suffered injury in fact and ha[ve] lost money or property as a result of such unfair competition." (Cal. Bus. & Prof. Code §§ 17204, 17535; see also *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326 [holding that the UCL and FAL standing requirements are identical].)[18]

To meet this standard, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury[19], and (2) show that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at 322.)  Where a case "is based on a fraud theory involving false advertising and misrepresentations to consumers," or material omissions, the plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." (*Id.* at 326–27, quoting *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 306, 325, fn.17; see also *Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966, 973 [reliance requirement for CLRA claims].)  It is not necessary however that the misrepresentations "were the sole or even the decisive cause" of the injury-producing conduct; nor is "an allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff." (*In re Tobacco II Cases*, 46 Cal.4th at 328.)

Furthermore, at the pleading stage, general factual allegations of injury resulting from the

---

[18] The standing requirement is substantially similar for Plaintiffs' CLRA claim as well. (See *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 641 ["in order to bring a CLRA action, not only must a consumer be exposed to an unlawful practice, but some kind of damage must result"].)

[19] Defendants do not challenge this element.

1  defendant's conduct may suffice. (*Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at 327.)

2  Accordingly, Plaintiffs need only allege economic injury arising from reliance on Defendants'

3  misrepresentations. (See *ibid.*)

4      According to the TAC, Defendants engaged in misleading and deceptive advertising. Defendants'

5  false and fraudulent statements as well as omissions of material fact, "went to the very center, very core

6  and very essence of the functionality, integrity and profit model of Defendants' cryptoderivative trading

7  services, that were offered for a fee, through the BitMEX online trading platform." (TAC, ¶ 566.)

8  Defendants misled each Plaintiff by making untrue and misleading statements regarding the nature of the

9  Insider Trading Desk and the available liquidity on the BitMEX website. (See *id.* at ¶¶ 547, 548, 555,

10  556.) Defendants' representations played a substantial role in Plaintiffs' decision to open an account and

11  pay trading commissions to Defendants to trade on their platform. (See *id.* at ¶ 587.) In addition to the

12  falsity of their statements, Defendants failed to disclose that the Insider Trading Desk uses traders'

13  information to trade against its customers including Plaintiffs. (*Id.* at ¶¶ 547, 556.) Plaintiffs would not

14  have opened trading accounts and traded derivatives on the BitMEX platform but for their reasonable

15  reliance on the truth of the misleading and deceptive advertising by Defendants. (*Id.* at ¶ 567; see also ¶¶

16  484, 453.) As a result, Plaintiffs sustained bitcoin loss of use damages of 0.0394 bitcoins, sustained

17  trading losses in the amount of 9.45 bitcoins and paid trading commissions in the amount of 0.85 bitcoins

18  to Defendants. (*Id.* at ¶¶ 549, 579, 591.) Plaintiffs allege actual reliance on Defendants' representations

19  in paragraphs 438, 443, 462, 463, 467, 504, and 505.

20      On their face, these allegations are sufficient under *Kwikset* to satisfy the standing requirement at

21  this time. (See *Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at 327-28.)

22      **2.    Reasonable Consumer Test and Puffery**

23      Defendants argue that Plaintiffs UCL, FAL, and CLRA claims should be dismissed because none

24  of the statements challenged by Plaintiffs are false, and therefore not likely to deceive a reasonable

25  consumer. Defendants also argue that the challenged statements are nonactionable puffery upon which a

26  reasonable consumer could not rely. (*Anunziato v. eMachines, Inc.* (2005) 402 F.Supp.2d 1133, 1139.)

27      California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,

28

deceptive, untrue or misleading advertising." (Cal. Bus. & Prof. Code § 17200.) California's FAL prohibits any "unfair, deceptive, untrue or misleading advertising." (*Id.* at § 17500.) California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." (Cal. Civ. Code § 1770.) Under these California statutes, conduct is deceptive or misleading if it is likely to deceive an ordinary consumer. (*Williams v. Gerber Products Co.* (9th Cir. 2008) 552 F.3d 934, 938.) "California courts ... have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer." (*Linear Tech. Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134–35.)

"Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could rely, and hence are not actionable" under the UCL, FAL, or CLRA. (*Anunziato v. eMachines, Inc.*, *supra*, 402 F.Supp.2d at 1139.) Puffery involves "outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers." (*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.* (9th Cir. 1990) 911 F.2d 242, 246.) "While product superiority claims that are vague or highly subjective often amount to nonactionable puffery, 'misdescriptions of specific or absolute characteristics of a product are actionable.' " (*Southland Sod Farms v. Stover Seed Co.*, (9th Cir. 1997) 108 F.3d 1134, 1145.) Whether a statement is puffery may be decided as a matter of law on a motion to dismiss. (*Cook*, 911 F.2d at 245.)

Here, the Court does not find that this is a situation where dismissing Plaintiffs' claims is appropriate. Based on the allegations in the complaint, it would not be impossible for Plaintiffs to prove that a reasonable consumer would be deceived by the statements regarding the nature of the Insider Trading Desk or the platform's liquidity. With respect to Defendants' puffery argument, the allegations in the complaint appear to be specific rather than generalized or vague, and the Court declines to dismiss the statements as puffery at this time.

The Court disagrees with Defendants' contention that "Plaintiff cannot prevail under its statutory claims if the representations are true,"[20] but nonetheless finds that Plaintiffs' claims fail because their

---

[20] A statement may be deceptive and actionable under the UCL, FAL, and CLRA even though it is truthful. (See *Morgan v. AT & T Wireless Servs., Inc.* (2009) 177 Cal.App.4th 1235, 1255 ["A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL."]; *Leoni v. State Bar* (1985) 39

fraud claims fail.  Plaintiffs' UCL, FAL, and CLRA claims are based on the same misrepresentations as their fraud claims.  Underlying their claims of deceit is that Defendants' statements were false, or "at least misleading" in the case of the Insider Trading Desk, because Defendants failed to disclose the "informational, technical and trading privileges that the Insider Desk enjoys."  (See TAC, ¶ 519.) Because Plaintiffs have not alleged sufficient particularized facts to support Plaintiffs' belief that the representations made regarding the Insider Trading Desk and available liquidity are false, or that the Insider Trading Desk enjoyed certain trading privileges not otherwise disclosed, Plaintiffs' claims under the UCL, FAL, and CLRA fail.

### 3.    UCL Claims (Counts IX–XI)

Plaintiffs' claim for "unlawful practices identifies three statutory predicates: violations of the CLRA and FAL, and violations of the FTCA, 15 U.S.C. §§ 45(a)(1) and 52(a).  (TAC, ¶¶ 584-588.)  The FAL and CLRA does not give rise to a valid UCL claim because Plaintiffs have not alleged prima facie claims under either statute.  In addition, the FTCA "does not provide individuals with a private right of action" (*Nelson v. Am. Home Mortg. Servicing Inc.* (C.D. Cal. July 29, 2020) 2010 WL 3034233, at *2), and therefore cannot serve as the statutory predicate for a UCL claim.  (See *Newton v. Am. Debt Servs., Inc.* (2014) 75 F.Supp.3d 1048, 1058 ["Where a private right of action under a given statute is absolutely barred, a litigant may not rely on the proscriptions of [that law] as the basis for a UCL claim."].)

Plaintiffs' claims for "unfair" and "fraudulent practices" likewise fail because they are entirely dependent on the "[a]llegations of specific acts constituting fraud and deceit and fraud by omission" set forth elsewhere in the complaint.  (TAC, ¶ 576; see also ¶ 566.)  Because Plaintiffs have not adequately pled their fraud cause of action and because Plaintiffs' "fraudulent" and "unfair" practices claims are predicated on that same conduct, (TAC, ¶¶ 575–77, 566, 568-571), Plaintiffs' claims under the "unfair" and "unlawful" prongs similarly fail.

### VII.    Conversion (Count XVI)

For the reasons stated below, Defendants' demurrer to the conversion cause of action is sustained

_____
Cal.3d 609, 626 [The UCL and FAL "have been interpreted broadly to embrace not only advertising which is false, but also advertising which although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."; see also TAC, ¶¶ 497-498, 500-501, 519 [alleging that the Warranty and Representation is "at least misleading"].)

1  with leave to amend.

2  A conversion claim consists of three elements: (1) a plaintiff's ownership or right to possession of

3  personal property; (2) defendant's disposition of property in a manner inconsistent with plaintiff's

4  property rights; and (3) resulting damages.  (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150.)

5  Plaintiffs allege that on the dates they purportedly suffered losses, Defendants caused liquidations

6  of Plaintiffs' respective swap positions on the BitMEX platform, resulting in confiscation of Plaintiffs'

7  respective collateral from their respective BitMEX accounts.  (TAC, ¶ 628.)  Defendants accomplished

8  this by developing "automated software tools" via the Insider Trading Desk and using the software to

9  access highly sensitive BitMEX trader information and manipulate the markets.  (*Id.* at ¶ 293.)  These

10  "automated tools" also helped plan and initiate "the deliberate server freezes and fraudulent system

11  overloads on BitMEX."  (*Ibid.*)

12  In their complaint, Plaintiffs concede that evidence of the operation of the aforesaid automated

13  software tools, used by Defendants' Insider Trading Desk on June 27, 2019, July 11, 2019 and July 15,

14  2019 to deliberately liquidate Plaintiffs' positions, is in sole and exclusive possession, custody and control

15  of Defendants and Plaintiffs have no realistic way of obtaining this evidence without the benefit of

16  discovery.  (TAC, ¶ 629.)  Before Plaintiffs are entitled to Defendants' proprietary information, Plaintiff

17  must allege the underlying allegations that support their belief that the Insider Trading Desk had software

18  (i) that analyzed the impact of hidden trade orders and liquidation prices that allowed Defendants to

19  determine when placing a large order would cause hidden orders to trigger, and (ii) froze its servers.  (See

20  e.g., *id.* at ¶ 424(a)-(d).)

21  **VIII.    Restitution Under Quasi-Contract (Count XIII), Constructive Trust (Count XIV),**
        **Accounting (Count XV), Aiding and Abetting Conversion (Count XVII), California Penal**
22      **Code § 496 (Count XIX), Replevin (Count XVIII)**

23  Plaintiffs do not address Defendants' challenges to their claims for restitution under quasi-

24  contract, constructive trust, accounting, aiding and abetting conversion, replevin, and violation of Penal

25  Code § 496.  Regardless, these claims are predicated on Plaintiffs' underlying fraud, negligence, and

26  conversion causes of action, and therefore fail.

27

28

1

## **CONCLUSION AND ORDER**

2          For the foregoing reasons, Defendants' motion is granted.  Plaintiffs are granted leave to amend

3   the complaint to address and cure the deficiencies detailed above.

4          Defendants shall provide Plaintiffs certain discovery within 30 days from the date of entry of this

5   Order.  Plaintiffs shall have 30 days after Defendants certify completion to file their amended complaint.

6          IT IS SO ORDERED.

7

8   Dated: August __26__, 2021

9                                                    Anne-Christine Massullo
                                                     Judge of the Superior Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 28 -

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6(6) & CRC 2.251)

I, Ericka Larnauti, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On August 27, 2021, I electronically served the attached document via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:  August 27, 2021

T. Michael Yuen, Clerk

By: _____
Ericka Larnauti, Deputy Clerk